2013–1446

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

E<small>SSOCIATE</small>, I<small>NC</small>.,

*Plaintiff–Appellant,*

*v.*

A<small>ZOOGLE</small>.<small>COM</small>, I<small>NC</small>., E<small>PIC</small> M<small>EDIA</small> G<small>ROUP</small>, I<small>NC</small>.,
and S<small>OCIAL</small> A<small>SSETS</small>, LLC (<small>DOING BUSINESS AS</small> K<small>INETIC</small> S<small>OCIAL</small>),

*Defendants–Appellees.*

Appeal from the United States District Court for the Western District of
Wisconsin in case no. 11-cv-0727, Senior Judge Barbara B. Crabb

## APPENDIX FOR PLAINTIFF–APPELLANT
## ESSOCIATE, INC.

D<small>EREK</small> A. N<small>EWMAN</small>
D<small>EREK</small> L<small>INKE</small>
J<small>OHN</small> D<small>U</small> W<small>ORS</small>
K<small>EITH</small> S<small>CULLY</small>
N<small>EWMAN</small> D<small>U</small> W<small>ORS</small> LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
(206) 274-2800

*Attorneys for Plaintiff–Appellant
Essociate, Inc.*

**ESSOCIATE, INC. V AZOOGLE.COM, INC., 2013-1446**

**(FEDERAL CIRCUIT)**

**JOINT APPENDIX**

| Index No. | Docket No. | Description | App. Page No. |
|---|---|---|---|
| 01 | 122 | Judgment in a Civil Case | A0001 |
| 02 | 121 | Opinion and Order | A0002 – A0032 |
| 03 | 1-1 | U.S. Patent Landau, et al | A0033 – A0056 |
| 04 | Docket | District Court Docket Sheet | A0057 – A0072 |
| 05 | 1 | Complaint | A0073 – A0079 |
| 06 | 58 | First Amended Complaint | A0080 – A0089 |
| 09 | 84 – main | Expert Report of George Edwards | A0101 –  A0113 |
| 10 | 93 EDITED | Brief in Support of Defendants' Motion for Summary Judgment | A0114 – A0134 |
| 11 | 97 – EDITED | Transcript of Deposition of Richard Okin | A0135 – A0139 |
| 12 | 98 EDITED | Transcript of Deposition of Sasenarina Rocky Appiah | A0140 – A0141 |
| 13 | 105 | Declaration of John Du Wors in Support of Essociates' Opposition of Defendants' Motion for Summary Judgment | A0142 – A0147 |
| 14 | 105-6 | Advertiser Implementation Cheat Sheet | A0148 – A0163 |
| 16 | 108-main – (SEALED) | Declaration of Michael Landau in Support of Essociates' Opposition of Defendants' Motion for Summary Judgment | A1880 – A1897 |
| 17 | 108-8 (Ex. H) | Email dated August 18, 2011 from Sagi Cezana to Michael Landau | A1898 – A1899 |

| Index No. | Docket No. | Description | App. Page No. |
|---|---|---|---|
| 18 | 108-9 (Ex. I) | Email dated October 18, 2010 from craig@asseenonpc.com to Michael Landau | A1900 – A1904 |
| 19 | 108-10 (Ex. J.) | Email dated September 9, 2011 from Adam Winters to David Schlesinger | A1905 – A1907 |
| 20 | 109 main EDITED | Plaintiff Essociates' Brief in Opposition to Defendants' Motion for Summary Judgment | A1908 – A1922 |
| 22 | 124 | Notice of Appeal | A146 |
| 23 | 98 – additional pages | Deposition Transcript of Sasenarine Rocky Appiah | A1947 – A1949 |
| 24 | 81 Excerpt | Expert Report of Peter Kent on the Validity of the patent in Suit, dated November 13, 2012 | A1950 - A1952 |
| 25 | 82 | Responsive Expert Report of Peter Kent on Infringement of the Patent-in-Suit, dated December 17, 2012 | A1953 – A1984 |
| 26 | 109 Main Excerpt | Plaintiff Essociate, Inc.'s Brief in Opposition to Defendants' Motion for Summary Judgment, filed February 23, 2013 | A1985 |
| 27 | 105-11 Excerpt | Exhibit I to the John Du Wors Declaration, Michael Landau's Expert Report, filed February 23, 2013 | A1986 – A1987 |
| 28 | 113 Excerpt | Reply in Support of Defendants' Motion for Summary Judgment filed March 4, 2013 | A1988 – A1992 |
| 29 | 89-11 | Essociate's Supplemental Response to Epic Media's First Set of Interrogatories, dated October 23, 2012 (infringement contention) | A1993 – A2040 |
| 30 | 76 Excerpt | Deposition of Michael Landau taken 10/8/2012 | A2041- A2044 |

| Index No. | Docket No. | Description | App. Page No. |
|---|---|---|---|
| 31 | 89-19 | Exhibit 19 to the Peterson Declaration dated 2/1/2013, May 19, 2005 email from Michael Landau to Evan Horowitz | A2045 – A2049 |
| 32 | 111 Excerpt | Defendants' Reply to Plaintiff Essociate, Inc.'s Response to Defendants' Statement of Proposed Findings of Fact in Support of Motion for Summary Judgment | A2050 – A2062 |
| 33 | 11 Excerpt | Preliminary Pretrial Conference Order, dated 12/29/2011 | A2063 – A2069 |
| 34 | 46 | Amended Scheduling Order, dated 7/18/2018 | A2070 |
| 35 | 89-22 Excerpt | Exhibit 22 to the Peterson Declaration dated 2/1/2013, Epic Media's Advertiser Implementation Guide | A2071 - A2086 |
| 36 | 88 | Declaration of Sasenarine Appiah | A2087 - A2088 |
| 37 | 88-1 | Exhibit A to the Rocky Appiah Declaration, insertion order | A2089 – A2091 |

10557435.1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESSOCIATE, INC.,

          Plaintiff,

   v.

AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC.
and SOCIAL ASSETS LLC d/b/a KINETIC SOCIAL,

          Defendants.

JUDGMENT IN A CIVIL CASE

Case No. 11-cv-727-bbc

---

This action came for consideration before the court with District Judge Barbara B. Crabb presiding. The issues have been considered and a decision has been rendered.

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC d/b/a Kinetic Social against plaintiff Essociate, Inc. granting summary judgment and dismissing plaintiff's claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15 and 28 of U.S. Patent No. 6,804,660. Defendants' counterclaims asserting invalidity and unenforceability are dismissed without prejudice.


_Peter Oppeneer_

Peter Oppeneer, Clerk of Court

_5/20/13_

Date

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ESSOCIATE, INC.,

                Plaintiff,

      v.

AZOOGLE.COM, INC., EPIC MEDIA
GROUP, INC., SOCIAL ASSETS LLC,
D/B/A KINETIC SOCIAL and
DOES 1-10,

                Defendants.

**OPINION AND ORDER**

11-cv-727-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Essociate, Inc. accuses defendants Azoogle.com and Epic Media Group, Inc. of infringing plaintiff's United States Patent No. 6,804,660. The '660 patent concerns a method of operating a virtual affiliate system, which is a type of internet promotion. Plaintiff also contends that Social Assets LLC, which does business as Kinetic Social, and its officers, Does 1-10, are liable for Epic Media's infringement under the doctrines of successor liability, alter ego liability and fraudulent transfer.

Now before the court is defendants' motion for summary judgment. Dkt. #87. Defendants have moved for summary judgment on (1) noninfringement; (2) invalidity of the '660 patent; (3) their defenses of laches and equitable estoppel; and (4) successor liability. I am granting defendants' motion with respect to noninfringement because plaintiff has failed to show that defendant Epic Media's affiliate system performs all steps of the asserted

claims of the '660 patent.  In particular, plaintiff has not shown that Epic's system provides a method for virtual affiliates to access existing merchant affiliate systems.  Plaintiff also has not shown that Epic's system performs the "configuring" or "correlating" steps of the asserted claims.  Because non-infringement is clear and defendants have shown no reason to believe they are at risk for further infringement suits, I will exercise my discretion not to decide defendants' invalidity or unenforceability counterclaims or defenses.  It is also unnecessary to address defendants' laches and equitable estoppel defenses or to determine whether Social Assets LLC and Does 1-10 may be held liable as successors of Epic Media.

From the parties' proposed findings of fact and the evidence in the record, I set forth the material and undisputed facts below.  However, there are a few evidentiary and procedural matters related to the facts that require some discussion.  First, I disregarded several of plaintiff's proposed facts because they were not supported by admissible evidence in the record.  In particular, plaintiff proposed several facts about the operation of defendant Epic Media Group's affiliate system, Epic Direct, but cited only the conclusory declaration of John Du Wors, dkt. #105, as supporting evidence.  Du Wors is plaintiff's trial counsel.  He did not explain why he would be qualified to provide expert or any other opinion testimony about the characteristics or operation of the Epic Direct system.  Second, plaintiff cites an "Advertiser Implementation Cheat Sheet and Guide" created by Epic as evidence of how the system works.  Dkt. #105-6.  However, plaintiff proposes several facts about the operation of the system that are not supported by the guide or by any expert opinion offered by plaintiff.  E.g., PPFOF, dkt. #107, ¶¶ 113, 119, 120, 124.  Finally, plaintiff cites a

declaration of Michael Landau, submitted on February 23, 2013, which includes several conclusory opinions about whether the Epic system infringed the '660 patent. Dkt. #108. I am disregarding Landau's statements as untimely expert opinion. (According to the preliminary pretrial conference order, plaintiff's expert report on infringement was due November 5, 2012. Dkt. #46. Plaintiff filed a timely expert opinion by George Edwards regarding infringement that I have considered.) Further Landau's declaration does not establish any foundation for his statements about the Epic system. (Plaintiff's expert reports on validity were also late, but because I am not reaching the issue of patent validity, I need not decide whether those reports should be stricken.)


## UNDISPUTED FACTS

### A. <u>The Parties</u>

Plaintiff Essociate, Inc. is the owner of the United States Patent No. 6,804,660. Michael Landau and Evan Horowitz are plaintiff's founders and the inventors of the '660 patent. Plaintiff operates a small affiliate network and has realized the majority of its revenue from settlements in suits to enforce the '660 patent.

Defendant Azoogle.com, Inc. operated an affiliate network, called Azoogle Ads, beginning in about 2000. In 2008, Azoogle.com changed its name to Epic Media Group, Inc. and the affiliate network was renamed the Epic Direct System. In a corporate restructuring in 2011, Epic Media Group, Inc. became Epic Media Group, LLC. Defendant Social Assets, LLC, doing business as Kinetic Social, was spun off from Epic Media and is

in the business of targeting social media advertising. Social Assets does not operate an affiliate network.

### B. The '660 Patent

The Patent and Trademark Office issued the '660 patent to Essociate, Inc. on October 12, 2004. Michael Landau and Evan Horowitz are listed as the inventors. The patent is titled "System Method and Article of Manufacture for Internet Based Affiliate Pooling" and relates to internet advertising.

In online affiliate marketing, a merchant promotes goods or services by paying website operators ("webmasters" or "affiliates") to send customers to the merchant's website. The basic components of online affiliate marketing are (1) an online merchant; (2) webmasters who operate websites visited by consumers; (3) advertisements provided by the merchant to be placed on an affiliate's website which, when clicked on by a visitor, send the visitor's web browser to the merchant's website; and (4) a financial incentive for webmasters to send visitors to the merchant's website. Some merchants, such as Amazon, operate their own affiliate systems in which webmasters may enroll as affiliates. Other merchants use affiliate "hub" systems, in which another system acts as an intermediary between affiliates and the merchants and supplies tracking functionality for the merchants.

The '660 patent identifies both stand-alone merchant-operated affiliate systems and affiliate hub systems as prior art. '660 patent, cols. 2 & 3. The specification explains that both prior art systems have weaknesses, including expense, slow growth and administrative

difficulties. The '660 patent purports to address these weaknesses by disclosing and claiming a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system. '660 pat., Abstract, col. 3, lns. 66-67, claims 1, 15 and 28.

"Virtual affiliates" are affiliates of one affiliate system, referred to in the patent as the "affiliate pool of source Webmasters" which can send traffic to an existing system, the "target system" without actually joining the target affiliate network. Id. at col. 7, ln. 49-50, col. 21, lns. 49-50. The applicants for the '660 patent do not claim to have invented the concept of virtual affiliates; they claim a particular multi-step technique for providing virtual affiliates access to an existing affiliate system. The invention requires that each member of the source pool be assigned a unique ID, known as the "source webmaster unique identifier," which is then correlated to another unique ID, known as the "target webmaster unique identifier," that functions in the existing target system. Id. at col. 22, lns. 1-7. In the process of directing an internet user to the target system, the source pool generates a URL for the existing target system that includes the target webmaster unique identifier. Id. The correlation of the source webmaster unique identifier and the target webmaster unique identifier allows the merchant system to track the referral from the virtual affiliate using the target webmaster unique identifier. Id. at col. 22, lns. 6-7.

## C.  Defendant's Accused Epic Direct System

Defendant Epic Media operates an affiliate network known as the Epic Direct System. The system consists of affiliated webmasters and Epic's merchant customers. Through the system, the affiliated webmasters are able to promote offers for the merchants and receive

a commission for completed offers.

To enable affiliate advertising through the Epic Direct system, a merchant first contracts with Epic to make an offer available for promotion by Epic's affiliates. The merchant must have a "landing page" for each offer, which is the place where an internet user ultimately would be directed after clicking on an affiliate's promotion of an offer. On the landing page, the user can complete some action, such as making a purchase or signing up for a service. The format and content of the landing page and its URL are determined by the merchant. Commonly, the merchant will set up a landing page to receive users from affiliate networks that is distinct from its standard home page or signup page. Merchants use many variations on how they structure their landing pages and the landing page URLs to suit their own purposes.

Before arriving at the landing page, the internet user must click on a "jump link," a link that is created by Epic for each affiliate who would like to promote a particular offer. To promote the offer, the Epic affiliate will place the jump link on its own materials that it publishes. For example, the affiliate might place the jump link in an email or on its website as part of a banner advertisement.

A jump link in the Epic Direct system is in a format like this: <x.azjump.com/009Gv>. In this example, "x.azjump.com" is the domain and subdomain on the Epic Direct system where the user request will be processed. "009Gv" is the Epic link ID that encodes pertinent information for this link, including at least the "affiliate ID," the "offer ID" and the "traffic type." The affiliate ID is the numerical code that Epic assigned to each affiliate in the Epic Direct system. This allows Epic to identify the affiliate ID for

the originating Epic affiliate when that link is clicked by a visitor to the Epic affiliate network.  The offer ID is a numerical code that is assigned to each offer.  A merchant will have as many offer IDs as it has separate offers.  The traffic type indicates what type of user traffic the affiliate would provide, such as web traffic from a website or traffic from an email campaign.  Other variables might also be encoded in the link ID, depending on the offer and needs of the merchant and the affiliates.

When a user clicks on a banner ad or other promotion on an affiliated webmaster's website, the user is directed by the jump link to the Epic Direct system, where the Epic system decodes the link ID.  The Epic system makes a record of the user request and places a cookie (a small, hidden text file) on the user's computer.  The Epic system then redirects the user to the merchant's landing page URL.  These steps are largely invisible to the user, to whom it appears that the banner ad linked directly to the merchant's website.  (A user may be able to recognize the transmission path on its browser address bar and browser history if the user is paying attention.)

If a user completes the transaction, the user is brought to a "lead conversion page" on the merchant's system.  The lead conversion page, or the "success" page, will typically say something like "thanks for signing up" to the user.  The purpose of the lead conversion page in the Epic Direct system is that it includes a "tracking pixel."  The pixel is invisible to the user, because it is set up to display as a one-pixel by one-pixel transparent square.  The function of the pixel is to prompt the user's browser to process a line of code that triggers the execution of a script on the Epic system.  The script reads the cookie from the user's computer, and the Epic system makes a record of the successful transaction.  After recording

both the offer ID and the affiliate ID from the cookie on the user's computer, Epic tracks the required payment information. This transaction tracking method used by the Epic Direct system is referred to variously as "cookie tracking" or "cookie and pixel tracking."

Some Epic merchants have their own merchant affiliate systems through which they can track transactions. However, if a promotion is going through the Epic Direct system, Epic does not rely on the merchant system for tracking transactions or commissions. Because the Epic system does not rely on merchants to track transactions and commissions for particular affiliates, there is no need for the Epic system to provide the identity of the affiliate to the merchant for Epic's tracking purposes. However, some merchants request that the affiliate ID or other information be passed to them for their own internal tracking or reconciliation purposes. Some merchants would like to determine which affiliates are most productive and which affiliates are sending low-quality traffic. If, for example, some affiliates produce a large number of bogus transactions, the merchant may investigate and seek to disqualify that affiliate. On request, Epic allows certain preset variables to be passed along to the merchant system. These variables include  the affiliate ID, affiliate sub-ID, a "click hash" value and a fixed code to represent the Epic system, "aZ2."  The requested variables are appended to the merchant landing page URL.

If a merchant has requested that certain variables be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link. For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%. In the syntax

of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL. The "%%" designates the beginning and the end of the label of the variable. Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL. If the affiliate's ID were 12345, the landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345. The merchant would then be able to record the affiliate's ID for whatever purposes it wanted. The Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant.

If a merchant requests it, the Epic system can also allow use of a sub ID variable, which can be useful for merchants and affiliates. For example, an affiliate that operates a local newspaper might have a website with various sections, including news, sports and arts. The affiliate promotes Epic offers and may like to know whether the offers were more successful in the sports section or the arts section. When the affiliate places an offer, for Netflix for example, in the sports section, the "sub_ID=001" is appended to the jump link. When the affiliate places the offer in the arts section, it appends "sub_ID=002." When the user clicks on the jump link, the landing page URL is completed by filling in the variables. The preformatted landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%&sub_id=%% SUB_ID%%. If the user clicked on the jump link in the sports section, the landing page URL would be completed to look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_id=001. In transaction and

commission reports, both the merchant and the affiliate would know that the commission was earned by affiliate 12345 and that the traffic came from a link that had sub ID 001 associated with it. In this example, the affiliate would know that this successful transaction came from the sports page. Again, Epic would be tracking the transaction and commission by using its cookie and pixel tracking method and Epic would not use the passed-along variables for its own transaction and commission reports.

Although Epic generally uses the pixel and cookie tracking method, some merchants are unwilling or unable to include a pixel on their lead conversion page. In such cases, Epic can track transactions using a "click_hash" variable that is included in a destination landing page URL. The click_hash is an alpha-numeric value which, when decoded by the Epic system, identifies affiliate, click and offer data. The "click_hash" variable can be included by using the string "%%CLICK-HASH%%" in a specified value field which causes the destination landing page URL to include the click hash. If an offer is completed, the merchant notifies Epic by submitting the click_hash variable. The merchant would not know the meaning of the variable, but simply would pass it back to Epic after a completed transaction.


D. SpeedDate.com Example

In his expert report, plaintiff's expert George Edwards analyzed a transaction involving the Epic Direct System and SpeedDate.com to reach his conclusion that the Epic Direct system infringed the '660 patent. SpeedDate.com is a merchant that uses the Epic system. A 2009 insertion order documents the relationship between SpeedDate.com and

Epic.  The insertion order states that Epic would provide an http tracking pixel to SpeedDate.com, that SpeedDate.com would place Epic's tracking pixel on its conversion page and that Epic would pass on the variables "affiliate_id" and "sub_id" to SpeedDate.com. Dkt. #88-1.

The transaction considered by Edwards involved an Epic affiliate in Colorado, with the affiliate ID number 48192.  The click URL Epic provided to the affiliate for a SpeedDate.com offer was <http://x.azjump.com/4b4Gq?sub=12268>, with 4b4Gq being the Epic link ID and 12268 being the sub-ID selected by the affiliate.  If a user clicked on the URL, the click would constitute a request for the Epic jump link that would lead to SpeedDate.com.  The destination landing page URL for SpeedDate.com on the Epic system is  http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2=%%SUB_ID%%. Thus,  for  this  particular  transaction,  the  URL  generated  was <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268>.  The affiliate ID is 48192 and the sub ID chosen by the affiliate for its purposes is 12268.  (It is unclear as to what a=53&c=1 refer.  Although plaintiff proposes an explanation, it offers no foundation for it. It is clear that these variables were chosen by SpeedDate.com for its own purposes.)

OPINION

A.  Infringement

Plaintiff contends that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the '660 patent.  Defendants have moved for summary judgment of noninfringement on all of these claims.  Patent infringement analysis has two steps: first, the patent claims must be

11

interpreted or construed to determine their meaning and scope; second, the properly-construed claims are compared to the process or product accused of infringing.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step of this analysis, claim construction, is a matter of law reserved to the court.  Id. at 970-71.

1. Claim construction

The parties disagree about the meaning of several of the terms of the asserted claims, but I need not resolve most of their disputes.  With respect to two of their disputes, the parties do not explain why the disputes or proposed constructions are relevant to any arguments presented in their briefs ("source webmaster unique identifier"; "generating a URL").  Additionally, the parties' proposed constructions for some terms are so similar that it appears that there are no real disputes about the meaning of those terms ("source webmaster unique identifier"; "target webmaster unique identifier").  However, to resolve the parties' summary judgment disputes, I must construe the terms "virtual affiliates" and "target merchant affiliate system" and provide scope and meaning to the "configuring" "correlating" steps of the asserted claims.

All of the disputed terms and phrases appear in the asserted independent claims of the '660 patent, claims 1, 15 and 28.  Claim 1 is representative:

1. A method for providing **Virtual Affiliates** to an **existing target affiliate system**, the method comprising the operations of:

configuring an **existing target affiliate system** to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the **target Merchant affiliate system** recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:

assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site;

receiving a user request for a **target Merchant affiliate system** URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target **Merchant affiliate system** includes a unique identification system for its own affiliated Webmasters;

**correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system**; and

generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

'660 pat., col. 21, ln. 45–col. 22, ln. 8.

Many of plaintiff's claim construction arguments rely on a decision issued by a district court in the Central District of California in a patent case in which plaintiff sued several defendants for infringement of the '660 patent.  Essociate, Inc. v. Blue Whaler Investments, LLC, 10-2107-jvs (C.D. Cal. Feb. 6, 2012).  In that case, the court construed all of the terms at issue here, often adopting the constructions proposed by plaintiff and rejecting the defendants' proposed constructions on the grounds that they read in limitations from the specification that were not supported by the claim language.  Although plaintiff contends that the claim construction decision has some persuasive value, it is of little use in the context of the parties' summary judgment arguments in this case.  The district court in California adopted specific definitions of the claims at issue, and to some degree focused on the words it believed would best define the term.  The court did not focus on the related

disputes about the scope of the claim terms but instead focused on clarifying the language of the terms.

At this stage of the proceedings, the only disputes that must be resolved are ones relating to the presence of specific limitations in the claims, not the ability of a juror or anyone else to understand the language. It is unnecessary to provide complete definitions for any of the terms below in order to resolve the parties' disputes about those limitations. Therefore, rather than adopt specific definitions in the manner of the California court, I will resolve only the specific disputes stemming from the following terms and phrases. Plaintiff's citations to the California court's opinion provide little help in this regard.

a. "Virtual Affiliates"

The dispute between the parties is whether the reference to "Virtual Affiliates" in the preamble of the independent claims is limiting. The term "virtual affiliates" is not used anywhere else in the claims. Plaintiff contends that the statement "method for providing Virtual Affiliates to an existing target affiliate system" is non-limiting because it does nothing more than cite the intended purpose or use for the claimed invention and provide an introduction. In other words, plaintiff contends that a system could be infringing even if it does not provide *virtual* affiliates access to an existing target affiliate system, so long as it performs all steps of the asserted claims. Defendants disagree, contending that the preambles include essential structures for the performance of the elements recited in the claims.

Generally, a preamble does not limit a claim. <u>Allen Engineering Corp. v. Bartell</u>

14

Industries, Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, this general rule has numerous exceptions. The preamble may limit the meaning of claim when (1) the preamble "recites essential structure or steps," Catalina Marketing International, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002); (2) the preamble is "necessary to give life, meaning, and vitality" to the claim, Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999); (3) "the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention," Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995); (4) the preamble is essential to understand limitations or terms in the claim body, Pitney Bowes, 182 F.3d at 1306; or (5) "limitations in the body of the claim rely upon and derive antecedent basis from the preamble," Eaton Corp. v. Rockwell International Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" Catalina, 289 F.3d at 808 (citing Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)). See also Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc., 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.").

As an initial matter, I note that plaintiff's argument is disingenuous in light of other arguments and statements it makes throughout its brief in opposition to defendants' motion

for summary judgment.  In particular, plaintiff concedes in its brief that the '660 "invention provides 'virtual affiliates' to a target affiliate system."  Plt.'s Br., dkt. #109, at 25.  See also id. at 60 (stating that '660 patent "claim[s] . . . a specific improvement" to "virtual affiliate networks").  Later, plaintiff distinguishes prior art on the basis that it did not "disclose an existing target merchant affiliate system which receives traffic from virtual affiliates."  Id. at 53.  Plaintiff's expert and inventor of the '660 patent also states in his expert report that "the '660 patent claims a specific kind of virtual affiliate system."  Landau Expert Rep., dkt. #85, at 18.  Plaintiff cannot argue that the invention is limited to specific systems involving virtual affiliates for the purposes of its validity arguments but deny that the system is so limited for the purpose of infringement.  Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement").

In any event, I agree with defendants that the preamble is limiting because it defines the environment in which the claimed method, program and system operate or function and provides essential structure and meaning to the specific steps set forth in the body of the claims.  The background and specification of the '660 patent make it clear that the claimed invention is a method, program and system for providing virtual affiliates access to an existing target affiliate system.  E.g., '660 pat., col. 3, lns. 65-67 ("Summary of the Invention") ("The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing affiliate system.").  This is one reason why the invention is purportedly novel and an improvement over prior systems.  As is explained in the background section, prior art already provided methods for affiliate webmasters to send

traffic to an existing merchant affiliate system, either directly or through an affiliate hub. '660 pat., cols. 2 & 3 (describing the Amazon and Linkshare systems). The '660 invention was meant to be an improvement of these systems because it allowed webmasters to refer traffic without creating a burden on the merchant affiliate systems. Id. at col. 4, lns. 53-56. ("Advantageously, the present invention allows groups of Webmasters to participate in existing Merchant affiliate systems without the need of joining those Merchant affiliate systems."); col. 7, lns. 40-45 ("Each Virtual Affiliate sends traffic to the Merchant through the Merchant's existing affiliate system, and thus has the ability to benefit from advertising the goods and/or services of the Merchant while not wholly a party of the Merchant's existing affiliate system."); col. 7, lns. 49-50 ("The Virtual Affiliate remains independent from the Merchant's affiliate system."); col. 9, lns. 47-50 ("Use of the Virtual Affiliate system allows for some responsibility to be removed from the Merchant, in terms of maintaining and expending system resources toward its relationship with the referring Webmaster."). The repeated references to virtual affiliates throughout the '660 specification make it clear that the claimed invention was a method relating to virtual affiliates.

In addition, the preamble language regarding virtual affiliates is needed to understand the limitations in the claim body. For example, the configuring step requires "configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system. . . ." '660 pat., col. 21, lns. 48-50. This language makes sense only if the "Webmasters" in the pool of affiliate webmasters are "virtual" affiliates. If the webmasters

17

A0018

had already joined or enrolled in the existing target affiliate system (the existing merchant affiliate system), there would be no reason to configure the system to receive referrals from the webmasters. Rather, the webmasters would simply refer traffic in accordance with the prior art cited in the '660 patent, by either registering with the merchant affiliate system or by registering with an affiliate hub system that conducts business with the merchant.

The language of the receiving step also confirms that the "first plurality of Webmasters in an affiliate pool of source Webmasters" are virtual affiliates. This step requires "a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters" to include "the source Webmaster unique identifier for the particular referring Webmaster." The step goes on to explain that the target merchant affiliate system for which a request is made "includes a unique identification system for *its own affiliate Webmasters*." Id. at col. 21, lns. 58-65 (Emphasis added). This explanation distinguishes the webmasters in the first plurality of webmasters (virtual affiliates) from webmasters that are actual affiliates of the existing target merchant system.

Finally, the correlating step requires "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the required Merchant affiliate system." Id. at col. 21, lns. 66-67, col. 22, lns. 1-2. The reason the source webmaster unique identifier must be correlated to a target webmaster unique identifier is because the referring webmaster is not an affiliate of the merchant affiliate system. If the webmaster were an affiliate enrolled in the merchant affiliate system, the system would be able to recognize the webmaster without the correlation

step.  Thus, this step makes sense only if the webmaster is a virtual affiliate, not an actual affiliate of the merchant affiliate system.

In sum, a "virtual affiliate" limitation in the preamble is necessary to describe the invention "in complete and exacting structural detail." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004).  Thus, I conclude that the asserted claims require a method for allowing virtual affiliates to gain access to an existing merchant affiliate system and thus, that the webmasters in the "pool of affiliate webmasters" must be "virtual affiliates."

b.  "target Merchant affiliate system" and "existing target affiliate system"

These two terms are used several times in the asserted independent claims.   The parties agree that they are synonymous for the purposes of their present disputes.  The parties also agree that a merchant affiliate system is a system through which a merchant can receive traffic from a group of webmasters.  However, the parties disagree about the extent to which the "target merchant affiliate system" referred to in the '660 patent must be a "complete" affiliate system that performs its own tracking functions.  Plaintiff contends that a merchant affiliate system is simply "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant."  Plt.'s Br., dkt. #109, at 26. Defendants contend that merchant affiliate system, as used in the '660 patent, entails much more structure.  Defendants' proposed construction is "[a] complete system that operates the merchant's affiliate program, including the tracking of transactions and commissions." Dfts.' Br., dkt. #93, at 26.

Plaintiff's proposed construction is too broad because it would encompass virtually any online linking arrangement. As defendants point out, plaintiff's proposed construction would cover a situation in which fans of an online merchant linked to the merchant's website. However, nothing in the patent suggests that it would cover such relationships. Defendants' proposed construction is too vague because it is unclear what qualifies as a "complete system." Further, although the specification states that "generally" a merchant affiliate system includes "the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates; the accounting system for payout of affiliates; the reporting system for reporting transaction statistics back to affiliates; and the support system for affiliate and technical support," '660 pat., col. 7, lns. 16-21, neither the claims nor the specification requires that the merchant affiliate system include all of these capabilities.

For the purpose of resolving the parties' present disputes, the claim language provides sufficient guidance about merchant affiliate systems contemplated by the claims. According to the claim language, the merchant affiliate system must (1) have its own affiliates and have a unique identification system for those affiliates; and (2) must recognize and track transactions as originating from particular source webmasters. '660 pat., col. 21, lns. 50-51, 63-65, col. 22, lns. 7-8. Even plaintiff concedes that a merchant affiliate system must meet these requirements. Plt.'s Br., dkt. #109, at 41-44 (arguing in context of its validity arguments that merchant affiliate system reads on the '660 patent only if it has "unique" identification for its affiliates and is "capable of tracking," as opposed to having the affiliate pool do tracking).

c. correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system

The parties are in substantial agreement as to the meaning of the terms "source Webmaster unique identifier" and "target Webmaster unique identifier." They agree that the source identifier is a unique code assigned to a webmaster within the affiliate pool of source webmasters. Dfts.' Br., dkt. #93, at 22; Plt.'s Br., dkt. #109, at 22. As for the target Webmaster unique identifier, they agree that it is a unique identifying code assigned to a webmaster in the source affiliate pool that is functional in the target merchant's affiliate system and that corresponds to the unique identification system of the target merchant's affiliate system. Plt.'s Br., dkt. #109, at 25; Dfts.' Br., dkt. #113, at 20; 660 pat., col. 21, ln. 67- col. 22, ln. 2. This definition is supported by the patent's specifications, which describe the target webmaster ID as a "unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the request Merchant's home affiliate system." '660 pat., col. 4, lns. 7–11. See also id. at col. 8, lns. 7-9 (target webmaster ID must be a "code that can be utilized by the particular Merchant's existing affiliate system").

However, the parties disagree as to what it means to "correlate" the source webmaster unique identifier to a target webmaster unique identifier. The parties' proposed definitions of the term "correlating" are not helpful. Plaintiff proposes "creating or recognizing a relationship between," Plt.'s Br., dkt. #109, at 24, while defendants propose "establishing a mutual or reciprocal relation between." Dfts.' Br., dkt. #93, at 25. Neither of these

definitions resolves the dispute between the parties, which is whether a system performs the "correlating" step if it merely "passes on" the source webmaster unique identifier to a merchant affiliate system that can use the source webmaster unique identifier for some purpose. Plaintiff contends that simply passing on the source ID can qualify as "correlating," while defendants contend that passing on the source ID is not enough.

Once again, plaintiff's argument seems disingenuous in light of statements it makes in its brief regarding validity and statements Landau made during his deposition to distinguish his prior art invention. Plaintiff states in its brief that "[t]he correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL." Plt.'s Br., dkt. #109, at 41. Similarly, Landau testified that his original system did not perform the "correlating" step because it merely "substituted" a source affiliate ID (the source webmaster unique identifier) for a placeholder or variable in the URL that was sent to the merchant affiliate system. 2012 Landau Dep., dkt. #76, at 127, 159; 2010 Landau Dep., dkt. #80, at 38-44. Landau testified that although the affiliate ID was included in the URL passed to the merchant affiliate system, there was no "correlating" step because there was no "logic" used to determine whether that was the appropriate way to set up a link for the merchant system. Id. Plaintiff makes no attempt to explain why "passing on" an affiliate ID without using any logic or algorithmic process would satisfy the "correlating" step if simply "substituting" the affiliate ID for a placeholder would not.

Although I cannot determine from the parties' arguments or the patent itself the

22

entire range of actions that would or would not satisfy the "correlating" step, I can conclude that the correlating step requires more than simply passing on the source webmaster unique identifier. Plaintiff essentially conceded this point in its validity arguments and any other conclusion would render the correlating step meaningless. The patent's specification states repeatedly that correlation occurs between unique codes assigned to source webmasters and unique codes functional in the target merchant system. This occurs when the affiliate pooling system determines which merchant is the target of a request. '660 pat., col. 10, lns. 63-65. The pooling system then determines which target webmaster unique identifier functional in the merchant system corresponds to the webmaster's source webmaster unique identifier. Id. at lns. 65-67. The affiliate pooling system may find this target webmaster unique identifier in a number of ways, including from a table provided by the merchant. Id. at col. 11, lns. 1-15. The purpose of this step is to hand off an ID code that is recognizable and functional within the merchant's own tracking system. Id. at lns. 40-45. Simply passing along the ID that was assigned to a webmaster by the affiliating pooling system does not satisfy these requirements.


2. Infringement by Epic Direct

Plaintiff contends that the Epic Direct system infringes the '660 patent because it provides a method using all steps of the asserted claims by which affiliate webmasters may refer traffic to merchant affiliate systems. Specifically, Epic Direct: (1) configures merchant affiliate systems by assigning unique IDs to webmaster affiliates and formatting URLs and offers by which affiliates can refer internet traffic to merchants; (2) receives user requests

23

when an internet user clicks on webmaster affiliate's promotion of a merchant's offer; (3) correlates its webmasters' unique IDs to unique IDs that are functional in the merchants' systems; and (4) generates URLs for merchant affiliate systems containing the correlated unique IDs by which the merchant system can track the transaction. Plaintiff relies specifically on Epic Direct's ability to pass on pre-set variables at the merchant's request, including the affiliate_id, sub_id and click_hash.

Defendants have moved for summary judgment on all asserted claims, contending that plaintiff cannot show that the Epic affiliate system performed every step of the asserted claims. Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2008) ("[A] method claim is directly infringed only if each step of the claimed method is performed."). Defendants contend that plaintiff has adduced no evidence showing that the Epic Direct affiliate system provides a method by which virtual affiliates access an existing merchant affiliate system. Rather, the evidence in the record shows only that Epic Direct acts as an affiliate hub through which webmaster affiliates access merchants directly. Because plaintiff cannot show that Epic's system satisfies this threshold requirement, plaintiff cannot show that Epic's system performs the configuring or correlating steps of the claims. (The parties agree that all asserted independent claims contain the same steps and requirements.)

Every step of the asserted claims involves an affiliate system acting in relation to an existing merchant affiliate system for the purpose of providing access for virtual affiliates. At the very least, that existing merchant affiliate system must have a unique identification system for its own affiliated webmasters and must have the ability to recognize and track referrals from particular webmasters. Thus, it is not enough for plaintiff to show that Epic

24

Direct provides a method for webmasters to send traffic to a merchant because those methods already existed in the prior art and were disclaimed in the '660 patent. Only transactions between the Epic system and another affiliate network can be infringing. Plaintiff must show that Epic Direct provides webmasters a method for accessing established merchant affiliate systems of which the webmasters are not affiliates.

Defendants submitted evidence showing that Epic Direct does not work with existing merchant affiliate systems to provide access for virtual affiliates but acts as an affiliate hub that contracts with merchants directly. In particular, Epic tracks all of its affiliates' transactions using the cookie and pixel method of transaction tracking and does not rely on merchant affiliate systems to track referrals. Plaintiff concedes in its brief that to read on the '660 patent, the affiliate pooling system must hand off traffic to a merchant affiliate system that "recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over." Plt.'s Br., dkt. #109 at 42.

Defendants also submitted evidence showing that the SpeedDate.com transaction identified as infringing by plaintiff did not involve SpeedDate.com's affiliate system. A 2009 insertion order documenting the relationship between Epic and SpeedDate.com shows that SpeedDate.com agreed to pay Epic $4.50 for each referral. The order also shows that Epic would use the cookie and pixel method of transaction tracking, meaning that Epic would not rely on SpeedDate.com's own merchant affiliate system to track referrals. Additionally, the SpeedDate.com domain used by SpeedDate.com affiliate system is "affiliates.speeddate.com." However, the SpeedDate domain used by the Epic Direct system

in the accused example transaction was "mysdate.com."

Plaintiff produced no evidence showing that the Epic Direct system sends virtual affiliates to existing merchant affiliate systems. Plaintiff states in its brief that "Epic provided offers from merchants with existing affiliate systems" and that the Epic Direct system generated URLs in order to refer traffic to existing merchant affiliate systems, Plt.'s Br., dkt. #109, at 29, but the evidence it cites to support this assertion is not admissible.

First, plaintiff cites the conclusory declaration of Michael Landau, the inventor of the '660 patent. As discussed above, Landau's opinion constitutes untimely expert opinion for which he fails to establish any foundation. Moreover, Landau's statements are primarily about plaintiff's own dealings with the SpeedDate.com and other affiliate systems. Landau Dec., dkt. #108, at ¶¶ 99-114. Plaintiff's dealings with affiliate networks do not establish whether and how Epic Direct interacted with affiliate networks.

Plaintiff also cites the opinion of George Edwards, its infringement expert, who states in his report that the Epic Direct system referred traffic to SpeedDate.com's "affiliate system." Edwards Rep., dkt. #84, at 6. Edwards uses the single SpeedDate.com offer as his one and only example of Epic's infringement. However, Edwards does not provide any foundation for his conclusion that Epic Direct referred traffic to SpeedDate.com's own affiliate system, rather than to an independent webpage created solely for affiliates of Epic Direct. Edwards states only that "[o]n information and belief," SpeedDate.com maintains a unique identification system for its own affiliates. Id. at 7. Edwards cites no evidence to support this assertion and plaintiff submitted no other evidence to confirm that SpeedDate.com provides a unique identification system for its affiliates, what that system

is or that Epic Direct affiliates engaged with such a system.

Because plaintiff has failed to show that the Epic Direct system allows webmasters to send traffic to existing merchant affiliate systems, plaintiff cannot show that the Epic Direct system "configur[es] an existing target affiliate system to receive referrals from a first plurality of Webmasters. . . ." '660 pat., col. 21, lns. 48-49. Plaintiff contends that the Epic Direct system "configured" merchant affiliate systems by setting up destination landing page URLs to include "sub_id" macros that would include an identifier to the referring webmaster. Plaintiff states that "[t]his step is satisfied by any offer in the [Epic system's] offer_urls table relating to an existing merchant affiliate system." Plt.'s Br., dkt. #109, at 32. However, plaintiff's argument fails because plaintiff did not adduce admissible evidence establishing that any offer in the offer_urls table related to an existing merchant affiliate system. With respect to the SpeedDate.com example transaction, plaintiff submitted no evidence showing that the URLs "configured" the SpeedDate.com system to recognize a transaction as coming from an affiliate in the Epic system. Without such evidence, plaintiff cannot prove that the Epic Direct system performs the "configuring" step of the asserted claims.

Plaintiff also has not shown that the Epic Direct system performs the "correlating" step of the asserted claims, which includes "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system." '660 pat., col. 21, lns. 66-67—col. 22, lns. 1-2. Plaintiff cites only the SpeedDate.com example as proof that the Epic Direct system performed the correlating steps of the asserted claims. However, as discussed above, plaintiff has no evidence that the Epic system engaged the SpeedDate.com affiliate

system, rather than engaging SpeedDate.com directly as a merchant in the Epic system.  If there is no virtual affiliate arrangement through which virtual affiliates may refer traffic to an existing merchant affiliate system, there can be no target webmaster unique identifier. Even assuming that Epic did engage SpeedDate.com's affiliate network, plaintiff has not shown that there is a target Webmaster unique identifier in the example transaction.

Plaintiff contends that, in the example transaction, the target webmaster unique identifier is a portion of the SpeedDate landing page URL: <a=53&c=1&s1=48192&s2=12268>.  However, plaintiff has not shown that this string of variables meets the definition of target webmaster unique identifier.  In particular, plaintiff adduced no evidence that this string of variables corresponds to a unique identification system of the SpeedDate affiliate system, that the expression is "functional" in the SpeedDate affiliate system, to the extent such a system even exists.  '660 pat., col. 22, lns. 5-8. Although plaintiff's expert George Edwards states in his report that SpeedDate.com assigned a target webmaster unique identifier to each of its affiliates, Edwards Rep., dkt. #84, at 7, Edwards establishes no foundation for this statement.

Additionally, the expression identified by plaintiff, <a=53&c=1&s1=48192&s2=12268>, is not a unique code assigned to each webmaster in the Epic Direct system.  Rather, it is a string of four independent and preset variables. It is not clear to what the first and second variables in the string correspond, but it is undisputed that SpeedDate.com chose them for its own purposes.  The third variable is the Epic ID for the affiliate in Denver.  The fourth variable is the sub_id chosen and used by the Denver affiliate for his own purposes.  The only unique code assigned to the webmaster in

28

this transaction is 48192, which all parties agree is the "source webmaster unique identifier" for purposes of the '660 patent. These variables were appended to the landing page link and passed on to SpeedDate.com. Plaintiff has not shown that the variables were "correlated" using logic or algorithms or that anything happened other than the passing on of pre-set variables. As discussed above, the "correlating" step requires more than simply passing an unmodified affiliate ID and other preset variables to the target merchant affiliate system.

In sum, plaintiff has introduced insufficient evidence to meet its burden at summary judgment. Although plaintiff contends that Epic Direct has engaged in at least 1200 infringing transactions, plaintiff failed to adduce evidence to prove that even one of Epic Direct's transactions was infringing. E–Pass Technologies v. 3Com Corp., 473 F.3d 1213, 1222–23 (Fed. Cir. 2007) ("If, as [plaintiff] argues, it is 'unfathomable' that no user in possession of one of the accused devices and its manual has practiced the accused method . . . [plaintiff] should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user."); Lucent Technologies, Inc. v. Gateway, Inc., 543 F.3d 710, 723 (Fed. Cir. 2008) (finding no error in court's analysis that if using infringing combination of software was "so common and so routine, then certainly [plaintiff] could have produced evidence of at least one instance" when infringement occurred); Minsurg International, Inc. v. Frontier Devices, Inc., 2011 WL 486120, *3 (M.D. Fla. Feb. 7, 2011) ("If infringement among surgeons is an inescapable conclusion, [plaintiff] should have been able to timely identify at least one instance of direct infringement."). Accordingly, defendants are entitled to summary judgment of noninfringement as to all asserted claims of the '660 patent.

### B. Invalidity and Unenforceability

Defendants have moved for summary judgment on their invalidity counterclaims, contending that all asserted claims of the '660 patent are invalid as anticipated by the inventor's own prior art system and because the claims are obvious in light of that system and in light of well known features of internet commerce. The Court of Appeals for the Federal Circuit has held that a district court has the discretion to dismiss invalidity and unenforceability counterclaims upon a grant of summary judgment of non-infringement. Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998); Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 95 (1993) (in addressing motion for declaratory judgment district court has discretion to decide whether to exercise jurisdiction even when established). It is appropriate for a district court to dismiss counterclaims of unenforceability and invalidity when non-infringement is clear and invalidity and unenforceability are not plainly evident. Phonometrics, 133 F.3d at 1468 (citing Leesona Corp. v. United States, 530 F.2d 896, 906 n.9 (Ct. Cl. 1976)).

Discretionary dismissal of defendants' invalidity and unenforceability counterclaims is appropriate in this case. It is clear that plaintiff has failed to prove infringement and it is less clear whether these patents are invalid or unenforceable. It would be a poor use of judicial resources to explore these issues at this time, particularly because defendants have given the court no reason to believe that they are at risk of a future infringement suit based on the '660 patent. Thus, I will exercise my discretionary authority and dismiss defendants' invalidity and unenforceability counterclaims without prejudice.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC, d/b/a Kinetic Social, dkt. #87, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to plaintiff Essociate, Inc.'s claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15, and 28 of the United States patent 6,804,660.

2. Defendants' counterclaims asserting invalidity and unenforceability are DISMISSED without prejudice.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 17th day of May, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

US006804660B2

## (12) United States Patent
Landau et al.

(10) Patent No.: **US 6,804,660 B2**
(45) Date of Patent: **Oct. 12, 2004**

(54) **SYSTEM METHOD AND ARTICLE OF MANUFACTURE FOR INTERNET BASED AFFILIATE POOLING**

(75) Inventors: **Michael Landau**, Sausalito, CA (US); **Evan Horowitz**, San Francisco, CA (US)

(73) Assignee: **Essociate, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 757 days.

(21) Appl. No.: **09/846,159**

(22) Filed: **May 1, 2001**

(65) **Prior Publication Data**

US 2001/0047413 A1 Nov. 29, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/201,041, filed on May 1, 2000.

(51) Int. Cl.[7] ............................................... G06F 17/60
(52) U.S. Cl. ....................................................... 705/14
(58) Field of Search ................................. 705/1, 10, 14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,712,979 A | 1/1998 | Graber et al. |
| 5,724,424 A | 3/1998 | Gifford |
| 5,793,972 A | 8/1998 | Shane |
| 5,974,396 A * | 10/1999 | Anderson et al. ............. 705/10 |
| 5,991,740 A | 11/1999 | Messer |
| 5,999,929 A | 12/1999 | Goodman |

| | | |
|---|---|---|
| 6,029,141 A | 2/2000 | Bezos et al. |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 001160714 A1 * | 5/2001 | .......... | G06F/17/60 |
| WO | WO 00/33272 | 6/2000 | | |
| WO | WO 00/60484 | 10/2000 | | |

OTHER PUBLICATIONS

Zineldin Mosdad; "Beyond Relationship Marketing: Technologicalship Marketing"; v18n1; ISSN:0263–4503; Sep. 23, 200 pp. 9–23.*

* cited by examiner

*Primary Examiner*—Stephen Gravini
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57) **ABSTRACT**

The present invention provides a method, system and computer program for affording Virtual Affiliates access to an existing affiliate system. First, having been assigned a unique identifier within a source affiliate system, a Webmaster operates a web site. Next, a request for a target Merchant Web site triggers a correlation function, such that the source Webmaster unique identifier is correlated to a target Webmaster unique identifier functional within the unique identification system of the requested Merchant system. Next, a properly formatted entry mechanism URL is returned, enabling a hand off to the target Merchant affiliate system and including the correlated target Webmaster unique identifier. The Virtual Affiliate system is notified of transactions that originated from a referring Webmaster. Referring Webmasters may be compensated for each completed transaction according to agreed-upon terms and conditions.

**40 Claims, 10 Drawing Sheets**



**U.S. Patent**      Oct. 12, 2004      Sheet 1 of 10      US 6,804,660 B2



FIGURE 1

Case: 3:11-cv-00727-bbc   Document #: 1-1   Filed: 10/21/11   Page 3 of 24



# FIGURE 2



# FIGURE 3

Case: 3:11-cv-00727-bbc   Document #: 1-1   Filed: 10/21/11   Page 5 of 24

**U.S. Patent**     Oct. 12, 2004     Sheet 4 of 10     US 6,804,660 B2



FIGURE 4

FIGURE 5



FIGURE 6



## FIGURE 7



FIGURE 8



# FIGURE 9



## FIGURE 10

US 6,804,660 B2

## 1

### SYSTEM METHOD AND ARTICLE OF MANUFACTURE FOR INTERNET BASED AFFILIATE POOLING

#### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. provisional patent application 60/201,041 filed May 1, 2000, incorporated herein by reference the same as if filly set forth.

#### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH

Not applicable.

#### FIELD OF THE INVENTION

The present invention relates generally to e-commerce and, more particularly to systems methods and articles of manufacture for Internet based affiliate pooling across existing affiliate system boundaries.

#### BACKGROUND OF THE INVENTION

Presently, both Merchants and consumers are increasingly conducting aspects of their commerce via a network of computers known as the Internet. Such business is commonly referred to as "e-commerce," or "electronic commerce."

The Internet enables vast and immediate interconnectedness through the use of a common software structure, generated and read via computer code known as hypertext markup language or "HTML." Access to information and movement around the web is enhanced through the use of hyperlinks ("links") within a web page's HTML. The link, manifest as a word in a text field or an image on a web page, acts as a path, moving a user from one web page address, known as a Uniform Resource Locator (URL), to another web page address.

The movement from one URL to another allows near-instant access to information, products, and services and is particularly well-suited to the exchange of information, goods, and services between buyers ("users") and sellers ("Merchants"). Such business is commonly referred to as "e-commerce," or "electronic commerce."

With the abundance of goods and services available, a problem arises in efficiently connecting an interested user with the appropriate information pertaining to the desired goods and/or services. A Merchant therefore must make known, or advertise, its URL in order to reach those users on the Internet that are interested in the goods and/or services offered. Hypertext links lend themselves to an active (rather than static) advertisement since they actually provide the user with a path or entry point to the Merchant's URL. Then, once at the Merchant's URL, the user can initiate a transaction.

By advertising through the use of hyperlinked banner images and/or text links, a Merchant may increase its sales by increasing the number of users (commonly referred to as "traffic") that visit their URL, and potentially increase transactions.

To this end, the Merchant must determine how and where on the Internet to advertise in order to maximize traffic that fits the Merchant's targeted market. In contrast to traditional static advertising, hyperlinked active advertising provides the opportunity to chart a transaction from inception to end, beginning with the initial movement from advertisement to Merchant URL, and ending with the user's completed transaction.

## 2

This tracking mechanism allows the Merchant to see where its traffic is coming from (i.e., from a given advertisement at a given URL). Further, the tracking mechanism allows the Merchant to determine advertising compensation based on quantity of traffic and/or the traffic's performance. Such a system, which relies on a tracking mechanism, is commonly referred to as an affiliate system.

Most Merchants currently utilize some form of affiliate system to increase sales, track traffic, and compensate Webmasters for referrals of traffic and/or transactions. Webmasters are the content providers of the Internet, who maintain URLs in order to disperse information and links to other URLs. These links are often in the form of another's advertisement, such as a banner ad. Therefore, the Webmaster directs traffic to given Merchants via their selection and placement of Merchant links. The Webmasters are then generally compensated according to a given scale or interval, based in some way on the referred traffic.

The growing popularity of affiliate systems among both Webmasters and Merchants has led to a wide array of resources addressing affiliate commerce. Such resources include search engines, directories, and compilations of Webmaster feedback relating exclusively to affiliate systems.

Two distinct models of affiliate systems have developed. The first is a stand-alone affiliate system for a single Merchant. The second type encompasses multiple Merchants within one master affiliate system.

FIG. 1 is an illustration showing a prior art stand-alone affiliate system 100. The stand-alone affiliate system 100 includes a group of Webmasters 102, and a Merchant affiliate system 104. The Merchant's affiliate system 100 is a full framework that operates the Merchant's affiliate program. Generally, the Merchant's affiliate system 100 includes the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates, the accounting system for payout of affiliates, the reporting system for reporting transaction statistics back to affiliates, and the support system for affiliate and technical support.

In use, the group of Webmasters 102 send traffic through the surrounding affiliate system 104. The traffic is tracked and any transactions initiated by the traffic are credited to the referring Webmaster. Each Webmaster has access to the full framework of affiliate services offered by the Merchant's affiliate system 104.

The stand-alone affiliate system 100 is utilized only by one Merchant and that Merchant's network of affiliated Webmasters 102.

As would be expected, the Merchant retains full access to and control of its affiliate system 104, as well as full responsibility for promotion, administration, and improvement of the system. A good example of a stand-alone affiliate system is that used by AMAZON.COM.

A number of shortcomings become evident in regard to the stand-alone affiliate system. First, from the Merchant's point of view, there is a large startup cost, since the Merchant needs to have its entire affiliate system 104 in place before even one Webmaster 102 can begin to refer transactions. Second, the stand-alone affiliate system suffers from slow growth, mainly due to a switch in target market, a switch from obtaining new consumers (users) to new Webmasters. The single Merchant may also fail to attract Webmasters simply due to the limited number of goods and/or services available for promotion. In addition, the stand-alone affiliate system 100 entails a continuing burden of administration, promotion of the system, and Webmaster relations, all of which can tax the single Merchant's resources.

US 6,804,660 B2

3

In addition, there are several drawbacks to the stand-alone affiliate program from the Webmaster's 102 point of view. Generally, the Webmaster 102 can only represent the goods and/or services of a single Merchant. Ideally, a Webmaster 102 would offer a variety of goods and/or services to its traffic in order to generate increased revenue from the available customers. In order for a Webmaster 102 using the stand-alone affiliate system 100 to add a variety of Merchants to the Webmaster's web page, the Webmaster 102 must find and join multiple stand-alone programs. This makes administration of the Webmaster's business more complex because the Webmaster must then coordinate with many programs—each with its own terms, conditions, accounting, tracking and customer service—in order to keep abreast of the performance of the Webmaster's referred traffic.

FIG. 2 is an illustration showing a prior art affiliate hub system 200. The affiliate hub system 200 includes a group of Webmasters 202, a master affiliate system 204, and an affiliate network 206 having individual affiliate systems 208. The master affiliate system 204 processes Webmaster 202 information and organizes the Webmasters 202 into the networked affiliate programs 208 within. The group of Webmasters 202 send traffic through the surrounding master affiliate system 204 to the individual affiliate programs 208 within.

Each individual affiliate system 208 of the affiliate network 206 uses the framework of the master affiliate system 204. This framework includes a back-end tracking mechanism (which keeps track of transactions and credits affiliates), an accounting system for payout of affiliates, a reporting system for reporting transaction statistics back to affiliates, and a support system for affiliate and technical support.

Thus, each individual Merchant affiliate system 208 depends on the master affiliate system 204 to provide the framework for the Webmasters 202 with traffic to become affiliates and promote the Merchant's particular goods and/or services. Each networked Merchant affiliate system 208 uses the same group of Webmasters 202 and their traffic from within the master affiliate system 204. An example of an affiliate hub system is that used by LINKSHARE.

Using the affiliate hub system 200, Webmasters can be affiliated with, or send traffic through, one or more of the networked Merchant affiliate systems 208. Webmaster can also be affiliated with, or send traffic through, the master affiliate system 204 (for example, a Webmaster already in the Linkshare network can promote Linkshare and earn commissions per referred new Webmaster who joins Linkshare).

The affiliate hub 200 addresses some of the weaknesses of the stand-alone system in bringing together groups of Merchants into one network. In addition to gaining the use of the framework of the master affiliate system 204, a Merchant entering the affiliate hub network 200 has immediate exposure to the Webmasters 202 within the hub 200, easing the growing pains of starting an affiliate program. The Webmaster also benefits from this system, with simplified, coordinated access to the goods and services of all Merchant affiliate programs in the hub. However, the Merchants must share the same resources for traffic (the group of Webmasters 202), and thus risk losing business to other Merchants in the hub 200.

## SUMMARY OF THE INVENTION

The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing

4

affiliate system. First, having been assigned a source unique identifier (source Webmaster ID), each of a group of Webmasters operates a web site. Then a request for a target Merchant Web site is initiated by a user (web surfer) or by the Webmaster, which utilizes the source Webmaster ID and triggers a correlation function. The source Webmaster ID is correlated to a target Webmaster ID, which is a unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the requested Merchant's home affiliate system.

Next, an entry mechanism URL for a target Merchant's affiliate system is generated and returned, containing the correlated target Webmaster ID code. The entry mechanism URL enables a hand off of the user to the requested Merchant's affiliate system, which further recognizes the source affiliate system from which the referring Webmaster sends traffic.

In one embodiment of the present invention, transaction information is obtained from the target Merchant's home affiliate system for specified transactions. The transaction information may be obtained by granting an affiliate pooling system access to a server operated by the target Merchant's affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from the server operated by the Merchant's affiliate system. Optionally, the transaction information may be obtained by granting the target Merchant's home affiliate system access to an affiliate pooling system server and allowing the target Merchant's affiliate system to transfer the transaction information to the affiliate pooling system server.

In another embodiment of the present invention, the received request further includes an identifier for the target Merchant's home affiliate system, and an identifier for the source affiliate pool of the referring Webmaster.

In a further embodiment of the present invention, the received source Webmaster ID code is correlated to the target Webmaster ID code by performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the unique identifier for the referring Webmaster. Optionally, the lookup function may provide the target Webmaster ID code from a block of designated codes from within the requested Merchant affiliate system.

In yet a further embodiment, a Webmaster operates a web site having a banner ad for a related Merchant affiliate system. Additionally, the banner ad may include a link that includes an identifier for the related Merchant affiliate system and a unique identifier for at least one of the plurality of Webmasters operating the web site. Also, the link may further include a URL for a virtual affiliate pooling system.

Advantageously, the present invention allows groups of Webmasters to participate in existing Merchant affiliate systems without the need of joining those Merchant affiliate systems.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention, together with further advantages thereof, may be best be understood by reference to the following description taken in conjunction with the accompanying drawings in which:

FIG. 1 is an illustration showing a prior art stand-alone affiliate system;

FIG. 2 is an illustration showing a prior art affiliate hub system;

US 6,804,660 B2

5                                                    6

FIG. **3** is an illustration showing an affiliate pooling system in accordance with an embodiment of the present invention;

FIG. **4** is an illustration showing a virtual affiliate system, in accordance with an embodiment of the present invention;

FIG. **5** is a flowchart showing a method for virtual affiliate pooling in accordance with one embodiment of the present invention;

FIG. **6** is a flowchart showing a method for processing and correlating user request data, in accordance with an embodiment of the present invention;

FIG. **7** is an illustration showing a complimentary affiliate pooling system, in accordance with an embodiment of the present invention;

FIG. **8** is an illustration showing an affiliate pooling system, in accordance with another embodiment of the present invention;

FIG. **9** is an illustration showing a complimentary affiliate pooling system, in accordance with yet another embodiment of the present invention; and

FIG. **10** is an illustration showing an affiliate pooling hub system, in accordance with a further embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

An invention is disclosed for Internet based affiliate pooling across existing affiliate system boundaries. In the following description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent, however, to those skilled in the art, that the present invention may be practiced without some or all of these specific details in order to not unnecessarily obscure the present invention.

The following terms and acronyms are used throughout the detailed description:

Client-Server. A model of interaction in a distributed system in which a program at one site sends a request to a program at another site and waits for a response. The requesting program is called the "client," and the program which responds to the request is called the "server." In the context of the World Wide Web (discussed below), the client is a "Web browser" (or simply "browser") which runs on a computer of a user; the program which responds to browser requests by serving Web pages is commonly referred to as a "Web server."

Hyperlink. A navigational link from one document to another, or from one portion (or component) of a document to another. Typically, a hyperlink is displayed as a highlighted word or phrase that can be selected by clicking on it using a mouse to jump to the associated document or documented portion.

Hypertext System. A computer-based informational system in which documents (and possibly other types of data entities) are linked together via hyperlinks to form a user-navigable "web."

Internet. A collection of interconnected (public and/or private) networks that are linked together by a set of standard protocols (such as TCP/IP and HTTP) to form a global, distributed network. (While this term is intended to refer to what is now commonly known as the Internet, it is also intended to encompass variations which may be made in the future, including changes and additions to existing standard protocols.)

World Wide Web ("Web"). Used herein to refer generally to both (i) a distributed collection of interlinked, user-viewable hypertext documents (commonly referred to as Web documents or Web pages) that are accessible via the Internet, and (ii) the client and server software components which provide user access to such documents using standardized Internet protocols. Currently, the primary standard protocol for allowing applications to locate and acquire Web documents is HTTP, and the Web pages are encoded using HTML. However, the terms "Web" and "World Wide Web" are intended to encompass future markup languages and transport protocols which may be used in place of (or in addition to) HTML and HTTP.

Web Site. A computer system that serves informational content over a network using the standard protocols of the World Wide Web. Typically, a Web site corresponds to a particular Internet domain name, such as "amazon.com," and includes the content associated with a particular organization. As used herein, the term is generally intended to encompass both (i) the hardware/software server components that serve the informational content over the network, and (ii) the "back end" hardware/software components, including any non-standard or specialized components, that interact with the server components to perform services for Web site users.

HTML (HyperText Markup Language). A standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents. (HTML 4.0 is currently the primary standard used for generating Web documents.) During a document authoring stage, the HTML codes (referred to as "tags") are embedded within the informational content of the document. When the Web document (or HTML document) is subsequently transferred from a Web server to a browser, the codes are interpreted by the browser and used to parse and display the document. Additionally in specifying how the Web browser is to display the document, HTML tags can be used to create links to other Web documents (commonly referred to as "hyperlinks"). For more information on HTML, see Ian S. Graham, The HTML Source Book, John Wiley and Sons, Inc., 1995 (ISBN 0471-11894-4).

HTTP (HyperText Transport Protocol). The standard World Wide Web client-server protocol used for the exchange of information (such as HTML documents, and client requests for such documents) between a browser and a Web server. HTTP includes a number of different types of messages which can be sent from the client to the server to request different types of server actions. For example, a "GET" message, which has the format GET, causes the server to return the document or file located at the specified URL.

URL (Uniform Resource Locator). A unique address which fully specifies the location of a file or other resource on the Internet. The general format of a URL is protocol:// machine address:port/path/filename. The port specification is optional, and if none is specified by the user, the browser defaults to the standard port for whatever service is specified as the protocol. For example, if HTTP is specified as the protocol, the browser will use the HTTP default port of **80**.

Cookies. A technology that enables a Web server to retrieve information from a user's computer that reveals prior browsing activities of the user. The informational item stored on the user's computer (typically on the hard drive) is commonly referred to as a "cookie." Many standard Web browsers support the use of cookies.

PUSH Technology. An information dissemination technology used to send data to users over a network. In contrast to the World Wide Web (a "pull" technology), in which the

US 6,804,660 B2

7

client browser must request a Web page before it is sent, PUSH protocols send the informational content to the user computer automatically, typically based on information prespecified by the user.

FIG. 3 is an illustration showing an affiliate pooling system 300 in accordance with an embodiment of the present invention. The affiliate pooling system 300 includes a group of Merchant affiliated Webmasters 302, a Merchant affiliate system 304, an affiliate pool of Webmasters 306, Virtual Affiliates 308, and a Virtual Affiliate system 310. The affiliate pool of Webmasters 306, the Virtual Affiliates 308, and the Virtual Affiliate system 310 may be added to an existing Merchant affiliate system 304.

The Merchant's affiliate system 304 is a full framework that operates the Merchant's affiliate program. Generally, the Merchant's affiliate system 304 includes the Merchant's back-end tracking mechanism, which keeps track of transactions and credits affiliates; the accounting system for payout of affiliates; the reporting system for reporting transaction statistics back to affiliate; and the support system for affiliate and technical support.

In use, the group of Merchant affiliated Webmasters 302 sends traffic through their surrounding Merchant affiliate system 304. The traffic is tracked and any transactions initiated by the traffic are credited to the particular referring Webmaster from within the group of Merchant affiliated Webmasters. Each Webmaster has access to the full framework of affiliate services offered by the Merchant affiliate system 304.

The affiliate pool of Webmasters 306 produces a quantity of traffic. The affiliate pool is a loose aggregation of Webmasters with a quantity of traffic, who may or may not already be utilizing a Merchant affiliate system or some master affiliate hub system. All that is required for a Webmaster to be considered part of the affiliate pool is the ability to send traffic through some affiliate system—that is, to have been assigned a unique identifying code (in order to track and credit referred transactions), as described in greater detail subsequently.

The Virtual Affiliates 308 are a subset of the Webmasters of the affiliate pool 306 with their quantity of traffic. Each Virtual Affiliate 308 sends traffic to the Merchant through the Merchant's existing affiliate system 304, and thus has the ability to benefit from advertising the goods and/or services of the Merchant while not wholly a part of the Merchant's existing affiliate system. In this way, the Virtual Affiliate Webmaster uses only a portion of the Merchant affiliate system's 304 framework (or resources).

The Virtual Affiliate remains independent from the Merchant's affiliate system. In addition, the Virtual Affiliate may remain anonymous to the Merchant's affiliate system, identified only as a member of the affiliate pool of Webmasters 306, as described in greater detail subsequently.

The Virtual Affiliate system 310 shows the flow of traffic, as the Webmasters in the affiliate pool 306 act as Virtual Affiliates 308 of the Merchant affiliate system 304, sending their quantity of traffic through the existing Merchant affiliate system 304.

FIG. 4 is an illustration showing a Virtual Affiliate system 310, in accordance with an embodiment of the present invention. The Virtual Affiliate system 310 includes a recognition system 400 and a transfer system 402.

As discussed in greater detail below, each Webmaster in the affiliate pool 306 has assigned to it a unique identifying code, referred to below as the "source Webmaster ID." Thereafter, traffic received from a particular Webmaster,

8

which flows through the affiliate pooling system 300, includes the source Webmaster ID code for that particular Webmaster.

This source Webmaster ID is utilized by the recognition system 400 to perform an initial function that identifies the source Webmaster ID as from the affiliate pool and correlates it to another unique ID code that can be utilized by the particular Merchant's existing affiliate system, referred to below as the "target Webmaster ID." Incorporating this target Webmaster ID, the recognition system 400 correlates the IDs and returns a properly formatted entry mechanism, such as a URL, which enables the traffic to be handed off to and recognized by the particular Merchant's existing affiliate system. In this manner the Webmaster participates as a Virtual Affiliate 308 of the Merchant's affiliate system.

The transfer system 402 receives or retrieves information from a Merchant's affiliate system concerning transactions initiated by the traffic referred by the Webmasters in the affiliate pool 306. Generally, the transfer system 402 re-correlates each target Webmaster ID (from a particular Merchant's affiliate system) to a source Webmaster ID (from the affiliate pool). This information is then saved and processed for subsequent reporting and payout, as discussed in greater detail below.

FIG. 5 is a flowchart showing a method 500 for Virtual Affiliate pooling in accordance with one embodiment of the present invention. In an initial operation 502, pre-process operations are performed. Pre-process operations include gathering Webmaster information for each Webmaster of the affiliate pool and other pre-process operations that will be apparent to those skilled in the art.

In a data setup operation 504, participating Merchant systems and participating Webmasters are configured to utilize the affiliate pooling system of the present invention.

As part of the data setup operation 504, any guidelines for integration of the Virtual Affiliate system and the existing Merchant affiliate system are laid out such that the subsequent operations (i.e., correlation 508, hand off 509, data obtaining 510, assimilation 512) between the systems can be executed. The configuration guidelines that are set can be accessed as necessary by any subsequent operation.

The configuration information will include guidelines that ensure that the Merchant affiliate system is able to recognize that a given segment of traffic originates from some Webmaster from a source affiliate pool, and that the Merchant affiliate system is able to relay back to the Virtual Affiliate system information regarding all completed transactions referred from the affiliate pool. These recognition and transfer functions are significant parts of the operations described in more detail hereinbelow.

The configuration information may include syntax of the URL links which Webmasters post on their sites, used in a transmitting operation 506, as described in more detail below.

The configuration information may include designation of the particular blocks or sequences of unique identifying codes within each participating system to be correlated to each other, or rules for generating correlated codes "on the fly," used in a correlation operation 506, as described in more detail below.

The configuration information may further include designation of the syntax/format of the correlated output such that it is recognized by the Merchant affiliate system and can be handed off to it, in a hand off operation 509, as described in more detail below. For example, redirection to the target Merchant affiliate system in this hand off operation can come in the form of a specified URL syntax.

US 6,804,660 B2

9

The configuration information may also include parameters for a data obtaining operation **510** (in which information from Virtual Affiliate-referred transactions is passed back to the Virtual Affiliate system); this includes, for example, choosing the mode of transfer and specifying the type and level of data content to be included in the transfer. At least one transfer mode should be chosen for the information to be passed from the Merchant affiliate system to the Virtual Affiliate system. These modes may include e-mail, file transfer protocol, script calls and manual entry of the information to an affiliate pooling system server. A determination as to the content of the information that is to be passed back to the Virtual Affiliate system should be made at setup. The content of information that is passed back may be different for each Merchant affiliate system that is used in connection with the affiliate pooling system. The content of information may vary depending upon the type of commerce and the tracking and reporting capabilities of the Merchant affiliate system with which the affiliate pooling system operates.

The configuration information may include rules for reporting of transaction statistics, as used in an assimilation operation **512**, as described in more detail below. For example, these rules may specify the interval of reporting (such as per day, per month, or real-time), treatment of erroneous or fraudulent transaction data, and terms of compensation for referring Webmasters (e.g., the Webmaster may receive a given unit per transaction, or a given percentage per transaction), such that revenue totals can be calculated.

Also as part of a data setup operation **504**, Webmasters in the affiliate pool are configured to operate with the affiliate pooling system. Each Webmaster from the affiliate pool of Webmasters has a quantity of traffic. As part of the setup operation, each Webmaster is assigned or verified to possess a unique identifying code (source Webmaster ID). This source Webmaster ID is the only information necessarily taken from the affiliate pool of Webmasters when used in conjunction with a Merchant's existing affiliate system. All other information (e.g., names, Social Security Numbers, or address of Webmasters, which are required for them to be compensated) can remain behind, such that the Webmaster is rendered anonymous to the Merchant affiliate system. This possibility for anonymity represents a significant advance over prior art, which limit the influx of traffic to only that which is completely tracked by and utilizes the full resources of the home system. Use of the Virtual Affiliate system allows for some responsibility to be removed from the Merchant, in terms of maintaining and expending system resources toward its relationship with the referring Webmaster. The Merchant is allowed to expand without the additional burden of keeping track of all the identifying data for every Webmaster who refers traffic, nor does the Merchant need to sign up, report on, pay out, or provide customer/technical support to every party who sends traffic to the Merchant system. Also, this anonymity feature provides added security to the Virtual Affiliate system in that the Merchants are not able to bypass the Virtual Affiliate system which some Merchants may see as a middleman. However, depending on preference and configuration, the participating systems may choose to forgo some portion or all of this anonymity feature and expend system resources to more fully participate in the relationship with Virtual Affiliate Webmasters.

As part of the Webmaster data setup operation **504**, a Webmaster may first be introduced to the affiliate pooling system of the present invention by visiting a web site

10

sponsored by the affiliate pooling system that outlines the terms and conditions of becoming a Virtual Affiliate. The terms may vary for each Merchant affiliate system participating in the affiliate pooling system. The unique identifying code (source Webmaster ID) for the Webmaster may be assigned when the Webmaster creates an online account with any of the various Merchant affiliate systems to which access is provided through the affiliate pooling system, or with the affiliate pooling system itself.

Each Webmaster then utilizes the source Webmaster ID in order to send traffic which is "trackable" through a system. In a preferred use, the source system can provide the Webmaster with properly formatted links, which will each contain the source Webmaster ID. The Webmaster can copy and paste these HTML coded links directly into their web pages. These links then are utilized by users of a web page to transmit requests for a Merchant whose products or services are being advertised, as described in greater detail below.

In a transmitting operation **506**, a request is transmitted to the affiliate pooling system which contains 1) the unique identifying code for the Webmaster within his origin affiliate system (source Webmaster ID), and 2) some identifier for the Merchant whose product or service is offered (target system identifier). The URL may also contain information identifying the source affiliate system of the Webmaster (a source system identifier), either explicitly within the URL or somehow based on other information within the URL (such as the source Webmaster ID) in combination with a previously determined rule from the configuration information from data setup operation **504**.

In use, the transmitted request can be initiated when a user (i.e., traffic of the Webmaster from the affiliate pool) clicks a URL (on the Webmaster's web site) which contains the source Webmaster ID and identifies the target Merchant system whose products or services are being advertised. Alternately, the request can be initiated by the Webmaster himself, or by the affiliate pooling system itself, such that the correlation operation described in detail below has already happened when a user visits the Webmaster's site, and the user can thus directly click the returned entry mechanism URL for hand off to the target system, as described in more detail below.

Next, in a correlation operation **508**, the affiliate pooling system receives a request for a target Merchant URL and correlates and processes the request. In this operation, the affiliate pooling system parses the request to determine the unique ID of the referring Webmaster (source Webmaster ID).

As part of the correlation operation, the Virtual Affiliate system also recognizes the source system from which the traffic comes and in which this referring Webmaster participates. This source system can be an existing Merchant affiliate system, or the affiliate pooling system itself, and corresponds to the system from which the referring source Webmaster obtained his source Webmaster ID. Recognition of the source system can occur via an identifier (source system identifier) in the URL request that is received by the affiliate pooling system, or via a rule previously determined in the configuration of the participating systems, as described in more detail previously and hereinbelow.

From the request, the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source Webmaster ID) can then be correlated to a unique ID for the Merchant's affiliate system (target Webmaster ID).

US 6,804,660 B2

**11**

Correlation can occur in a number of ways. For example, the Merchant may have previously allocated a sufficiently large number of unique ID's from within its existing affiliate system, reserved (or blocked off) for use with the affiliate pooling system. As needed (on the fly, or having been assigned previously), the lookup table matching the existing Merchant system's ID (target Webmaster ID) to the appropriate source Webmaster ID from the affiliate pool is created or augmented. Accordingly, when the pooling system utilizes webmaster identifiers that are different from the target Merchant affiliate system's identifiers, the Webmaster ID's can be referenced using a lookup table that cross-references the two codes.

The Merchant affiliate system may also use a hybrid string of characters as a target Webmaster ID for identifying Webmasters associated with the affiliate pooling system. For example, the first portion of the code may be an acronym for the source system from which the Webmaster is sending traffic, while the next portion may consist of numbers that represent the particular source Webmaster ID assigned to the Virtual Affiliate Webmaster. In this respect, the Merchant affiliate system recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over.

As another alternative for setting up the Virtual Affiliate system to interact with an existing Merchant affiliate system, the Merchant can set up custom interfaces (for example, using a scripting platform like CGI, PHP, Apache, Perl, etc.), in order to incorporate variables which designate the source Webmaster as a Virtual Affiliate. Traffic sent to the target Merchant's system is recognized as originating from the source system based on the variables present or use of the interface. The variables can be set in hidden HTML in a web page or as part of the URL. In most cases, the hidden HTML and the URL are treated the same; thus it wouldn't make a difference which was used in a particular situation.

In a hand off operation **509**, the affiliate pooling system hands off the traffic to the target Merchant affiliate system. In order for the hand off to the Merchant affiliate system to run smoothly, the Merchant should be prepared to recognize traffic from the Virtual Affiliate system, as described above. The Merchant system should further recognize the target Webmaster ID and URL syntax such that the Merchant's tracking mechanism can take over, as described above.

In most cases, the Merchant has some mechanism in place for keeping track of traffic and resulting transactions; this is done using any number of methods, which will be apparent to those skilled in the art, and include use of referring URL's, unique ID numbers, user IP's, cookies, or session variables. For those Merchants that do not have this capability, a type of setup that incorporates customized compatibility between the affiliate pooling system and the existing Merchant affiliate system may be provided.

No separate transaction payment system, including authorization or processing of user-requested transactions for Merchant goods and/or services, is necessary with the present invention since it uses the existing transaction payment system of the Merchant's e-commerce setup.

The hand off to the Merchant affiliate system for processing of any initiated transactions includes the target Webmaster ID. The Merchant affiliate system then processes the rest of the user request, including completing transactions for the user. The Merchant affiliate system tracks all transactions occurring for each unique target Webmaster ID. This tracked data is then obtained by the Virtual Affiliate system, as described below.

**12**

In a data obtaining operation **510**, the Virtual Affiliate system obtains transaction data from the Merchant affiliate system. There are generally two methods of obtaining this information from the Merchant affiliate system: retrieving and receiving.

Retrieval of information is scheduled, such that at a designated time or interval the Virtual Affiliate system is granted access to the relevant transaction data of the Merchant's affiliate system, via the process for retrieving data from a remote server. The affiliate pooling system may receive and retrieve information through a server computer with a database.

Receipt of transaction data can occur either on a schedule or in real time. Scheduled receipt of transaction data occurs using the same method and process as "retrieving" the data, as explained above, except reversed. That is, the Merchant affiliate system is granted access to an area of the Virtual Affiliate system, and transfers the retained data to this area via the process for transferring data between remote servers.

Real-time receipt of transaction data occurs as follows: a given transaction is processed, and as soon as the transaction is completed, the mechanism that completes the transaction automatically sends an impulse to the Virtual Affiliate system, relating or containing information about the transaction's occurrence.

The information that is reported back to the Virtual Affiliate system includes at the very least the target Webmaster ID of the referring Webmaster, and may also include relevant transaction data, such as a transaction date, a transaction amount, an order number, customer information, product information, and so on. The level and type of transaction data available will vary depending on the type of commerce, on the tracking and reporting capabilities of the Merchant affiliate system with which the affiliate pooling system operates, and most importantly, on the configuration information for that Merchant affiliate system, as determined in a data setup operation **504**.

The information that is transmitted back to the Virtual Affiliate system may be transmitted through a variety of means. The mode may be e-mail, file transfer protocol, a direct call from the target Merchant's system, or manual entry. E-mail may be used for processing that is practically real time. E-mail also represents an advantage since e-mails are filtered by author, subject or other criteria. The subject or author field may be used to quickly determine which Merchant has sent the information. E-mail is also a convenient means for delivery of transaction information since a message that is originally undeliverable may be re-queued for later delivery.

File transfer protocol also has its advantages. File transfer protocol is a set of guidelines and programs, and is commonly used to transfer files between different computers on the Internet. As discussed above, during a data setup operation, the systems may agree on a configuration whereby the Merchant affiliate system will maintain transaction information in a directory on a server that can be accessed via an FTP client. At designated times, the Virtual Affiliate system may access the network of a Merchant affiliate system to copy new transaction information or files from a directory to the Virtual Affiliate system. The access to the Merchant affiliate system may be initiated according to a Merchant-specific process, or subroutine, set to run at designated times; for example, the subroutine could run every quarter-hour, every half-hour, every hour, daily or weekly.

The direct call from the target affiliate system may also be used as a means of passing transaction information back to

US 6,804,660 B2

13

the Virtual Affiliate system. This method would involve passing the required information to the Virtual Affiliate system immediately upon completion of the transaction. Network dependability would be a factor in determining whether or not this method is feasible since network failures might result in a loss of information. However, the direct call may be re-queued in the same manner as a temporarily undeliverable e-mail. Also, it should be noted that the direct call is most akin to a real-time processing mode.

Manual entry of the transaction information is also an option. However, the costs associated with labor and the probability of human error in entering the transaction would make this option less preferred. The fact that the inaccurate entry of one letter or number could make such a difference with this transaction information teaches against using this mode. In the event this method is used, it can be used to directly enter the information into the Virtual Affiliate system. The information could be entered from a print-out, fax or other form into the Virtual Affiliate system via Web interface.

The obtained data is assimilated in a data assimilation operation 512. The data obtained from the target Merchant affiliate system is assimilated in order to enable compensation of the Webmasters for referred transactions, and to report transaction statistics back to these Webmasters. During this operation, the data obtained from the Merchant affiliate system is parsed and utilized by the Virtual Affiliate system, as described in greater detail subsequently.

The data assimilation operation 512 should have the capacity to extract relevant information from the transaction data which has been passed back from the Merchant affiliate system. The data assimilation operation 512 can be triggered by an impulse request for the obtained transaction/referral data, in the form of an impulse sent to the system. The impulse can be sent upon receipt of the obtained data above, according to a previously configured schedule, or by request of the source affiliate system. The impulse request contains information for the affiliate pooling system, namely the source system identifier, such that the configuration information for the source system can be located, and the reverse correlation can occur, as described in more detail below.

The data assimilation operation 512 should further have the capacity to perform a reverse correlation on the isolated target Webmaster ID (from the stored transaction data), in which the target Webmaster ID is correlated back to the source Webmaster ID for use by Virtual Affiliate system. That is, using the same database structure as the original correlation operation 508, the system correlates the previously designated (or created) ID code (the target Webmaster ID, corresponding to the coding system of the target Merchant affiliate system) with the source Webmaster ID. The reverse correlation returns the source Webmaster ID, along with the parsed relevant transaction data.

The data assimilation operation 512 should also have the capacity to perform auditing functions to verify the integrity of the data (e.g., to analyze transaction records thus eliminating duplicates or fraud), depending on the related commerce.

The data assimilation operation 512 should further have the capacity to update statistical information with the new information that has been passed back from the Merchant affiliate system. Once parsed, reverse correlated, and audited, the transaction information and the "refund" code may be packaged, and these packages of information may be inserted into the appropriate place in the database structure of the affiliate pooling system's centralized database, or may

14

be sent to or retrieved by a source affiliate system server (for performing its own post-process operations such as reporting, payout, etc.).

In some cases, it may also be desirable for the data assimilation operation 512 to trigger e-mail notifications to the Webmasters themselves as to the receipt of transaction information that has been passed back from the Merchant affiliate system to the Virtual Affiliate system.

Finally, in operation 514, post-process operations are performed. Post-process operations include payment of Webmasters from the affiliate pool, and other post-process operations that will be apparent to those skilled in the art. The Virtual Affiliates receive payment based on the number and value of referred transactions. Payment processing is made based on the terms and conditions of the Webmaster's agreement to provide referral services to a Merchant. Since the affiliate pooling system is based on a centralized database, check printing, account maintenance and other administrative tasks can be achieved by way of a web interface.

The affiliate pooling system has the capacity to generate statistics based on the information received from the Merchant affiliate system. The information may be broken down into whatever form the affiliate pooling system desires. For example, the statistics may organized by type of commerce, or by product and/or service currently enjoying the largest number of completed transactions or best overall performance. In addition to transaction and revenue statistics, the Virtual Affiliate system can also report statistics relating to raw traffic. Statistics will reflect information based on the type of commerce involved, the tracking and reporting capabilities of the Merchant's existing affiliate system, and the configuration information specified at setup. This information will be available to Webmasters and/or Merchants participating in the affiliate pooling system and will generally assist in improving marketing practices.

FIG. 6 is a flowchart showing a method 508 for processing and correlating user request data, in accordance with an embodiment of the present invention. In an initial operation pre-process operations are performed. Pre-process operations include assigning or verifying the presence of Webmaster unique identifier codes and other pre-process operations that will be apparent to those skilled in the art.

In a receiving operation 604, a URL request is received by the affiliate pooling system. As described previously, the URL received includes the following information: 1) the unique identifying code for the Webmaster within his origin affiliate system or pool (source Webmaster ID), and 2) some identifier for the Merchant whose product or service is offered (target system identifier). The URL may also contain information identifying the source affiliate system of the Webmaster (a source system identifier), either explicitly within the URL or indirectly via other information within the URL (such as the source Webmaster ID) in combination with a previously determined rule from the configuration information of the systems.

Next, in a lookup operation 606, a lookup function is performed. Specifically, the lookup function finds the database assigned to the target Merchant affiliate system (target system identifier). Within this database are three fields of information: the source system information, the Webmaster's unique ID within this source system (source Webmaster ID), and a unique identifying code from a block of designated identifiers within the target Merchant's affiliate system (target Webmaster ID). The database is then used to determine a correlating target Webmaster ID for the referring

US 6,804,660 B2

15

Webmaster. This identifier is then returned as an affiliate tracking code for use within the Merchant's existing affiliate system.

Depending on the complexity of the system, a database entry for a Webmaster may also include any additional unique identifiers, which would reference the source-target entry and could be used for additional or internal tracking by the affiliate pooling system.

The system of the present invention thus does a look up with the two pieces of source information (source system identifier and source Webmaster ID) to determine a correlated code for the target Merchant affiliate system.

A decision is then made as to whether a code has been returned by the system, in operation 608. If a code has not been returned, the method continues with an assignment operation 610. However, if a code has been returned, the method continues with an operation 612.

In an assignment operation 610, an unused target Webmaster ID is assigned to the referring Webmaster. If no correlated code is returned, the referring Webmaster has not yet sent ANY traffic through this mechanism (has not acted as a Virtual Affiliate). So an unused unique ID is then assigned from a block of designated codes within the target affiliate system. And, on subsequent lookups for this Webmaster's target Webmaster ID (as a result of subsequent referred transactions), the previously assigned code will be returned.

In a new URL determination operation 612, a new URL is determined based on the target Merchant and the target Webmaster ID. Once the correlated ID number for use by the target Merchant affiliate system is determined by the lookup function, the system returns a new URL, containing the "looked up" code and acting as an entry mechanism into the target Merchant's existing affiliate system. The format of the URL (i.e., syntax for the location of the target Merchant affiliate system) is determined using the configuration information specified during a data setup operation, as described in greater detail above. At this point, the user (traffic) is handed to the Merchant, and the transaction is then either completed or abandoned.

In one instance of real time use, the user begins by requesting one URL, but by the time the lookup function is done, the URL is transformed, thus re-directing the user to another URL immediately.

In this way, the Virtual Affiliate needs only to utilize the tracking mechanism of the target Merchant's affiliate system, not the entire affiliate system (i.e., not the accounting system, reporting system, support system, etc.). The target Webmaster ID (supplied in the URL) is retained by the Merchant affiliate system, along with the other transaction statistics that are collected by the Merchant's own processing of transactions (for its own affiliate system or otherwise), including date of transaction, time, order number, order total, itemized order information, etc. The retained information is then passed back to the affiliate pooling system, as described in greater detail above.

Finally, in operation 614, post process operations are performed. Post process operations include data assimilation and other post-process operations that will be apparent to others skilled in the art. As described above, transaction data is assimilated in order to enable compensation of the Webmasters for referred transactions by the source system, as well as report transaction statistics back to these Webmasters.

FIG. 7 is an illustration showing a complimentary affiliate pooling system 700, in accordance with an embodiment of

16

the present invention. The complimentary affiliate pooling system 700 includes a first group of Merchant affiliated Webmasters 702, a first Merchant affiliate system 704, a first Virtual Affiliate pool 706, a second group of Merchant affiliated Webmasters 708, a second Merchant affiliate system 710, and a second Virtual Affiliate pool 712.

In this embodiment, the present invention enables a first existing Merchant affiliate system 704 to send traffic or Virtual Affiliates 706 from its own system to a second Merchant affiliate system 710.

In addition, the second Merchant affiliate system 710 sends traffic or Virtual Affiliates 712 from its own system to the first Merchant affiliate system 704.

The present invention thus allows these two distinct and separate affiliate systems 704,710 to share respective sets of Virtual Affiliates 706,712. The two affiliate systems remain independent and distinct, retaining their own systems. The invention allows the two to integrate without utilizing the same system and without taking Webmasters from one another.

The following is an exemplary use of the embodiment of the present invention shown in FIG. 7. In the following example Associate is a company implementing the present invention, that is further capable of installing a system utilizing the present invention on Merchant servers.

CDMerchant.com has its own Merchant affiliate system 704 for the promotion of its goods, namely music CDs.

CDMerchant.com comes to Essociate looking for ways to increase their sales/ traffic. Essociate advises CDMerchant-.com that their customers are similar to the customers at MusicMemorabilia.com.

MusicMemorabilia.com has its own Merchant affiliate system 710 for the promotion of its goods, namely memorabilia relating to rock, jazz, and blues music.

An agreement is made between the three parties, such that Essociate will enable the two Merchants to share respective pools of Virtual Affiliates; that is, CDMerchant.com's affiliate Webmasters can become Virtual Affiliates 712 of MusicMemorabilia.com 710, and MusicMemorabilia.com's affiliate Webmasters can become Virtual Affiliates 706 of CDMerchant.com 704. The affiliates of CDMerchant.com gain the ability to offer the products of MusicMemorabilia.com and be compensated for referred transactions, without having to maintain a separate account with MusicMemorabilia.com's own affiliate system. Similarly, the affiliates of MusicMemorabilia.com gain the ability to offer the products of CDMerchant.com and be compensated for referred transactions, without having to maintain a separate account with CDMerchant.com's own affiliate system.

As part of the agreement, the parties define a transaction as the purchase of an item from either MusicMemorabilia.com CDMerchant.com. The parties also agree on a set commission structure for transactions. For example, MusicMemorabilia.com may pay out 15% of every referred sale, of which the referring Webmaster (from CDMerchant.com) gets 5%, CDMerchant.com gets 5%, and Essociate gets 5%; and CDMerchant.com may also pay out 15% of every referred sale, of which the referring Webmaster (from MusicMemorabilia.com) gets 5%, MusicMemorabilia.com gets 5%, and Essociate gets 5%.

Also, to facilitate this integration, MusicMemorabila.com defines a scheme for a block of unique identifying codes from its existing affiliate system. In this example, this block consists of the letters "cd" plus a four digit code. CDMerchant.com also sets off a block of unique identifying codes

US 6,804,660 B2

17

from its existing affiliate system for use by the MusicMemorabilia.com Virtual Affiliates.

Thus Essociate's affiliate pooling system enables the sharing of Webmasters across existing affiliate boundaries. CDMerchant.com and MusicMemorabilia.com do not have to release their own confidential Webmaster information (an asset itself), yet still gain the benefits of sharing Webmaster and their traffic. Both Merchants also gain traffic without having to dedicate resources to new affiliate Webmasters.

Webmaster Fred runs a site for his band at http://www.fred.com.

On his site, he participates in a Merchant affiliate system for CDMerchant.com (**702**). As a participant, he places banners and links on his band site, advertising the products of CDMerchant.com. These banners and links point to URLs that contain Fred's unique identifying code, **1001**, for the CDMerchant.com affiliate system (**704**).

So the URL that Fred sends his traffic to may look like: http://www.cdmerchant.com/affiliate/1001/product.html

User Gretta is interested in music. After seeing Fred's band, Gretta decides to visit the band's website at http://www.fred.com. After learning about the band from the information on this site, Gretta decides she would like to purchase one of their recommended CDs.

Fred's site provides a banner for CDMerchant.com and suggests clicking the banner to purchase any CDs. Gretta clicks on this banner and is taken to a URL on one of CDMerchant.com's servers.

http://www.cdmerchant.com/affiliate/1001/product.html

As stated, this URL contains the target address as well as Fred's unique identifying code for the CDMerchant.com affiliate system **704**.

Gretta arrives at the specified URL, a page on CDMerchant.com's server. To ensure that Fred's potential sale is not lost, CDMerchant.com's affiliate system has sufficient tracking such that if Gretta completes a transaction during her visit, Fred is credited.

Because of CDMerchant.com's use of Essociate's affiliate pooling system, CDMerchant.com can expand the choice of links on its pages to include goods and service of MusicMemorabilia.com, without losing the ability to credit transactions to CDMerchant.com's referring affiliate Webmasters.

Thus, the URLs accessed by Greta after she moves from Fred's Web page to the Merchant's on-line store may contain a banner ad for MusicMemorabilia.com at the top of the page, with a URL that also contains Fred's unique identifying code (from the source CDMerchant.com affiliate system).

Alternatively, Gretta could get a "pop-up" window upon entry to CDMerchant.com, or upon exit, which would advertise and link to MusicMemorabilia.com. Or Gretta could see an interstitial, which is a temporarily loaded transition document, similar in many ways to a television commercial, and which would advertise and link to the goods of Music-Memorabilia.com. In any above case, the advertisements use links which each contain Fred's source Webmaster ID "**1001**."

Gretta arrives at a page containing the CD she was looking for. If Gretta purchases the CD during this visit, Fred will get credit for the transaction as part of the CDMerchant.com stand-alone affiliate system.

On the page, near the CD description, CDMerchant.com has placed an advertisement for MusicMemorabilia.com, stating "If you like this band, why not get one of their posters!"

18

As before, this ad contains a URL which contains Fred's CDMerchant.com source Webmaster ID, and because it is outside the scope of CDMerchant.com's products and tracking, the URL targets a location on Essociate's server. The URL also contains some identifier for MusicMemorabilia.com (target system identifier) and some identifier for CDMerchant.com (source system identifier) and may look like:

http://memorabilia.essociate.com/partners/cdmerch/1001/

The address includes the following: a target system identifier (in this example, memorabilia.essociate.com identifies the target as MusicMemorabilia.com), a source system identifier (cdmerch), and source Webmaster ID (**1001**).

The Essociate server receives (loads) the URL request, taking the information in the URL and processing it with a lookup function.

Specifically, the lookup function finds the database assigned to the target Merchant affiliate system (MusicMemorabilia.com). Within this database are three fields of information: the source system identifier (cdmerch), the unique Webmaster ID from this system (**1001**), and a unique identifying code from the block of previous described codes within the MusicMemorabilia.com affiliate system (a target Webmaster ID).

So, the Essociate system does a look up with the two pieces of source information, to determine a correlating MusicMemorabilia.com affiliate tracking ID.

In this example, Fred's CDMerchant.com code is **1001**. Essociate's server looks up this source Webmaster ID and correlates it with the target Webmaster ID "cd1001."

Once the correlated ID number for the MusicMemorabilia.com's affiliate program is determined by the Essociate server's lookup function, the server returns a new URL, containing the "looked up" code for MusicMemorabilia, and then targets the location on MusicMemorabilia.com's server.

http://www.musicmemorabilia.com/affiliatepartners/cd1001/poster.html

In real time, this process is extremely fast from Gretta's point of view. Gretta begins by loading one URL, but by the time the lookup function is done, this URL is transformed, thus re-directing her to another URL almost immediately.

Gretta is now within MusicMemorabilia.com's site (**712**), specifically at a URL containing the new "looked up" identifying code.

Gretta purchases the poster, as well as some lyric sheets and a set of autographed guitar picks for $100.

Using only the tracking mechanism of the MusicMemorabilia.com affiliate system and/or shopping cart, the unique identifying code and transaction details are carried through to the completion of Gretta's transaction, and this information is then sent to or grabbed by an Essociate server.

In this example, MusicMemorabilia.com sends Essociate the transaction information (referring code and designated statistics) in real-time. So when Gretta completes her transaction (her credit card is charged), the MusicMemorabilia.com affiliate system automatically sends the information to a storage area on the Essociate server.

In this example, the information includes the target Webmaster ID (from MusicMemorabilia.com's affiliate system; "cd1001" in this example), the date and time of the order, the order number, and the total of the purchases.

Once on the Essociate server, the assimilation process begins when a request for the data is received by the Essociate server.

In this example, a request impulse is sent by CDMerchant.com's affiliate system once each hour. The request

US 6,804,660 B2

19

includes information that denotes that CDMerchant.com is the source Merchant affiliate system.

When Essociate receives the request, Gretta's transaction information, as well as all other referred transactions added during that hour are parsed (line by line, with one transaction per line).

In this example, the MusicMemorabilia.com target Webmaster ID from Gretta's transaction line is matched with the corresponding source Webmaster ID (Fred's code from the CDMerchant.com affiliate system) via a "reverse lookup" function.

Using the same database structure as the original lookup, the system correlates the previously designated (or created) target Webmaster ID (MusicMemorabilia.com) with Fred's source Webmaster ID (CDMerchant.com).

Gretta's transaction information is parsed according to the configuration information for CDMerchant.com's integration with MusicMemorabilia.com and Essociate. In this example, only the date and time of the transaction and the total of the purchase, and of course Fred's "refund" source Webmaster ID, are retained through the parsing process. In addition, compensation can be calculated for the parsed information using the configuration information for the participating systems.

In this example, the Essociate system calculates Fred's commission as $5.00 (5% of Gretta's $100 transaction).

The information (Fred's ID code, date/time of Gretta's transaction, $100 transaction total, and the $5.00 commission amount for Fred) is packaged and sent to the CDMerchant.com affiliate system.

The CDMerchant.com affiliate system now takes over, using the data in the information packages to handle subsequent affiliate services for Fred, such as accounting services by paying Fred $5 for his referred transaction as a Virtual Affiliate, and reporting the transaction total and date and time of the transaction to Fred.

The same set of operations which enable affiliate pooling above also apply with the source and target roles reversed. In other words, MusicMemorabilia.com's existing affiliate system acts as the source system and allows its Webmasters to send traffic to CDMerchant.com (now figured as the target system) while retaining their identity as MusicMemorabilia.com affiliates.

So, a second Webmaster Ernie has a Web site where he places links and banners promoting MusicMemorabilia.com through MusicMemorabilia.com's existing affiliate system; and a given user (either Gretta or any other user visiting Ernie's Web site) clicks one of these banners and is taken to a URL within MusicMemorabilia.com's existing affiliate system. Upon the user's exit from the MusicMemorabilia.com site, a new browser window is automatically displayed which shows advertising information for CDMerchant.com and utilizes links which include Ernie's now correlated target Webmaster ID and direct the user to the CDMerchant target affiliate system. Thus MusicMemorabilia.com's use of the Virtual Affiliate system incorporates the correlation function directly into the exit traffic mechanism used by the source MusicMemorabilia.com affiliate system, correlating the source Webmaster ID to the target Webmaster ID automatically whenever an exit console for the target Merchant affiliate system is triggered. The exit console loads a URL such that Ernie will get credit for any referred sale at CDMerchant.com initiated during that visit, but will remain separate from CDMerchant's existing affiliate system.

It should be noted that both possible configurations of target and source systems discussed above, and their respec-

20

tive flows of traffic and Virtual Affiliates, can co-exist, operating simultaneously and in parallel.

FIG. **8** is an illustration showing an affiliate pooling system **800**, in accordance with another embodiment of the present invention. The affiliate pooling system **800** includes a first group of Merchant affiliated Webmasters **802**, a first Merchant affiliate system **804**, a first Virtual Affiliate pool **806**, a second group of Merchant affiliated Webmasters **808**, and a second Merchant affiliate system **810**. The affiliate pooling system **800** further includes a third group of Webmasters **812**, and a third Virtual Affiliate pool **814**.

In this embodiment, the present invention enables a first existing Merchant affiliate system **804** to send traffic or Virtual Affiliates **806** to a second existing Merchant affiliate system **810**.

In addition, the present invention allows a third pool of Webmasters **812** (not necessarily associated with any existing Merchant affiliate system, but nonetheless possessing unique identifying codes) to be Virtual Affiliates **814** of the second Merchant affiliate system **810**.

Thus the second Merchant affiliate system **810** benefits from increased traffic (and therefore more potential sales), without having to divert resources dedicated to its existing affiliate Webmasters **808** or to new Webmasters.

The first pool of Webmasters **802** and the first Merchant affiliate system **804** both benefit by being able to additionally promote the goods and/or services of the second Merchant **810**, while still being credited for referred transactions and without having to leave the pool or affiliate system where they currently "reside" and conduct business.

Also, the second system's **810** own base of Webmasters **808** are not Virtual Affiliates for either of the other two participating systems (however, they could be in another given situation).

FIG. **9** is an illustration showing a complimentary affiliate pooling system **900**, in accordance with yet another embodiment of the present invention. The complimentary affiliate pooling system **900** includes a first group of Merchant affiliated Webmasters **902**, a first Merchant affiliate system **904**, a first Virtual Affiliate pool **906**, a second group of Merchant affiliated Webmasters **908**, a second Merchant affiliate system **910**, and a second Virtual Affiliate pool **912**. The complimentary affiliate pooling system **900** further includes a third group of Webmasters **914**, and a third Virtual Affiliate pool **916** and a fourth Virtual Affiliate pool **918**.

In this embodiment, the present invention enables a first existing Merchant affiliate system **904** to send traffic or Virtual Affiliates **906** from its own system to a second Merchant affiliate system **910**.

In addition, the second Merchant affiliate system **910** sends traffic or Virtual Affiliates **912** from its own system to the first Merchant affiliate system **904**.

The present invention thus allows these two distinct and separate affiliate systems **904,910** to share their respective sets of Virtual Affiliates **906,912**. The two affiliate systems remain independent, using their own systems, and yet can share their Webmaster traffic without cannibalizing Webmasters from one another.

Additionally, the third pool of Webmasters **914** with unique identifying codes are Virtual Affiliates **916,918** of both existing Merchant affiliate systems **904,910**, sending traffic through either or both of the existing systems, while still being credited for referred transactions and without having to leave the pool or affiliate system where they currently "reside" and conduct business.

FIG. **10** is an illustration showing a affiliate pooling hub system **1000**, in accordance with a further embodiment of

US 6,804,660 B2

21

the present invention. The affiliate pooling hub system **1000** includes a first group of Webmasters **1002**, Virtual Affiliates **1004**, a second group of Webmasters **1006**, a Master Affiliate System **1008**, and an affiliate network **1010** having individual affiliate systems **1012**.

The Master Affiliate System **1008** operates as described with respect to FIG. **2**. However, in this embodiment, the present invention enables an existing affiliate pool **1002** to act as Virtual Affiliates **1004** for an existing Master Affiliate System **1008** with a number of networked affiliate systems **1010**. An example of such a Master Affiliate System would be Linkshare.com.

Used in this way, the affiliate pooling hub system **1000** creates Virtual Affiliates **1004** from the affiliate pool **1002**, allowing them to promote the goods and/or services of any one of the networked affiliate systems within the Master Affiliate System **1008**. Yet, the Virtual Affiliates **1004** do not consume as many resources from the networked affiliate system **1010** or the Master Affiliate System **1008** as the true affiliated Webmasters **1006** of these systems.

The invention can be utilized with any one of the networked affiliate systems **1012**, or all of them **1010**, or with the Master Affiliate System **1008** itself.

It should be borne in mind that FIGS. **7**, **8**, **9**, and **10** are examples of the use of the present invention. The use of the invention is not limited to these four examples. The invention actually enables combination or interconnection of any of the FIGS. **7**, **8**, **9**, and/or **10**, or of variations of them. FIGS. **7**, **8**, **9**, and **10** could all be combined to represent some ubiquitous configuration, each linked with an affiliate system enabled by the present invention.

The system of the invention enables the creation of an architecture of affiliate systems as simple as FIG. **3**, or an architecture of affiliate systems that extends ad infinitum.

While the present invention has been described in terms of several preferred embodiments, there are many alterations, permutations, and equivalents which may fall within the scope of this invention. It should also be noted that there are many alternative ways of implementing the methods and systems of the present invention. It is therefore intended that the following appended claims is interpreted as including all such alterations, permutations, and equivalents as fall within the true spirit and scope of the present invention.

What is claimed is:

**1**. A method for providing Virtual Affiliates to an existing target affiliate system, the method comprising the operations of:

configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:

assigning a source Webmaster unique identifier for each of said first

plurality of Webmasters each operating at least one web site;

receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corre-

22

sponding to the unique identification system of the requested Merchant affiliate system; and

generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

**2**. A method as recited in claim **1**, wherein the operation of correlating the received source Webmaster unique identifier and generating a URL for the target Merchant affiliate system occur prior to the receipt of the user request for the target Merchant affiliate system.

**3**. A method as recited in claim **1**, further comprising the operation of obtaining transaction information from the target Merchant affiliate system for specified transactions.

**4**. A method as recited in claim **3**, wherein the transaction information includes a target Webmaster unique identifier, as well as other relevant transaction data, such as a transaction amount and a transaction date.

**5**. A method as recited in claim **3**, wherein the transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

**6**. A method as recited in claim **3**, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

**7**. A method as recited in claim **1**, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

**8**. A method as recited in claim **7**, wherein the operation of correlating the source Webmaster unique identifier to the target Webmaster unique identifier comprises the operation of performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

**9**. A method as recited in claim **8**, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested target Merchant affiliate system.

**10**. A method as recited in claim **1**, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

**11**. A method as recited in claim **10**, wherein the banner ad utilizes a link that includes an identifier for the target Merchant affiliate system whose banner is being displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

**12**. A method as recited in claim **11**, wherein the link further includes a URL for a Virtual Affiliate pooling system.

**13**. A method as recited in claim **1**, wherein the operation of configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes the step of:

selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

**14**. A method as recited in claim **13**, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

**15**. A computer program embodied on a computer readable medium for providing Virtual Affiliates to an existing affiliate system, the computer program code comprising:

US 6,804,660 B2

23

a code segment for configuring an existing affiliate system to receive referrals from source Webmasters of an affiliate pool of Webmasters, including:

a code segment for assigning a unique identifier for each of a first

plurality of Webmasters each operating at least one web site;

a code segment for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

a code segment for correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and

a code segment for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

16. A computer program as recited in claim 15, further comprising a code segment for obtaining transaction information from the target Merchant affiliate system for specified transactions.

17. A computer program as recited in claim 15, wherein the transaction information includes a target Webmaster unique identifier, a transaction amount and a transaction date.

18. A computer program as recited in claim 16, wherein transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

19. A computer program as recited in claim 16, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

20. A computer program as recited in claim 15, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

21. A computer program as recited in claim 20, wherein the operation of correlating the source Webmaster unique identifier to the target Webmaster unique identifier comprises the operation of performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

22. A computer program as recited in claim 21, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested target Merchant affiliate system.

23. A computer program as recited in claim 15, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

24. A computer program as recited in claim 23, wherein the banner ad utilizes a link that includes an identifier for the target Merchant affiliate system whose banner is being

24

displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

25. A computer program as recited in claim 24, wherein the link further includes a URL for a Virtual Affiliate pooling system.

26. A computer program as recited in claim 15, wherein the code segment for configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes:

code segment for selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

27. A computer program as recited in claim 26, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

28. A system for providing Virtual Affiliates to an existing affiliate system, the system comprising:

logic for configuring an existing affiliate system to receive referrals from a referring Webmaster in an affiliate pool of Webmasters, including:

logic for assigning a source Webmaster unique identifier for each of a first plurality of Webmasters each operating at least one web site;

logic for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters;

logic for correlating the received unique identifier to a Merchant unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and

logic for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

29. A system as recited in claim 28, further comprising logic for obtaining transaction information from the target Merchant affiliate system for specified transactions.

30. A system as recited in claim 29, wherein the transaction information includes a target Webmaster unique identifier a transaction amount and a transaction date.

31. A system as recited in claim 29, wherein the transaction information is obtained by granting an affiliate pooling system access to a target Merchant affiliate system and allowing the affiliate pooling system to retrieve stored transaction information from said Merchant affiliate system.

32. A system as recited in claim 29, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the transaction information to the affiliate pooling system.

33. A system as recited in claim 28, wherein the received user request further includes an identifier for the target Merchant affiliate system, and an identifier for a source affiliate pool of the referring Webmaster.

34. A system as recited in claim 28, wherein the logic for correlating the source Webmaster unique identifier to the

US 6,804,660 B2

25

target Webmaster unique identifier comprises logic for performing a lookup function utilizing the identifier for the source affiliate pool of the referring Webmaster and the source Webmaster unique identifier for the referring Webmaster.

**35**. A system as recited in claim **34**, wherein the lookup function provides the target Webmaster unique identifier from a block of designated codes within the requested target Merchant affiliate system.

**36**. A system as recited in claim **28**, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system.

**37**. A system as recited in claim **36**, wherein the banner ad includes a link that includes an identifier for the target Merchant affiliate system whose banner is being displayed and a source Webmaster unique identifier for at least one of the plurality of Webmasters operating the web site.

26

**38**. A system as recited in claim **37**, wherein the link further includes a URL for a Virtual Affiliate pooling system.

**39**. A system as recited in claim **28**, wherein the logic for configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes:

logic for selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system.

**40**. A system as recited in claim **28**, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry.

\* \* \* \* \*

APPEAL,CLOSED,JRR,PROTECTIVE_ORDER

**U.S. District Court**
**Western District of Wisconsin (Madison)**
**CIVIL DOCKET FOR CASE #: 3:11-cv-00727-bbc**

Essociate, Inc. v. Azoogle.com, Inc. et al                    Date Filed: 10/21/2011
Assigned to: District Judge Barbara B. Crabb                    Date Terminated: 05/20/2013
Referred to: Magistrate Judge Stephen L. Crocker                    Jury Demand: Both
Case in other court: Federal Circuit, 13-01446                    Nature of Suit: 830 Patent
Cause: 35:271 Patent Infringement                    Jurisdiction: Federal Question

**Plaintiff**

**Essociate, Inc.**                    represented by **Derek Linke**
                                        Newman & Newman, Attorneys at Law, LLP
                                        1201 Third Avenue
                                        Suite 1600
                                        Seattle, WA 98101-3029
                                        206-274-2827
                                        Email: linke@newmanlaw.com
                                        *ATTORNEY TO BE NOTICED*

                                        **Derek Alan Newman**
                                        Newman & Newman
                                        Attorneys at Law, LLP
                                        505 Fifth Avenue South, Suite 610
                                        Seattle, WA 98104
                                        206-274-2800
                                        Fax: 206-274-2801
                                        Email: derek@newmanlaw.com
                                        *ATTORNEY TO BE NOTICED*

                                        **John David Du Wors**
                                        Newman & Newman, Attorneys at Law, LLP
                                        1201 Third Avenue
                                        Suite 1600
                                        Seattle, WA 98101-3029
                                        206-274-2800
                                        Fax: 206-274-2801
                                        Email: duwors@newmanlaw.com
                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Azoogle.com, Inc.**                    represented by **Bryan J. Cahill**
                                        Godfrey & Kahn, S.C.
                                        One East Main Street, Suite 500
                                        P.O. Box 2719
                                        Madison, WI 53701
                                        608-257-3911x2227
                                        Fax: 608-257-0609
                                        Email: bcahill@gklaw.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **James Donald Peterson**

Godfrey & Kahn, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701
608-257-3911
Fax: 608-257-0609
Email: jpeterson@gklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
Godfrey & Kahn S.C.
One East Main Street
Suite 500
P.O. Box 2719
Madison, WI 53701-2719
608-284-2629
Fax: 608-257-0609
Email: jgregor@gklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Warriner**
K&L Gates LLP
111 Congress Avenue
Suite 900
Austin, TX 78701
512-482-6885
Fax: 512-482-6859
Email: jim.warriner@klgates.com
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
K&L Gates
1717 Main Street
Suite 2800
Dallas, TX 75201
214-939-5497
Fax: 214-939-5849
Email: jennifer.ayers@klgates.com
*TERMINATED: 06/08/2012*

**Seth Gold**
K&L Gates LLP
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, CA 90067
310-552-5000
Fax: 310-552-5001
Email: seth.gold@klgates.com
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
K&L Gates
1717 Main Street
Suite 2800
Dallas, TX 75201
214-939-5567
Fax: 214-939-5849

Email: steve.schortgen@klgates.com
*TERMINATED: 06/08/2012*

**Defendant**

**Epic Media Group, Inc.**                    represented by    **Bryan J. Cahill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Donald Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Warriner**
(See above for address)
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
(See above for address)
*TERMINATED: 06/08/2012*

**Seth Gold**
(See above for address)
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
(See above for address)
*TERMINATED: 06/08/2012*

**Defendant**

**Social Assets LLC**                    represented by    **James Donald Peterson**
*doing business as*                                         (See above for address)
Kinetic Social                                              *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Epic Media Group, Inc.**                    represented by    **Bryan J. Cahill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Donald Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**James George Warriner**
(See above for address)
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
(See above for address)
*TERMINATED: 06/08/2012*

**Seth Gold**
(See above for address)
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
(See above for address)
*TERMINATED: 06/08/2012*

**Counter Claimant**

**Azoogle.com, Inc.**                      represented by  **Bryan J. Cahill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Donald Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Warriner**
(See above for address)
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
(See above for address)
*TERMINATED: 06/08/2012*

**Seth Gold**
(See above for address)
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
(See above for address)
*TERMINATED: 06/08/2012*

V.

**Counter Defendant**

**Essociate, Inc.**                        represented by  **Derek Linke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Derek Alan Newman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**John David Du Wors**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Epic Media Group, Inc.**                represented by **Bryan J. Cahill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Donald Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Warriner**
(See above for address)
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
(See above for address)
*TERMINATED: 06/08/2012*

**Seth Gold**
(See above for address)
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
(See above for address)
*TERMINATED: 06/08/2012*

**Counter Claimant**

**Social Assets LLC**                represented by **Jennifer Lynn Gregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Azoogle.com, Inc.**                represented by **Bryan J. Cahill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Donald Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Gregor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James George Warriner**
(See above for address)
*TERMINATED: 06/08/2012*

**Jennifer Klein Ayers**
(See above for address)
*TERMINATED: 06/08/2012*

**Seth Gold**
(See above for address)
*TERMINATED: 06/08/2012*

**Steven G. Schortgen**
(See above for address)
*TERMINATED: 06/08/2012*

V.

**Counter Defendant**

**Essociate, Inc.**                    represented by **Derek Linke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Derek Alan Newman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John David Du Wors**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/21/2011 | 1 | PATENT COMPLAINT against Azoogle.com, Inc., Epic Media Group, Inc. ( Filing Fee $350, receipt number 0758-863959) by Essociate, Inc. PATENTS AT ISSUE: Patent # 6,804,660, issued 10/12/2004, held by Essociate, Inc. (Attachments:<br># 1 Exhibit A - U.S. Patent No. 6,804,660,<br># 2 Report on Filing Patent/Trademark Action,<br># 3 JS-44 Civil Cover Sheet,<br># 4 Summons,<br># 5 Summons) (Linke, Derek) (Entered: 10/21/2011) |
| 10/24/2011 |  | Case non-randomly assigned to District Judge Barbara B. Crabb and Magistrate Judge Stephen L. Crocker. Related Case: 11-cv-714-bbc. (arw) (Entered: 10/24/2011) |
| 10/24/2011 |  | Standard attachments for Judge Barbara B. Crabb required to be served on all parties with summons or waiver of service: NORTC, Briefing Guidelines, Corporate Disclosure Statement, Order on Dispositive Motions. (arw) (Entered: 10/24/2011) |
| 10/24/2011 | 2 | Summons Issued as to Azoogle.com, Inc. and Epic Media Group, Inc. (Attachments:<br># 1 Summons - Epic Media Group, Inc.) (arw) (Entered: 10/24/2011) |
| 10/24/2011 | 3 | Report on Filing of Patent or Trademark Action. Copy provided to the US Patent and Trademark Office electronically. (arw) (Entered: 10/24/2011) |
| 11/16/2011 | 4 | Motion for Extension of Time - *Consented Motion for Extension of Time to Respond to the Complaint* - by Defendants Azoogle.com, Inc., Epic Media Group, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. Response due 11/23/2011. (Peterson, James) (Entered: 11/16/2011) |
| 11/16/2011 | 5 | ** TEXT ONLY ORDER **<br>ORDER granting 4 Motion for Extension of Time. Answer due 12/7/11. Signed by Magistrate Judge Stephen L. Crocker on |

| | | |
|---|---|---|
| | | 11/16/11. (krj) (Entered: 11/16/2011) |
| 11/16/2011 | | Set Telephone Pretrial or Status Conference: Telephone Pretrial Conference set for 12/28/2011 at 01:00 PM before Magistrate Judge Stephen L. Crocker. Counsel for Plaintiff responsible for setting up the call to chambers at (608) 264-5153. Standing Order Governing Preliminary Pretrial Conference attached. (krj) (Entered: 11/16/2011) |
| 12/07/2011 | 6 | ANSWER with Jury Demand, COUNTERCLAIM against Essociate, Inc. by Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Peterson, James) Modified on 12/8/2011. (jaf) (Entered: 12/07/2011) |
| 12/07/2011 | 7 | Corporate Disclosure Statement by Defendant Epic Media Group, Inc. (Peterson, James) (Entered: 12/07/2011) |
| 12/21/2011 | 8 | **MOTION TO DISMISS** *Counterclaim Re Inequitable Conduct* by Plaintiff Essociate, Inc., Counter Defendant Essociate, Inc.. Brief in Opposition due 1/11/2012. Brief in Reply due 1/23/2012. (Linke, Derek) (Entered: 12/21/2011) |
| 12/21/2011 | 9 | Brief in Support of 8 Motion to Dismiss *Counterclaim Re Inequitable Conduct* by Plaintiff Essociate, Inc., Counter Defendant Essociate, Inc. (Linke, Derek) (Entered: 12/21/2011) |
| 12/23/2011 | 10 | Joint Discovery Plan (Linke, Derek) (Entered: 12/23/2011) |
| 12/28/2011 | | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Preliminary Pretrial Conference held on 12/28/2011 [:15] (skv) (Entered: 12/28/2011) |
| 12/29/2011 | 11 | Pretrial Conference Order: Proof of standing to sue on claimed patents due 2/10/2012. Amendments to the Pleadings due 2/10/2012. Dispositive Motions due 8/24/2012. Settlement Letters due 1/18/2013. Rule 26(a)(3) Disclosures and Motions in Limine due 1/18/2013, Responses due 2/4/2013. Final Pretrial Conference set for 2/14/2013 at 4:00 PM. Jury Selection and Trial set for 2/25/2013 at 9:00 AM. Signed by Magistrate Judge Stephen L. Crocker on 12/29/2011. (arw) (Entered: 12/29/2011) |
| 12/29/2011 | 12 | Notice of Appearance filed by Bryan J Cahill for Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Cahill, Bryan) (Entered: 12/29/2011) |
| 12/30/2011 | 13 | Motion to Admit Steven G. Schortgen Pro Hac Vice. (Pro Hac Vice Fee $50, receipt number 0758-904686) by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Azoogle.com, Inc., Epic Media Group, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Schortgen, Steven) (Entered: 12/30/2011) |
| 12/30/2011 | 14 | Motion to Admit Jennifer Klein Ayers Pro Hac Vice. (Pro Hac Vice Fee $50, receipt number 0758-904698) by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Ayers, Jennifer) (Entered: 12/30/2011) |
| 12/30/2011 | 15 | ** TEXT ONLY ORDER ** <br> ORDER granting 13 Motion to Admit Steven G. Schortgen Pro Hac Vice, granting 14 Motion to Admit Jennifer Klein Ayers Pro Hac Vice. Signed by Magistrate Judge Stephen L. Crocker on 12/30/2011. (arw) (Entered: 12/30/2011) |
| 01/02/2012 | 16 | Motion to Admit James George Warriner Pro Hac Vice. (Pro Hac Vice Fee $50, receipt number 0758-905067) by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Warriner, James) (Entered: 01/02/2012) |
| 01/03/2012 | 17 | ** TEXT ONLY ORDER ** <br> ORDER granting 16 Motion to Admit James George Warriner Pro Hac Vice. Signed by Magistrate Judge Stephen L. Crocker on 1/2/2012. (arw) (Entered: 01/03/2012) |
| 01/05/2012 | 18 | Motion to Admit Seth Gold Pro Hac Vice. (Pro Hac Vice Fee $50, receipt number 0758-907129) by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Gold, Seth) (Entered: 01/05/2012) |
| 01/05/2012 | 19 | ** TEXT ONLY ORDER ** <br> ORDER granting 18 Motion to Admit Seth Gold Pro Hac Vice. Signed by Magistrate Judge Stephen L. Crocker on 1/5/2012. (arw) (Entered: 01/05/2012) |
| 01/11/2012 | 20 | Amended Answer to 1 Complaint, COUNTERCLAIM against Essociate, Inc. by Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Peterson, James) Modified on 1/11/2012. (jaf) (Entered: 01/11/2012) |
| 01/11/2012 | 21 | Brief in Opposition by Defendants Azoogle.com, Inc., Epic Media Group, Inc. re: 8 Motion to Dismiss filed by Essociate, Inc. *Defendant's Response to Plaintiff's Motion to Dismiss Counterclaim re: Inequitable Conduct* (Peterson, James) (Entered: 01/11/2012) |
| 01/16/2012 | 22 | Notice by Defendants Azoogle.com, Inc., Epic Media Group, Inc. *of Compliance re: Initial Disclosures*. (Warriner, James) (Entered: 01/16/2012) |

| 01/17/2012 | 23 | Notice of Withdrawal of Motion by Plaintiff Essociate, Inc. re 8 MOTION TO DISMISS *Counterclaim Re Inequitable Conduct* filed by Essociate, Inc. (Linke, Derek) (Entered: 01/17/2012) |
| 02/10/2012 | 24 | Second Amended Answer to 1 Complaint, COUNTERCLAIM against Essociate, Inc. by Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Peterson, James) Modified on 2/13/2012. (jaf) (Entered: 02/10/2012) |
| 02/10/2012 | 25 | Proof of Standing to Sue on Claimed Patents by Plaintiff Essociate, Inc. (Attachments:<br># 1 Exhibit A - Patent Assignment to Essociate, Inc.,<br># 2 Exhibit B - U.S. Patent & Trademark Office Abstract of Title reflecting assignment and recordation) (Linke, Derek) (Entered: 02/10/2012) |
| 03/02/2012 | 26 | Motion to Deem Admissions by Essociate with Request for Expedited Consideration by Defendant Epic Media Group, Inc. Response due 3/9/2012. (Peterson, James) Modified on 3/29/2012 (llj). (Entered: 03/02/2012) |
| 03/02/2012 | 27 | Reply to Counterclaim by Plaintiff Essociate, Inc. (Linke, Derek) (Entered: 03/02/2012) |
| 03/06/2012 |  | Set Deadlines and Hearings re: 26 Motion to Deem Admission by Essociate with Request for Expedited Consideration. Telephone Motion Hearing set for 3/14/2012 at 12:30 PM before Magistrate Judge Stephen L. Crocker. Counsel for Defendant responsible for setting up the call to chambers at (608) 264-5153. (arw/slc) (Entered: 03/06/2012) |
| 03/09/2012 | 28 | Brief in Opposition by Plaintiff Essociate, Inc. re: 26 Motion to Deem Admission by Essociate with Request for Expedited Consideration filed by Defendant Epic Media Group, Inc. (Linke, Derek) Modified on 3/22/2012 (llj). (Entered: 03/09/2012) |
| 03/14/2012 | 29 | ** TEXT ONLY ORDER **<br>ORDER Denying 26 Motion to Deem Admissions by Essociate with Request for Expedited Consideration by Defendant Epic Media Group, Inc. Signed by District Judge Barbara B. Crabb on 3/14/2012. (voc) Modified on 3/29/2012 (llj). (Entered: 03/14/2012) |
| 03/20/2012 |  | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Motion Hearing held on 3/14/2012 [:10] (cak) (Entered: 03/20/2012) |
| 03/23/2012 | 30 | Joint Motion for Protective Order by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Plaintiff Essociate, Inc. (Attachments:<br># 1 Exhibit 1 - Proposed Protective Order) (Schortgen, Steven) (Entered: 03/23/2012) |
| 03/27/2012 | 31 | ** TEXT ONLY ORDER **<br>ORDER granting 30 Joint Motion for Protective Order by Plaintiff Essociate, Inc., Defendants Azoogle.com, Inc. and Epic Media Group, Inc. Signed by Magistrate Judge Stephen L. Crocker on 3/27/2012. (arw) (Entered: 03/27/2012) |
| 06/07/2012 | 32 | Unopposed Motion to Withdraw as Attorney by Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc., Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Attachments:<br># 1 Exhibit A - Declaration of Steven G. Schortgen - See also 35 ) (Schortgen, Steven) Requested attorney file declaration as separate docket entry on 6/8/2012. (jaf) (Entered: 06/07/2012) |
| 06/07/2012 | 33 | Motion to Withdraw as Attorney by Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc., Defendants Azoogle.com, Inc., Epic Media Group, Inc.. Response due 6/14/2012. (Peterson, James) (Entered: 06/07/2012) |
| 06/07/2012 | 34 | Declaration of James D. Peterson filed by Defendant Epic Media Group, Inc., Counter Claimant Epic Media Group, Inc. re: 33 Motion to Withdraw as Attorney (Peterson, James) (Entered: 06/07/2012) |
| 06/08/2012 | 35 | Declaration of Steven G. Schortgen filed by Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc., Defendants Azoogle.com, Inc., Epic Media Group, Inc. re: 32 Motion to Withdraw as Attorney, (Schortgen, Steven) (Entered: 06/08/2012) |
| 06/08/2012 | 36 | ORDER granting 32 Motion to Withdraw as Counsel, granting 33 Motion to Withdraw as Counsel. Defendants may have until 6/22/2012 to notify the court in writing whether they intend to obtain new counsel and what actions they are taking to do so. Signed by District Judge Barbara B. Crabb on 6/8/2012. (arw) (Entered: 06/08/2012) |
| 06/22/2012 | 37 | Response to 36 Order on Motion to Withdraw as Attorney by Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Graff, David) (Entered: 06/22/2012) |
| 07/02/2012 | 38 | Motion for Entry of Default as to Defendants Azoogle.com, Inc., Epic Media Group, Inc. by Plaintiff Essociate, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Attachments:<br># 1 Text of Proposed Order,<br># 2 Certificate of Service) (Linke, Derek) Modified on 7/3/2012. (arw) (Entered: 07/02/2012) |

| 07/02/2012 | 39 | Declaration of Derek Linke filed by Plaintiff Essoicate, Inc. re: 38 Motion for Entry of Default, (Linke, Derek) (Entered: 07/02/2012) |
|---|---|---|
| 07/03/2012 |  | Set/Reset Briefing Deadlines as to 38 Motion for Entry of Default as to All Defendants. Brief in Opposition due 7/10/2012. (voc/slc) (Entered: 07/03/2012) |
| 07/05/2012 | 40 | Notice of Appearance filed by James Donald Peterson for Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Peterson, James) (Entered: 07/05/2012) |
| 07/05/2012 | 41 | Motion for Status Conference re 37 Response to Order *Concerning New Counsel* by Defendants Azoogle.com, Inc., Epic Media Group, Inc.. Response due 7/12/2012. (Peterson, James) (Entered: 07/05/2012) |
| 07/05/2012 |  | Set Pretrial or Status Conference: Telephone Status Conference set for 7/18/2012 at 1:00 PM before Magistrate Judge Stephen L. Crocker. Counsel for Defendants responsible for setting up the call to chambers at (608) 264-5153. (arw) (Entered: 07/05/2012) |
| 07/05/2012 | 42 | Notice of Withdrawal of Motion by Plaintiff Essoicate, Inc. re: 38 Motion for Entry of Default as to Defendants Azoogle.com, Inc., Epic Media Group, Inc. filed by Essoicate, Inc. (Linke, Derek) (Entered: 07/05/2012) |
| 07/10/2012 | 43 | Joint Motion to Amend Scheduling Order re: 11 Pretrial Conference Order by Plaintiff Essoicate, Inc., Defendants Azoogle.com, Inc., Epic Media Group, Inc. (Peterson, James) Modified on 7/10/2012. (arw) (Entered: 07/10/2012) |
| 07/10/2012 | 44 | ** TEXT ONLY ORDER ** <br> The parties have filed a joint motion 43 to add about four months to all dates and deadlines in the schedule due to defendants' "acute financial difficulties." They propose a new trial date of June 17, 2013. That date is not available for a patent trial. The only trial date the court can offer is August 12, 2013. The parties have until July 13, 2012 to advise the court if they are willing to try this case on August 12, 2013. Otherwise, the February 25, 2013 trial date remains in place. Signed by Magistrate Judge Stephen L. Crocker on 7/10/2012. (arw) (Entered: 07/10/2012) |
| 07/12/2012 | 45 | Notice by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Plaintiff Essoicate, Inc. re: 44 Order on Motion for Miscellaneous Relief *Accepting August 2013 Trial Date*. (Peterson, James) (Entered: 07/12/2012) |
| 07/18/2012 |  | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Status Conference held on 7/18/2012 [:08] (cak) (Entered: 07/18/2012) |
| 07/18/2012 | 46 | AMENDED Scheduling Order: Dispositive Motions due 2/1/2013. Settlement Letters due 6/28/2013. Motions in Limine due 6/28/2013. Responses to Motions due 7/15/2013. Final Pretrial Conference set for 8/1/2013 at 04:00 PM. Jury Selection and Trial set for 8/12/2013 at 09:00 AM.. Signed by Magistrate Judge Stephen L. Crocker on 7/18/12. (krj) (Entered: 07/18/2012) |
| 07/19/2012 |  | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Status Conference held on 7/19/2012 [:05] (cak) (Entered: 07/19/2012) |
| 08/06/2012 | 47 | Motion to Amend 1 Complaint by Plaintiff Essoicate, Inc. Brief in Opposition due 8/13/2012. Brief in Reply due 8/20/2012. (Attachments: <br> # 1 Proposed Amended Complaint) (Linke, Derek) (Entered: 08/06/2012) |
| 08/06/2012 | 48 | Brief in Support of 47 Motion to Amend Complaint by Plaintiff Essoicate, Inc. (Linke, Derek) (Entered: 08/06/2012) |
| 08/06/2012 | 49 | Declaration of Derek Linke filed by Plaintiff Essoicate, Inc. re: 47 Motion to Amend Complaint (Attachments: <br> # 1 Exhibit A - January 4, 2012 Kinetic Social Press Release, <br> # 2 Exhibit B - Kinetic Social webpage, <br> # 3 Exhibit C - Delaware Secretary of State entity details report re Social Assets LLC, <br> # 4 Exhibit D - WHOIS domain name registration record for <kineticsocial.com>, <br> # 5 Exhibit E - USPTO trademark application record for KINETIC SOCIAL, <br> # 6 Exhibit F - public LinkedIn profile for Don Mathis, <br> # 7 Exhibit G - public LinkedIn profile for Rick Okin, <br> # 8 Exhibit H - public LinkedIn profile for Stephen McDermott, <br> # 9 Exhibit I - public LinkedIn profile for Paul Biondi, <br> # 10 Exhibit J - LinkedIn public profile for Charlie Nowaczek, <br> # 11 Exhibit K - public LinkedIn profile for Nate Armstrong, <br> # 12 Exhibit L - June 6, 2012 Performance Industry Insider article, <br> # 13 Exhibit M - June 6, 2012 letter from Accord Associates re Epic debt management, <br> # 14 Exhibit N - May 11, 2012 Performance Industry Insider article, <br> # 15 Exhibit O - June 15, 2012 judgment, |

| | | |
|---|---|---|
| | | # 16 Exhibit P - February 3, 2011 declaration of Nowaczek,<br># 17 Exhibit Q - Essociate's Rule 30(b)(6) deposition notice of Epic,<br># 18 Exhibit R - July 5, 2012 email from Derek Linke to James Peterson re Epic deposition,<br># 19 Exhibit S - New York Secretary of State status report for Social Assets LLC,<br># 20 Exhibit T - LinkedIn webpage for Epic Media Group) (Linke, Derek) (Entered: 08/06/2012) |
| 08/09/2012 | 50 | Unopposed Motion for Extension of Time *to File Response to Plaintiff's Motion to Amend the Complaint* by Counter Claimants Azoogle.com, Inc., Epic Media Group, Inc., Defendants Azoogle.com, Inc., Epic Media Group, Inc., Plaintiff Essociate, Inc., Counter Defendant Essociate, Inc. Motions referred to Magistrate Judge Stephen L. Crocker. (Peterson, James) (Entered: 08/09/2012) |
| 08/10/2012 | 51 | ** TEXT ONLY ORDER **<br>ORDER granting 50 Unopposed Motion for Extension of Time. Response to 47 Motion to Amend Complaint due 8/20/2012. Brief in Reply due 8/27/2012. Signed by Magistrate Judge Stephen L. Crocker on 8/9/2012. (arw) (Entered: 08/10/2012) |
| 08/20/2012 | 52 | Brief in Opposition by Defendants Azoogle.com, Inc., Epic Media Group, Inc. re: 47 Motion to Amend Complaint filed by Essociate, Inc. (Peterson, James) (Entered: 08/20/2012) |
| 08/20/2012 | 53 | Disregard. See docket entry 55 . Requested attorney file signed document on 8/21/2012. (jaf) (Entered: 08/20/2012) |
| 08/20/2012 | 54 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc. re: 47 Motion to Amend Complaint (Attachments:<br># 1 Exhibit A Email exchange between Mr. Peterson and Mr. Linke,<br># 2 Exhibit B July 18, 2012 email from Mr. Peterson to Mr. Linke) (Peterson, James) (Entered: 08/20/2012) |
| 08/21/2012 | 55 | Declaration of David Graff filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc. re: 47 Motion to Amend Complaint (Attachments:<br># 1 Exhibit A - FAS Labs, Inc. Corporate Structure) (Peterson, James) (Entered: 08/21/2012) |
| 08/27/2012 | 56 | Brief in Reply by Plaintiff Essociate, Inc. in Support of 47 Motion to Amend Complaint (Linke, Derek) (Entered: 08/27/2012) |
| 09/13/2012 | 57 | ORDER granting 47 Motion to Amend Complaint by Plaintiff Essociate, Inc. Signed by District Judge Barbara B. Crabb on 9/13/2012. (arw) (Entered: 09/13/2012) |
| 09/26/2012 | 58 | AMENDED COMPLAINT *for Patent Infringement* against Azoogle.com, Inc., Does 1-10, Epic Media Group, Inc., Social Assets LLC, filed by Essociate, Inc.. (Attachments:<br># 1 Exhibit A - U.S. Patent No. 6,804,660) (Linke, Derek) (Entered: 09/26/2012) |
| 09/26/2012 | 59 | Request for Issuance of Summons by Plaintiff Essociate, Inc.. (Attachments:<br># 1 Summons) (Linke, Derek) (Entered: 09/26/2012) |
| 09/27/2012 | 60 | Summons Issued as to Social Assets LLC. (arw) (Entered: 09/27/2012) |
| 09/27/2012 | 61 | Motion for Extension of Time to File Answer re 58 Amended Complaint by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Motions referred to Magistrate Judge Stephen L. Crocker. Response due 10/4/2012. (Peterson, James) (Entered: 09/27/2012) |
| 10/03/2012 | 62 | ** TEXT ONLY ORDER **<br>ORDER granting 61 Motion for Extension of Time to Answer by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Answer due 10/22/2012. Signed by Magistrate Judge Stephen L. Crocker on 10/3/2012. (arw) (Entered: 10/03/2012) |
| 10/22/2012 | 63 | ANSWER to Amended Complaint , *Affirmative Defenses* and COUNTERCLAIM against Essociate, Inc. by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. (Gregor, Jennifer) Modified on 10/23/2012. (jaf) (Entered: 10/22/2012) |
| 01/16/2013 | 64 | Motion for Court Determination of Location of Deposition *with request for expedited consideration* by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Response due 1/23/2013. (Peterson, James) (Entered: 01/16/2013) |
| 01/16/2013 | 65 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 64 Motion for Miscellaneous Relief (Attachments:<br># 1 Exhibit A January 3 email exchange,<br># 2 Exhibit B January 10 email exchange, |

| | | |
|---|---|---|
| | | # 3 Exhibit C January 11 email,<br># 4 Exhibit D Deposition Notice for Don Mathis,<br># 5 Exhibit E January 15 email exchange) (Peterson, James) (Entered: 01/16/2013) |
| 01/16/2013 | | Set Deadlines and Hearings re: 64 Motion for Court Determination of Location of Deposition *with request for expedited consideration*. Response due 1/17/2013 not later than 4:30 PM. Telephone Motion Hearing set for 1/18/2013 at 10:30 AM before Magistrate Judge Stephen L. Crocker. Counsel for Defendant responsible for setting up the call to chambers at (608) 264-5153. (arw) (Entered: 01/16/2013) |
| 01/17/2013 | 66 | Brief in Opposition by Plaintiff Essociate, Inc. re: 64 Motion for Miscellaneous Relief filed by Epic Media Group, Inc., Social Assets LLC, Azoogle.com, Inc. (Linke, Derek) (Entered: 01/17/2013) |
| 01/17/2013 | 67 | Declaration of John Du Wors filed by Plaintiff Essociate, Inc. re: 64 Motion for Miscellaneous Relief (Attachments:<br># 1 Exhibit A - 12/18/12 E-Mail,<br># 2 Exhibit B - 1/3/13 E-Mail,<br># 3 Exhibit C - Notice of Deposition,<br># 4 Exhibit D - Google Maps Transit Page) (Linke, Derek) Modified on 1/18/2013 (jaf). (Entered: 01/17/2013) |
| 01/18/2013 | 68 | ** TEXT ONLY ORDER **<br>On Wednesday afternoon, January 16, 2013, defendants filed a motion for "miscellaneous relief" asking the court to countermand on an expedited basis plaintiff's choice to hold a Chicago deposition in the Loop rather than near O'Hare. See 64 and 65 . The court allowed a next-day response and set a telephonic hearing for today (January 18, 2013) at 10:30 AM. Plaintiff filed its opposition yesterday afternoon outlining the hardship to plaintiff of shifting the deposition to O'Hare and questioning the hardship claimed by defendants of making the trip from O'Hare to the Loop. See 66 and 67 . Having carefully considered both sides' presentations, the motion for relief is DENIED without the need for further input at a hearing. As a former resident of and frequent visitor to Chicago, I am exasperatingly familiar with travel times on the JFK and the El from O'Hare to the Loop and back, and I take judicial notice that plaintiff's predictions on travel time are downright Panglossian. But this is plaintiff's deposition and its attorney has provided other valid reasons to maintain the status quo that this court is not inclined to second guess. This court takes a laissez-faire approach to discovery in civil cases between evenly matched parties and it is not about to micromanage the location of a deposition in the Chicago metropolitan area absent a much stronger showing than defendants have made here. Since this is not technically a discovery motion, the cost-shifting mechanism of Rule 37(a)(5) does not apply. Signed by Magistrate Judge Stephen L. Crocker on 1/18/2013. (arw) Modified on 1/28/2013 (llj). (Entered: 01/18/2013) |
| 02/01/2013 | 69 | Deposition of Richard Okin 30(b)(6) taken on October 2, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 70 | Deposition of Richard Okin, Continued 30(b)(6) taken on October 3, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 71 | Deposition of Sasenarine Rocky Appiah, 30(b)(6) taken on October 2, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 72 | Deposition of Sasenarine Rocky Appiah, Continued 30(b)(6) taken on October 3, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 73 | Deposition of Charles Nowaczek taken on October 4, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 74 | Deposition of Young Kim taken on October 5, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 75 | Deposition of Donald Mathis taken on January 21, 2013 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 76 | Deposition of Michael Landau taken on October 8, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 77 | Deposition of Michael Landau, Continued taken on October 9, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 78 | Deposition of Michael Landau, 30(b)(6) taken on October 9, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 79 | Deposition of Evan Horowitz taken on October 9, 2012 (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 80 | Transcript of Deposition of Michael Landau, (30) (b)(6) held on January 6, 2010 *in Essociate, Inc. v. Clickxchange Corp., et al. - U.S. C.D. Cal. Case No. SACV09-536 JVS (MLGx)* - See also 94 (Sealed Document) (Attachments:<br># 1 Exhibit 1 - U.S. Patent No. US 6,804,660 B2,<br># 2 Exhibit 2 - xmake.cgi code,<br># 3 Exhibit 3 - xmake.cgi Properties, |

|  |  |  |
|---|---|---|
|  |  | # 4 Exhibit 4 - 1-5-2010 Join Now! Members Entrance Free Tour Page, <br> # 5 Exhibit 5 - 1-5-2010 view-source:file://C:/Documents and..., <br> # 6 Exhibit 6 - index.html Properties, <br> # 7 Exhibit 7 - XPays - Terms and Conditions, <br> # 8 Exhibit 8 - XPays Performance Commerce Network Terms, <br> # 9 Exhibit 9 - XPays Performance Commerce Network Home, <br> # 10 Exhibit 10 - Xpays - Installation) (Peterson, James) Requested attorney file condensed version of transcript on 2/4/2013 (jaf). Modified on 2/5/2013 (jaf). (Entered: 02/01/2013) |
| 02/01/2013 | 81 | Expert Report of Peter Kent by Defendant Epic Media Group, Inc. (Sealed Document) (Attachments: <br> # 1 Exhibit 1 - Curriculum Vitae, <br> # 2 Exhibit 2 - Prior testimony list, <br> # 3 Exhibit 3 - '660 patent, <br> # 4 Exhibit 4 - Judge Selna's claim construction order, <br> # 5 Exhibit 5 - Essociate's claim terms and proposed constructions, <br> # 6 Exhibit 6 - Epic Media Group, Inc.'s claim terms and proposed constructions, <br> # 7 Exhibit 7 - 2010 Landau Dep Exhibit 7, <br> # 8 Exhibit 8 - 2010 Landau Dep Exhibit 8, <br> # 9 Exhibit 9 - 1-2-2010 letter from John DuWors to Thomas Lewry, <br> # 10 Exhibit 10 - claim chart, <br> # 11 Exhibit 11 - 2012 Landau Dep Exhibit 20, <br> # 12 Exhibit 12 - U.S. Patent No. 6,629,135 to Ross, filed 9-17-1998, <br> # 13 Exhibit 13 - License and Services Agreement, <br> # 14 Exhibit 14 - Ad Networks and Multi-Site Networks, <br> # 15 Exhibit 15 - US Patent No 5,991,740 to Messer, <br> # 16 Exhibit 16 - analysis chart, <br> # 17 Exhibit 17 - 2-26-2002 Petition to Make Special, <br> # 18 Exhibit 18 - Web page captures from www.clicktrade.com, <br> # 19 Exhibit 19 - U.S. Patent No. 6,243,750 to Verma, <br> # 20 Exhibit 20 - U.S. Patent No. 5,712,979, <br> # 21 Exhibit 21 - U.S. Patent No. 5,717,860) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 82 | Expert Report of Peter Kent, Responsive Expert Report of Peter Kent on Infringement of the Patent-in-Suit by Defendant Epic Media Group, Inc. (Sealed Document) (Attachments: <br> # 1 Exhibit A - Analysis of Edwards infringement opinion) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 83 | Declaration of PETER KENT re: 81 Expert Report of Peter Kent, 82 Responsive Expert Report of Peter Kent on Infringement of the Patent-in-Suit. (Peterson, James) Modified on 2/4/2013. (arw) (Entered: 02/01/2013) |
| 02/01/2013 | 84 | Expert Report of George Edwards, Ph.D. by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Sealed Document) (Attachments: <br> # 1 Exhibit Curriculum Vitae) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 85 | Expert Report of Michael Landau by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 86 | Expert Report of David Stern by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Sealed Document) (Attachments: <br> # 1 Exhibit A - curriculum vitae) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 87 | **MOTION FOR SUMMARY JUDGMENT** by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Brief in Opposition due 2/22/2013. Brief in Reply due 3/4/2013. (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 88 | Declaration of SASENARINE APPIAH filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Sealed Document) (Attachments: <br> # 1 Exhibit A - speeddate IO) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 89 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment. (Sealed Document) (Attachments: <br> # 1 Exhibit 1 - 12/13/2013 email exchange, <br> # 2 Exhibit 2 - Du Wors Response on Late Expert Report, <br> # 3 Exhibit 3 - 12/24/2012 email from plaintiff serving the expert reports, <br> # 4 Exhibit 4 - Exhibit 5 to the 1/6/2010 Landau Deposition, |

| | | |
|---|---|---|
| | | # 5 Exhibit 5 - U.S. Patent No. 6,804,660,<br># 6 Exhibit 6 - File history of the prosecution of U.S. Patent No. 6,804,660,<br># 7 Exhibit 7 - Essociate's Responses to 1st Requests for Admissions, 2nd Interrog, 2nd Requests for Prod,<br># 8 Exhibit 8 - Essociate's Responses to Epic Media's 1st Request for Production of Documents,<br># 9 Exhibit 9 - Essociate's Responses to 1st Requests for Admissions, 2nd Interrog, 2nd Requests for Prod,<br># 10 Exhibit 10 - Disregard; wrong document attached; to be refiled. 02/13/2012 Essociate's responses to Epic Media's 1st Set of Interrogatories,<br># 11 Exhibit 11 - 10/23/2012 Essociate's supp response to Epic Media's interrogatory No. 1,<br># 12 Exhibit 12 - 11/26/2012 Essociate's Response to Epic's 3rd Set of Interrogatories, 3rd Requests for Prod,<br># 13 Exhibit 13 - Ex. 29 to Landau 30(b)(6) - 10/19/04 Letter,<br># 14 Exhibit 14 - Ex. 31 to Landau 30(b)(6) - 10/25/04 Letter,<br># 15 Exhibit 15 - Ex. 32 to Landau 30(b)(6) - 11/3/04 Letter,<br># 16 Exhibit 16 - Ex. 33 to Landau 30(b)(6) - 11/23/04 Letter,<br># 17 Exhibit 17 - Ex. 34 to Landau 30(b)(6) - 11/30/04 Letter,<br># 18 Exhibit 18 - Ex. 35 to Landau 30(b)(6) - 5/25/05 E-Mail,<br># 19 Exhibit 19 - Ex. 36 to Landau 30(b)(6) - 5/19/05 E-Mail,<br># 20 Exhibit 20 - Docket Sheet Clickxchange,<br># 21 Exhibit 21 - PACER Essociate 830 case results,<br># 22 Exhibit 22 - Ex. 6 Appiah Deposition - Epic Media's Advertiser Implementation Guide) (Peterson, James) Modified on 2/4/2013. (jaf) Filer contacted court on 2/5/2013; wrong document attached as exhibit 10; will refile correct exhibit. (krj) (Entered: 02/01/2013) |
| 02/01/2013 | 90 | Proposed Findings of Fact filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Sealed Document) (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 91 | Declaration of David Graff filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Peterson, James) (Entered: 02/01/2013) |
| 02/01/2013 | 92 | Declaration of Young Kim filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Sealed Document) (Attachments:<br># 1 Exhibit 1 - Epic Direct version 2.0 investment schedule,<br># 2 Exhibit 2 - Dechert PowerPoint presentation,<br># 3 Exhibit 3 - Narrative summary of restructuring plan,<br># 4 Exhibit 4 - Epic Media Group, Inc. board resolutions,<br># 5 Exhibit 5 - Certificate of Formation of Social Assets LLC,<br># 6 Exhibit 6 - Certificate of Formation of Emerald Social LLC,<br># 7 Exhibit 7 - LLC Agreement of Social Assets LLC,<br># 8 Exhibit 8 - Certificate of Incorporation of FAS Labs, Inc.,<br># 9 Exhibit LLC Agreement of Emerald Social, LLC,<br># 10 Exhibit 10 - Epic Media Group, Inc. Written Consent of Series A Preferred Stockholders,<br># 11 Exhibit 11 - Diagram illustrating corporate structure,<br># 12 Exhibit 12 - Contribution and Assignment Agreement,<br># 13 Exhibit 13 - Written Consent of Emerald Social LLC,<br># 14 Exhibit 14 - Summary of intercompany balance,<br># 15 Exhibit 15 - Intercompany Service Agreement) (Peterson, James) (Entered: 02/01/2013) |
| 02/02/2013 | 93 | Brief in Support of 87 Motion for Summary Judgment by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Sealed Document) (Peterson, James) (Entered: 02/02/2013) |
| 02/04/2013 | 94 | Transcript of Deposition of Michael Landau, (30) (b)(6) held on January 6, 2010 in *Essociate, Inc. v. Clickxchange Corp., et al. - U.S. C.D. Cal. Case No. SACV09-536 JVS (MLGx); See exhibits 1-10 attached to Dkt. No. 80* (Sealed Document) (Peterson, James) (Entered: 02/04/2013) |
| 02/05/2013 | 95 | Exhibit 10 to 89 Declaration James D. Peterson filed by Epic Media Group, Inc., Social Assets LLC, Azoogle.com, Inc. *Essociate's Responses to Epic Media's 1st Set of Interrogatories* (Sealed Document) (Peterson, James) Modified on 2/6/2013. (jaf) (Entered: 02/05/2013) |
| 02/05/2013 | 96 | Corrected Proposed Findings of Fact filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Sealed Document) (Gregor, Jennifer) (Entered: 02/05/2013) |
| 02/22/2013 | 97 | Deposition of Richard Okin taken on October 2, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/22/2013 | 98 | Deposition of Rocky Appiah taken on October 2, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |

| 02/22/2013 | 99 | Deposition of Richard Okin (continued) taken on October 3, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
|---|---|---|
| 02/22/2013 | 100 | Deposition of Rocky Appiah (continued) taken on October 3, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/22/2013 | 101 | Deposition of Charles Nowaczek taken on October 4, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/22/2013 | 102 | Deposition of Young Kim taken on October 5, 2012 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/22/2013 | 103 | Deposition of Don Mathis taken on January 21, 2013 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/22/2013 | 104 | Deposition of Alex Zhardanovsky taken on February 11, 2013 (Sealed Document) (Linke, Derek) (Entered: 02/22/2013) |
| 02/23/2013 | 105 | Declaration of John Du Wors filed by Plaintiff Essociate, Inc. *in Support of Essociate's Opposition to Epic's Motion for Summary Judgment* re: 87 Motion for Summary Judgment (Sealed Document) (Attachments: # 1 Exhibit A - January 4, 2012 Press Release Issued by Social Assets, # 2 Exhibit B - "About Us" Page on Social Assets' Website, # 3 Exhibit C - Don Mathis LinkedIn Page, # 4 Exhibit D - Charlie Nowaczeck LinkedIn Page Page, # 5 Exhibit E - Rick Okin LinkedIn Page, # 6 Exhibit F - Epic's Advertiser Implementation Cheat Sheet and Guide, # 7 Exhibit G-1 - Epic's "offer_urls" Table Pages 1-570, # 8 Exhibit G-2 - Epic's "offer_urls" Table Pages 571-1140, # 9 Exhibit G-3 - Epic's "offer_urls" Table Pages 1141-1716, # 10 Exhibit H - Letter from Accord Associated Denver, Ltd., # 11 Exhibit I - Michael Landau's Expert Report, # 12 Exhibit J - George Edwards's Expert Report, # 13 Exhibit K - David Stern's Expert Report) (Linke, Derek) (Entered: 02/23/2013) |
| 02/23/2013 | 106 | Response to Proposed Findings of Fact filed by Plaintiff Essociate, Inc. re: 87 Motion for Summary Judgment (Sealed Document) (Linke, Derek) (Entered: 02/23/2013) |
| 02/23/2013 | 107 | Supplemental Proposed Findings of Fact filed by Plaintiff Essociate, Inc. re: 87 Motion for Summary Judgment (Sealed Document) (Linke, Derek) (Entered: 02/23/2013) |
| 02/23/2013 | 108 | Declaration of Michael Landau filed by Plaintiff Essociate, Inc. *in Support of Essociate's Opposition to Epic's Motion for Summary Judgment* re: 87 Motion for Summary Judgment (Sealed Document) (Attachments: # 1 Exhibit A - U.S. Patent No. 6,804,660, # 2 Exhibit B - Essociate Assignment, # 3 Exhibit C - October 19, 2004 Letter to Azoogle, # 4 Exhibit D - October 25, 2004 Letter to Essociate, # 5 Exhibit E - November 3, 2004 letter to Essociate, # 6 Exhibit F - November 23, 2004 letter to Azoogle, # 7 Exhibit G - November 30, 2004 letter to Essociate, # 8 Exhibit H - August 18, 2011 Email from Sagi Cezana to Michael Landau and Evan Horowitz, # 9 Exhibit I - October 18, 2010 Email from Craig Amell to Michael Landau and Evan Horowitz, # 10 Exhibit J - September 9, 2011 Email from Adam Winters to David Schlesinger) (Linke, Derek) (Entered: 02/23/2013) |
| 02/23/2013 | 109 | Brief in Opposition to Plaintiff Essociate, Inc. re: 87 Motion for Summary Judgment filed by Epic Media Group, Inc., Social Assets LLC, Azoogle.com, Inc. (Sealed Document) (Attachments: # 1 Exhibit A - February 6, 2012 Claim Construction) (Linke, Derek) (Entered: 02/23/2013) |
| 03/04/2013 | 110 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment (Attachments: # 1 Exhibit 23 - Essociate's Infringement Contentions) (Peterson, James) (Entered: 03/04/2013) |
| 03/04/2013 | 111 | Reply in Support of Proposed Findings of Fact filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment - *Defendants' Reply to Plaintiff Essociate, Inc.'s Response to Defendants' Statement of Proposed Findings of Fact in Support of Motion for Summary Judgment* (Sealed Document) (Peterson, James) (Entered: 03/04/2013) |
| 03/04/2013 | 112 | Response to Proposed Findings of Fact filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment - *Defendants' Response to Essociate's Supplemental Proposed Findings of Fact* (Sealed Document) (Peterson, James) (Entered: 03/04/2013) |

A0070

| | | |
|---|---|---|
| 03/04/2013 | 113 | Brief in Reply by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC in Support of 87 Motion for Summary Judgment (Sealed Document) (Peterson, James) (Entered: 03/04/2013) |
| 03/11/2013 | 114 | Summary Judgment Claims Chart by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 87 Motion for Summary Judgment. (Gregor, Jennifer) (Entered: 03/11/2013) |
| 03/12/2013 | 115 | Notice of Supplemental Authority by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re 87 MOTION FOR SUMMARY JUDGMENT . (Attachments: # 1 Exhibit Radio Systems Corp. v. Lalor Slip Opinion) (Peterson, James) (Entered: 03/12/2013) |
| 03/15/2013 | 116 | Redaction to 111 Reply in Support of Proposed Findings of Fact, by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Peterson, James) (Entered: 03/15/2013) |
| 03/15/2013 | 117 | Redaction to 112 Response to Proposed Findings of Fact, by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Peterson, James) (Entered: 03/15/2013) |
| 03/15/2013 | 118 | Redaction to 113 Brief in Reply by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC (Peterson, James) (Entered: 03/15/2013) |
| 05/10/2013 | 119 | Motion to Compel *Discovery Response* by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Motions referred to Magistrate Judge Stephen L. Crocker. Response due 5/17/2013. (Peterson, James) (Entered: 05/10/2013) |
| 05/10/2013 | 120 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 119 Motion to Compel (Peterson, James) (Entered: 05/10/2013) |
| 05/13/2013 | | Set Deadlines and Hearing re: 119 Motion to Compel *Discovery Response*. Telephone Motion Hearing set for 5/22/2013 at 10:00 AM before Magistrate Judge Stephen L. Crocker. Counsel for Defendant responsible for setting up the call to chambers at (608) 264-5153. (arw) (Entered: 05/13/2013) |
| 05/17/2013 | 121 | ORDER granting in part and denying in part 87 Motion for Summary Judgment by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. The motion is granted with respect to plaintiff's claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15 and 28 of U.S. Patent No. 6,804,660. Defendants' counterclaims asserting invalidity and unenforceability are dismissed without prejudice. Signed by District Judge Barbara B. Crabb on 5/17/2013. (arw) (Entered: 05/17/2013) |
| 05/20/2013 | 122 | JUDGMENT entered in favor of Defendants Azoogle.com, Inc., Epic Media Group, Inc. and Social Assets LLC granting summary judgment and dismissing plaintiff's claim that defendants infringe claims 1, 3, 6, 10, 13, 14, 15 and 28 of U.S. Patent No. 6,804,660. (PAO) (arw) (Entered: 05/20/2013) |
| 05/21/2013 | 123 | Report on Filing of Patent or Trademark Action. Copy provided to the US Patent and Trademark Office electronically. (arw) (Entered: 05/21/2013) |
| 06/10/2013 | 124 | NOTICE OF APPEAL - FEDERAL CIRCUIT by Plaintiff Essociate, Inc. as to 122 Judgment, 121 Order on Motion for Summary Judgment,. Filing fee of $ 455, receipt number 0758-1188550 paid. (Attachments: # 1 Federal Circuit Appeal Information Sheet) (Linke, Derek) (Entered: 06/10/2013) |
| 06/11/2013 | 125 | Transmission of Notice of Appeal, Appeal Information Sheet, Order, Judgment and Docket Sheet re 124 Notice of Appeal to the US Court of Appeals for the Federal Circuit. (mmo) (Entered: 06/11/2013) |
| 06/12/2013 | | USCA Case Number 13-1446 for 124 Notice of Appeal by Essociate, Inc. (arw) (Entered: 06/12/2013) |
| 08/23/2013 | 126 | Bill of Costs by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC. Motions referred to Magistrate Judge Stephen L. Crocker. Objection to Bill of Costs due 9/3/2013. Brief in Support to Bill of Costs due 9/12/2013. Brief in Reply in Opposition to Bill of Costs due 9/17/2013. (Peterson, James) (Entered: 08/23/2013) |
| 08/23/2013 | 127 | Declaration of James D. Peterson filed by Defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC re: 126 Bill of Costs, (Attachments: # 1 Exhibit 1 - Summary, # 2 Exhibit 2 - Deposition invoices, # 3 Exhibit 3 - G & K copier report, # 4 Exhibit 4 - Alphagraphics invoices, # 5 Exhibit 5 - Patent file history invoice) (Peterson, James) (Entered: 08/23/2013) |
| 09/03/2013 | 128 | Objection to Bill of Costs by Plaintiff Essociate, Inc., Counter Defendants Essociate, Inc., Essociate, Inc. re: 126 Bill of Costs filed by Epic Media Group, Inc., Social Assets LLC, Azoogle.com, Inc. (Attachments: # 1 Certificate of Service) (Linke, Derek) (Entered: 09/03/2013) |

ECF Western District of Wisconsin                                        https://ecf.wiwd.uscourts.gov/cgi-bin/DktRpt.pl?515084810517368-L_1_0-1

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 09/11/2013 14:52:41 | | |
| **PACER Login:** | nn0039 | **Client Code:** | centerpoint |
| **Description:** | Docket Report | **Search Criteria:** | 3:11-cv-00727-bbc |
| **Billable Pages:** | 19 | **Cost:** | 1.90 |

A0072

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ESSOCIATE, INC., | |
| Plaintiff, | **CASE NO. 11-cv-727** |
| v. | **DEMAND FOR JURY TRIAL** |
| AZOOGLE.COM, INC., and EPIC MEDIA GROUP, INC., | |
| Defendants. | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Essociate, Inc. hereby alleges for its complaint against defendants

Azoogle.com, Inc. and Epic Media Group, Inc. (together, "Defendants") on personal

information as to Defendants' own activities, and upon information and belief as to the

activities of others, as follows:

### NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of

the United States, Title 35 of the United States Code.

### PARTIES

2.      Plaintiff ESSOCIATE, INC. is a Delaware corporation with its principal

place of business in California.

3.      Essociate is the owner of U.S. Patent No. 6,804,660 ("the '660 Patent"),

entitled "System Method and Article of Manufacture for Internet Based Affiliate

Pooling", issued October 12, 2004 (copy attached as Exhibit A).

4.     Essociate is the owner of the entire right, title, and interest in the '660 Patent and has standing to sue for all past, present, and future infringement of the '660 Patent.

5.     Upon information and belief, Defendant Epic Media Group, Inc. is a Delaware corporation with its principal business address at 60 Columbia Way #310, Markham, Ontario  L3R0C9, Canada. Upon information and belief, Epic Media Group, Inc. transacts business and has provided to customers in this judicial district and throughout the State of Wisconsin products and/or services that infringe and/or induce infringement of, and/or contribute to infringement of, one or more claims of the '660 Patent.

6.     Upon information and belief, Defendant Azoogle.com, Inc. is an Ontario, Canada corporation with its principal business address at 60 Columbia Way #310, Markham, Ontario  L3R0C9, Canada. Upon information and belief, Azoogle.com, Inc. transacts business and has provided to customers in this judicial district and throughout the State of Wisconsin products and/or services that infringe and/or induce infringement of, and/or contribute to infringement of, one or more claims of the '660 Patent.

7.     Upon information and belief, Defendants manufacture, import into the United States, sell, offer for sale, and/or use software products that infringe one or more claims of the '660 Patent. Upon information and belief, such software products are offered for sale to customers in this judicial district and throughout the State of Wisconsin.

## JURISDICTION AND VENUE

8.      This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      Personal jurisdiction over Defendants is proper in this court. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c) and/or 1400(b).

## ESSOCIATE'S BUSINESS AND PATENTED TECHNOLOGY

10.      Michael Landau and Evan Horowitz founded Essociate to develop and provide to customers new and more effective affiliate marketing products and services.

11.      As a testament to the innovations of Messrs. Landau and Horowitz, they were issued the '660 Patent for the novel affiliate marketing technology they invented.

12.      Essociate owns the '660 patent and provides services to many customers throughout the United States based on the technology disclosed in the '660 Patent.

13.      Essociate is still owned and controlled by Messrs. Landau and Horowitz.

## DEFENDANTS' INFRINGEMENT OF THE '660 PATENT

14.      Upon information and belief, Defendants have infringed and continue to infringe the '660 Patent under 35 U.S.C. § 271(a) by making, using, modifying, upgrading, performing quality control, and providing support for their affiliate marketing software and/or hardware and/or other products and/or services provided by means of that software and/or hardware.

15.      Upon information and belief, Defendants have also been and are directly infringing the '660 Patent under 35 U.S.C. § 271(a) by selling, offering for sale, and/or importing into the United States affiliate marketing software and/or other products and/or services that infringe one or more claims of the '660 patent.

16.     Upon information and belief, Defendants' customers and other users of Defendants' software and other products and the services provided by means of that software and/or hardware and other products, have been and are directly infringing one or more claims of the '660 Patent under 35 U.S.C. § 271(a).

17.     Upon information and belief, Defendants have been and are actively inducing infringement of one or more claims of the '660 Patent under 35 U.S.C. § 271(b) by providing to customers, including customers in this judicial district, their affiliate marketing software and other products, as well as services provided by means of their affiliate marketing software and other products, along with instructions and directions that result in the use of the methods, computer programs, and systems disclosed and claimed in the '660 Patent. On information and belief, Defendants knew, or should have known, that their customers and other users of their services would use Defendants' affiliate marketing software and other products to infringe the '660 Patent and intended such infringement.

18.     Upon information and belief, Defendants have been and are contributorily infringing one or more claims of the '660 Patent under 35 U.S.C. § 271(c) by making, selling, and/or offering for sale to customers, including customers in this judicial district, their affiliate marketing software and other products, as well as services provided by means of their affiliate marketing software and other products. Defendants' affiliate marketing software and other products are each a material part of the invention claimed in the '660 patent, are not staple articles or commodities of commerce, and have no substantial non-infringing use. Upon information and belief, Defendants knew, or should

have known, that their affiliate marketing software and other products were especially made or adapted for an infringing use.

19.     Defendants' infringement, contributory infringement, and inducement to infringe the '660 Patent has been willful and has deliberately injured and will continue to injure Essociate unless and until the Court enters a preliminary and permanent injunction prohibiting further infringement and, specifically, enjoining further manufacture, use, importation, sale, and/or offer for sale of products that infringe the '660 Patent.

<div align="center">

**CAUSE OF ACTION**
**INFRINGEMENT OF U.S. PATENT NO. 6,804,660**

</div>

20.     Defendants have infringed and are infringing the '660 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services that infringe one or more claims of the '660 Patent.

21.     Defendants' infringement of the '660 Patent is willful and deliberate, justifying an increase of damages of up to three times under 35 U.S.C. § 284.

22.     Defendants' infringement of the '660 Patent is exceptional and entitles Essociate to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

23.     Defendants' acts of infringement have caused damage to Essociate, and Essociate is entitled to recover from Defendants compensation as a result of Defendants' wrongful acts in an amount subject to proof at trial, injunctive relief, and such other relief as may be appropriate.

<div align="center">

**DEMAND FOR JURY TRIAL**

</div>

24.     Essociate demands a trial by jury under Federal Rule of Civil Procedure 38(b).

**RELIEF REQUESTED**

WHEREFORE, Essociate asks this Court to enter judgment against Defendants and against Defendants' subsidiaries, affiliates, agents, servants, and employees and all persons in active concert or participation with them, granting the following relief:

A.    A judgment or order declaring that Defendants have infringed, induced others to infringe, and/or contributorily infringed the '660 Patent;

B.    A judgment, order, or award of damages adequate to compensate Essociate for Defendants' infringement of the '660 Patent, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory, together with prejudgment interest from the date infringement of the '660 Patent began;

C.    Preliminary and permanent injunctions prohibiting further infringement, inducement, and contributory infringement of the '660 Patent;

D.    A finding that this case is exceptional and an award to Essociate of its attorneys' fees and costs as provided by 35 U.S.C. § 285;

E.    Increased damages as permitted by 35 U.S.C. § 284, together with prejudgment interest; and

F.    Such other and further relief as this Court or a jury may deem proper and just.

Dated October 21, 2011.          Respectfully Submitted,


NEWMAN DU WORS LLP


/s/ Derek Linke
Derek A. Newman
Derek Linke
John Du Wors
1201 Third Avenue, Suite 1600
Seattle, WA 98101
Telephone:    (206) 274-2800
Facsimile:    (206) 274-2801
*derek@newmanlaw.com*
*linke@newmanlaw.com*
*john@newmanlaw.com*

Attorneys for Plaintiff Essociate, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ESSOCIATE, INC., | |
| Plaintiff, | **CASE NO. 11-cv-727-bbc** |
| v. | **DEMAND FOR JURY TRIAL** |
| AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC., SOCIAL ASSETS LLC d/b/a KINETIC SOCIAL, and DOES 1-10; | |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff Essociate, Inc. hereby alleges for its First Amended Complaint against defendants Azoogle.com, Inc., Epic Media Group, Inc., Social Assets LLC doing business as Kinetic Social, and Does 1-10, on personal information as to Plaintiff's own activities, and upon information and belief as to the activities of others, as follows:

**NATURE OF THE ACTION**

1.     Essociate is suing Azoogle and Epic for patent infringement under 35 U.S.C. § 271.

2.     Essociate is suing Social Assets LLC because it is Epic's successor.

3.     Essociate is suing Social Assets and Does 1–10 because they are Epic's alter egos.

4.     Essociate is also suing Epic, Social Assets, and Does 1–10 because Epic fraudulently transferred and continues to fraudulently transfer assets to Social Assets and Does 1-10 in an attempt to defraud Epic's creditors, including Essociate.

**PARTIES**

5.      Plaintiff Essociate, Inc. is a Delaware corporation with its principal place of business in California.

6.      Essociate is the owner of U.S. Patent No. 6,804,660 ("the '660 Patent"), entitled "System Method and Article of Manufacture for Internet Based Affiliate Pooling", issued October 12, 2004 (copy attached as Exhibit A).

7.      Essociate is the owner of the entire right, title, and interest in the '660 Patent and has standing to sue for all past, present, and future infringement of the '660 Patent.

8.      Upon information and belief, Defendant Epic Media Group, Inc. is a Delaware corporation with its principal business address at 512 Seventh Avenue, Twelfth Floor, New York, New York 10018. Upon information and belief, Epic Media Group, Inc. transacts business and has provided to customers in this judicial district and throughout the State of Wisconsin products and/or services that infringe and/or induce infringement of, and/or contribute to infringement of, one or more claims of the '660 Patent.

9.      Upon information and belief, Defendant Azoogle.com, Inc. is an Ontario, Canada corporation with its principal business address at 60 Columbia Way #310, Markham, Ontario  L3R0C9, Canada. Upon information and belief, Azoogle.com, Inc. transacts business and has provided to customers in this judicial district and throughout the State of Wisconsin products and/or services that infringe and/or induce infringement of, and/or contribute to infringement of, one or more claims of the '660 Patent.

10.     Upon information and belief, Defendants Epic and Azoogle have and/or continue to manufacture, import into the United States, sell, offer for sale, and/or use online affiliate network marketing software that infringes one or more claims of the '660 Patent including, without limitation, claims 1, 10, 15, 23, 28, and 36. Upon information and belief, such software products have been offered and are offered for sale to customers in this judicial district and throughout the State of Wisconsin.

11.     Upon information and belief, Defendant Social Assets LLC is a Delaware limited liability company with its principal business address in New York, New York. Upon information and belief, Social Assets LLC is a mere continuation and alter ego of Epic Media Group, and Epic Media Group and Social Assets LLC collaborated in one or more fraudulent transfers of assets between Epic Media and Social Assets for the purpose of preventing creditors, including Essociate, from collecting funds from Epic Media. Consequently, Social Assets LLC is liable for Epic Media's infringement of the '660 Patent as Epic Media's successor.

12.     Essociate is unaware of the true names and capacities of the defendants identified as Does 1-10 and therefore sues those defendants under fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named defendants is the alter ego of Epic, is responsible for the fraudulent transfer of Epic's assets to Social Assets, and/or is itself the transferee of fraudulently-transferred Epic assets. These fictitiously named defendants, along with Epic, Azoogle, and Social Assets, are referred to collectively as "Defendants".

### JURISDICTION AND VENUE

13.    This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14.    Personal jurisdiction over Defendants is proper in this court. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c) and/or 1400(b).

### ESSOCIATE'S BUSINESS AND PATENTED TECHNOLOGY

15.    Michael Landau and Evan Horowitz founded Essociate to develop and provide to customers new and more effective affiliate marketing products and services.

16.    As a testament to the innovations of Messrs. Landau and Horowitz, they were issued the '660 Patent for the novel affiliate marketing technology they invented.

17.    Essociate owns the '660 patent and provides services to many customers throughout the United States based on the technology disclosed in the '660 Patent.

18.    Essociate is still owned and controlled by Messrs. Landau and Horowitz.

### DEFENDANTS' INFRINGEMENT OF THE '660 PATENT

19.    Upon information and belief, Defendant Epic and Azoogle have infringed and continue to infringe the '660 Patent under 35 U.S.C. § 271(a) by making, using, modifying, upgrading, performing quality control, and providing support for their affiliate marketing software and/or hardware and/or other products and/or services provided by means of that software and/or hardware. The accused products and services include the online affiliate marketing network operated by Defendants at <<http://www.epicdirectnetwork.com>> and previously at <<http://www.azoogleads.com>>.

20.    Upon information and belief, Defendants have also been and are directly infringing the '660 Patent under 35 U.S.C. § 271(a) by selling, offering for sale, and/or importing into the United States affiliate marketing software and/or other products and/or services that infringe one or more claims of the '660 patent.

21.    Upon information and belief, Defendants' customers and other users of Defendants' software and other products and the services provided by means of that software and/or hardware and other products, have been and are directly infringing one or more claims of the '660 Patent under 35 U.S.C. § 271(a).

22.    Upon information and belief, Defendants have been and are actively inducing infringement of one or more claims of the '660 Patent under 35 U.S.C. § 271(b) by providing to customers, including customers in this judicial district, their affiliate marketing software and other products, as well as services provided by means of their affiliate marketing software and other products, along with instructions and directions that result in the use of the methods, computer programs, and systems disclosed and claimed in the '660 Patent. On information and belief, Defendants knew, or should have known, that their customers and other users of their services would use Defendants' affiliate marketing software and other products to infringe the '660 Patent and intended such infringement.

23.    Upon information and belief, Defendants have been and are contributorily infringing one or more claims of the '660 Patent under 35 U.S.C. § 271(c) by making, selling, and/or offering for sale to customers, including customers in this judicial district, their affiliate marketing software and other products, as well as services provided by means of their affiliate marketing software and other products. Defendants' affiliate

marketing software and other products are each a material part of the invention claimed

in the '660 patent, are not staple articles or commodities of commerce, and have no

substantial non-infringing use. Upon information and belief, Defendants knew, or should

have known, that their affiliate marketing software and other products were especially

made or adapted for an infringing use.

24.    Defendants' infringement, contributory infringement, and inducement to

infringe the '660 Patent has been willful and has deliberately injured and will continue to

injure Essociate unless and until the Court enters a preliminary and permanent injunction

prohibiting further infringement and, specifically, enjoining further manufacture, use,

importation, sale, and/or offer for sale of products that infringe the '660 Patent.

### FIRST CAUSE OF ACTION
### INFRINGEMENT OF U.S. PATENT NO. 6,804,660

25.    Essociate herein incorporates by reference Paragraphs 1–23.

26.    Defendants have infringed and are infringing the '660 Patent by making,

using, offering for sale, and selling in the United States, without authority, products and

services that infringe one or more claims of the '660 Patent.

27.    Defendants' infringement of the '660 Patent is willful and deliberate,

justifying an increase of damages of up to three times under 35 U.S.C. § 284.

28.    Defendants' infringement of the '660 Patent is exceptional and entitles

Essociate to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C.

§ 285.

29.    Defendants' acts of infringement have caused damage to Essociate, and

Essociate is entitled to recover from Defendants compensation as a result of Defendants'

wrongful acts in an amount subject to proof at trial, injunctive relief, and such other relief

as may be appropriate.

## SECOND CAUSE OF ACTION
## SUCCESSOR LIABILITY
### (Against Social Assets, LLC)

30.    Essociate herein incorporates by reference Paragraphs 1–29.

31.    Social Assets is a successor to Epic.

32.    Epic has committed the tort of patent infringement as alleged herein.

33.    Social Assets is liable for Epic's torts because: Social Assets is a mere

continuation of Epic, or in the alternative, the transaction in which Epic transferred assets

to Social Assets was entered into fraudulently to escape Epic's liability for Epic's torts.

34.    Therefore, Social Assets is liable as a successor for Epic's torts, including

its infringement of Essociate's '660 Patent.

## THIRD CAUSE OF ACTION
## ALTER EGO LIABILITY
### (Against Defendants Epic Media Group, LLC, Social Assets, LLC, and Does 1–10)

35.    Essociate herein incorporates by reference Paragraphs 1–34.

36.    Social Assets and Does 1–10 control Epic to such a degree that Epic has

become a mere instrumentality for Social Assets and Does 1–10.

37.    Social Assets and Does 1–10 have committed fraud through Epic by

transferring assets and corporate opportunities away from Epic at a time when Epic is

undercapitalized in an attempt to defraud Epic's creditors.

38.    Social Assets and Does 1–10 have thereby caused unjust loss or injury to

Essociate.

39.    Therefore, Social Assets and Does 1–10 are alter egos of Epic and are

liable for Epic's torts, including its infringement of Essociate's '660 Patent.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT TRANSFER**
**(Against Defendants Epic Media Group, LLC, Social Assets, LLC, and Does 1–10)**

40.    Essociate herein incorporates by reference Paragraphs 1–39.

41.    Epic has transferred and is continuing to transfer assets to Social Assets and Does 1–10.

42.    Those transfers were and are fraudulent under 6 Del. C. § 1304(a)(1) because they were made with the actual intent to hinder, delay, or defraud Essociate and other creditors of Epic.

43.    That actual intent is demonstrated by, without limitation, the following factors: (1) Epic's transfers to Social Assets and Does 1–10 were to insiders, namely the former executive management of Epic; (2) the transfers were concealed; (3) shortly before the transfers was made, Epic had been sued by Essociate for patent infringement; (4) the consideration Epic received for the transfers was not reasonably equivalent to the value of the assets transferred to Social Assets and Does 1–10; (5) Epic was insolvent either before or shortly after the transfers were made; and (6) the transfers were made either shortly before or shortly after a substantial debt was incurred by Epic.

44.    Additionally those transfers were and are fraudulent under 6 Del. C. § 1304(a)(2)(a) because Epic made the transfers without receiving a reasonably equivalent value in exchange for the transfer, and Epic was engaged in business for which Epic's remaining assets were unreasonably small in relation to that business.

45.    Additionally those transfers were and are fraudulent under 6 Del. C. § 1304(a)(2)(b) because Epic made the transfers without receiving a reasonably equivalent value in exchange for the transfer, and Epic intended to occur, or believed or

reasonably should have believed that it would incur, debts beyond Epic's ability to pay those debts as they became due.

## DEMAND FOR JURY TRIAL

46.     Essociate demands a trial by jury under Federal Rule of Civil Procedure 38(b).

## RELIEF REQUESTED

WHEREFORE, Essociate asks this Court to enter judgment against Defendants and against Defendants' subsidiaries, affiliates, agents, servants, and employees and all persons in active concert or participation with them, granting the following relief:

A.     A judgment or order declaring that Defendants have infringed, induced others to infringe, and/or contributorily infringed the '660 Patent;

B.     A judgment, order, or award of damages adequate to compensate Essociate for Defendants' infringement of the '660 Patent, based on lost sales, lost profits, price erosion, loss of market share, or any other applicable theory, together with prejudgment interest from the date infringement of the '660 Patent began;

C.     Preliminary and permanent injunctions prohibiting further infringement, inducement, and contributory infringement of the '660 Patent;

D.     A finding that this case is exceptional and an award to Essociate of its attorneys' fees and costs as provided by 35 U.S.C. § 285;

E.     Increased damages as permitted by 35 U.S.C. § 284, together with prejudgment interest;

F.      A judgment or order declaring that Social Assets is liable for Epic's infringement as its successor;

G.      A judgment or order declaring that Social Assets and Does 1–10 are Epic's alter egos and therefore liable for Epic's torts, including patent infringement;

H.      A judgment or order declaring that Epic has fraudulently transferred assets to Social Assets and Does 1–10 and avoiding such transfers to the extent necessary to satisfy Essociate's claims; and

I.      Such other and further relief as this Court or a jury may deem proper and just.


Dated September 26, 2012.              Respectfully Submitted,


NEWMAN DU WORS LLP


/s/ Derek Linke
Derek A. Newman
Derek Linke
John Du Wors
1201 Third Avenue, Suite 1600
Seattle, WA  98101
Telephone:     (206) 274-2800
Facsimile:      (206) 274-2801
*derek@newmanlaw.com*
*linke@newmanlaw.com*
*john@newmanlaw.com*

Attorneys for Plaintiff Essociate, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

ESSOCIATE, INC.

        Plaintiff,

    v.

AZOOGLE.COM, INC., EPIC MEDIA GROUP,
INC., SOCIAL ASSETS LLC d/b/a KINETIC
SOCIAL, and DOES 1–10,

        Defendants.

**CASE NO. 11-cv-727-bbc**

**EXPERT REPORT OF GEORGE EDWARDS, Ph.D**

I, George Edwards, the undersigned, declare:

**Qualifications**

I am a Computer Scientist at Quandary Peak Research, Inc. and an Adjunct

Instructor at the University of Southern California. I formerly worked as a research

scientist, software architect, software engineer, and programmer at International Business

Machines Corp., The Boeing Company, Intelligent Systems Technology Inc., the

University of Southern California, and Vanderbilt University. I received my PhD in

Computer Science from the University of Southern California in 2010. I also hold a MS

in Computer Science from USC, received in 2006, and a BS in Computer Science from

Vanderbilt University, which I received in 2003.

I have authored over thirty scholarly journal articles, magazine articles,

conference papers, and book chapters on varied topics related to the design and

architecture of distributed software, including websites and web-based applications. I

have delivered numerous invited lectures, seminars, and technology demonstrations

related to the design and architecture of distributed software, including web-based

applications, for university courses, research symposia, conferences, workshops, and

industry events in the field of computer science. I have also served as a reviewer,

committee member, or panelist for over a dozen computer science journals, magazines,

and conferences. I am also listed as a co-inventor on a pending application for a software

technology patent.

During my career as a software engineer and research scientist, I have gained

extensive experience analyzing the structure and behavior of software systems and

conducting code reviews and design audits of distributed systems, including web-based

applications. I have analyzed digital video recording software, automated financial

trading software, medical planning software, and mobile device software to determine the

quality of the software, the level of effort required to create the software, the causes of

failures in the software, and the functions performed by the software.

The publications I have authored in the previous ten years are listed on my

*curriculum vitae* attached as Exhibit A hereto. I have not served as an expert at trial or by

deposition during the previous four years.

### Opinions

I have been retained to provide an expert assessment of the extent to which

Defendant Epic Media Group, Inc, formerly known as Azoogle.com, Inc., ("Epic"), has

infringed plaintiff Essociate, Inc.'s U.S. Patent No. 6,804,660 (the " '660 patent").

I have reviewed the '660 Patent. I have also reviewed the following materials:

Epic's Advertiser Implementation Cheat Sheet and Advertiser Implementation Guide

(Bates No. EPIC003212–EPIC003228), Essociate's Supplemental Answers to Epic's

First Interrogatories and Ex. A thereto (the "Contentions"), the transcript of the October

2, 2012 and October 3, 2012 deposition of Sasenarine "Rocky" Appiah and deposition

Exhibit 4 thereto, the file titled offer_urls.csv, and the file titled azoogle-offer_urls.sql.

Based on my review of the '660 Patent and the other materials listed above, and

my experience as described above, it is my opinion that the Contentions are sound and

that Epic has infringed and is infringing the claims listed in the infringement contentions,

for the reasons listed in the Contentions. Without limitation, the infringed claims include

independent claims 1, 15, and 28.

Claim 1 of the '660 Patent is infringed by Epic's affiliate marketing service (the

"Service") for at least the following reasons:

The Service performs a method to provide Virtual Affiliates to an existing target

Merchant affiliate system. The Service allows an affiliate system operated directly or

indirectly by a merchant, in which a group of affiliate webmasters direct web traffic to

the merchant, to receive web traffic from webmasters who are in an affiliate pool of the

Service but who are not affiliates in the merchant's affiliate system. The webmasters

direct traffic to the merchant affiliate system by placing links to merchant's websites on

the webmasters' websites (*See* Contentions, Att. 1). The links are created such that the

merchant affiliate system identifies the web traffic received through the link as

originating from a webmaster in the affiliate pool of the Service. The Service does this by

performing the following steps:

The Service performs a data setup operation that configures the existing target

affiliate system, operated directly or indirectly by a merchant, to receive referrals from a

webmasters in the affiliate pool of the Service. One instance of an existing target

merchant affiliate system so configured by the Service is operated by SpeedDate.com.

SpeedDate.com is a merchant who operates an affiliate system. Information describing

the SpeedDate.com target affiliate system was available at

< http://www.speeddate.com/apps/site/views/mp/affiliates.php >. (*See* Contentions, Att.

3.)

      Webmasters who elect to join an affiliate pool of the Service sign up to join the

Epic virtual affiliate network. These webmasters constitute an affiliate pool of source

Webmasters. A subset of the webmasters in the Epic virtual affiliate network

("Participating Webmasters") sign up to send referrals to the target affiliate system (e.g.,

the "SpeedDate.com" target affiliate system). The Participating Webmasters act as a pool

of Webmasters who refer web traffic to an existing target Merchant affiliate system. The

Epic virtual affiliate network, which includes an affiliate pool of source Webmasters, was

described at <http://www.epicdirectnetwork.com/>. (*See* Contentions, Att. 1.) According

to my assessment, the Epic virtual affiliate network includes a database named

AzoogleAds, and this database includes a table known as the offer URL table. Also

according to my assessment, the offer URL table contains the links, known as offer URLs

or landing page URLs, used to refer web traffic to advertisers, including merchant

affiliate systems, such that the target affiliate system identifies the web traffic received

through the link as originating from the Epic virtual affiliate network. (*See* Deposition of

Rocky Appiah, 32:7-35:13.)

      The Service structures the software that operates the Epic virtual affiliate network

so that the target Merchant affiliate system (*e.g.* "SpeedDate.com") recognizes a

transaction between the merchant affiliate system and a participant in the Epic virtual

affiliate network as originating from a source Webmaster in an affiliate pool of the

Service. As shown through the performance of the various claimed steps below, in one example, SpeedDate.com recognizes web traffic referred by a webmaster in the Epic virtual affiliate network as originating from a source Webmaster in the Service's affiliate pooling system. The target affiliate system may recognize the web traffic as originating from the Epic virtual affiliate system through the use of an identifier embedded or encoded in the offer URL. (*Id.*, 22:11-22:18.)

The Service assigns a source Webmaster unique identifier ("SID"), which is a unique identifying code assigned to a webmaster within an affiliate pool of source webmasters, for each Participating Webmaster in Epic's affiliate network. Epic's Advertiser Implementation Guide explains that Epic's affiliates (*i.e.* "Participating Webmasters") each have a unique numeric id (an "Epic affiliate id").

The Service uses Epic affiliate ids for various purposes. Each URL the Service provides to its Participating Webmasters includes a unique id specific to that link which includes "pertinent information such as the affiliate id, the offer id, and the traffic type." (*See* Advertiser Implementation Guide at 7.) The unique id specific to the link allows the Service to identify information including the affiliate id. (*See* Deposition of Rocky Appiah, 18:2-18:10.)

For example, to allow Participating Webmasters in the Epic virtual affiliate system to refer web traffic to the SpeedDate.com affiliate network, the Service provided the URL <http://x.azjmp.com/4b4Gq?sub=12268> (the "Sample Epic URL") to a particular Participating Webmaster for placement on a website. This URL was found on the website appearing as Attachment 4 to the Contentions. In this example, <4b4Gq?sub=12268> is a SID (or alternatively, contains a SID or discloses an SID when

interpreted by the Service) assigned to a particular Participating Webmaster in the Service's affiliate network.

The domain name <azjmp.com> is owned by Epic Direct. (*See* Contentions, Att. 5.) Epic's Advertiser Implementation Guidelines explains that all links provided to Epic's Participating Webmasters begin with <http://x.azjmp.com/ > and then include a code which is the Epic unique id for that particular link which "includes information such as the affiliate id, the offer id, and the traffic type." (*See* Advertiser Implementation Guidelines at 7) Based on Epic's explanation and the example provided in the Advertiser Implementation Guidelines, the Epic unique id for the Sample Epic URL is "4b4Gq."

A webmaster in Epic's affiliate network would use the Sample Epic URL (or one with the same format created specifically for that webmaster) in connection with an ad placed on the webmaster's web page. A visitor to the webmaster's web page clicks the ad. The Service receives, as a result of the click, a user request for a URL to the target affiliate system. Epic's Advertiser Implementation Guidelines confirms this functionality: "When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page." (*See* Advertiser Implementation Guidelines at 7.)

For example, when a visitor to a participant's web page clicks on an ad associated with the Sample Epic URL, the click on the link shown as: <http://x.azjmp.com/4b4Gq?sub=12268> is received by the Service and indicates a request for a URL to the SpeedDate.com affiliate system. The user is thereby directed from the webmaster to the SpeedDate.com affiliate system. Clicking the ad associated with the Sample Epic URL acts as the request for a URL to the SpeedDate.com affiliate

system: <http://x.azjmp.com/4b4Gq?sub=12268>. The SID <4b4Gq?sub=12268> is

transmitted with the request as a component of the HTTP request for the resource pointed

to by the above link.

On information and belief, the target affiliate system, SpeedDate.com in this

example, maintains a system for using unique identification information to identify at

least one webmaster in an affiliate system for its own affiliates (*i.e.*, Webmasters who

direct consumer traffic to SpeedDate.com's website). That unique identification

information is a "target Webmaster unique identifier" ("TWUID"), which is a unique

identifying code assigned to each source webmaster in the source affiliate pool that is

functional within the target Merchant's affiliate system.

The Service creates or recognizes a relationship between SIDs for participants in

the Epic affiliate network and TWUIDs at the target affiliate system. When the Sample

Epic URL is clicked, the Service creates or recognizes a relationship between the

received SID and a TWUID. In the scenario described above, the TWUID is a unique

identifier assigned by SpeedDate.com to each of its affiliates. In the current example, the

Service creates or recognizes a relationship between the SID <4b4Gq?sub=12268> and

the TWUID < a=53&c=1&s1=48192&s2=12268>.

An advertiser may request that Epic include the Epic affiliate id in the landing

page URL associated with a particular offer. (*See* Advertiser Implementation Guide at 7.)

Epic notes that an advertiser would make such a request "for their internal tracking or

reconciliation purposes." (*Id.*) An Epic advertising manager can configure the landing

page URL associated with an advertiser's specific offer by including one of several

different preset variables, or "macros", in the landing page URL. (*Id.*) Those variables

include: "affiliate_id", "affiliate_id-sub_id", and "click_hash". (*Id.*) Each of those three

variables causes the Epic affiliate id to be included in or incorporated in a landing page

URL. The "affiliate_id" variable is included in a landing page URL by using the string

"%%AFFILIATE_ID%%" and causes the landing page URL to include the Epic affiliate

id. (*Id.*) The "affiliate_id-sub_id" variable is included in a landing page URL by using the

string "%%AFFILIATE-SUB%%" and causes the landing page URL to include "the

combination of affiliate_id and a sub-id, which is a code selected by a Participating

Webmaster. (*Id.*) The "click_hash" variable is included in a landing page URL by using

the string "%%CLICK-HASH%%" and causes the landing page URL to include "an

alpha-numeric value which when decoded identifies affiliate, click, and offer data." (*Id.*)

The click hash discloses the affiliate id when interpreted by the Epic virtual affiliate

system (*See* Cont'd Deposition of Rocky Appiah, 45:22-46:1.)

     The Epic affiliate id is also used by the Service in connection with transaction

information Epic obtains from advertisers in the Epic Service. Epic's system obtains

transaction information from advertisers using tracking pixel and delay reporting

functions. (Advertiser Implementation Guidelines at 9-11). The tracking pixel reporting

function is used to obtain transaction information from the target Merchant affiliate

system for specified transactions. The tracking pixel is a small segment of computer

code, or script, which is inserted into the code of the "lead conversion page." The lead

conversion page is a web page to which web traffic is redirected after completing a

transaction. The tracking pixel may contain the offer_id, which is a unique identifier

associated with each offer advertised by a merchant. (*Id.*) The tracking pixel causes a

request to be sent to the Epic system indicating that a transaction originating from a

Participating Webmaster in the Epic virtual affiliate system occurred.  (Advertiser Implementation Guide at 8 "Epic reads Tracking Pixel… on the Advertiser's lead conversion page; …associates the Lead, the Affiliate, and the Offer; and returns the data to Epic.")

The delay reporting function is also used to obtain information from the target Merchant affiliate system for specified transactions. In the delay reporting functionality, the advertiser keeps track of transactions and later sends a report to Epic. (Advertiser Implementation Guidelines at 11.) The advertiser must provide the Service a .csv file with the following information for each transaction: offer name, offer_id, affiliate_id, sub_id, date, and the number of transactions. (*Id*. at 11.) An advertiser which has elected to use the affiliate_id-sub_id or click_hash variables must include those as well. (*Id*.) As noted above, the affiliate_id, affiliate_id-sub_id, and click_hash variables each include, incorporate, or disclose the Epic unique affiliate id. The advertiser may send this report to the Service by email, or can make it available for the Service to periodically download from the advertiser's FTP site. (*Id*.)

When the Epic Sample URL is clicked, the Service causes a URL to appear in a user's web browser without a further user request. That URL is associated with the requested Merchant affiliate system, SpeedDate.com in this example. In the current example the following URL appears in the user's web browser without a further user request: <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268>. That link then redirects the user to the following URL: <

http://www.speeddate.com/index.php?page=signup&act

ion=join&afid=53&asid=48192&asid2=12268&pid=865 9&cid=1&xid=8639528>,

which is associated with SpeedDate.com's website (*see* Contentions, Att. 6).

    As indicated above, the URL generated by the Service includes a TWUID, which

is a unique identifying code assigned to each source Webmaster in the source affiliate

pool that is functional within the target Merchant's Affiliate System and for which a

relationship has been created or recognized with a source webmaster identifying code. In

this example: <a=53&c=1&s1=48192&s2=12268> is a unique identifying code assigned

to a source Webmaster in the source affiliate pool (here, Epic's Service) that is functional

within the target Merchant's home affiliate system (here, SpeedDate.com's affiliate

system) for which a relationship has been created or recognized with the source

webmaster identifying code <4b4Gq?sub=12268>.

    The Sample Epic URL can be used to access the requested Merchant affiliate

system. In the current example, the above URL points to the SpeedDate.com affiliate

system at: <http://mysdate.com/?a=53&c=1&s1=48192&s2=12268 >, which then

redirects the user to the following URL:

<http://www.speeddate.com/index.php?page=signup&action=join&afid=53&asid=48192

&asid2=12268&pid=865 9&cid=1&xid=8639528>, thereby causing resources to be

retrieved from the SpeedDate.com website.

    The TWUID from the URL can be used to identify and track the referring source

Webmaster. In the current example, the TWUID <a=53&c=1&s1=48192&s2=12268>

allows identification of the Participating Webmaster as the source because the TWUID

contains the unique affiliate ID  <48192> assigned to that particular webmaster by the

Epic virtual affiliate system along with an identifier that indicates that the source

Claim 28 of the '660 Patent reads on the Epic Affiliate Marketing Service for reasons analogous to the discussion of claim 1, above. Claim 28 describes a means plus function for executing the method described in claim 1.

## Compensation

I am receiving $275 per hour for my case preparation, review of records, investigation, testing, evaluation, assessment, analysis, reports and consultation in this case. I am receiving $375 per hour for my deposition and trial testimony.

DATED this 13th day of November, 2012.

_____
George Edwards, Ph.D.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ESSOCIATE, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-727-bbc |
| | ) | |
| EPIC MEDIA GROUP, INC., ET AL, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

James D. Peterson
Jennifer L. Gregor
Dustin B. Brown
Kerry L. Gabrielson
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719
Phone: 608-257-3911
Fax:    608-257-0609

*Attorneys for Defendants, Epic Media*
*Group, Inc.,(f/k/a Azoogle.com, Inc.), and*
*Social Assets LLC d/b/a Kinetic Social.*

3.    The claim construction order from the Central District of California is not binding on the defendants and this Court should accord it little weight.

Essociate's proposed claim constructions here are largely drawn from the claim construction order in a previous litigation.  Kent Invalidity Report, Ex. 4; *Essociate, Inc. v. Blue Whaler Investments, LLC, et al.*, CV-10-2107 (C.D. Cal.).  In that case, Essociate had sued several parties for infringement, but by the time the parties briefed claim construction, only one defendant, Direct ROI, LLC remained.  Direct ROI's strategy was to propose narrow constructions which it contended were "consistent" with the specification.  The court rejected each of Direct ROI's claim constructions on the grounds that the improperly read in limitations from the specification that were not supported by the claim language.  In general, the court simply adopted the alternative proposed by Essociate, with little analysis of the issues that are now material to this case.

The Direct ROI order is, of course, not binding on the defendants here because they did not participate in that case.  *See Markman v. Westview Instruments*, 517 U.S. 370, 391 (1996).  This Court may draw what it finds persuasive from that order, but it will be of little assistance.  The court in Direct ROI did not decide the case-decisive claim term issues that are critical here.

B.    Claim terms requiring construction.

For the Court's convenience, we divide the claim term issues into two categories.  The first group includes four terms that are disputed and highly material to this motion.  The second group includes terms on which the parties agree, or for which the dispute is minor and immaterial to this motion.

### 1.    Disputed constructions material to this motion.

#### a.    Virtual affiliates

> Essociate: Webmasters who direct traffic to one or more merchants
> via the placement of links to merchant websites on the
> webmasters' websites, but who are independent from the
> merchants' own affiliate systems

> Epic Media: Webmasters who can send traffic to a target affiliate
> system without being enrolled in it

The '660 patent is directed to a method of providing *virtual* affiliates with access to an existing affiliate network, and thus it is important to define what is meant by the term virtual.  A system that provides *non-virtual* affiliates to an affiliate network, like the prior-art Linkshare system disclosed in the '660 patent, cannot not infringe.  Epic Media operates an affiliate network with its own affiliated webmasters and its own merchant customers.  It is, at its core, just like Linkshare and it has actual affiliates, not *virtual* affiliates.

The primary difference between the parties' proposals is in the manner in which the relationship between the virtual affiliate and the merchant's affiliate network is described. Essociate contends that a virtual affiliate is merely "independent" of the merchant system.  Epic Media proposes that a virtual affiliate is "not enrolled in" the merchant system.

The problem with Essociate's proposed construction is that the term "independent" is vague.  Most affiliates are in some sense "independent" of the merchant's system.  Essociate's proposal might include affiliates who access merchants through third-party networks, such as the hub-style network operated by Linkshare, or service bureau providers such as Commission Junction.  If a merchant were to outsource its affiliate operations to a third party, such as Commission Junction or Linkshare, all of the affiliates would be in that sense be "independent" of the merchant's own affiliate system.  Epic Media's proposal addresses this problem by clarifying that a virtual affiliate is one that can sent traffic to a target system without enrolling in

it.  Epic's proposed construction is supported by the description of "the invention" in the

Summary of the Invention section of the specification:

> Advantageously, the present invention allows groups of
> Webmasters to participate in existing Merchant affiliate systems
> *without the need of joining those Merchant affiliate systems*.

'660 patent 4:53-56 (emphasis added).

Essociate's objection to Epic's proposed term is that Epic's proposal "requires the

referring virtual affiliate to remain anonymous to the merchant's affiliate system."  Landau

Report at 11. But Epic's proposal includes no such requirement.  The referring virtual affiliate

may remain anonymous, depending on the operation of the affiliate system.  However, if the

definition of virtual affiliate is broad enough to include an affiliate that actually joins the target

affiliate system, then the concept of *virtual* affiliate is meaningless.

### b.      Source webmaster unique identifier (SID)

> Essociate: A unique identifying code assigned to a webmaster
> within an affiliate pool of source webmasters
>
> Epic Media: The unique identifying code assigned to each
> webmaster in the source affiliate system

The difference between the parties' positions is subtle, but important.  Essociate proposes

that the SID is "a" unique code assigned to an affiliate; Epic Media proposes that the SID is

"the" code assigned to each webmaster in the source affiliate system.  The significance of this

distinction is apparent in Essociate's infringement contentions, which trace a single example

transaction.  *See* Essociate's Infringement Contentions.

Epic Media's proposed construction is supported by the specification and the claim

language itself.  The claim contemplates that in the configuring operation, *a* source webmaster

unique identifier will be assigned to *each* webmaster.  The claim does not contemplate that each

webmaster will receive multiple codes, one for each offer promoted.  Throughout the

specification the '660 patent contemplates that each source webmaster will have one ID assigned to it.  *See*, e.g. '660 patent 11:20-21.

Essociate's proposed construction is vastly overbroad, because it allows Essociate to label as a SID any string of code that includes the actual affiliate ID.   This problem is addressed in the infringement analysis below.

<p style="text-align:center"><strong>c.      Generating a URL</strong></p>

> Essociate: causing a URL to appear in a user's web browser
> without a further user request
>
> Epic Media: Plain meaning (or, if construction is needed:
> Generating a URL which may be presented to a user or to which
> traffic may be directed automatically)

Generating a URL does not require construction, because it is readily understood by one of skill in the art.  Essociate's proposal adds a limitation that is not present in the claims, and that finds no support in the specification.  Indeed, the generating a URL operation receives almost no discussion in the specification.  Nowhere does the specification state that the generated URL must appear in the user's browser, nor does it state that it must do so without a further user request.

Essociate's argument for its proposed construction relies on a passage in the specification in which the redirection of the user to the merchant system is discussed.  Dkt. No. 85, Landau Expert Report at 8 (citing '660 patent, 15:29-41).  The pertinent language is apparently "At this point, the user (traffic) is handed to the Merchant."  But this language does not support Essociate for two reasons.  First, there is nothing in the cited passage that precludes the hand off from being prompted by the user's clicking on a URL.  Second, and more important, this passage is drawn from the discussion of a particular embodiment, the one shown in Figure 6.  This is expressly described in the patent as "*a method*" in accordance with "*an embodiment* of the

present invention." '660 patent, 14:38-40 (emphasis added).  No "textual hook" in the claim language justifies reading in this limitation.  *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005) ("there must be a textual reference in the actual language of the claim with which to associate a proffered claim construction").

Essociate's purpose in reading in this limitation is to avoid anticipation by Old XPays. Essociate contends that in the Old XPays system, when the internet user clicked on a link on an affiliate website, the user would be redirected to the Old XPays system, and the user's browser would display the a link to the merchant's system.  The user, however, would not be redirected to the merchant's system without clicking on this link.  Old XPays includes the "generating a URL" operation, unless the limitation "without a further user request" is read into it.  This, of course, is improper.  "No principle of law . . . authorize[s] . . . read[ing] into a claim an element which is not present, for the purpose of making out a case of novelty . . . ." *E. I. Du Pont de Nemours*, 849 F.2d at 1430, 1433 (*quoting McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110, 116 (1895)).

The Direct ROI order offers no useful guidance on this point.  The court in that case rejected Direct ROI's proposed construction because it contained redundant, unsupported and incorrect information.  Although the court adopted Essociate's proposed construction, it did so without any discussion whatsoever of the "without a further user request" limitation.  *Essociate, Inc. v. Blue Whaler Investments, LLC, et al.*, CV-10-2107 (C.D. Cal. Feb 6, 2012) (Judge Selna's Claim Construction Order) (unpublished order); Kent Invalidity Report, Ex. 4.

If construction is needed, this Court should construe the term to expressly provide that the URL need not be presented to the user at all: Generating a URL which may be presented to a user or to which traffic may be directed automatically.

### d.    Correlating

Essociate: creating or recognizing a relationship between

24

Epic Media: to establish a mutual or reciprocal relation between

According to the inventors, the correlating operation in the '660 patent is the crux of the invention.  DPF 110.  But the fundamental issue here is not the meaning of the word "correlating," which is used more or less in its plain language sense.[1]  The real issue concerns what operation constitutes the "correlation operation" within the meaning of the patent.

The patent requires that the affiliate's ID in the source affiliate system (the SID) be correlated to another ID assigned to the affiliate that works in the target system.  The critical issue in the case, bearing on both infringement and validity, is whether merely passing along the affiliate ID to the merchant is enough to constitute "correlating."  This issue is presented thoroughly in the infringement analysis below.

### 2.    Substantially agreed constructions

The meaning of terms in this group are either not disputed, or the disputes are minor and not material to this motion.  We include the parties' proposed constructions because it will be helpful to the Court in understanding the argument.

### a.    Target webmaster unique identifier (TWID)

Essociate: a unique identifying code assigned to each source
Webmaster in the source affiliate pool that is functional within the
target Merchant's home Affiliate System

Epic Media: A unique identifying code assigned to a virtual
affiliate that is functional in the target affiliate system

The parties agree that the TWID is a unique code assigned to an affiliate webmaster and that it must be functional within the target system.  The difference between the parties' proposal

---

[1] Although not highly material to this motion, the difference between the parties' proposed construction of the term itself is that Epic's proposal that "correlation" means "establishing" a mutual or reciprocal relationship, whereas Essociate proposes that it means either "creating or recognizing" a relationship. Epic's proposal makes sense in the context of the technology at issue, where the objects to be related are entirely artificial creations of the affiliate system.  Correlation in the sense of "recognizing" relationships makes sense in the natural world, where meaningful relationships are discovered, but it makes less sense here.  *See* Kent Invalidity Report, ¶ 70.

is that under Essociate's proposal, the TWID is assigned to each source webmaster in the source

affiliate pool.  But this is unnecessary and illogical, because under the '660 patent, a TWID is not

assigned to an affiliate until it there is a request for the merchant.  This dispute is not material to

this motion.

### b.        Configuring an existing target affiliate system

> Essociate: a data setup operation relating to a system, operated
> directly or indirectly by a merchant, in which a group of
> webmasters direct traffic to a merchant

> Epic: plain meaning

This dispute over the meaning of this term is not substantive.  Although Essociate

contends that the term requires construction, the only substantive content in its definition is the

addition of the term "data setup operation."  But this term is no more informative than the claim

language itself, and thus judicial construction is unnecessary.

### c.        Merchant affiliate system

> Essociate: A system, operated directly or indirectly by a merchant,
> in which a group of webmasters direct traffic to a merchant

> Epic Media: A complete system that operates the merchant's
> affiliate program, including the tracking of transactions and
> commissions

The real issue here is the term "affiliate system."  The same issue arises in connection

with the term "target affiliate system."  Essociate's proposal for "affiliate system" too broad, as it

would cover virtually any linking arrangement.  For example, if a popular on-line merchant had

fans who linked to its website, under Essociate's definition, that would be a merchant affiliate

system.  The patent is not directed to casual arrangements of gratuitous linking.  Epic's proposal

is supported by the specification.  The first mention of "merchant affiliate system" after the

Abstract states:

Epic system then redirects the user to the merchant's website, at a landing page URL specified

by the merchant. If the user completes a transaction on the merchant's website, the website takes

the user to a "success page," which indicates to the user that the transaction is successful. But

the success page also has a bit of code called a "pixel," which prompts the Epic Direct system to

read the information from the cookie on the user's computer. The Epic Direct system thus tracks

the referral and the resulting commission without using the tracking system of the merchant.

Essociate has acknowledged that Epic's cookie and pixel tracking does not infringe the

'660 patent. DPF 36. Instead, Essociate attempts to make out an infringement case based on

Epic Direct capacity to use certain "preset variables."

## 2.    Preset variables in the Epic system

The Epic system does not rely on merchants to track transactions and commissions for

particular affiliates, and thus there is no need for the Epic system to provide the identity of the

affiliate to the merchant. However, some merchants request that the affiliate ID or other

information is passed along to them for their own purposes. Some merchants would like to

determine which affiliates are most productive, or which affiliates are sending low-quality

traffic. DPF 73. If, for example, some affiliates produce a large number of bogus transactions,

the merchant may investigate and ultimately seek to disqualify that affiliate.

To serve the various needs of its merchants and its affiliates, Epic allows, upon request,

certain preset variables to be passed along to the merchant system. These variables include: the

affiliate ID, affiliate sub-ID, click hash value, and a fixed code to represent the Epic system,

"az2." The requested variables are appended to the merchant landing page URL. DPF 74.

When variables are to be passed along, the merchant landing page URLs are formatted to

include variables that will be filled in when the user clicks on the jump link. DPF 75. For

example, if the merchant were Netflix and it had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIA
> TE_ID%%

DPF 75.

In the syntax of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL. The "%%" designates the beginning and the end of the label of the variable. Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL. If the affiliate's ID were 12354, the landing page URL would look like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=12345

DPF 76.

The merchant would then be able to record the affiliate's ID for whatever purposes it wanted. However, the Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant. DPF 77.

If the merchant requests it, the Epic system can also allow use of a sub ID variable, which can be useful for affiliates. DPF 78. Imagine, for example, that the affiliate is a website operated by a local newspaper at the domain name www.citytoday.com. The website, like the newspaper, has various sections, including news, sports, and arts. The affiliate promotes Epic offers, and it would like to keep track of whether the offers were more successful in the sports section or the arts section. Let's say that CityToday puts the Netflix offer in both the sports section and the arts section. When the affiliate places the offer in the sports section, the

"sub_ID=001" is appended to the jump link.  When the affiliate places the offer in the arts section, it appends "sub_ID=002."  DPF 78.

When the user clicks on the jump link, the landing page URL is completed by filling in the variables.  The pre-formatted landing page URL would look like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIA
> TE_ID%%& sub_id=%%SUB_ID%%

DPF 79.  If the user clicked on the jump link in the sports section, the landing page URL would be completed to look like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_i
> d=001

DPF 80.

In transaction and commission reports, both the merchant and the affiliate would know that the commission was earned by affiliate 12345 and that the traffic came from a link that had sub id 001 associated with it.  DPF 81.  In our example, the affiliate would thus know that this successful transaction came from the sports page.  Again, however, Epic would be tracking the transaction and commission by using its cookie and pixel tracking method, and Epic would not use the passed-along variables for its own transaction and commission reports.  DPF 83.

**B.    Essociate's infringement theory is flawed.**

Essociate's infringement theory if fundamentally flawed in three ways.  First, the infringement theory is based entirely on a single example transaction, with SpeedDate.com, which is manifestly not representative of all Epic transactions.  Second, Essociate lacks admissible evidence to show that the SpeedDate.com transaction involves a virtual affiliate relationship.  Third, Essociate's infringement theory is substantively flawed: even the single example transaction does not meet all the limitations of claim 1 (or any independent claim) of the '660 patent.

1.    **Essociate's infringement contentions accuse only one transaction, which is not representative of all Epic's transactions.**

Essociate's infringement theory is based entirely on a single transaction involving the merchant SpeedDate.com.  Essociate contends that it recorded a sequence of URL redirections involving the SpeedDate.com transaction using Epic Media's affiliate network, and its infringement case analyzes only this single transaction, which it contends "provides an example of Epic's infringing conduct."  Epic Media's First Set of Interrogatories and Plaintiff Essociate, Inc.'s Answers and Objections thereto.  ("Essociate's Infringement Contentions").  Peterson Decl. ¶ 13, Ex. 11.

But a single example is not, in itself, enough because it does not put Epic Media on notice of the set of transactions that are accused of infringement.  Essociate apparently concedes that Epic Media's basic cookie and pixel tracking method does not infringe the '660 patent. Apparently, Essociate also concedes that any transaction in which the Epic affiliate ID is not passed along to the merchant does not infringe.  But beyond that, Epic is unable to discern what transactions, beyond this single example, Essociate is accusing.

After it received Essociate's infringement contentions, and after it had provided to Essociate a table listing all the URLs used for Epic transactions, Epic requested that Essociate specify which transactions it regarded as infringing.  DPF 82.  Essociate declined to do so at that time, objecting on several grounds and contending that it would require an Essociate representative to have access to material designated as attorney-eyes only under the protective order.  DPF 82.  When Essociate disclosed the Edwards report on infringement, the expert—who had unfettered access to all discovery materials—again cited only the single SpeedDate.com transaction.  Essentially, Essociate has accused only one transaction of infringing the '660 patent.

2.    **Essociate has no admissible evidence that the SpeedDate.com transaction involves virtual affiliates.**

The '660 patent claims a method of providing virtual affiliates access to an existing merchant affiliate system, as explained above.  Although the parties dispute the precise definition of "virtual affiliate," there can be no genuine dispute that a transaction involving a webmaster who is a enrolled as an affiliate in the Epic system with a merchant who is enrolled in the Epic system does not involve a *virtual* affiliate.  Such an arrangement is involves an *actual* affiliate, just as in the prior-art Linkshare system.

Essociate's infringement theory thus relies on the notion that example SpeedDate.com transaction is not a transaction with SpeedDate.com as a merchant in the Epic system.  Rather, to prove that this example transaction is infringing, Essociate must show that the transaction is with SpeedDate.com's own affiliate network, not with SpeedDate.com as a merchant.

Essociate apparently recognizes this necessity, and it has adduced evidence that SpeedDate.com has an affiliate system.  Essociate's Infringement Contentions, Ex. 3, Peterson Decl. ¶ 13, Ex. 11.  But Essociate has no evidence to show that the example transaction—or any Epic transaction—used SpeedDate.com's affiliate network.  There is nothing that links SpeedDate.com's affiliate system to any of the URLs in the redirection sequence in the example transaction.

In fact, SpeedDate.com is an Epic client, a merchant who uses the Epic system.  DPF 84.  As a 2009 insertion order documenting the relationship shows, SpeedDate.com agreed to pay Epic $4.50 for each referral.  Notably, the insertion order also shows that SpeedDate.com would use the cookie and pixel method of transaction tracking.  The insertion order indicates that SpeedDate.com was able to display the pixel on its conversion page, and that "Epic/Azoogle will provide HTTP tracking pixel code to the Advertiser."  DPF 85.

SpeedDate.com may indeed have its own affiliate system, but Essociate has no evidence to show that the example transaction involved that affiliate system. Based on the prior relationship between SpeedDate.com and Epic, the example transaction demonstrates an actual affiliate relationship, not a virtual affiliate relationship.

### 3. Essociate's infringement analysis is flawed, and the SpeedDate.com transaction does not meet the limitations of the independent claims of the '660 patent.

The example transaction is not infringing, even Epic did use the SpeedDate.com's affiliate network. Essociate's infringement analysis contains multiple errors, as set out in Kent's responsive expert report on non-infringement. Kent's report also shows that claim elements are lacking in the example transaction.

### a. SpeedDate is not "configured" by Epic.

The Epic system does not perform the configuring operation as required in the independent claims. See Kent Infringement Report, ¶¶ 46-50.

As provided in claim 1, the method requires that the accused infringer perform the operation of:

> configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of:
>
> > assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site

'660 patent, 3:47-57. The important point here is that the accused infringer, Epic Media, must perform the step of configuring the target system, the SpeedDate.com affiliate system, so that SpeedDate.com recognizes a transaction as originating from a particular Epic affiliate.

Essociate provides no evidence that Epic configures the SpeedDate.com system.  The format of the merchant's landing page links are provided by the merchant.  DPF 58.  Although Epic provides a tracking pixel to SpeedDate.com, the pixel does not provide any information to SpeedDate.com.  Rather, the pixel triggers the running of a script on the Epic system, which reads information from the cookie on the user's computer.  DPF 71.  Epic does the tracking.  Epic has done nothing to configure SpeedDate.com affiliate system to recognize that transactions come from a particular Epic affiliate.

> **b.** **There is no TWID and no correlation operation in the Epic system.**

Essociate's infringement theory plays fast and loose with the concepts of SID and TWID in an effort to stretch the '660 patent to cover the example transaction with SpeedDate.com.

Essociate's infringement expert, George Edwards, misidentifies the SID.  *See* Kent Infringement Report, ¶¶ 51-58.  Epic assigns a unique ID to each of its affiliates.  DPF 63.  That unique ID is the SID.  In the example transaction, the SID is 48192, which is the affiliate ID for an Epic affiliate in Denver, Colorado.  DPF 86.

Edwards is somewhat equivocal concerning the SID.  He contends that "a" SID is <4b4Gq?sub=12268>, or alternatively that this expression contains "a" SID or discloses "an" SID when interpreted by the Epic system.  Dkt. No. 84, Expert Report of George Edwards ("Edwards Report").  However, throughout most of his report, he treats <4b4Gq?sub=12268> as the SID.

Edwards is similarly lax in his identification of the TWID, which he contends is <a=53&c=1&s1=48192&s2=12268>.  This, too, is incorrect.  *See* Kent Infringement Report, ¶¶ 59-69.  The TWID, using Essociate's definition, is

> a unique identifying code assigned to each source Webmaster in
> the source affiliate pool that is functional within the target
> Merchant's home Affiliate System.

Dkt. No. 84 at 7.  But the compound expression <a=53&c=1&s1=48192&s2=12268> is not an example of a unique code assigned to each webmaster in the Epic system.  The expression is, instead, a string of four independent variables, in a format prescribed by SpeedDate.com.  DPF 58.  The third variable in the string is the Epic ID for the affiliate in Denver, 48192.  DPF 86.  The fourth variable is the sub-ID chosen and used by the Denver affiliate for his own purposes.  DPF 78.  The first and second variables were prescribed by SpeedDate.com for its own purposes.  DPF 58.  Essociate offers no explanation, and has no evidence, for what these variables represent or how they are used.  But this much is clear: the only unique code assigned to the webmaster in this transaction is 48192, which is the Epic affiliate ID.  In the terms of the '660 patent, the Epic ID is the SID.  There simply is no TWID.

Edward's mistakes about the SID and TWID leads to a misconception of the correlation operation.  According to Edwards, the Epic system performs the required correlation operation because the system "creates or recognizes a relationship between the SID <4b4Gq?sub=12268> and the TWID <a=53&c=1&s1=48192&s2=12268>."  Edwards Report at 7.  This description of the correlation operation renders the correlation nearly meaningless.  There is a "relationship" between <4b4Gq?sub=12268> and <a=53&c=1&s1=48192&s2=12268> because they are both portions of URLs used in the SpeedDate.com example transaction.  But that is a far cry from the correlation operation described in the '660 patent.  *See* Kent Infringement Report, ¶¶ 70-73.

In the Epic system, the affiliate webmaster gets one affiliate ID, the SID in the terms used in the '660 patent.  At the merchant's option, that affiliate ID may be passed along, unmodified, to the merchant as one of the pre-set variables available in the Epic system.  DPF 74-75.  The passing along of the unmodified SID is not the correlation operation required in the '660 patent.

37

The correlation operation in the '660 patent requires that the SID be correlated to a second ID assigned to the affiliate, the TWID, one that is functional within the target system.

Indeed, when it comes to defending the validity of the '660 patent, Essociate specifically disclaims that idea that passing along the source affiliate ID to the merchant constitutes "correlation" within the meaning of the '660 patent. As Landau (speaking as Essociate's validity expert) put it:

> The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The Old Xpays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated.
>
> . . .
>
> Rather, it is clear that the xmake.cgi script—even assuming that was used in connection with iGallery and Python, which does not appear to be the case—operated by substitution. That script substituted a placeholder, <!--ASJCGI- -> with the 5-digit code for a particular Xpays affiliate.

Landau Report at 20-21. Just as Landau (speaking as the inventor) testified, the simple substitution of a variable does not constitute "correlation" within the meaning of the '660 patent. 2012 Landau Dep. 157:19-158:22. Landau's testimony as the inventor is worth little as evidence on claim construction, but Essociate cannot have it both ways. *See Markman v. Westview Instruments, Inc*., 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) (testimony of the inventor or his attorney is entitled to no deference and the court may disregard or exclude it). If the mere substitution of a variable is not correlation, then Epic does not infringe. If substitution of the affiliate ID is correlation, then the patent is invalid because Old XPays anticipates it.

IV.    **The '660 patent is invalid.**

The asserted claims of the '660 patent are invalid, thus cannot be infringed.  All of the

asserted claims are invalid under 35 U.S.C. § 102 because they are anticipated by prior art, and

under § 103 because the alleged invention in the '660 patent was obvious.  Although issued

patents are presumed valid, if the USPTO "did not have all material facts before it, its considered

judgment may lose significant force."  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S.__, 131 S.Ct.

2238, 2251 (2011) (explaining that the "clear and convincing" standard of proof of invalidity

may be easier to sustain when the prior art at issue was not examined by the USPTO).  The

asserted means-plus-function claims (15 and 28) are invalid for the additional reason that they

are indefinite under 35 U.S.C. § 112.

In particular, the '660 patent is invalidated by the inventors' own predecessor system,

referred to here as "Old XPays," which the USPTO was not aware of during prosecution of the

'660 patent. DPF 91.  Old XPays is an embodiment of, and contains every element of the

asserted claims of the '660 patent, thus invalidates the patent under § 102.  But even if Old

XPays is not found to be an invalidating system—or even without Old XPays—the alleged

invention of the '660 patent would have been obvious to a person of ordinary skill in the art at

the time of the invention, and the patent is thus invalid under § 103.

A.    **Essociate's expert testimony concerning patent validity should be
        excluded.**

Before addressing the merits of invalidity, we address an evidentiary issue concerning

Essociate's two expert reports regarding the validity of the '660 patent.  Both of these expert

reports should be disregarded.

Essociates, Inc. v. Azoogle.com, Inc., et al          CONFIDENTIAL          ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

```
ESSOCIATE, INC.,              )
                              )
              Plaintiff,      )
                              )
        vs                    )  11-cv-0072-bbc
                              )
AZOOGLE.COM, INC., and        )
EPIC MEDIA GROUP, INC., et al.;)
                              )
              Defendant.      )
```

Videotaped deposition of RICHARD OKIN,
called as a 30 (b)(6) witness for examination
pursuant to the Rules of Civil Procedure for the
United States District Courts pertaining to the
taking of depositions, taken before
Michelle Engler, a notary public within and for
the County of County and State of Illinois, at
221 North LaSalle, Illinois, on October 2nd, 2012,
at the hour of 10:00 o'clock A.M.

Reported for
SCHEFF & ASSOCIATES, by:
Michelle Engler, CSR
Illinois License No. 084-004576

Scheff & Associates, Inc.
(312) 214-1994

---

Essociates, Inc. v. Azoogle.com, Inc., et al.          CONFIDENTIAL          ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 2

```
 1           APPEARANCES:
 2
 3           NEWMAN DU WORS, LLP
             BY:  MR. JOHN DU WORS and
 4                MR. DEREK LINKE
             1201 Third Avenue
 5           Suite 1600
             Seattle, Washington 98101
 6           (206) 274-2800
             john@newmanlaw.com
 7           derek@newmanlaw.com
 8           Representing the Plaintiff;
 9           GODFREY & KAHN, S.C.
             BY:  MR. JAMES D. PETERSON and
10                MS. JENNIFER GREGOR
             One East Main Street
11           P.O. Box 2719
             Madison, Wisconsin 53701
12           (608) 257-3911
             jpeterson@gklaw.com
13
             Representing the Defendants;
14
15           MR. DAVID GRAFF and
             MS. ANEWSA PAUL,
16           (In-house counsel)
             Epic Media Group, Inc.;
17
18
19           ALSO PRESENT:
20
             Mr. Sasenarine Rocky Appiah;
21
22           VIDEOTAPED BY:
             Mr. Charlie Cook, LITICORP
23           (773) 743-8338.
24
```

Scheff & Associates, Inc.
(312) 214-1994

---

Essociates, Inc. v. Azoogle.com, Inc., et al          CONFIDENTIAL          ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 3

```
 1                  I N D E X
 2              RICHARD OKIN
 3
 4    EXAMINATION BY:            PAGE:LINE
 5    Mr. Du Wors                  17:12
 6
 7
 8
 9    EXHIBITS                   PAGE:LINE
10
11    Deposition Exhibit 1, id     78:10
12    Deposition Exhibit 2, id    157:20
13    Deposition Exhibit 3, id    209:09
14
15
16
17
18
19
20
21
22
23
24
```

Scheff & Associates, Inc.
(312) 214-1994

---

Essociates, Inc. v. Azoogle.com, Inc., et al.          CONFIDENTIAL          ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 4

```
 1         THE VIDEOGRAPHER:  Today's date is October
 2    2nd, 2012.  We're going on the video record at
 3    10:10 a.m.
 4         We are present at the offices of Scheff
 5    & Associates, 221 North LaSalle Street in Chicago,
 6    Illinois for the purpose -- for the purpose of
 7    taking a videotaped deposition of Richard Okin.
 8         The party on who's behalf the
 9    deposition is being taken is the Plaintiff and
10    party on whose instance the deposition is being
11    recorded on an audiovisual device is the
12    Plaintiff.
13         This case is instituted in the United
14    States District Court for the Western District of
15    Wisconsin, case number 11-cv-00727-bbc, entitled
16    Essociate, Inc. versus Azoogle.com, Incorporated,
17    et al.
18         My name is Charlie Cook.  I am the
19    legal video specialist from Liticorp, 1919
20    Milwaukee Avenue Chicago, Illinois.
21         The Court Reporter is Michelle Engler,
22    from Scheff & Associates, 221 North LaSalle Street
23    Chicago, Illinois.
24         Now it's the attorneys turn to
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al     CONFIDENTIAL     ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 97

```
 1   -- might not truly know whether they were with
 2   Epic or not.
 3           You know, I don't spend my days
 4   worrying about necessarily the customers, but I
 5   just know a few just because they cross my path.
 6       Q.  Totally understand, makes perfect sense.
 7   I don't think you're testifying as the
 8   institutional component on this issue.
 9           I think at this point I'm just taking
10   to Rich Okin -- do you go by Rich or Rick?
11       A.  Rick.
12       Q.  Would you be offend if I call you Rick
13   periodically?
14       A.  Not at all.
15       Q.  Okay.  And please feel free to call me
16   John?
17       A.  Thank you.
18       Q.  So I understand that you're not speaking
19   on behalf of the institution, there may be more
20   knowledgeable people on this subject.
21           I just want to know all of the common
22   advertisers that you can think of.  And with that
23   in mind, if you'll allow me to rephrase the
24   question so we have a clean record, please.
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al     CONFIDENTIAL     ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 98

```
 1           Would you please tell me the identities
 2   of all of the advertisers with whom Kinetic Social
 3   has done business that Epic also did business with
 4   either directly or through one of its subsidiary
 5   or affiliate companies?
 6       A.  Verizon, Volkswagen, I believe Motorola, I
 7   believe Kia, I believe Obama, I believe UTI.
 8   Those are the ones that I can think of.
 9       Q.  What does UTI stand for in this context?
10       A.  I think it stands for Universal Technical
11   Institute or something along -- it's an
12   educational, you know, for-profit education
13   company, I believe.
14       Q.  We spoke earlier about the user segments
15   data product.
16           Do you recall that?
17       A.  Yes.
18       Q.  Would you explain that data product to me?
19       A.  The purpose behind that data product is to
20   try to look for patterns in user click stream data
21   such that you can build segments that you can then
22   target when you see that user subsequent to having
23   seen them the first time.
24       Q.  Is that user identified during subsequent
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al     CONFIDENTIAL     ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 99

```
 1   sessions by any other means besides IP address?
 2       A.  Yes.
 3       Q.  By what other means that user subsequently
 4   identified?
 5       A.  A user ID.
 6       Q.  To be identified by a user ID, the user
 7   during some portion of the session must apply
 8   credentials, mustn't they?
 9       A.  No.
10       Q.  How is a user ID tracked if they don't go
11   through an authentication process of some kind?
12       A.  It's just a unique identifier that's set
13   in the cookies.
14       Q.  Oh, it's through the use of cookies?
15       A.  Correct.
16       Q.  Okay.  In other words, if the user clears
17   history, including cash data and cookies the ID is
18   removed?
19       A.  Correct.
20       Q.  Do those cookies have a limited duration
21   to the time that they remain active?
22       A.  Yes.
23       Q.  What is that duration?
24       A.  I believe 18 months.  I'd have to look at
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al     CONFIDENTIAL     ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 100

```
 1   our privacy policy to be sure.
 2       Q.  Okay.  So in other words, with respect to
 3   the user segments data product, a cookie is
 4   supplied to the browser of a user during a session
 5   of some kind and tracks their commercial behavior
 6   online in order to determine what kinds of ads
 7   should be presented to them during subsequent
 8   sessions based on intell (sic) about what they
 9   like to purchase; is that fair?
10       A.  That is fair.
11       Q.  We also discussed the multi-various
12   testing data product.
13           Do you recall that?
14       A.  Yes.
15       Q.  Can you explain the multi-various data
16   product to me?
17       A.  Yes.
18       Q.  Would you do so?
19       A.  Yes, yes, I will.  It is basically, um --
20   it's using well defined mathematics to limit the
21   number of variations of elements that would go
22   into advertising such that you can more rapidly
23   ascertain what is performing best for your
24   particular campaign based on the performance
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 141

1          Q.   Okay.  Do you know how far back the oldest
2     of the data goes within that Azoogle Ads database?
3          A.   I believe some of the data goes back to
4     whenever that database was created, and I don't
5     know when exactly that was.  It predates me, so --
6     it predates my being at the company.
7          Q.   Sure, sure.  When we first started talking
8     about the destination landing page URL supplied by
9     the advertiser client to the Epic Affiliate
10    Network I asked you is there ever a blank space
11    left in which the publisher ID may be substituted
12    by the Epic Affiliate Network.
13               And I recall you saying yes, which is
14    not my attempt to recreate your testimony, but I'm
15    just telling you what I recall, so you can correct
16    me if I'm wrong.
17               Thereafter we talked more thoroughly
18    about the fact that what appears in that
19    destination landing page under certain
20    circumstances is a click hash that includes, among
21    other things, the publisher ID.
22               Do you remember generally all of that
23    testimony?
24         A.   Yes.

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 142

1          Q.   Is it the case though, that separate of
2     the click hash there had ever been a time where
3     instead of a hash, what was substituted into the
4     destination landing page URL was a -- a literal
5     representation of the publisher ID?
6          A.   Yes.
7          Q.   Okay.  When did that occur?
8          A.   When -- Once again, when -- whenever
9     someone set it up to be that way.  You know,
10    whenever someone would set the landing page URL up
11    to specify that the publisher ID should be
12    included in it.
13         Q.   And so the advertiser client would have
14    been given the option to elect to have either a
15    click hash be passed through or the literal
16    publisher ID -- publisher ID; is that right?
17         A.   Not -- Not -- I mean, not -- not -- not
18    really.  It's -- It's really -- these details get
19    worked out during implementation of the tracking.
20               So, you know, it depends on that
21    conversation that occurs, but there's the
22    potential to do it.  The option to do it exists.
23               Whether it gets set up or not there's
24    -- there's -- you know, I can think of various

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 143

1     reasons why it gets -- that would be done, but I
2     don't know -- can't give you specifics as to if
3     like you pointed at one why it was done in that
4     specific case, so...
5          Q.   What are those various reasons that you
6     can think of as to why it would be done that way?
7          A.   One example would be, you know, some
8     merchant's actually like to know, you know, they
9     might be interested in figuring out what the
10    quality of the traffic is coming from our
11    affiliates.
12               So the only way they are going to
13    ascertain that is since, you know, the conversion
14    is occurring on their end totally disconnected
15    from us they know, for instance, an example say of
16    like a Netflix, you know, does someone who's
17    signing up for Netflix do they stay six months, or
18    do they stay two days, do they cancel after two
19    days, do they cancel after six months, do they
20    cancel after a year?
21               What's the quality of that traffic that
22    came from a particular affiliate?
23               So in order for them to do that, they
24    can do that analysis on their end if we tell them

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY  Dep of Richard Okin

Page 144

1     this, you know, this -- they can associate that
2     with this, you know, um, affiliate ID and do their
3     own statistical analysis on where -- who's doing
4     best.
5          Q.   What are the other reasons you can think
6     of as to why it might be set up that way?
7          A.   I'm trying to think.  That would probably
8     be one of the biggest use cases.
9               I mean, that would probably be the
10    biggest use case I can think of.
11         Q.   Does -- Did the Epic Affiliate Network
12    ever have a relationship with the advertiser
13    customer where the advertiser told Epic how much
14    Epic was entitled to in terms of royalties from
15    CPA transactions as distinguished from a
16    relationship where Epic sent the advertiser a bill
17    at the end of a particular pay period?
18         A.   So if I understand your question, are you
19    saying -- so we -- we are -- we would have clients
20    that in which we'd either bill off their numbers
21    or bill off of our numbers, which I think is what
22    you're asking, so --
23         Q.   Yeah.
24         A.   -- I think the answer is yes.

Page 145

1    Q.  There were clients where the billing would
2   be off their numbers?
3    A.  Yes.
4    Q.  And by clients, you mean advertiser
5   clients?
6    A.  Yes.
7    Q.  In order to accomplish that tracking do
8   you happen to know whether or not the advertiser
9   client would rely on the content of the
10   destination landing page URL or to figure out what
11   the numbers were for the billing relationship to
12   be based on?
13    A.  As far as I know all they relied on is,
14   you know, whether the transaction was related to
15   an Azoogle affiliate or not.
16        How they ascertain that, you know, I
17   can only guess at the different ways they can do
18   that, so...
19    Q.  Well, what are the -- What are the various
20   ways you're aware of as to how the advertiser
21   client could track those transactions for the
22   purpose of determining the numbers associated with
23   what royalties Azoogle and its affiliated
24   publishers would be entitled to?

Page 146

1    A.  Well, the simplest would be just -- well,
2   you know, if we're the only -- if they are all
3   working one affiliate network, then it's pretty
4   easy, then anything referred would be, you know,
5   to -- to a particular landing page if it was
6   customized for that, that would be one way.
7        Even -- And if they were working with
8   multiple affiliate networks, same thing, you can
9   set up different landing pages for each network
10   and based on where people entered, that's another
11   way you could do it.
12        As you mentioned earlier, you know, the
13   advertiser could ask us to put in the landing page
14   URL some identifier that would say this originated
15   through Azoogle.
16        You know, just some -- some indicator
17   that would allow them to know it came from
18   Azoogle.
19    Q.  And then beyond just knowing that it came
20   from Azoogle, how would the advertiser who was
21   doing the tracking for the purpose of billing then
22   payment (sic) Azoogle and its affiliates know
23   which of Azoogle's own affiliated publishers were
24   the origin for that referred traffic?

Page 147

1    A.  They -- That was not a -- That was not the
2   concern.  They would tell us the number of leads
3   that occurred on their system.
4    Q.  But then how would Azoogle know who to
5   pay?
6    A.  Well, because -- Any -- Well, good
7   question.
8        We would know who to pay based on, you
9   know, this -- some of them -- because we use
10   pixels to track most of it.
11        We will know who to pay, but in the
12   occa -- because pixels are unreliable at times for
13   various reasons, if there's -- if their numbers
14   are higher than ours, we would then prorate those
15   leads to publishers based on what they've done.
16        (Exit Mr. Appiah.)
17   BY MR. DU WORS:
18    Q.  Well, but in the -- in the setting where
19   Epic was doing billing based on the advertiser's
20   numbers as opposed to its own numbers, didn't
21   those advertiser numbers include productivity of a
22   particular referring affiliate for the purpose of
23   calculating that affiliates's payout?
24        (Enter Mr. Appiah.)

Page 148

1        THE WITNESS:  No.
2   BY MR. DU WORS:
3    Q.  No?
4    A.  No.
5    Q.  You said there were -- You said pixels
6   were sometimes unreliable, why is that?
7    A.  The internet is unreliable, so...
8    Q.  Was there ever a problem associated with
9   advertiser clients not properly affixing the web
10   pixels on their success pages for the purpose of
11   circumventing Azoogle's payouts?
12    A.  I -- There have been times when there have
13   been problems with the pixel on pages disappearing
14   and things like that.
15        So when we send a user to a landing
16   page, we lose control of that situation.  So it's
17   part of the -- part of the -- that world.
18    Q.  Has Azoogle or Epic ever relied on the use
19   of content in the destination landing page URL's
20   as a secondary method of auditing the efficacy of
21   the pixel firing tracking method for the specific
22   purpose, for instance, of seeing whether or not an
23   advertiser client is not properly affixing the
24   pixel on their success page?

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Dep of Richard Okin

Page 149

1          A.  I'm not sure if I under -- I mean, I
2    understand the question about using content to --
3    to -- to be sure that it's there.
4          Q.  Let me clarify.
5               Epic can track transactions using the
6    passing of the click hash if they want to, right?
7          A.  Um-hum.
8          Q.  Or it can track transactions relying on
9    the pixel firing method.
10              Has Epic or have Epic or Azoogle ever
11   relied on the passing of the click hash method as
12   a secondary method of auditing transactions to
13   protect against the possibility that an advertiser
14   client was not properly affixing the pixel on
15   their success page?
16         A.  Okay.  So I -- So what we would normally
17   do in that situation if we were having that issue,
18   we work with the advertiser and ask them to send
19   us some unique identifier from their system that
20   would identify that transaction so that we could
21   see if -- if we had a discrepancy between, you
22   know, them having a certain number of leads and
23   us, we could try to figure out which ones didn't
24   make it to us.  If that's the question I think

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Dep of Richard Okin

Page 150

1    you're asking.
2          Q.  It's not what I'm asking.
3          A.  Okay.
4          Q.  It's close.
5          A.  Okay.
6          Q.  I think you're -- I was asking you if
7    there was this specific lar -- specific method
8    Epic or Azoogle ever utilized for the purpose of
9    auditing and I think you jumped to the point told
10   me how it is you --
11         A.  Okay.
12         Q.  -- (inaudible) which is very helpful.
13         A.  All right.
14         Q.  I guess what I'd like to know is has the
15   passage of the click hash to the destination
16   landing page URL ever served as a secondary method
17   of tracking that Epic or Azoogle had to used in
18   addition to the pixel firing tracking method with
19   respect to the same offer?
20         A.  I don't personally know of a case where it
21   was, but I'm sure the -- it probably existed I
22   would think.  It seems to make logical sense, but
23   I'm not aware of one personally.
24         Q.  Okay.  The click hash passed to the

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Dep of Richard Okin

Page 151

1    destination landing page URL by the Epic Affiliate
2    Network contains, among other things, the
3    publisher ID, correct?
4          A.  No.
5          Q.  The click hash somehow gets translated in
6    a way that would cause the publisher ID to be
7    disclosed to the Epic Affiliate Network for
8    tracking purposes, correct?
9          A.  That is correct.
10         Q.  Okay.  Would you walk me through that
11   process?
12         A.  Okay.  Using which -- Any specific use
13   case whether it be delayed reporting or
14   server-to-server tracking or...
15         Q.  Let's discuss delayed reporting?
16         A.  Okay.  So at the point where the user
17   clicks through and it lands on our merchant
18   landing page, the URL now contains the click hash
19   in the actual, what we refer to as the get string
20   of the URL.
21              The -- It is the responsibility of the
22   merchant in that particular -- this particular use
23   case to capture that click hash and when -- and on
24   their side they would record if the user, you

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Dep of Richard Okin

Page 152

1    know, successfully submits the action that is
2    being tracked, the merchant would store that click
3    hash and indicate that a successful transaction
4    occurred for that particular click hash.
5               So that could be as simple as just say
6    -- storing the click hash and saying, you know,
7    transaction for click hash one, transaction for
8    click hash five, transaction for click hash ten,
9    you know, three transactions in that case.
10              Or they might -- you know, they might
11   store it -- you know, it's up to them how they
12   want to store it.
13              Ultimately what happens is they've
14   stored the click hash and they return to Epic a
15   file of some sort, normally -- generally this
16   would be an Excel sheet for a CSV-type file where
17   it would have one row for each transaction and in
18   that row one of the pieces of data would be the
19   click hash.
20              (Exit Mr. Graff.)
21         THE WITNESS:  When that file came to our
22   system there's -- you know, a very simple program
23   that would take the click hash, look up the other
24   data that was stored when that click occurred and,

Essociate, Inc. v. Azoogle.com, Inc., et. al          CONFIDENTIAL     ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF WISCONSIN


ESSOCIATE, INC.,          )
                          )
            Plaintiff,    )
                          )
     vs                   )  11-cv-0072-bbc
                          )
AZOOGLE.COM, INC., and    )
EPIC MEDIA GROUP, INC., et al.;)
                          )
            Defendant.    )


     Videotaped deposition of SASENARINE
ROCKY APPIAH, called as a 30 (b)(6) witness for
examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before Michelle Engler, a notary public within and
for the County of County and State of Illinois, at
221 North LaSalle, Illinois, on October 2nd, 2012,
at the hour of 5:15 P.M.




Reported for
SCHEFF & ASSOCIATES, by:
Michelle Engler, CSR
Illinois License No. 084-004576
```

Scheff & Associates, Inc.
(312) 214-1994

---

Page 2

```
1     APPEARANCES:
2
3     NEWMAN DU WORS, LLP
      BY:  MR. JOHN DU WORS and
4          MR. DEREK LINKE
      1201 Third Avenue
5     Suite 1600
      Seattle, Washington 98101
6     (206) 274-2800
      john@newmanlaw.com,
7     derek@newmanlaw.com

8     Representing the Plaintiff;

9     GODFREY & KAHN, S.C.
      BY:  MR. JAMES D. PETERSON and
10         MS. JENNIFER GREGOR
      One East Main Street
11    P.O. Box 2719
      Madison, Wisconsin 53701
12    (608) 257-3911
      jpeterson@gklaw.com
13
      Representing the Defendants;
14
15    MR. DAVID GRAFF and
      MS. ANEWSA PAUL,
16    (In-house counsel)
      Epic Media Group, Inc.;
17
18
19    ALSO PRESENT:
20
      Mr. Richard Okin;
21
22    VIDEOTAPED BY:
      Mr. Charlie Cook, LITICORP
23    (773) 743-8338.
24
```

Scheff & Associates, Inc.
(312) 214-1994

---

Page 3

```
1              I N D E X
2
3          SASENARINE ROCKY APPIAH
4
5    DIRECT EXAMINATION BY:        PAGE:LINE
6    Mr. Du Wors.....................05:17
7
8
9
10   EXHIBITS                      PAGE:LINE
11
12          (No Exhibits Marked.)
13
14
...
24
```

Scheff & Associates, Inc.
(312) 214-1994

---

Page 4

```
1        THE VIDEOGRAPHER:  Okay, I'll do my intro
2    again.  Today's date is October 2nd, 2012.  We are
3    going on the video record at 5:18 p.m.
4        We are present at the office of Scheff
5    & Associates, 221 North LaSalle Street Chicago,
6    Illinois for the purpose of taking the videotaped
7    deposition of Rocky Appiah.
8        The party on whose behalf the
9    deposition is being taken is the Plaintiff, and
10   the party at whose instance the deposition is
11   being recorded on an audiovisual device is the
12   Plaintiff.
13       This case is instituted in the United
14   States District Court for the Western District of
15   Wisconsin, case number 11-cv-00727-bbc, entitled
16   Essociate, Inc. versus AZOOGLE.COM Inc., et al.
17       My name is Charlie Cook.  I am a legal
18   video specialist from Liticorp, 1919 North
19   Milwaukee Avenue, Chicago.
20       The Court Reporter is Michelle Engler
21   -- Engler from Scheff & Associates, 221 North
22   LaSalle Street in Chicago, Illinois.
23       Now it's the attorneys turn to
24   introduce themselves starting with the Plaintiff's
```

Scheff & Associates, Inc.
(312) 214-1994

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 17

1    recognize that as a click parameter?
2        A.  I just know how URL's are constructed.
3    Specifically the fact that it starts with X means
4    it's a click, and anything before the question
5    mark would be a click parameter.
6        Q.  It is common with respect to the AZ Jump
7    URL's that Epic provided its affiliated publishers
8    for the click parameter data subsets to be
9    punctuated at the end by a question mark?
10       A.  I'm sorry --
11       MS. GREGOR:  Object --
12       THE WITNESS:  -- rephrase.
13   BY MR. DU WORS:
14       Q.  Was it common -- Strike that.
15           Was it a common convention with respect
16   to the AZ Jump URL's, the Epic Affiliate Network
17   provided its publishers for the data sets
18   constituting the click parameters to be punctuated
19   at the end with a question mark?
20       A.  Yes.
21       Q.  And when you say a click parameter, do you
22   mean it to say that is an encrypted data set?
23       A.  I wouldn't say encrypted, no.
24       Q.  What would you say if not encrypted?

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 18

1        A.  I would say it's a look-up value.
2        Q.  You're understanding is that upon
3    receiving that value, the Epic Affiliate Network
4    would identify a larger set of information; is
5    that correct?
6        A.  Yes.
7        Q.  And that larger set of information would
8    include the identification number for the
9    referring publisher, correct?
10       A.  Yes.
11       Q.  It would include the offer ID as well,
12   correct?
13       A.  Yes.
14       Q.  Would it include any other information
15   that you're aware of?
16       A.  Yes.
17       Q.  What other information would it include?
18       A.  It would contain offer and affiliate as we
19   said.  It would contain traffic type, so search,
20   display, that type of thing.  It would contain
21   program ID, which is always one.
22       Q.  May I please ask to turn your attention to
23   the last page of Deposition Exhibit 3?
24           I'd like to pose another hypothetical

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 19

1    question to you, and as the premises for that
2    hypothetical, I'll represent to you that this is a
3    destination landing page reached by a user who has
4    clicked on an AZ Jump URL provided to an Epic
5    Affiliate Network publisher.
6            Do you understand that premise?
7        A.  Yes, I do.
8        Q.  Okay.  Assuming the truth of that premise,
9    would you please direct your attention to the URL
10   at the bottom of the page, which I'll refer to as
11   a get string, and tell me if you recognize any of
12   the values contained within that get string?
13       A.  No.
14       Q.  Do you recognize based on your technical
15   experience the purposes of any of those values
16   contained within that get string?
17       A.  The purpose of the values, no, I don't
18   know what the values are, so I don't know what
19   their purpose would be.
20       Q.  Okay.  Well, in -- Towards the right-hand
21   side of that get string you see the letters 12268,
22   do you see that?
23       A.  Yes.
24       Q.  Do you recall that 12268 was the sub value

Essociates, Inc. v. Azoogle.com, Inc., et. al        CONFIDENTIAL        ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 20

1    contained within the AZ Jump URL we just looked at
2    on page three of this document?
3        A.  Yeah, I see that now.
4        Q.  Based on that and, again, assuming the
5    truth of the premise that I proposed to you for
6    the purpose of this hypothetical, do you have any
7    reason to believe whether or not the 12268
8    identified in the get string on the last page of
9    this document is a carry over of the sub value
10   from the AZ Jump URL we looked at on page three of
11   this document?
12       MS. GREGOR:  Object, vague.
13       THE WITNESS:  So, no, I don't know if it is
14   because based on my experience, these URL's are --
15   can be dynamically generated or static.
16           So just because it was in the sub value
17   on that previous page does not mean that it was
18   passed to this.
19           It could be in the offer URL's table
20   that we have.  It could already have 12268.
21           So if you change 12268 on the sub and
22   you put ABC, that doesn't -- there's no -- I can't
23   say definitively without seeing everything in the
24   equation to know that that's what this represents.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ESSOCIATE, INC, | |
| Plaintiff, | **Case No.  11-cv-727-bbc** |
| v. | |
| EPIC MEDIA GROUP, INC., AZOOGLE.COM, INC., AND SOCIAL ASSETS, LLC d/b/a Kinetic Social, | |
| Defendants. | |

**DECLARATION OF JOHN DU WORS IN SUPPORT OF ESSOCIATE, INC.'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, John Du Wors, hereby declare:

1.      I am counsel of record for Plaintiff Essociate, Inc., over the age of 18, and competent to testify in this action.

2.      A true and correct copy of a January 4, 2012 press release issued by Social Assets, LLC d/b/a Kinetic Social ("Social Assets") is attached as Exhibit A. This document was authenticated in the Don Mathis deposition at 172:1–7.

3.      A true and correct copy of the "About Us" page on Social Assets' website is attached as Exhibit B. This document was authenticated in the Don Mathis deposition at 158:21–159:24.

4.      A true and correct copy of the LinkedIn web page of Don Mathis is attached as Exhibit C.

5.      A true and correct copy of the LinkedIn web page of Charlie Nowaczeck is attached as Exhibit D.

6.      A true and correct copy of the LinkedIn web page of Rick Okin is attached as Exhibit E.

7.      Most of Epic's creditors were left out in the cold. Epic appointed a debt workout

- 1 of 6-

URLs occurred when they were configured by an Epic customer service representative who modified the Destination Landing Page URLs provided by merchant customers operating an existing target affiliate system to include macros that in turn caused the destination landing page URLs reached by referred users to contain source webmaster identifiers.

20.     Exhibit F reveals that often, the Accused Epic Network used the click-hash and the source webmaster identifier contained within the click-hash to function as a secondary tracking method to audit or confirm the information obtained by the Accused Epic Network through its use of cookies or pixels. This fact is also disputed because, with respect to some of its merchants, Epic did not perform some of its own tracking but instead relied on the merchants' tracking.

21.     Exhibit F indicates the Accused Epic Network needs to provide its affiliate IDs to merchants who request that it be included in their Destination Landing Page URLs for the merchants' requisite tracking in order to be marketable to the merchants who desire that service. Additionally, the Accused Epic Network can use the click-hash it includes in those Destination Landing Page URLs as a secondary method of tracking and it can also use non-click-hash URLs contained within its merchant's records to reconcile disputes between the Accused Epic Network and its merchant customers over transaction tracking. All that is required to infringe the '660 Patent is for the use of the source webmaster ID values included in Destination Landing Page URLs to become a possible source of tracking for either the merchant or the Accused Epic Network or both.

22.     Exhibit F states that where a click-hash containing an encrypted reference to the source webmaster's identifier is included in the Destination Landing Page URL the accused Epic Network uses that encrypted set of values as a secondary method of tracking to audit or confirm the tracking data obtained throught its use of cookies or pixels. Also, the Accused Epic Network can use the literal referred webmaster values for tracking either form its own records or the merchants' — especially where there is a dispute over transaction data.

23.     Exhibit F shows that the Accused Epic Network relied on the inclusion of click-

- 4 of 6-

A0145

hashes of Destination Landing Page URLs for secondary tracking and was able to use the literal values in those Destination Landing Page URLs for tracking as well which is all that is necessary to infringe the '660 Patent.

24.     The insertion order appended as Exhibit A to Appiah's declaration (Dkt. No. 88, Ex. A) reveals that SpeedDate.com requested a customer service representative on behalf of the Accused Epic Network configure the Destination Landing Page URL that is part of SpeedDate.com's existing target affiliate network to include both the source webmaster ID and sub-ID of the referring source webmaster affiliate to be included in the Destination Landing Page URL as target webmaster identifier functional within SpeedDate.com's target affiliate network to be used for requisite tracking.

25.     A true and correct copy of a Microsoft Excel chart displaying data in Epic's offer_urls table is attached as Exhibit G.

26.     A true and correct copy of Michael Landau's Expert Report is attached as Exhibit I.

27.     A true and correct copy of George Edwards's Expert Report is attached as Exhibit J.

28.     A true and correct copy of David Stern's Expert Report is attached as Exhibit K.

29.     In the first lawsuit Essociate filed on the '660 Patent in the Central District of California, styled *Essociate Inc. v. ClickXchange Corp. et al.*, USDC C.D. Cal. Case No. SACV09-536JVS, I wrote a settlement letter cited in Defendants' brief which Defendants rely on as evidence of the functionalities of the Old XPays network. I mis-described those functionalities by mistake.

30.     The offer_urls table includes thousands of Destination Landing Page URLs, which include the affiliate_id macro.

31.     One Destination Landing Page URL in the offer_urls table which includes the affiliate_id macro and which is associated with a merchant affiliate system is: http://affiliates.speeddate.com/z/4/CD35/&subid1=%%AFFILIATE_ID%%&subid2=%%SUB_I

D%%&subid3=%%CLICK_HASH%%.

32.    The offer_urls table includes thousands of Destination Landing Page URLs which include the affiliate_id-sub_id macro. One such Destination Landing Page URL associated with a merchant affiliate system is:

http://asseenonpc.directtrack.com/z/3451/CD1923/&subid1=%%AFFILIATE-SUB%%.

33.    There are thousands of Destination Landing Page URLs in the offer_urls table which include the click_hash variable. One example Destination Landing Page URL which is associated with a existing merchant affiliate system is: http://iballers.com/cgi-bin/ib.cgi/141/40685:%%CLICK_HASH%%?page=land/v1/r1.

34.    In the SpeedDate.com example, the Destination Landing Page URL included in Epic's offer_urls table is < ID%%&s2=%%SUB_ID%%>.

35.    Defendants seek to exclude two expert reports—the Landau Report and the Stern Report—because delivery of the reports was delayed by one week, from December 17 to December 24. There was no harm to the Defendants from this brief delay, which was caused by the holiday travel of the witnesses and Essociate's counsel.

36.    The Landau and Stern reports were provided months before the discovery cutoff date and several weeks prior to Defendants' summary judgment briefing deadline and the Defendants make only a general, conclusory allegation of harm.


Dated February 22, 2013.


s/ John Du Wors
John Du Wors


- 6 of 6-

A0147



## Advertiser Implementation:  Cheat Sheet

**Here is a quick list of steps to set up offer tracking with us.  They are offer specific.**  For detailed info, please refer to our Advertiser Implementation Guidelines documentation.

1.  Provide us with correct landing page URL and instruction on how we should pass our **AFFILIATE-SUB** attribute to you via the URL string.

    a.  On your side, capture and store our AFFILIATE-SUB value **and** match it to your unique ID (i.e. order id or transaction id) for the associated conversion.

2.  Place our provided "**landing page pixel**" on the homepage of your site.

3.  Place our provided "**tracking pixel**" on your payout conversion page, and pass us your unique ID in the pixel by appending an **E=[YOUR UNIQUE ID]** attribute when it fires.

4.  Implement and set a **cookie** to track our network's referred consumer for at least 30 days.

5.  Provide web-based lead reports to us for conversions you recorded from our network (URL location, user id, and password).

6.  **If accepting "email" traffic type**, provide a weekly email suppression list to us (via UnsubCentral email or automated FTP exchange).

7.  Use our provided test link to **conduct lead tests on your side**.  Once completed, let us know and we will check our reporting for the results.

    There are 3 types of tests:

    a.  Click thru our test link, arrive on your landing page, and immediately proceed to complete the conversion.

    b.  Click thru our test link, arrive on your landing page but leave your landing page without completing a conversion by closing your browser window, open a new browser window and enter your site via its domain, then proceed to complete the conversion.

    c.  Click thru our test link, arrive on your landing page, bookmark your landing page, leave your landing page without completing a conversion by closing your browser window, open a new browser and enter your site via the bookmark, then proceed to complete the conversion.

8.  For quality assurance, once you are satisfied with your tests, we need to verify your setup by performing **Epic Ads own lead tests**.  If conversions require a credit card, please provide a dummy credit card with billing info to us for this purpose.

EPIC003212



# Advertiser Implementation Guide

**Version 3.0.3**

**Target Audience:**
**Advertiser technical contact**

EPIC003213

# 1.     INTRODUCTION

## 1.1.    Document Objective

The goal of this Implementation Guide is to provide Advertiser technical persons with a high-level overview of the Epic Advertising and its AzoogleAds Network, how our program works, features that we offer, and what is required to integrate with our network.

## 1.2.    Business Overview

Epic Advertising (www.EpicAdvertising.com) is a global online performance marketing company that provides advertisers with measurable Internet advertising impact. Leveraging proprietary and patent-pending technologies, and the over 38,000 publishers in AzoogleAds, its highly-acclaimed performance ad network, Epic provides its advertising partners with performance and direct response marketing services, search engine marketing, media planning, branded marketing campaigns and a targeted, worldwide online reach.  A pioneer in both the online performance marketing industry and in Internet advertising integrity assurance and compliance, Epic Advertising brings an intense focus on achieving the highest ROI yield for its advertising partners via transparent Display and Search consumer web traffic. Epic scales its solutions through enormous internet reach, proprietary and patent-pending technology and unparalleled industry expertise.

Our Advertiser offers generally consist of a flat-fee payout to Publishers for every lead that they refer and convert (CPA).

We define a lead as a Publisher referred customer that completes a specific action as defined in an Advertiser's offer (such as product sales, service registrations, or new lead acquisitions).

Our Epic business managers work with our Advertisers to develop attractive offers to promote to our Publisher marketplace.



Finally, our robust technology enables us to facilitate the administrative needs necessary to push offers to our Publisher network, track traffic and lead conversions, and provide reports to analyze offer performances.

Some of the *major* tasks that Epic performs on behalf of our Advertisers via our platform are:

- Creating offers

- Uploading promotional assets such as email campaign copies, banners for website ads, suggested keywords for search programs

- Designating landing page URLs and any variables that Advertisers may want AzoogleAds to pass to their website (for their internal tracking purposes)

- Analyzing traffic, leads converted, and revenue performances by means of reporting

## 2. TECHNICAL DESCRIPTION

### 2.1. Advertiser Offer Landing Page and URL

All offers (whether Publishers promote user traffic to Advertisers via email, web, or search) require a landing web page. The purpose is when a user clicks-thru from a Publisher's promotion, the user will be directed to the Advertiser's landing page for an offer.

For example, this may be the Advertiser's homepage, a product page, or a sign up page such as:

http://www.advertiserspage.com
http://www.advertiserspage.com/product-abc.html
http://www.advertiserspage.com/registration.html

The offer landing page is generally hosted by the Advertiser and the URL provided to our Epic managers.

EPIC003216

## 2.2.   Preset Epic Variables

**To accommodate some technical terms, please note that from this point forward, Publishers are referred to as Affiliates.**

Upon request, Epic can pass any of the following preset variables to the Advertiser for their internal tracking or reconciliation purposes:

| Variable name * | Variable value as set up in AzoogleAds system | Variable value description |
|---|---|---|
| affiliate_id | %%AFFILIATE_ID%% | Epic's unique numeric id for Affiliates |
| sub_id | %%SUB_ID%% | An offer specific **constant** value that Advertisers may want limited, special affiliates to pass to them via Epic affiliate links ** |
| affiliate_id-sub_id | %%AFFILIATE-SUB%% | The combination of affiliate_id and sub_id values |
| click_hash | %%CLICK_HASH%% | An alpha-numeric value which when decoded identifies affiliate, click, and offer data *** |
| nsrc | az2 | For advertisers not placing tracking pixels, this **constant** variable value pair can be passed along with click_hash to help advertisers identify Epic leads |

\*    Can be renamed as long as it adheres to standard URL format rules.

\*\*   If a field called "Data Pass-Thru" is turned on in the Epic system for the offer (set up by Epic Managers), any additional variables appended to affiliate links (usually set up by the Affiliates or Affiliate Managers running the offer) may also be passed.

\*\*\* Enabled by turning on a field called "Direct Reporting" in the Epic system for the offer (set up by Epic Managers).

For example:  If an Advertiser wants to log the "affiliate id" of Affiliates sending user traffic, then in the Epic system the landing URL will be set up, per offer, like this by an Epic manager:

http://www.advertiserspage?affiliate_id=%%AFFILIATE_ID%%
http://www.advertiserspage.com/product-abc.html?affiliate_id=%%AFFILIATE_ID%%
http://www.advertiserspage.com/registration.html?affiliate_id=%%AFFILIATE_ID%%

Upon a user's arrival to the Advertiser's offer landing page, the URL may appear like this:

http://www.advertiserspage.com/affiliate_id=12345
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345
http://www.advertiserspage.com/registration.html?affiliate_id=12345

To use these preset Epic variables, Advertisers should notify their Epic manager in advance so that proper set up and tests may be observed.

URL format follows a set of standard rules for passing variables. A question mark (?) indicates the end of the web address, and the beginning of the variables being passed. The first variable will always be pre-pended with a question mark. All additional variables thereafter will be pre-pended by an ampersand (&).

## 2.3.    Sub ID Restrictions

Note that the sub_id's value is restricted to alphanumeric characters and _ (underscore).  This means a-z and 0-9 respectively as well as the underscore symbol.

The use of spaces or any of the following characters is strictly prohibited:

| Character | Description | Character | Description |
|---|---|---|---|
| ; | Semi-colon | - | Minus sign |
| , | Comma | $ | Dollar sign |
| / | Front slash | % | Percent sign |
| \ | Back slash | ^ | Carrot |
| ? | Question mark | ! | Exclamation mark |
| : | Full colon | ( | Open parenthesis |
| = | Equal sign | ) | Close parenthesis |
| # | Number sign | ~ | Tilde |
| & | Ampersand | ' | Single quote |
| + | Plus sign | " | Double quote |
| [ | Open bracket | ] | Close bracket |
| { | Open bracket | } | Close bracket |
| > | Greater than | < | Less than |
| | | Pipe | _ | Underscore |
| * | Asterisk | @ | At sign |

## 2.4.    Hardcoded Custom Variables

Hardcoded custom variables, adhering to standard URL format rules, may also be passed to Advertisers upon request. This allows Epic to send additional data to Advertisers, using their own specified variables, for extended internal tracking purposes.

All hardcoded custom variables will retain their names throughout the process and should follow the same standard as variable sub_id's.  This means that no spaces and no special characters will be accepted in the variable names or their values.

EPIC003218

For example:  If an Advertiser wants to log the preset Epic variable "affiliate_id" of Affiliates sending user traffic and also the Epic "offer_id" the traffic is for, then in the Epic system the landing URL will be set up, per offer, by an Epic manager like this:

http://www.advertiserspage.com?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789

Notice that the offer_id variable's value is hardcoded to the landing page URL.

Upon the user's arrival to the Advertiser's offer landing page, the URL may appear like this:

http://www.advertiserspage.com?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=12345&offer_id=6789

To use hardcoded custom variables, Advertisers should notify their Epic manager in advance so that proper set up and tests may be performed.

## 2.5.   Affiliate Links and Tracking

For Epic to manage all the offers, traffic, activities, and reporting in our Advertiser and Affiliate network, all Advertiser links are provided to Affiliates in the form of Epic offer-specific links first.

A sample Epic Affiliate link is below:
http://x.azjmp.com/009Gv

In this example, **x.azjmp.com** is the Epic sub-domain and domain respectively; and **"009Gv"** is the Epic unique id for this link which contains pertinent information such as:

- The affiliate id
- The offer id
- The traffic type

When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page.

Upon the user's arrival to the Advertiser's landing page, Epic will set cookies on the user-side to tag the prospect with Epic data for tracking purposes.

The URL the user lands with will usually appear as the offer landing page URL as provided to Epic – along with any variables requested such as:

http://www.advertiserspage.com?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=12345&offer_id=6789

EPIC003219

## 2.6.    Return Days

This feature enables Advertisers to compensate Affiliates for leads that were not converted during the users' initial visit via an Affiliate link; but, rather is converted during a subsequent visit.

> With Return Days, Epic offer Advertisers the opportunity to specify, per offer, a time window for Affiliates to be credited for a future lead conversion completed from a previous unconverted click.

This functionality uses cookie technology.  When a user clicks-thru from an offer-specific Affiliate link and lands on the Advertiser website, Epic will set a Return Days cookie on the user-side.  This cookie will store information for this feature including the number of days the cookie will be valid before it expires, which our system will read.

The cookie will remain valid either before its auto expiration date or when an Affiliate deletes the cookie.

Typically, Returns Days are set to expire in 30, 60, or 90 days.  Epic recommends higher Return Days as a competitive incentive to attract affiliates.

Below is an example of how Return Days work if an offer is set for 30 Return Days:

- User clicks through from an Affiliate offer link.

- Epic sets cookies on the user-side including one for 30 Return Days.

- Epic redirects the user to Advertiser's website.

- User lands on Advertiser's offer landing page.

- User departs Advertiser's website before converting.

- User returns to Advertiser's website directly or via a bookmark within 30 days (not from an Affiliate link).

- User proceeds to complete the offer transaction and lands on Advertiser's lead conversion page (usually a Thank You or Confirmation page).

- Epic reads Tracking Pixel (explained on following page) on the Advertiser's lead conversion page; checks the user-side for cookies; associates the Lead, the Affiliate, and the Offer; and returns the data to Epic.

- Affiliate will be credited for the lead.

   **Continue**...

EPIC003220

To offer Return Days, Advertisers should notify their Epic managers in advance so that proper set up and tests may be performed.

> **Note:**
>
> In order to credit affiliates properly, Advertisers that are working with **multiple networks (Epic + other networks)** and planning to use Return Days will need to set their **own** cookies and codes; so that they may track each network's traffic and then conditionally display the correct network's tracking pixel on their lead conversion page.

## 2.7. Tracking Pixel and Integration

Our system tracks various activities including key statistics such as impressions and clicks for both Advertiser and Affiliate reporting.

**In order to close the circle and track leads, we simply require Advertisers to add a 1 line IFRAME tracking pixel code in the body of their lead conversion page (typically a Thank You or Confirmation page).\*\***

> Advertisers that are running Epic programs only, can simply display the Epic tracking pixel every time "any" users land on their lead conversion page.
>
> Advertisers that are running multiple ad/affiliate network programs (Epic + other networks) **and** offering Return Days will need to set their own cookies/codes to track each network's traffic; and conditionally display the correct network's tracking pixel on their lead conversion page in order to credit affiliates properly.

The pixel will be invisible to the Advertiser's website visitors; and it will not change the Advertiser website's look and feel.

The code cleanly displays a transparent 1x1 pixel graphic which triggers verification activities to check if the lead was from an Epic Affiliate referral; if yes, then return data to Epic for reporting.

**The pixel can be implemented as secure (https://) or non-secure (http://) depending on the Advertiser's needs.**

> HTTPS is an encrypted version of HTTP implemented over an encrypted SSL, Secure Socket Layer, standard. SSL enables the encryption of sensitive information in order to provide reasonable protection from eavesdroppers during online data transmissions.
>
> Epic's SSL certificate is registered for the domain of **azjmp.com**

**Advertiser's Epic Manager will distribute a unique code per Advertiser, per offer. \*\***

EPIC003221

---

**Sample IFRAME Tracking Pixel Code (Do Not Use)**

Secure:
`<iframe src="https://l.azjmp.com/f.php?o=[offer_id]" width="1" height="1" frameborder="0"></iframe>`

Non-Secure:
`<iframe src="http://l.azjmp.com/f.php=[offer_id] height="1" width="1" frameborder="0"></iframe>`

\*    [offer_id] would be replaced with the unique ID of the Epic offer.

\*\*  If IFRAME pixel is incompatible with Advertiser website, Epic will provide an IMG pixel.

---

## 2.8.    Advertiser Order ID

We highly recommend that you pass a unique value or orderID in the tracking pixel.

Simply append the value using "**e=**" to the tracking pixel.  For example:

---

`<iframe src="http://l.azjmp.com/f.php?o=1234&e=XXXXX" width="1" height="1" frameborder="0"></iframe>`

---

Our system will capture your unique/orderID value associated with each lead.

## 2.9. Delay Reporting

This feature is only required for advertisers who can not add an Epic tracking pixel to their lead conversion page. This results in the lack of lead tracking and reporting by Epic.

In order to secure reporting, Epic will need the Advertiser to track the lead conversions themselves and then send the "Delay Reporting" to us.

**File Format:**

- Comma delimited format (.csv)

Note: File may be zipped.

**File Header and Fields:**

- Offer Name (required)
- Offer ID (required)
- Affil ID (required) *
- Sub ID (required if applicable)
- YYYY-MM-DD (required)
- No. of Leads (required)

* If using affiliate_id-sub_id **or** click_hash variables, data should be reported under this field.

**File Naming Convention:**

- [offer id]_[YYYYMMDD].csv

For example, 1234_20081112.csv
where 1234 is the offer ID.

**File Transfer via Email:**

- Email Address:  reporting@azoogleads.com
- Subject Line:  Delay Reporting – Offer ID **[offer id]**

For example, Delay Reporting – Offer ID 1234
where 1234 is the offer ID.

Alternatively, Epic can pick up the reports from an Advertiser's hosted FTP site. Advertiser will need to create an FTP account for Epic and provide the login information to us.

**File Transfer Frequency:**

- Daily

## 2.10.    Email Opt-Out Suppression File

This feature is only required for advertisers accepting e-mail traffic types (affiliates may run e-mail campaigns promoting the advertiser's offer).  In which case, the advertiser will need to provide consumers with the option to unsubscribe/opt-out from receiving future e-mail promotions.

According to CANSPAM, all consumer unsubscribe requests must be processed with 10 business days of request.  To accommodate processing time, advertisers must deliver their suppression lists, containing new unsubscribe email addresses, to AzoogleAds between 1-7 business days of a consumer's unsubscribe request.

We currently utilize the services of UnsubCentral (www.unsubcentral.com) to process and host our advertisers' suppression files.  UnsubCentral will remove any email address which contains any special characters which are not compliant with RFC standards.  Our publishers will download your suppression list directly from UnsubCentral.

UnsubCentral currently has several options for automation methods available.  The preferred methods are via email or FTP, or if you are also an UnsubCentral client.

### Email

- We will provide you with a unique UnsubCentral email address to send your suppression lists to
    - ❖ Looks like **[HASH]**@EpicAdvertising.login2.unsubcentral.com
- When emailing suppression lists to UnsubCentral, there are no hard coded size limitations for incoming email to UnsubCentral.  Emailing an attachment or one email address per line within the body of the email are both supported, but the file needs to be in a standardized format for UnsubCentral to be able to process it.
- Currently, the files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ.  .XLS files, .XLSX files, .DOC files, .DOCX files, .RTF files and other proprietary formats are not supported by UnsubCentral.
- Each email address within the suppression list needs to be on its own line without any extra characters.  Leading and trailing whitespace, commas, quotations, and other delimiters should all be removed leaving nothing but one email address on each line.

### FTP

- UnsubCentral will automatically log into the your FTP server weekly to retrieve and process the suppression list
- If your FTP site has IP restrictions, you must allow UnsubCentral's IP address to access their FTP server, as well as our own IP address
- The files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ.  Other formats such as .XLS files, .XLSX files, .DOC files, .RTF files are not supported by UnsubCentral.  The files can be comma-delimited or tab-delimited, but email addresses in the first column are preferred

- Dynamic filenames are supported using regular expressions

### Mutual UnsubCentral Clients

- If you are already working with UnsubCentral, we will setup an automatic fetch to pull their suppression list from their UnsubCentral account weekly
- To do this, we will need a permanent key (i.e. One that does not expire)
- To make the key permanent, please contact your UnsubCentral account manager to make that URL permanent and provide us with the full URL to the key (i.e. https://login.unsubcentral.net/uc/[**HASH**])

### HTTP

- We can setup UnsubCentral to automatically fetch from a simple HTTP site
- Simple login credentials are supported (standard IE or FF popup box for login credentials)
- Static GET and POST URLs are also supported (e.g. http://www.yoursite.com/suppression/suppressionlist.zip)

  The files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ.  Other formats such as .XLS files, .XLSX files, .DOC files, .RTF files are not supported by UnsubCentral.  The files can be comma-delimited or tab-delimited, but email addresses in the first column are preferred

## 2.11.    Advertiser-Side Reporting

Unless this feature is waived by Epic business managers, all advertisers are required to track Epic lead conversions internally and make the report accessible online behind a password-protected website to Epic.

Requirements:

- Login page with username and password requirements
- Both Itemized and Aggregate data viewing
- Ability to download the file in .csv (comma delimited) or .xls (excel) format
- Epic access to these reports should be available at all times

EPIC003225

## 2.12.   Test and Launch

Once all the features that are selected for an Advertiser's offer/campaign are implemented, as defined by the Advertiser and their Epic manager, then advertiser-side (internal) and Epic-side (external) tests will need to be conducted.  The goal is to ensure that lead conversion tracking and reporting are all in-place and set up properly prior to launch.

Following are general steps for testing and approval:

1.   **Advertiser performs internal test(s) by**

   a.   Clicking thru a test affiliate link, which an Epic technical manager will provide.

   b.   Completing a lead conversion (a sale, registration, etc).

   c.   Notifying the Epic technical manager once completed.

   d.   If Return Days feature is offered then a separate test is required by

      i.   Clicking thru a test affiliate link and departing the Advertiser website without completing a lead conversion on "visit 1".

      ii.   Visiting the Advertiser website directly and completing a lead conversion on "visit 2".

      iii.   Notifying Epic technical manager once completed.

2.   Epic technical manager verifies that the lead(s) was properly tracked and reported in the Epic system. *

3.   Once Step 2 is successful, the Epic technical manager will perform Steps 1-2 externally as a final test.

4.   Once Step 3 is successful, the Epic technical manager will officially sign off on the set-up approval.

* If Delay Reporting, Email Suppression Files, or Advertiser-Side Reporting is required, then tests and approvals are necessary for these features as well.

| |
|---|
| Please *CLEAR* your cookies before *EACH* test. |

EPIC00422.

### 3.   PROCESS FLOW



EPIC003227

4.       HELP

For help during the implementation process, Advertisers will have access to their assigned Epic technical managers.

For help after launch, Advertisers may contact their dedicated Epic business managers.  Our business managers will bring in the proper resources, including technical support assistance when needed.

Thank you for choosing Epic Advertising!

EPIC003228

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

ESSOCIATE, INC,

　　　　　Plaintiff,

　　v.

EPIC MEDIA GROUP, INC., AZOOGLE.COM,
INC., AND SOCIAL ASSETS, LLC d/b/a
Kinetic Social,

　　　　　Defendants.

**Case No.  11-cv-727-bbc**

**DECLARATION OF MICHAEL LANDAU IN SUPPORT OF ESSOCIATE, INC.'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Michael Landau, hereby declare:

1.　　I am the Chief Technology Officer for Plaintiff Essociate, Inc. ("Essociate"), over the age of 18, and competent to testify in this action.

2.　　A true and correct copy of the U.S. Patent No. 6,804,660 (the "'660 Patent") is attached as Exhibit A.

3.　　Essociate is the proper assignee of the '660 Patent and all claims for damages at issue in this suit. A true and correct copy of the assignment of the '660 Patent application to Essociate is attached as Exhibit B.

4.　　Essociate achieved relative success notwithstanding Defendants' infringement.

5.　　The invention disclosed by the '660 Patent is an improvement to hub affiliate networks—such as LinkShare—and merchant affiliate networks—such as Amazon.com's affiliate network. XPays needed a way to enable tracking by a merchant affiliate network of the XPays referring source webmaster when the merchant had a system for tracking referrals from affiliates at the sub-ID level. The first example of this occurred when XPays began participating in the SexToy.com merchant affiliate network.

6.　　Essociate first learned of the infringing nature of the Accused Epic Network in

2011.

7.      At that time, Essociate discovered Click URLs and Destination Landing Page URLs associated with the Accused Epic Network and was enabled thereby to conduct a satisfactory Rule 11 investigation of the Accused Epic Network, which is the only accused infringing device in this case.

8.      Essociate does not accuse the Old Azoogle Network of infringement in this case, though the Accused Epic Network was operated by Azoogle apparently under the new d/b/a/ "Epic," from 2008 to 2010.

9.      Essociate was never able to conduct a Rule 11 investigation into the issue of whether the Old Azoogle Network infringed.

10.      Rather, its previous counsel sent correspondence in late 2004 and early 2005 expressing Essociate's suspicion that the Old Azoogle Network did infringe.

11.      Azoogle's counsel responded with representations that the Old Azoogle Network did not utilize any tracking methods other than cookie or pixel tracking.

12.      Although that appears to be a misrepresentation, Essociate did not initiate suit because it lacked the technological evidence to satisfy its Rule 11 obligations with respect to the Old Azoogle Network.

13.      Essociate did not know until the time this suit was filed that Epic had any relationship with Azoogle.com, Inc. or that the Accused Epic Network was the replacement device for the Old Azoogle Network.

14.      The '660 Patent was issued to Essociate, Inc. Mr. Horowitz and myself are the listed inventors.

15.      "Virtual affiliates" carries the meaning set forth in the ''660 Patent, which does not prohibit the virtual affiliate from being a member of the target affiliate network. Acting as a virtual affiliate merely requires that the webmaster in question be sending traffic to the target affiliate system independent of any membership that webmaster might have in the target affiliate network.

16.     Essociate communicated its belief that the Old Azoogle Network may have infringed the '660 Patent. But Azoogle's counsel communicated that the Old Aoogle Network did not enable tracking through the inclusion of affiliate codes in Destination Landing Page URLs. And Essociate lacked technological evidence to disprove that representation or conduct a Rule 11 investigation sufficient to learn whether the Old Azoogle Network in fact infringed.

17.     A true and correct copy of Essociate's October 19, 2004 letter to Azoogle is attached as Exhibit C.

18.     A true and correct copy of Azoogle's October 25, 2004 letter to Essociate is attached as Exhibit D.

19.     A true and correct copy of Azoogle's November 3, 2004 letter to Essociate is attached as Exhibit E.

20.     A true and correct copy of Essociate's November 23, 2004 letter to Azoogle is attached as Exhibit F.

21.     A true and correct copy of Azoogle's November 30, 2004 letter to Essociate is attached as Exhibit G.

22.     This letter indicates my belief that the Old Azoogle Network may still use infringing URL-based tracking methods even though the Old Azoogle Network claims to rely primarily on cookie and pixel tracking. But I was never able to obtain evidence to disprove Azoogle's representation or satisfy Essociate's Rule 11 violation.

23.     The Xmake.CGI script does not relate to the technology disclosed by the '660 Patent.

24.     The Xmake.CGI script was not used in any system that embodied the invention disclosed in the '660 Patent.

25.     Essociate has been forced to advance several hundred thousand dollars in costs, which has imposed a substantial burden on Essociate. Essociate was unable to fund those costs until 2009 primarily due to the market share wrongfully appropriated by large infringers such as defendants.

26.     The Accused Epic Network utilizes URL-based tracking to refer traffic to merchant customers' existing target affiliate systems. There is no evidence that Linkshare ever utilized that tracking method or referred traffic to an existing target affiliate system before the priority date for the '660 Patent.

27.     The Destination Landing Page need not allow the user to take any action for the '660 Patent to be infringed. For example, sometimes compensation will become owing purely as a result of the user having visited the merchant's site.

28.     The transmission path from a webmaster's web page through the Epic system to the Destination Landing Page URL is often visible in the user's browser address bar and browser history.

29.     The Accused Epic Network needs to provide its affiliate IDs to merchants who request that it be included in their Destination Landing Page URLs for the merchants' requisite tracking in order to be marketable to the merchants who desire that service. Additionally, the Accused Epic Network can use the click-hash it includes in those Destination Landing Page URLs as a secondary method of tracking and it can also use non-click-hash URLs contained within its merchant's records to reconcile disputes between the Accused Epic Network and its merchant customers over transaction tracking. All that is required to infringe the '660 Patent is for the use of the source webmaster ID values included in Destination Landing Page URLs to become a possible source of tracking for either the merchant or the Accused Epic Network or both.

30.     The affiliate ID values contained within an infringing Destination Landing Page URL are not "passed long"—they are created anew and included in a hybrid string of characters along with a value identifying the Accused Epic Network as the referring system as a function of the macros a Epic customer service representative configures the Destination Landing Page URL to include.

31.     The Accused Epic Network relied on the inclusion of click-hashes of Destination Landing Page URLs for secondary tracking and was able to use the literal values in those

Destination Landing Page URLs for tracking as well which is all that is necessary to infringe the '660 Patent.

32.     "Old XPays" was used after May 1, 1999 and "New XPays" was not used prior to May 5, 1999.

33.     The structure of Old XPays was disclosed both during the prosecution of the '660 Patent and in the discussion of prior art of the '660 Patent as it was substantially identical to Linkshare.

34.     The deposition portions cited do not support this factual assertion. And because of the use of intermediate page, Old XPays affiliates could not provide traffic to python or iGallery—they could only provide it to XPays.

35.     Old XPays did not associate webmasters with merchants and was not "used to track referral identifying the referring webmaster."

36.     These webpages do not show that "Old XPays was a commercialized, fully operational system."

37.     Python and iGallery were not configured to receive referrals from affiliates signed up with Old XPays.

38.     Python and iGallery could not recognize a transaction as originating from an Old XPays affiliate. Instead, Horowitz and myself were forced to track it manually. Python and iGallery could only tell that traffic was being referred from XPays.

39.     Old XPays was unable to allow its affiliates to refer traffic to a target merchant.

40.     There is no evidence that Python or iGallery had a unique identification system apart from the Old XPays identification system for their own affiliates.

41.     There is no evidence that the identifier Old XPays received from Python or iGallery was unique.

42.     Essociate does not know whether or not the 811930 number was an identifier assigned to Old XPays by iGallery.

43.     The '660 Patent was allowed for multiple reasons.

44.     I testified that generally speaking, the correlation step was the crucial difference but many other important differences exist and the issue of the legal significance associated with the differences between Old XPays and the '660 Patent is a question of law, not fact.

45.     The hybrid string embodiment described at Col. 11:17–22 in the '660 Patent does not provide for the addition of "an individual affiliate's ID to the end of a single target-merchant ID" or the creation of "a unique ID that can be passed through to the target merchant".

46.     One of ordinary skill in the art would not recognize that scripting platforms such as CGI, PHP, Apache, and Perl, among others, would allow virtual affiliate systems to create a template that could incorporate the source webmaster ID into a URL for the target affiliate system in response to a user request originating from a source webmaster.

47.     Old XPays did not use the hybrid string method of correlation described at Col. 11:17–21 in the '660 Patent.

48.     The correlation step did not occur with Old XPays.

49.     The URL "http://www.xpays.com/clients/00025/01/promo.html" is not an example of a link used in association with Old XPays.

50.     "00025" is not an example of a link used in association with Old XPays.

51.     Xmake.cgi was never used in association with Old XPays. It was used in association with Netfill which did not operate its own merchant affiliate network. Additionally, no script was operated at the intermediate page of Old XPays. Rather, the script was used long in advance to create the intermediate page. Horowitz and Landau manually used the script for each affiliate to create separate intermediate pages for each affiliate.

52.     The xmake.cgi script was never used in association with Old XPays or in relation to any merchant customer operating its own target affiliate system.

53.     This link does not relate to the invention disclosed by the '660 Patent.

54.     The xmake.cgi script was never used in association with Old XPays or in relation to any merchant customer operating its own target affiliate system.

55.     The xmake.cgi script was never used in association with Old XPays or in relation

to any merchant customer operating its own target affiliate system.

56.     The xmake.cgi script was never used in association with Old XPays or in relation to any merchant customer operating its own target affiliate system. No correlation occurred with respect to Old XPays. In Old XPays, the merchant did not use the supposed hybrid string values for tracking nor was there a hybrid string of values.

57.     The Old XPays system did not generate a URL, did not correlate anything to a "target webmaster unique identifier", did not provide either service for Python or iGallery and never involved a correlated hybrid string.

58.     No URL was generated with Old XPays and Python and iGallery were never able to recognize the referring source webmasters associated with Old XPays.

59.     No URL was generated in the Old XPays system and no webmaster identifier was used by the target system for requisite tracking.

60.     I have extensive programming experience.

61.     Correlation functions—as contemplated by the '660 Patent—were novel at the time the invention disclosed by the '660 Patent was conceived.

62.     Neither Graber patent makes the claimed disclosures.

63.     The correlation contemplated by the '660 Patent would not have been obvious to a person of ordinary skill in the art.

64.     The virtual affiliate networking technique disclosed by the claims of the '660 Patent were not known in the art by May 1, 1999.

65.     Multi-tier affiliate system techniques were not known in the art relevant to the '660 Patent.

66.     The Be Free system does not disclose the techniques associated with the claims of the '660 Patent.

67.     The virtual affiliate networking techniques disclosed by the claims of the '660 Patent were not known in the art before May 1, 1999.

68.     One of ordinary skill in the art at the time of the '660 Patent would not have been

able to combine an existing affiliate system and other e-commerce or website development principals to create the invention claimed in the '660 Patent.

69.     Evan Horowitz and myself—the '660 Patent's inventors—did not inaccurately describe the Linkshare system during the prosecution of the '660 Patent.

70.     iGallery did not transfer transaction information to Old XPays for purposes of paying commissions to affiliates. Nor did the iGallery system know Old XPays involved affiliates.

71.     The '660 Patent discloses the algorithm or code or other structure necessary for performing the correlating step in claims 15 and 28—one example is the hybrid string method.

72.     The '660 Patent discloses structure both qualitatively and quantitatively comparable to that of other patents in the same field.

73.     A person of ordinary skill in the art would be able to determine the scope of claims 15 and 28 of the '660 Patent.

74.     Social media marketing and affiliate networking have significant overlap with respect to both business and technology. They often share the same software platforms, merchant customer bases, vendor relationships, proprietary data, and distribution channels. Social media marketing is an obvious and natural area of expansion for any affiliate networking company. Both fall under the general rubric of digital media marketing. And a multitude of digital media marketing companies do both affiliate networking as well as social media marketing, and even ad placement, because of the natural synergy between those three fields.

75.     A person of ordinary skill in the art would not have been able to combine old XPays with correlation functions known in the art and achieve predictable results.

76.     In online affiliate marketing, a merchant promotes goods or services by paying website operators ("webmasters" or "affiliates") to send consumers to the merchant's website.

77.     The basic components of online affiliate marketing are: (1) an online merchant; (2) webmasters who operate websites visited by consumers; (3) advertisements, including text ads or images ("banner ads"), provided by the merchant to be placed on an affiliate's website which, when clicked on by a visitor to one of the webmasters' websites, send the visitor's web browser to

the merchant's website; and (4) a financial incentive for webmasters to send visitors to the merchant's website.

78.     Essociate operates an online affiliate network at essociate.com in which Essociate's affiliated webmasters may obtain ads for online merchants—usually in the form of banner ads—to display on the webmaster's websites.

79.     Each banner ad Essociate provides to an affiliate functions as a hyperlink so that when the banner is clicked by a visitor to the affiliate's website (a website visitor may also be referred to as a "user" or "traffic"), the visitor's web browser is redirected from the webmaster's page to the URL associated with that hyperlink.

80.     Essociate needs to identify the affiliate responsible for each visitor in order to pay a commission, so each time Essociate provides a banner ad to an affiliate, the URL associated with the hyperlink (a "Click URL") includes a unique code identifying that Essociate affiliate.

81.     Then Essociate automatically redirects that traffic to the merchant (also referred to as a "hand-off") advertised on the banner ad by sending the traffic to a URL provided by the merchant to Essociate (a "Destination Landing Page URL").

82.     To the visitor, the hand-off occurs smoothly, and the next webpage displayed following their click is the merchant's webpage.

83.     The Click URLs Essociate provides to its webmaster affiliates for use on their websites use the following structure: http://go.essociate.com/[affiliate ID].[sub-id].[offer-ID].

84.     When an Essociate affiliate obtains a banner ad from Essociate to display on its website, the Click URL will be completed as follows: the [affiliate ID] value field will include the unique ID for that Essociate affiliate; the [sub-id] value field will include the Sub-ID specified by the affiliate (see following paragraph); the [offer-ID] value field will include a unique identifier for the particular advertisement.

85.     Essociate also permits its affiliates to designate a Sub-ID value which they may elect to include in a Click URL for a banner placed on their website.

86.     Sub-IDs permit a deeper level of tracking—for example, the affiliate may have

multiple webpages for which it would like to identify as the source of traffic.

87.     It may do so by inserting a different Sub-ID into the Click URL to indicate a specific webpage.

88.     Essociate's affiliate system tracks Sub-IDs for its affiliates.

89.     An Essociate affiliate might use the following Essociate Click URL: http://go.essociate.com/12345.12.1234.

90.     Essociate's Click URL identifies the Essociate affiliate (12345), the Sub-ID specified by that affiliate (12), and the offer the Click URL is for (1234).

91.     Essociate's affiliate network operates in several ways in order to accommodate the operations of each merchant.

92.     For some merchants, Essociate acts as an affiliate hub meaning that Essociate acts as an intermediary between affiliates and the merchants and supplies all of the back-end tracking functionalities for those merchants.

93.     Essociate's role as an affiliate hub is necessary where an online merchant lacks the infrastructure to operate its own affiliate network.

94.     Some online merchants operate their own affiliate systems in which webmasters may enroll as affiliates.

95.     Without the invention disclosed in the '660 Patent, neither Essociate nor any other affiliate network can participate as a hub in a merchant affiliate system because the merchant already has tracking functionality.

96.     Essociate's founders, Evan Horowitz and myself, invented the technology disclosed in the '660 Patent in order to permit a stand-alone affiliate network to participate in an existing merchant affiliate network in order to permit the stand-alone network's affiliates to participate in the merchant's offers.

97.     The primary challenge that had to be met was in reconciling the affiliate hub's system for affiliate tracking with the merchant affiliate system's method for tracking affiliate ID's and Sub-ID's.

98.     The invention disclosed in the '660 Patent enables this by permitting a stand-alone affiliate network to configure a merchant affiliate system to receive referrals from the network's own affiliates such that the merchant's existing tracking system can recognize the source of the traffic as originating from the stand-alone network.

99.     Essociate has participated in merchant affiliate systems for SpeedDate.com, AsSeenOnPC.com, and iBallers.com in order to provide Essociate's own affiliates with the ability to participate in those offers through Essociate's affiliate network.

100.     In all cases where Essociate participated in a merchant's existing affiliate network, the merchant provides Essociate specific instructions about how to configure the URLs the merchant's system in order that it will recognize and credit traffic originating from Essociate's webmasters.

101.     In order to participate in an existing merchant affiliate system, the merchant affiliate system assigns Essociate a unique affiliate ID and provides Essociate with a particular URL structure which Essociate is required to use in order to be able to refer its webmaster's traffic to that merchant.

102.     A unique affiliate ID and particular URL structure are assigned by SpeedDate.com, AsSeenOnPC.com, and iballers.com—as well as all of the other merchant affiliate systems Essociate has participated in in order to make that merchant's offers available to Essociate's own affiliates.

103.     The SpeedDate.com merchant affiliate system assigned Essociate a unique affiliate ID, "CD223", and instructed it to use the following Destination Landing Page URL: http://affiliates.speeddate.com/z/4/CD223/&subid1=[FIELD]&subid2=[FIELD]. A true and correct copy of an email from Sagi Cezana to Evan Horowitz and myself dated August 18, 2011 is attached as Exhibit H.

104.     That URL includes Essociate's unique affiliate ID for the SpeedDate.com merchant affiliate system, "CD223," and includes functional Sub-ID value fields (labeled as &subid1= and &subid2=) into which Essociate could include the originating Essociate affiliate ID

and Sub-ID.

105.    Essociate used SpeedDate.com's instructions and was successfully able to direct traffic from its affiliated webmasters to the SpeedDate.com merchant affiliate system.

106.    AsSeenOnPC assigned Essociate a unique affiliate ID, "CD4541," and instructed it to use specific Destination Landing Page URLs in order to participate in AsSeenOnMyPC offers. A true and correct copy of an email from Craig Amell to Evan Horowitz and myself on October 18, 2010 is attached as Exhibit I.

107.    AsSeenOnPC instructed Essociate to use the following Destination Landing Page URL for AsSeenOnPC's PillowPets offer:

http://asseenonpc.directtrack.com/z/1959/CD4541/&subid1={aff_sub}.

108.    AsSeenOnPC's URL includes Essociate's unique affiliate ID for the AsSeenOnPC merchant affiliate system, "CD4541".

109.    AsSeenOnPC's URL also includes the functional Sub-ID value field {aff_sub} which AsSeenOnPC instructed Essociate was to be filled with Essociate's "tracking systems sub ID code" which would facilitate AsSeenOnPC's "internal tracking".

110.    Essociate used AsSeenOnPC's instructions, including filling the {aff_sub} value field with the originating Essociate affiliate ID.

111.    The iballers merchant affiliate system assigned Essociate a unique affiliate ID, "40583," and instructed it to use a specific Destination Landing Page URL structure in order to participate in iballers offers: http://iballers.com/cgi-bin/ib.cgi/141/40583:[%M%]. A true and correct copy of an email from Adam Winters to David Schlesinger on September 9, 2011 is attached as Exhibit J.

112.    The URL structure provided by iballers includes Essociate's unique affiliate ID for the iballers merchant affiliate system, "40583".

113.    The URL also includes the functional value field [%M%] which Essociate filled with Essociate's unique affiliate ID which would facilitate iballers internal tracking.

114.    Essociate used these instructions, including filling the [%M%] value field with the

originating Essociate affiliate ID, and was successfully able to direct traffic from its affiliated webmasters to the iballers merchant affiliate system.

115.    Essociate filed this lawsuit within three years of the Accused Epic Network's creation and within months of learning about Epic's infringement.

116.    Without any revenue to fund litigation, there was no reasonable way for Essociate to file suit against Epic—a company that paid $3 million per month in commissions alone.

117.    This suit has been costly and complicated.

118.    The evidence Defendants allege was lost would have been gone by 2001, if it ever even existed.

119.    Essociate provided all relevant XPays records in the possession, custody, or control of Evan Horowitz and myself even though XPays is not a party to this action.

120.    All materials relating to the operation of XPays' affiliate system in 1998, 1999, and 2000 were lost or discarded by 2001 in the normal course of business, with the exception of the copies of certain materials—the xmake.cgi script and the html files Essociate was able to locate— all of which Essociate produced.

121.    In *Essociate, Inc. v. Blue Whaler Investments, Ltd. et al.*, U.S.D.C. Case No. 10-cv-2107-JVS, Essociate asserted infringement claims against several competing online affiliate networks. The defendants that participated in claim construction infringed the '660 Patent in essentially the same manner as Epic and relied primarily on Old XPays, just like Epic.

122.    Like Essociate, Epic provided offers from merchants with existing affiliate systems.

123.    A Destination Landing Page URL is part of the merchant's affiliate system.

124.    Based on my dealings on behalf of Essociate with many of the same merchant affiliate systems Epic provided services to, I am able to confirm that at least approximately 1200 of the configured Destination Landing Page URL's in Epic's offer_urls table are infringing offers.

125.    In the example SpeedDate.com TWUID: a=53 is the value field containing the

unique ID assigned to Epic; $c=1$ is the value field containing an identifier for a particular SpeedDate.com advertising offer; $s1=48192$ is the value field containing the SID of the originating Epic affiliate; and $s2=12268$ is the value field containing the Sub-ID selected by the Epic affiliate.

126.    Epic's claim that I testified that passing the SID is not correlation is incorrect. Rather, my testimony was that Old XPays did not use correlation because the SID (the XPays affiliate ID) was not correlated to a "target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system".

127.    XPays practiced several forms of the prior art affiliate services. For example, in 1998 XPays provided affiliate services to a company called Netfill. XPays operated as an "Internet affiliate service bureau" in connection with Netfill which Epic's expert defines as a service provided to "e-commerce merchants that did not want to build their own affiliate networks."

128.    Epic's expert is incorrect when he says "the system that XPays operated in 1998 also worked as a virtual affiliate system...it contained a mechanism by which it could interface with other affiliate systems, allowing XPays affiliates to send visitors to merchants outside the XPays affiliate network; that is, to merchants that ran their own affiliate programs." This is false.

129.    Neither iGallery nor Python assigned XPays any Sub-ID's or additional affiliate codes which could be used to track XPays affiliates.

130.    In order to track its affiliates, XPays improvised by manually building and hosted a separate webpage for each XPays affiliate that participated in the iGallery campaign.

131.    When an XPays affiliate enrolled with XPays to participate in the iGallery campaign, XPays would manually build and host a web page for that affiliate to participate in that campaign (an "Intermediate Page").

132.    XPays provided a Click URL to their affiliate which looked substantially as follows: xpays.com/igallery/12345 (where igallery was the campaign ID and 12345 was the affiliate ID), and which linked to the Intermediate Web page created and hosted for that specific

XPays affiliate.

133.    At the Intermediate Page, a banner ad for iGallery would be displayed with an embedded hyperlink to iGallery's website.

134.    No URL was generated, as required for the second step of claim 1 of the patent.

135.    No Destination Landing Page URL was displayed or contained in the browser or any part of the user interface.

136.    The user was not automatically forwarded to the website of the target merchant affiliate system as required both by Defendant Epic's proposed construction of "generating a URL" and the construction of "generating a URL" adopted by Judge Selna in the *Blue Whaler* case.

137.    The five-digit XPays affiliate ID did not have any functionality within either iGallery's or Python's system.

138.    Epic's expert incorrectly states that "Old XPays affiliates could use the Old XPays system to send their site visitors to an iGallery web site, and be tracked by the iGallery affiliate system." iGallery performed no such tracking or had the ability to do so. The only code ever accepted by or functional within those systems was the code for XPays itself (e.g. "Xpays"), which identified XPays but was the same for every XPays affiliate participating in those campaigns.

139.    Old XPays did not involve a correlating step.

140.    The correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL.

141.    The Python and iGallery Destination Landing Page URL's did not have Sub ID value fields.

142.    Python and iGallery had no technological ability to track at the Sub ID level.

143.    Horowitz and myself would modify the Destination Landing Page URL by appending the referring affiliate's ID code on the end, such as iGallery.com/Xpays12345.

144.     Horowitz and myself manually tracked—as opposed to relying on the merchant affiliate system being capable of tracking as disclosed in the '660 Patent—how many transactions were associated with a Destination Landing Page URL containing the 12345 affiliate ID, and then calculate for themselves what commissions to pay that affiliate.

145.     The iGallery and Python merchant affiliate systems had no idea what the 12345 value meant and did not track transactions were associated with it, which means it failed the requirements of the correlation step, which provides: "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system."

146.     The Python and iGallery systems did not practice the invention disclosed by the '660 patent because the affiliate ID that appeared in the Click URL did not correspond to a value that "corresponded to the unique identification system of the requested Merchant affiliate system."

147.     It instead corresponded to a value that was unrecognized by the Python and iGallery systems in a value field that, from Python and iGallery's point of view, did not exist.

148.     Python and iGallery did not have the ability to recognize a transaction as originating from a source Webmaster in an affiliate pooling system—it only had the ability to recognize the referring pooling system, which was XPays.

149.     Epic discusses the functionality of the <xmake.cgi> script, but there is no evidence that <xmake.cgi> was used in connection with the iGallery or Python campaigns. In fact, the date on that file is from November 1998, months prior to the iGallery and Python campaigns.

150.     At the time, XPays was only providing "affiliate service bureau" services to Netfill—which Epic does not claim invalidates the '660 Patent. Additionally, the <xmake.cgi> file contains a reference to a specific XPays computer server used only for providing services to Netfill, and not services provided in connection with Python or iGallery.

151.     The need to correlate affiliate codes in Click URL's to unique identifying codes recognizable by a target merchant affiliate system did not arise until myself and Horowitz began

referring XPays' affiliate traffic to the Sextoy.com merchant affiliate system (which occurred less than a year before the '660 patent application was filed).

152.    The Sextoy.com merchant affiliate system had the capability of tracking at the Sub ID level, and its own Sub ID coding conventions.

153.    This meant that myself and Horowitz had to invent the '660 patent's correlation technology to ensure that the affiliate ID in their Click URL's resulted in a Sub ID in the Destination Landing Page URL that was functional within the target merchant affiliate system.

154.    It also meant they could rely on the Sextoy.com merchant affiliate network's own tracking functionalities to calculate the commissions owed to the referring XPays affiliates.

155.    It was not until XPays began participating in the Sextoy.com merchant affiliate network that the invention disclosed by the '660 patent was first publicly used.

156.    Epic's claim that I previously admitted that either Python or iGallery had a "unique" identification system for their affiliates is false.

157.    Epic's expert's application of the "user request" step to Old XPays is irreconcilably flawed because it is internally inconsistent. Kent claims that the user request (i) occurs when "[t]he visitor's browser sends a request for the Intermediate Page [hosted by XPays] to the Xpays server," and (ii) that it is something "sent to the target merchant. But these are distinct events—the request for the Intermediate page is sent to XPays, not the target merchant.

158.    In the '660 Patent, the request initiated with the link continuing the SID is sent to the affiliate pool and the user is "handed off" to the target Merchant affiliate system. But in Old XPays, the first "request" dead ends at the Intermediate Page, which is XPays—not the target merchant affiliate system. To get there, you have to request (by clicking) yet again.

159.    The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The Old XPays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated.

160.    XPays could not have used a "script" to "perform the correlating step" when a visitor arrived at the Intermediate Page because the script was used to create the Intermediate Page.

161.    Mr. Horowitz was required to manually run a script in order to create the Old XPays Intermediate Page and all of its components. It is nonsensical to talk about running the script once the visitor has already arrived at an Intermediate Page, because running the script is how that page was created.

162.    The Old XPays system had no ability to retrieve information for specified transactions, instead iGallery sent transaction reports to XPays without any breakdown by affiliate. Horowitz and myself had to manually calculate payments to XPays affiliates.

163.    iGallery never "had access to the Old XPays affiliate pooling system."


Dated February 22, 2013.

Michael Landau
in Greenbrae, California

Sagi Cezana <sagi@speeddate.com>                                              August 18, 2011  3:50 p.m.
To: "'Michael Landau'" <michael@essociate.com>
Cc: "'Evan Horowitz'" <evan@essociate.com>, <david@essociate.com>
RE: SpeedDate Copy of Essociate IO (david.mizne@speeddate.com)

---

Michael,

To add a subid just add &subid1=<id> to the end of the URL.  You can have upto 5 subids.  Here is an example using subid1 and subid2:
http://affiliates.speeddate.com/z/4/CD223/&subid1=michael&subid2=landau

Are you able to provide me with a server to server pixel?

-Sagi


**From:** landau@gmail.com [mailto:landau@gmail.com] **On Behalf Of** Michael Landau
**Sent:** Thursday, August 18, 2011 3:37 PM
**To:** Sagi Cezana
**Cc:** Evan Horowitz; david@essociate.com
**Subject:** Re: SpeedDate Copy of Essociate IO (david.mizne@speeddate.com)

Hi Sagi,

Please send me the linking syntax for subID tracking within our account.

Can I simply send you a secure image pixel to place or do we need to implement another sort of reporting?

Also, it would be great if you could forward me a zip file of all of your creative.

Thanks in advance!

Michael


On Thu, Aug 18, 2011 at 3:23 PM, Evan Horowitz <evan@essociate.com> wrote:
thanks Sagi! will countersign and get back to you when I am back in the office later.  Michael, please integrate
SpeedDate.  best, Evan


On Thu, Aug 18, 2011 at 3:19 PM, Sagi Cezana <sagi@speeddate.com> wrote:
Attached are the signed terms

-Sagi

**From:** evanmichael@gmail.com [mailto:evanmichael@gmail.com] **On Behalf Of** Evan Horowitz
**Sent:** Monday, August 15, 2011 9:04 PM
**To:** David Mizne

**Cc:** michael@essociate.com; david@essociate.com; sagi@speeddate.com
**Subject:** Re: SpeedDate Copy of Essociate IO (david.mizne@speeddate.com)

hi Everyone, we are ready to roll.  let's execute and integrate.  please zip us up all available creative for publishers.  best,

A1898

Evan

On Thu, Jul 7, 2011 at 3:39 PM, David Mizne <david.mizne@speeddate.com> wrote:
Hey all,

I incorporated all of our requested changes within the Google doc.

Thanks,
David Mizne
Marketing Associate
Speeddate.com

---

**From:** evanmichael@gmail.com [mailto:evanmichael@gmail.com]
**Sent:** Thursday, July 07, 2011 1:14 AM
**To:** david.mizne@speeddate.com
**Cc:** michael@essociate.com; david@essociate.com; sagi@speeddate.com
**Subject:** SpeedDate Copy of Essociate IO (david.mizne@speeddate.com)

        I've shared SpeedDate Copy of Essociate IO

**Message from evanmichael@gmail.com:**
Optional method to edit the Essociate IO.  best, Evan

Click to open:
·    SpeedDate Copy of Essociate IO

Google Docs makes it easy to create, store and share online documents, spreadsheets and presentations.



craig@asseenonpc.com                                                      October 18, 2010  7:22 a.m.
To: "Michael Landau" <michael@essociate.com>
Cc: "Evan Horowitz" <evan@essociate.com>, "David Schlesinger" <david@essociate.com>
RE: Re: [SPAM] IO scan

---

Hello Michael,

Thank you for your pixels. Your tracking pixels have been loaded in our system. Below you will find your affiliate link for each campaign below. Please note that you will need to switch the aff_sub with your tracking systems sub ID code. This will allow your information to be passed along to us in our internal tracking software.

Once you have your test links ready I will be happy to get these tested and loaded for you.


GEM for Women:
http://asseenonpc.directtrack.com/z/4113/CD4541/&subid1={aff_sub}

Miracle Foot Repair:
http://asseenonpc.directtrack.com/z/3365/CD4541/&subid1={aff_sub}

P90X:
http://asseenonpc.directtrack.com/z/2449/CD4541/&subid1={aff_sub}

Instyler:
http://asseenonpc.directtrack.com/z/1458/CD4541/&subid1={aff_sub}

Green Wash Ball:
http://asseenonpc.directtrack.com/z/4555/CD4541/&subid1={aff_sub}

Rack Trap:
http://asseenonpc.directtrack.com/z/4020/CD4541/&subid1={aff_sub}

CamiSecret:
http://asseenonpc.directtrack.com/z/3641/CD4541/&subid1={aff_sub}

PillowPets:
http://asseenonpc.directtrack.com/z/1959/CD4541/&subid1={aff_sub}

Craig Amell
www.AsSeenOnPC.com
Catalog Solutions Inc.
Affiliate Director
25 Walls Drive Suite 1-C
Fairfield, CT, 06824
P: 203.256.9897
F: 203.256.9845




-------- Original Message --------
Subject: Re: [SPAM] Re: IO scan
From: Michael Landau <michael@essociate.com>
Date: Mon, October 18, 2010 1:10 am
To: craig@asseenonpc.com
Cc: Evan Horowitz <evan@essociate.com>, David Schlesinger
<david@essociate.com>

A1900

Hi Craig,

Here are our pixels ... please send me over proper redirect links for
passing in our affiliate sub-tracking values to the various offers.
Once the pixels are all setup and I have the redirect info, I will
send you over test links.

Pixel fire substitutions ...
{aff_sub} = sub-affiliate tracking value
{transaction_id} = unique transaction number

GEM for Women:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1061"
frameborder="no" height="0" width="0">

Miracle Foot Repair:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1060"
frameborder="no" height="0" width="0">

P90X:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1059"
frameborder="no" height="0" width="0">

Instyler:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1058"
frameborder="no" height="0" width="0">

Green Wash Ball:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1057"
frameborder="no" height="0" width="0">

Rack Trap:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1056"
frameborder="no" height="0" width="0">

CamiSecret:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1055"
frameborder="no" height="0" width="0">

PillowPets:
<iframe src="https://secure.essociate.com/pixelframe?px=1&aff={aff_sub}&tid=
{transaction_id}&amt=0.00&spon=1026&offer=1054"
frameborder="no" height="0" width="0">


Please let me know if there are any questions or issues.

Thanks,

Michael


On Wed, Oct 13, 2010 at 1:54 PM, <craig@asseenonpc.com> wrote:
> Hello Michael and Evan,

> Here are the creative packages for each of your campaigns. These campaign
> packages include affiliate links, creative banners, creative emails, subject
> lines extra. Please let me know if you have any questions on these offers
> and if you need any tracking pixel placed.
> Craig Amell
> www.AsSeenOnPC.com
> Catalog Solutions Inc.
> Affiliate Director
> 25 Walls Drive Suite 1-C
> Fairfield, CT, 06824
> P: 203.256.9897
> F: 203.256.9845
>
>
>
> -------- Original Message --------
> Subject: Re: [SPAM] Re: IO scan
> From: Michael Landau <michael@essociate.com>
> Date: Wed, October 13, 2010 2:53 pm
> To: craig@asseenonpc.com
> Cc: Evan Horowitz <evan@essociate.com>
>
> Hi Craig,
>
> I just submitted the application.
>
> - ML
>
>
> On Wed, Oct 13, 2010 at 6:46 AM, <craig@asseenonpc.com> wrote:
>> Hello Michael,
>> I have your banners and creatives ready to go however I can not find your
>> account in our system. Can you please let me know your CD number or the
>> email you used to sign up?
>> If you have not signed up yet please go to www.asseenonpc.com to sign up
>> and
>> create a account. Once you have a account set up I will forward you your
>> affiliate links and creatives.
>> Craig Amell
>> www.AsSeenOnPC.com
>> Catalog Solutions Inc.
>> Affiliate Director
>> 25 Walls Drive Suite 1-C
>> Fairfield, CT, 06824
>> P: 203.256.9897
>> F: 203.256.9845
>>
>>
>>
>>
>> -------- Original Message --------
>> Subject: Re: [SPAM] Re: IO scan
>> From: Michael Landau <michael@essociate.com>
>> Date: Tue, October 12, 2010 5:18 pm
>> To: craig@asseenonpc.com
>> Cc: Evan Horowitz <evan@essociate.com>
>>
>> GEM for Women
>> Miracle Foot Repair
>> P90X
>> Instyler

>> Green Wash Ball
>> Rack Trap
>> CamiSecret
>> PillowPets
>>
>> Thanks,
>>
>> ML
>>
>>
>> On Tue, Oct 12, 2010 at 2:14 PM, <craig@asseenonpc.com> wrote:
>>> Hello Michael,
>>> I would be happy to send over any information you need. Can you please
>>> confirm which campaigns you will be moving forward with.
>>> Craig Amell
>>> www.AsSeenOnPC.com
>>> Catalog Solutions Inc.
>>> Affiliate Director
>>> 25 Walls Drive Suite 1-C
>>> Fairfield, CT, 06824
>>> P: 203.256.9897
>>> F: 203.256.9845
>>>
>>>
>>>
>>>
>>> -------- Original Message --------
>>> Subject: [SPAM] Re: IO scan
>>> From: Michael Landau <michael@essociate.com>
>>> Date: Tue, October 12, 2010 5:11 pm
>>> To: craig@asseenonpc.com
>>> Cc: Evan Horowitz <evan@essociate.com>
>>>
>>> Hi Craig,
>>>
>>> Can you please send over your creative packages and linking
>>> instructions (including sub-id tracking)?
>>>
>>> Thanks,
>>>
>>> Michael
>>>
>>>
>>> On Tue, Oct 12, 2010 at 12:13 PM, Evan Horowitz <evan@essociate.com>
>>> wrote:
>>>> Hi Craig,
>>>>
>>>> Got it thanks.  Michael will be in touch regarding any integration
>>>> topics.
>>>>
>>>> Best,
>>>> Evan
>>>>
>>>> On Tue, Oct 12, 2010 at 7:12 AM,  <craig@asseenonpc.com> wrote:
>>>>> Hello Evan,
>>>>> Thank you for your email. I apologize for not responding yesterday I
>>>>> was
>>>>> out
>>>>> of the office.
>>>>> Attached is your signed IO. Please confirm that you have received this
>>>>> attachment.
>>>>> If there is anything else that you need on my end please let me know. I

>>>>> would be happy to send you over any creatives or affiliate links that
>>>>> you
>>>>> may need.
>>>>> Craig Amell
>>>>> www.AsSeenOnPC.com
>>>>> Catalog Solutions Inc.
>>>>> Affiliate Director
>>>>> 25 Walls Drive Suite 1-C
>>>>> Fairfield, CT, 06824
>>>>> P: 203.256.9897
>>>>> F: 203.256.9845
>>>>>
>>>>>
>>>>>
>>>>>
>>>>> -------- Original Message --------
>>>>> Subject: Re: IO scan
>>>>> From: Evan Horowitz <evan@essociate.com>
>>>>> Date: Mon, October 11, 2010 7:02 pm
>>>>> To: craig@asseenonpc.com
>>>>>
>>>>> Hi Craig, just touching base to see if you got the IO etc.. Thanks,
>>>>> Evan
>>>>>
>>>>> On Fri, Oct 8, 2010 at 11:30 AM, Evan Horowitz <evan@essociate.com>
>>>>> wrote:
>>>>>> Hi Craig,
>>>>>>
>>>>>> Please see the attached signed IO.
>>>>>>
>>>>>> Best,
>>>>>> Evan Horowitz
>>>>>> Essociate
>>>>>> 415-750-2570 Ph
>>>>>>
>>>>>
>>>>
>>>
>>
>

Adam Winters <adam@iballers.com>                                        September 9, 2011  10:52 a.m.
To:  David Schlesinger <david@essociate.com>
RE: let's do it...

---

$4 CPL

http://www.iballers.com/stats/stats.php?
user=40583
pass=HotPocket

Full gamut of display creatives are in there

You want to send them here:

http://iballers.com/cgi-bin/ib.cgi/141/40583?page=home&M

**From:** slesss@gmail.com [mailto:slesss@gmail.com] **On Behalf Of** David Schlesinger
**Sent:** Thursday, September 08, 2011 8:36 PM
**To:** Adam Winters
**Subject:** Re: let's do it...

You get our payout adjusted? let's get this shit up.

On Wed, Sep 7, 2011 at 12:30 PM, David Schlesinger <david@essociate.com> wrote:
info@essociate.com

On Wed, Sep 7, 2011 at 11:35 AM, Adam Winters <adam@iballers.com> wrote:
1 demerit. What email is it under? I'll find it

Adam Winters, CMO
adam@iballers.com
ICQ:     167846030
Skype: adwinters1
M:       973.229.1027
iBallers - Turning Eyes Into Dollars

> **From:** slesss@gmail.com [mailto:slesss@gmail.com] **On Behalf Of** David Schlesinger
> **Sent:** Wednesday, September 07, 2011 11:23 AM

**To:** Adam Winters
**Subject:** Re: let's do it...

Great question. Didn't write it down and can't log in without it. Are you mad at me?

On Wed, Sep 7, 2011 at 11:13 AM, Adam Winters <adam@iballers.com> wrote:
ID?

> **From:** slesss@gmail.com [mailto:slesss@gmail.com] **On Behalf Of** David Schlesinger
> **Sent:** Wednesday, September 07, 2011 9:45 AM
> **To:** Adam Winters
> **Subject:** Re: let's do it...

Signed up...

On Tue, Sep 6, 2011 at 5:16 PM, Adam Winters <adam@iballers.com> wrote:

A1905

We totally need to fix that bro! ☺

First things first, let's get you set up on iballers - http://iballers.com/wm_join.php?prog=iBallers

Send me the ID and I'll approve the acct and configure it accordingly.

We can test on Intl traffic but US is going to perform better obviously. Why can't you make my life easy and send us US traffic?

Adam Winters, CMO
adam@iballers.com
ICQ:     167846030
Skype: adwinters1
M:        973.229.1027
iBallers - Turning Eyes Into Dollars

**From:** slesss@gmail.com [mailto:slesss@gmail.com] **On Behalf Of** David Schlesinger
**Sent:** Tuesday, September 06, 2011 2:16 PM
**To:** Adam Winters
**Subject:** let's do it...

Adam...

Good seeing you out of town - we gotta fix that by the way.

Let's talk dating. We need CPL that can take international. Make it so...

--
David Schlesinger
Essociate/Hunting Moon
david@essociate.com
310.867.3606
AIM: slesss
www.facebook.com/essociate

--
David Schlesinger
Essociate/Hunting Moon
david@essociate.com
310.867.3606
AIM: slesss
www.facebook.com/essociate

--
David Schlesinger
Essociate/Hunting Moon
david@essociate.com
310.867.3606

A1906

AIM: slesss
www.facebook.com/essociate

--
David Schlesinger
Essociate/Hunting Moon
david@essociate.com
310.867.3606
AIM: slesss
www.facebook.com/essociate

--
David Schlesinger
Essociate/Hunting Moon
david@essociate.com
310.867.3606
AIM: slesss
www.facebook.com/essociate

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ESSOCIATE, INC,

        Plaintiff,

    v.

EPIC MEDIA GROUP, INC., AZOOGLE.COM,
INC., AND SOCIAL ASSETS, LLC d/b/a
Kinetic Social,

        Defendants.

**Case No. 11-cv-727-bbc**

**[FILED UNDER SEAL]**

---

## PLAINTIFF ESSOCIATE, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Derek A. Newman
John Du Wors
Derek Linke
NEWMAN DU WORS LLP
1201 Third Avenue, Suite 1600
Seattle, Washington 98101
Telephone:    (206) 274-2800
Facsimile: (206) 274-2801
*derek@newmanlaw.com*
*john@newmanlaw.com*
*linke@newmanlaw.com*

Attorneys for Plaintiff
Essociate, Inc.

*Construction*")[2]. The *Blue Whaler* construction was based on plain meaning and intrinsic evidence.

Prior *Markman* rulings may be accorded "reasoned deference" in assessing the disputed claim terms. *See, e.g.*, *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting that "in the interests of uniformity and correctness," the Federal Circuit "consults the claim analysis of different district courts on the identical terms in the context of the same patent."); *Visto Corp. v. Sproqit Techs., Inc.*, 445 F. Supp. 2d 1104, 1108 (N.D. Cal. 2006).

And while the *Blue Whaler* construction is not binding on this Court, it is entitled to consideration and careful analysis under the doctrine of *stare decisis*. *See Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*, 494 F. Supp. 2d 54, 60 (D. Mass. 2007) (citing *United States v. Rodriguez-Pacheco*, 475 F.3d 434, 441 (1st Cir. 2007)); *Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589 (E.D. Tex. 2002); *Cf. Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting that "in the interests of uniformity and correctness," the Federal Circuit "consults the claim analysis of different district courts on the identical terms in the context of the same patent.")

### 2.    "Virtual Affiliates"

The term "Virtual Affiliates" does not require construction. Of the claims asserted, it only appears in the preamble of independent claims 1, 15, and 28. The term imposes no limitations on the scope of the claimed invention and is purely introductory in nature. Terms in the preamble are only limiting when they are "necessary to give life, meaning, and vitality to the claims." *Kropa v. Robie*, 187 F.2d 150, 861 (CCPA 1951). And a preamble is not limiting when the body of the claim "describes a structurally complete invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002); *see also Intertool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004) (finding the preamble non-limiting where the body of the claim described the invention in "complete and exacting structural detail"). Statements of

---

[2] A copy of the February 6, 2012 claim construction order in *Blue Whaler* is attached as Exhibit A.

intended uses of an invention are generally not limiting. *Catalina*, 289 F.3d at 809. This is because "the patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure." *Id.* Thus, many cases turn on the question of whether a statement in the preamble describing the purpose of an invention is deemed to describe a "necessary and defining aspect of the invention" (which is limiting), or is simply a "statement of intended use" (which is not limiting). The preamble in claim 1 of the '660 Patent merely describes the intended use of the invention: "providing Virtual Affiliates to an existing 45 target affiliate system" ('660 pat., col. 21, lns. 44-46)

In the alternative, if the Court determines the term "Virtual Affiliates" requires construction, Essociate proposes a compromise:

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| Webmasters who direct traffic to one or more merchants via the placement of links, but who are independent from the merchants' own affiliate systems | Webmasters who can send traffic to a target affiliate system without being enrolled in it |

Essociate's proposed definition for this term closely tracks the language of the specification (SPF 83): "Most Merchants currently utilize some form of affiliate system . . . the Webmaster directs traffic to given Merchants via their selection and placement of Merchant links" ('660 pat., col. 2, lns. 8-16); "The Virtual Affiliate remains independent from the Merchant's affiliate system." (*Id.*, col. 7, lns. 50-51)

Epic's proposed construction is too limiting insofar as it requires the referring webmaster to not be enrolled in the merchant's affiliate system. (SPF 84) Anonymity is expressly identified as an optional feature in the specification (SPF 85):

> The Virtual Affiliate remains independent from the Merchant's affiliate system. In addition, the Virtual Affiliate may remain anonymous to the Merchant's affiliate system, identified only as a member of the affiliate pool of Webmasters 306, as described in greater detail subsequently.

(*Id.*, col. 7, lns. 50-54 (emphasis added); *see also id.*, col. 9, lns. 43-44: ("This possibility for anonymity...")). The '660 Patent identifies anonymity as one possible benefit of the disclosed

technology, but it is not a limitation on the scope of the claims. (SPF 86) A patent's specification, and the embodiments disclosed therein, may not be used to limit the patent's claims. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to [even] his preferred embodiment…."). Epic's proposal is motivated by an effort to require that Essociate obtain proof for each Epic webmaster that it did not independently participate in each merchant affiliate system—this is an impossible burden of proof and has no support in the patent.

3.    **"source Webmaster unique identifier"**

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| A unique identifying code assigned to a webmaster within an affiliate pool of source webmasters | The unique identifying code assigned to each webmaster in the source affiliate system |

Essociate's proposal was adopted by the *Blue Whaler* court because it "reflect[ed] the plain and ordinary meaning for these terms as determined by the context of the claim and specification." (*Blue Whaler Claim Construction* at 17) The plain language of the '660 Patent indicates that a source webmaster unique identifier is a code that uniquely identifies a webmaster within an affiliate pool of such webmasters (*i.e.*, "source webmasters"). Essociate's proposed construction accurately reflects this meaning.

In contrast, Epic's construction would require that each source webmaster be assigned <u>only one</u> such unique code. That position is not supported by the specification (SPF 87), and fails in light of the Federal Circuit's rule "[t]hat 'a' or 'an' can mean 'one or more'…" *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). In discussing this rule, the Federal Circuit has explained that "This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Id.* "The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." *Id.* Here, the pertinent claim language is

for a method "comprising the operations of: … assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site." ('660 pat., col. 21, lns. 45-57) Therefore, under the general rule, "a source Webmaster unique identifier" is not limited to a single such identifier.

### 4.   "generating a URL"

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| Causing a URL to appear in a user's web browser without a further user request | Plain meaning (or, if construction is needed: Generating a URL which may be presented to a user or to which traffic may be directed automatically) |

Essociate's proposed construction was adopted by the *Blue Whaler* court because it is supported by the plain meaning and intrinsic evidence: "The claim is analyzed as a whole in construction and for a finding of infringement. The context is provided by the other language in the claim explicitly." (*Blue Whaler Claim Construction* at 14) The '660 Patent specification expressly describes the return of a URL which enables a user to access the target Merchant's existing affiliate system without a further user request:

> In a new URL determination operation **612**, a new URL is determined based on the target Merchant and the target Webmaster ID. Once the correlated ID number for use by the target Merchant affiliate system is determined by the lookup function, **the system returns a new URL, containing the "looked up" code and acting as an entry mechanism into the target Merchant's existing affiliate system.** The format of the URL (i.e., syntax for the location of the target Merchant affiliate system) is determined using the configuration information specified during a data setup operation, as described in greater detail above. **At this point, the user (traffic) is handed to the Merchant**, and the transaction is then either completed or abandoned.

('660 pat., col. 15, lns. 29-41, emphasis added). This is consistent with the discussion of the key "hand off operation" in the specification (which occurs immediately after the "correlation operation" (*See id.*, Fig. 5) In a hand off operation, the "affiliate pooling system hands off the traffic to the target Merchant affiliate system. In order for the hand off to the Merchant affiliate system to run smoothly, the Merchant should be prepared to recognize traffic from the Virtual

Affiliate system, as described above." (*id.*, col. 11, lns. 38-42; *see also id.*, col. 8, lns. 65-67 (hand off operation involves "redirection" to the target Merchant affiliate system).)

Epic is incorrect that this term does not require construction, as it has specific meaning ascribed to it in the '660 Patent in the context in which it appears. And Epic's alternative proposed construction includes an improper limitation not supported by the claims or specification: "which may be presented to a user." With the removal of that limitation, Epic's construction is functionally the same as Essociate's, "Generating a URL to which traffic may be directed automatically".

5. **"correlating"**

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| Creating or recognizing a relationship between | to establish a mutual or reciprocal relation between |

Essociate's proposed construction was adopted by the *Blue Whaler* court because it is supported by plain meaning and intrinsic evidence: "The Court agrees with Essociate's construction of 'correlating.' The term is a word where the ordinary meaning to a person of skill in the art is readily apparent to a lay person. As such, the general purpose dictionary definition is helpful. Further the specification provides for an embodiment that may not only recognize an existing relationship between a target webmaster unique identifier ("TWID") and Source Webmaster unique Identifier ("SWID"), but also can create one. '660 Patent 11:5-13; 15:18-27." (*Blue Whaler Claim Construction* at 4–5)

In the '660 Patent, the word "correlate" means to create or recognize a relationship:

> From the request, the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source webmaster ID) can then be **correlated** to a unique ID for the Merchant's affiliate system (target webmaster ID).

('660 pat., col. 10, lns. 63-67, emphasis added) The paragraph immediately preceding the above quote indicates that "**[r]ecognition** of the source system can occur via an identifier (source system identifier) in the URL request that is received by the affiliate pooling system." (*id.*, col.

- 24 -

10, lns. 57-59, emphasis added) The identification of the source in the URL request allows the system to recognize which merchant is the target of the request—thus, the system creates or recognizes a relationship between the source webmaster ID and the target webmaster ID. The *Blue Whaler* court agreed, based on the plain language of the claim and intrinsic evidence:

In contrast, there is no basis for Epic's proposal to limit "correlating" to "establishing" a relationship. The specification of the '660 Patent discloses various examples of ways in which correlation may occur. One of those ways is by using a "lookup table that cross-references the two codes." (*See* '660 pat., col. 11, lns. 1-12). Epic's proposed definition improperly rejects the possibility that a correlation occurs upon recognition of an existing relationship. *See Kara Tech. Inc.*, 582 F.3d at 1348.

### 6. "target Webmaster unique identifier"

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| A unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System | A unique identifying code assigned to a virtual affiliate that is functional in the target affiliate system |

Epic's proposed construction is ambiguous and inconsistent with the '660 Patent. The "correlation" which occurs in the '660 Patent—even under Epic's improper proposed construction—indicates that each target Webmaster unique identifier is assigned to one of the source Webmasters. Epic is correct that the invention provides "virtual affiliates" to a target affiliate system, but overlooks the fact that functionality is made possible by assigning a target Webmaster unique identifier to each of the source Webmasters. Without that assignment, which Epic's proposed construction ignores, there can be no "virtual affiliates."

Additionally, Epic's proposal does not clarify the scope of the claims because it includes the term "virtual affiliate," which itself has no plain meaning and would require further construction. But that term only appears in the claim preamble and is not limiting. *See Catalina*

*Mktg. Int'l*, 289 F.3d at 808-09 (Preamble not limiting when the body of the claim "describes a structurally complete invention.")

Finally, Epic claims that the target Webmaster unique identifier is not assigned until there is a request for the merchant. That is incorrect. The specification discloses an embodiment in which the target Webmaster unique identifiers include unique identifiers "previously allocated" to the affiliate pool, ('660 pat., col. 11, lns. 1–7) and there is nothing in the claim or the specification restricting the affiliate pool from assigning those to source webmasters prior to a user request.

7.    **"configuring an existing target affiliate system"**

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| a data setup operation relating to a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant | plain meaning |

Epic claims this term does not need construction because the claim language has a plain meaning. But while the word "configuring" alone has a plain meaning, there is no plain meaning for the phrase "configuring an existing target affiliate system." So this term requires construction, and the "configuring" which occurs is disclosed in the specification as a "data setup operation."

8.    **"Merchant affiliate system"**

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant | A complete system that operates the merchant's affiliate program, including the tracking of transactions and commissions |

As used in the '660 Patent, the term "merchant affiliate system" is essentially synonymous with an "existing target affiliate system". Both terms can be described as "a system, operated directly or indirectly by a merchant, in which a group of webmasters direct traffic to a merchant." This construction is consistently supported by the specification:

"Most Merchants currently utilize some form of affiliate system to increase sales, track traffic, and compensate Webmasters for referrals of traffic and/or transactions". ('660 pat., col. 2, lns. 8-10)

"the Merchant retains full access to and control of its affiliate system"). (*Id.*, col. 2, lns. 49-50)

"a user (i.e. traffic of the Webmaster from the affiliate pool) clicks a URL (on the Webmaster's web site) which . . . identifies the target Merchant system whose products or services are being advertised". (*Id.*, col. 10, lns. 33-37)

"the affiliate pooling system knows which Merchant is the target of the request, such that the Webmaster's unique ID for the affiliate pooling system (source webmaster ID) can then be correlated to a unique ID for the Merchant's affiliate system (target Webmaster ID)". (*Id.*, col. 10, lns. 63-67)

Each of those references in the specification supports Essociate's proposed construction.

In contrast, Epic's proposed construction is far too narrow in the context of the '660 Patent or in the context of online affiliate marketing in general. Epic would limit this term by requiring that it only apply to a "complete system" and that it not apply to "pay-per-click traffic." But according to the specification, the features Epic would require are only "generally" included in a merchant affiliate system—they are not required. ('660 pat., col. 2, lns. 30-39)

Additionally, the '660 Patent does not require that the merchant affiliate system perform its tracking mechanisms for the purpose of determining compensation—it merely requires the performance of "requisite tracking" ('660 pat., col. 22, lns. 7-8) which is not limited to determining compensation. Defendant's 30(b)(6) witness confirmed this: "some merchants actually like to know, you know, they might be interested in figuring out what the quality of the traffic is coming from our affiliates." (October 2 Okin Dep. 143:7–11)

And there is no reason why "merchant affiliate system" would not apply even to a system in which affiliates sent traffic "gratuitously" or on a "pay-per-click" basis—indeed, the independent claims of the '660 Patent do not require that any compensation be provided to the source Webmaster.

9.    "correlated target Webmaster unique identifier"

| Essociate's proposed construction | Defendants' proposed construction |
|---|---|
| a unique identifying code assigned to each source Webmaster in the source affiliate pool that is functional within the target Merchant's home Affiliate System for which a relationship has been created or recognized with a source webmaster identifying code | no proposed construction |

The *Blue Whaler* court adopted Essociate proposed construction because: "The same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." (*Blue Whaler Claim Construction* at 15 (quoting *Fin Control Systems Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001)).

While Epic claims that this term does not require construction, it relies on it for a key invalidity position. (*See* Defs' Brief at 52) Accordingly, construction of this term is appropriate.

D.    **The Accused Epic Network infringed the '660 patent**

"'Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents.'" *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374-1375 (Fed. Cir. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)). Patent infringement analysis involves two steps. First, the patent claims must be interpreted or construed to determine their meaning and scope. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). Second, the properly construed claims are compared to the process or device accused of infringing. *Id.* To establish infringement, the plaintiff must prove that each claim element is present in the accused product, either literally or by equivalence. *Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998).

forwarded to the website of the target merchant affiliate system as required both by Defendant Epic's proposed construction of "generating a URL" and the construction of "generating a URL" adopted by Judge Selna in the *Blue Whaler* case. (SPF 148)

And the five-digit XPays affiliate ID did not have any functionality within either iGallery's or Python's system. (SPF 149) Epic's expert incorrectly states that "Old XPays affiliates could use the Old XPays system to send their site visitors to an iGallery web site, and be tracked by the iGallery affiliate system." (SPF 150) iGallery performed no such tracking or had the ability to do so. Rather, the only code ever accepted by or functional within those systems was the code for XPays itself (*e.g.* "Xpays"), which identified XPays but was the same for every XPays affiliate participating in those campaigns. (SPF 150)

Nor did Old XPays involve a correlating step. (SPF 151) The correlating step contemplated by the '660 patent involves an algorithmic process whereby the value in the affiliate ID field of the Click URL determines what value appears in the Sub ID value field of the Destination Landing Page URL. (SPF 152) But the Python and iGallery Destination Landing Page URL's did not have Sub ID value fields. (SPF 153) In fact, Python and iGallery had no technological ability to track at the Sub ID level. (SPF 154)

So instead, Messrs. Landau and Horowitz would modify the Destination Landing Page URL by appending the referring affiliate's ID code on the end, such as iGallery.com/Xpays12345. (SPF 155) And then Messrs. Landau and Horowitz manually tracked—as opposed to relying on the merchant affiliate system being capable of tracking as disclosed in the '660 Patent—how many transactions were associated with a Destination Landing Page URL containing the 12345 affiliate ID, and then calculate for themselves what commissions to pay that affiliate. (SPF 156) The iGallery and Python merchant affiliate systems had no idea what the 12345 value meant and did not track transactions were associated with it, which means it failed the requirements of the correlation step, which provides: "correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system." (SPF 157)

In other words, the Python and iGallery systems did not practice the invention disclosed by the '660 Patent because the affiliate ID that appeared in the Click URL did not correspond to a value that "corresponded to the unique identification system of the requested Merchant affiliate system." (SPF 158) It instead corresponded to a value that was unrecognized by the Python and iGallery systems in a value field that, from Python and iGallery's point of view, did not exist. (SPF 159) Python and iGallery's inability to recognize the target webmaster ID value means that Old X-Pays not failed the correlating step, but also the configuring step, the language of which describes:

> configuring an existing target affiliate system to receive referrals from a first plurality of Webmasters in an affiliate pool of source Webmasters *such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system*[.]

('660 pat., col. 21, lns. 48–53, emphasis added) Python and iGallery did not have the ability to recognize a transaction as originating from a source Webmaster in an affiliate pooling system—it only had the ability to recognize the referring pooling system, which was XPays. (SPF 160)

Recognizing the referring affiliate pooling system (*e.g.* XPays) is not enough. According to the '660 patent's specifications, the Target Webmaster ID must be a "unique identifying code functional within the target Merchant's home affiliate system and which corresponds to the unique identification system of the request Merchant's home affiliate system." ('660 pat., col. 4, lns. 7–11) The specifications also dictate that the target webmaster ID must be a "code that can be utilized by the particular Merchant's existing affiliate system…" ('660 pat., col. 8, lns. 7-9) The language of the '660 patent repeatedly affirms that the Destination Landing Page URL's values must "ensure that the Merchant affiliate system is able to recognize that a given segment of traffic originates from some Webmaster from a source affiliate pool." ('660 pat., col. 8, lns. 42-45) "The Merchant affiliate system recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over." ('660 pat., col. 11, lns. 21-25)

Epic relies on Old XPays for invalidity, but its primary documentary evidence is irrelevant. Epic discusses the functionality of the <xmake.cgi> script, but there is no evidence that <xmake.cgi> was used in connection with the iGallery or Python campaigns. (SPF 161) In fact, the date on that file is from November 1998, months prior to the iGallery and Python campaigns. (SPF 161) And at that time, XPays was only providing "affiliate service bureau" services to Netfill—which Epic does not claim invalidates the '660 Patent. (SPF 162) Additionally, the <xmake.cgi> file contains a reference to a specific XPays computer server used only for providing services to Netfill, and not services provided in connection with Python or iGallery. (SPF 162)

The need to correlate affiliate codes in Click URL's to unique identifying codes recognizable by a target merchant affiliate system did not arise until Messrs. Landau and Horowitz began referring XPays' affiliate traffic to the Sextoy.com merchant affiliate system (which the parties agree occurred less than a year before the '660 patent application was filed). (SPF 163) The Sextoy.com merchant affiliate system had the capability of tracking at the Sub ID level, and its own Sub ID coding conventions. (SPF 164) This meant that Landau and Horowitz had to invent the '660 Patent's correlation technology to ensure that the affiliate ID in their Click URL's resulted in a Sub ID in the Destination Landing Page URL that was functional within the target merchant affiliate system. (SPF 165) It also meant they could rely on the Sextoy.com merchant affiliate network's own tracking functionalities to calculate the commissions owed to the referring XPays affiliates. (SPF 166) Thus, it was not until XPays began participating in the Sextoy.com merchant affiliate network that the invention disclosed by the '660 patent was first publicly used. (SPF 167)

### b. There is no evidence that Old XPays performed the "configuring" step.

Old XPays did not perform the "configuring" step of claim 1, which requires that the "target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system." ('660 pat., col. 21, lns. 50–52) There is no evidence that either of the putative target Merchant affiliate systems (*i.e.* Python and iGallery) involved in Old XPays "recognized" any transactions as originating from a source other than XPays itself.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ESSOCIATE, INC,

        Plaintiff,

    v.

EPIC MEDIA GROUP, INC., AZOOGLE.COM,
INC., AND SOCIAL ASSETS, LLC d/b/a
Kinetic Social,

        Defendants.

**Case No. 11-cv-727-bbc**

### NOTICE OF APPEAL

Notice is hereby given that Essociate, Inc. in the above named case hereby appeals to the

United States District Court of Appeals for the Federal Circuit from the order granting summary

judgment entered in this action on May 17, 2013 and the final judgment entered on May 20, 2013.

Dated June 10, 2013.

        Respectfully Submitted,

        NEWMAN DU WORS LLP

        s/ Derek Linke
        Derek A. Newman
        John Du Wors
        Derek Linke
        1201 Third Avenue, Suite 1600
        Seattle, WA 98101
        Telephone:    (206) 274-2800
        Facsimile:  (206) 274-2801
        *derek@newmanlaw.com*
        *john@newmanlaw.com*
        *linke@newmanlaw.com*

        Attorneys for Plaintiff
        Essociate, Inc.

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WISCONSIN


ESSOCIATE, INC.,                )
                                )
              Plaintiff,         )
                                )
     vs                         )  11-cv-0072-bbc
                                )
AZOOGLE.COM, INC., and          )
EPIC MEDIA GROUP, INC., et al.; )
                                )
              Defendant.         )


        Videotaped deposition of SASENARINE

ROCKY APPIAH, called as a 30 (b)(6) witness for

examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Michelle Engler, a notary public within and

for the County of County and State of Illinois, at

221 North LaSalle, Illinois, on October 2nd, 2012,

at the hour of 5:15 P.M.




Reported for
SCHEFF & ASSOCIATES, by:
Michelle Engler, CSR
Illinois License No. 084-004576
```

Page 2

```
 1          APPEARANCES:
 2
 3          NEWMAN DU WORS, LLP
            BY:  MR. JOHN DU WORS and
 4               MR. DEREK LINKE
            1201 Third Avenue
 5          Suite 1600
            Seattle, Washington 98101
 6          (206) 274-2800
            john@newmanlaw.com,
 7          derek@newmanlaw.com

            Representing the Plaintiff;
 8
 9          GODFREY & KAHN, S.C.
            BY:  MR. JAMES D. PETERSON and
10               MS. JENNIFER GREGOR
            One East Main Street
11          P.O. Box 2719
            Madison, Wisconsin 53701
12          (608) 257-3911
            jpeterson@gklaw.com
13
            Representing the Defendants;
14
15          MR. DAVID GRAFF and
            MS. ANEWSA PAUL,
16          (In-house counsel)
17          Epic Media Group, Inc.;
18
19          ALSO PRESENT:
20
            Mr. Richard Okin;
21
22          VIDEOTAPED BY:
            Mr. Charlie Cook, LITICORP
23          (773) 743-8338.
24
```

Page 3

```
 1                    I N D E X
 2
 3          SASENARINE ROCKY APPIAH
 4
 5  DIRECT EXAMINATION BY:            PAGE:LINE
 6  Mr. Du Wors.........................05:17
 7
 8
 9
10  EXHIBITS                         PAGE:LINE
11
12          (No Exhibits Marked.)
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          THE VIDEOGRAPHER:  Okay, I'll do my intro
 2  again.  Today's date is October 2nd, 2012.  We are
 3  going on the video record at 5:18 p.m.
 4          We are present at the office of Scheff
 5  & Associates, 221 North LaSalle Street Chicago,
 6  Illinois for the purpose of taking the videotaped
 7  deposition of Rocky Appiah.
 8          The party on whose behalf the
 9  deposition is being taken is the Plaintiff, and
10  the party at whose instance the deposition is
11  being recorded on an audiovisual device is the
12  Plaintiff.
13          This case is instituted in the United
14  States District Court for the Western District of
15  Wisconsin, case number 11-cv-00727-bbc, entitled
16  Essociate, Inc. versus AZOOGLE.COM Inc., et al.
17          My name is Charlie Cook.  I am a legal
18  video specialist from Liticorp, 1919 North
19  Milwaukee Avenue, Chicago.
20          The Court Reporter is Michelle Engler
21  -- Engler from Scheff & Associates, 221 North
22  LaSalle Street in Chicago, Illinois.
23          Now it's the attorneys turn to
24  introduce themselves starting with the Plaintiff's
```

Essociates, Inc. v. Azoogle.com, Inc., et al    CONFIDENTIAL    ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 29

1     A. Yes.

2     Q. And by saying yes, do you mean to tell me

3  that in fact we can obtain?

4     A. No.

5     Q. Okay.

6     A. I'm saying yes, I know that -- if that

7  information is present.

8       And the answer is no, that information

9  prior -- raw lead data prior to 2007 is not

10  available.

11     Q. When you say raw lead data is not

12  available, do you mean that there is some kind of

13  non-raw lead data such as summary data or reports

14  going back farther than 2007?

15     A. Yes.

16     Q. What kind of data is available?

17     A. There's summary data going back

18  to 2005, I believe. And it's an aggregate level

19  of -- of the summary.

20     Q. Okay. And can you tell me sort of in

21  broad categories what is contained on those

22  summaries?

23     A. Yes. On a broad level it is by publisher,

24  by offer, by month, impressions, clicks,

---

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 30

1  conversions, payout, so what we pay the publisher,

2  and revenue, what we receive from the advertiser.

3     Q. Okay. And it would not identify the

4  destination landing page URL either by specific

5  URL or L-Spy (sic) offer URL ID; is that correct?

6     A. Yes.

7     Q. So in other words, I couldn't figure out

8  what the offer URL was based on those summary

9  reports that you're talking about?

10     A. That's correct, you would not be able to.

11     Q. Do you know why it is that the leads

12  tables don't go back any farther than 2007?

13     A. Yes.

14     Q. And why is that?

15     A. It's a matter of operation, technical

16  operations. The -- These tables can get quite

17  large.

18     Q. Okay.

19     A. There's a reason I use the word raw is

20  because it's, you know, 50-something columns wide,

21  so each record contains a lot of data.

22     So when we're storing billions and

23  millions, we just don't have the disc space to

24  keep all those raw records forever.

---

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 31

1     So we periodically in order to keep the

2  systems online will purge that data knowing that

3  the summary level data is sufficient for

4  operational purposes.

5     Q. Okay. Just a moment. Do you recall us

6  having some discussion in this room before your

7  deposition began about the defendant's production

8  of the offer URL tables?

9     A. Yes.

10     Q. Okay. And you participated in the

11  production of paper and electronic records to

12  Epic's prior counsel K & L Gates in association

13  with this litigation; is that correct?

14     A. That's correct.

15     Q. Were you the primary person on behalf of

16  Epic performing the functions of producing

17  electronic and paper records to K & L Gates in

18  association with this litigation?

19     A. It depends on what was produced.

20     If it was related technical data, such

21  as source code and raw data like some of those

22  summary tables, then, yes, I was the primary

23  person responsible for it.

24     Q. Do you know if you produced the offer URL

---

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY   Deposition of Rocky Appiah

Page 32

1  tables to counsel at K & L Gates in association

2  with this litigation?

3     A. No, I do not recall if I did.

4     Q. Are you familiar with the content of those

5  offer URL tables?

6     A. Yes.

7     Q. And can you describe for me what

8  categories of information are disclosed on those

9  tables to the best of your recollection?

10     A. Sure. The offer URL table is the URL for

11  an offer. There's not a one to one relationship

12  for an offer, so an offer can have multiple

13  landing pages.

14     So what we do is we have a separate

15  table which is called the offer URL's table which

16  says this is where the browser or user is going to

17  land on.

18     Q. Is there any other information disclosed?

19     A. I think it also has when the URL was added

20  to the system. So you don't have to have all

21  URL's right at the beginning. You can add them.

22     Whether or not to show a publisher that

23  URL, and when that URL should be, you know,

24  expired, AKA, no longer used and conversely when

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Deposition of Rocky Appiah

Page 33

```
1      it should also start.
2          Q.  Does it disclose the numerical URL ID that
3      correlates to each offer URL contained on the
4      table?
5          MS. GREGOR:  Objection, vague.
6          THE WITNESS:  Does it -- Can you say that
7      again?
8      BY MR. DU WORS:
9          Q.  Does the URL -- I'm sorry, does the offer
10     URL table also disclose the numerical offer URL ID
11     that corresponds to each offer URL?
12         A.  If I think what you mean to say is that is
13     there an ID for each offer URL that represents the
14     offer, is that what you're asking?
15             So if there's five URL's, it says this
16     is offer -- those five URL's a are offer A and
17     there's six URL's those are offer B.
18             Is that what you're asking?
19         Q.  No, thank you though.  I see you're trying
20     to be helpful and I appreciate that.
21             I understand each offer to have an
22     offer ID.  I also understand each offer URL to
23     have its own specific ID.
24             Do you understand that to be the case?
```

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Deposition of Rocky Appiah

Page 34

```
1          A.  Yes.
2          Q.  Okay.  So now what I hope to distinguish
3      between is the offer ID versus the offer URL ID,
4      okay?
5          A.  Yes.
6          Q.  On the offer URL table, each offer URL is
7      listed, correct?
8          A.  Yes.
9          Q.  Okay.  Is the offer URL numerical ID for
10     each disclosed offer also listed on that offer
11     table?
12         A.  Yes.
13         Q.  Okay.  Such that if I'm looking at the
14     offer table and the offer table discloses the ID
15     code, the numerical ID code for each offer URL,
16     but not offer the URL itself, I can use that to
17     cross-reference to the numerical ID disclosed on
18     the offer URL table.  Make sense?
19         A.  Yes.
20         Q.  Okay.  And so your answer is yes, I can do
21     that cross-referencing because of the disclosure
22     of offer the URL ID contained within the offer URL
23     table?
24         A.  Yes, you can look it up.
```

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Deposition of Rocky Appiah

Page 35

```
1          Q.  Okay.  Is there any other information --
2      Sorry.  It is the case -- Hold on for one sec.
3              It is the case that an advertiser
4      setting up a new offer to be made available for
5      distribution through the Epic Affiliate Network
6      can elect to have the destination landing pages
7      for that offer include the numerical ID code Epic
8      assigns to the referring publisher, correct?
9          A.  Yes.
10         Q.  Is it the fact of the Epic advertiser
11     having made that election disclosed on the offer
12     URL table?
13         A.  Yes.
14         Q.  It is also the case, is it not, the that
15     the advertiser setting up that new offer to be
16     made available for distribution through the Epic
17     Affiliate Network can elect to have tracking
18     performed by way of a pixel firing or by
19     way of the passing of the -- a click hash into the
20     URL of the destination landing page?
21         A.  Yes, just one thing.  The advertiser
22     doesn't set it up.  We set it up, but they can
23     request for that information to be passed to them.
24         Q.  Thank you.  When I say set up, I do not
```

Essociates, Inc. v. Azoogle.com, Inc., et. al    CONFIDENTIAL    ATTORNEYS' EYES ONLY    Deposition of Rocky Appiah

Page 36

```
1      mean that the technological configuration is being
2      executed by the advertiser, rather that in
3      cooperation with the customer service
4      representative from Epic, they are directly or
5      indirectly causing that set up process to occur?
6          A.  Then you correct.
7          Q.  Let me re-ask that question again.
8              In the course of setting up a new offer
9      for distribution through the Epic Affiliate
10     Network, an advertiser can choose to have tracking
11     accomplished via the firing of a pixel or
12     alternatively the passing of a click hash into the
13     URL of the destination landing page, correct?
14         A.  Yes.
15         Q.  Will the fact of that election by the
16     advertiser be disclosed on the offer URL table?
17         A.  No.
18         Q.  What table, if any, within the Azoogle Ads
19     database will disclose the election of that option
20     by the advertiser?
21         A.  So -- I want to make sure you -- I
22     understand.
23             So the -- They can request that the
24     click hash be passed, but there's no table to say
```

that one of ordinary skill in the art need not be a skilled programmer, but he or she should be familiar with the functions and capabilities of the scripting languages used in Web-based e-commerce. At the time that the '660 patent was filed, I was already at least one of ordinary skill in the art under this definition.

29.     Additional principles of patent law may be explained or alluded to as appropriate in other portions of my report.

## IV.     General Background of Internet Affiliate Networks

30.     Internet affiliate networks, also referred to as Internet affiliate programs, are a type of promotion particularly suited to the capabilities of the Internet as they developed in the 1990s. In a simple form, an e-commerce merchant creates an Internet affiliate network by arranging for other Web sites—affiliates—to post links to the merchant's Web site. If an Internet user visits the affiliate's Web site and clicks on the link, the user is directed to the merchant's Web site. If the user makes a purchase from the merchant, the merchant pays a commission to the affiliate Web site. Merchants use affiliate networks to attract traffic to their Web sites, and in most cases the merchant pays only when the traffic produces a completed transaction, such as a purchase.

31.     Internet affiliate programs were facilitated by the development in the early 1990s of the World Wide Web, also known as the Web. The Web is a set of hypertext protocols that allow Internet users to view Web sites using browser software and to navigate easily from one Web site to another by means of hypertext links. The conventions of the Web greatly facilitated the use of the Internet by non-expert users and greatly facilitated the development of e-commerce merchant Web sites, such as Amazon.com and CDnow.

32.     Amazon.com and CDnow were among the earliest e-commerce merchants to build affiliate networks.  Amazon launched its affiliate network in 1996.  CDnow had a small informal affiliate program in late 1994, and it launched a formal affiliate network in March 1997.  I chronicled the development of CDnow and its affiliate network called Cosmic Credit, in the book *The CDnow Story: Rags to Riches on the Internet*.  I also discussed the general context of Internet marketing in *Poor Richard's Web Site: Geek-Free, Commonsense Advice on Building a Low-Cost Web Site* and *Poor Richard's Internet Marketing and Promotions* (published in 1998 and 1999 respectively).  I incorporate the information in those books by reference.

33.     Amazon.com and CDnow were successful in recruiting affiliates in part because they had products, books and CDs, that were of interest to just about any audience.  For example, a Web site about woodworking could become an Amazon.com affiliate and earn commissions by promoting books about woodworking that were on sale at Amazon.com.  A fan Web site devoted to a particular musician could become an affiliate of CDnow and earn commissions by promoting CDs by that musician or other similar musicians.  Merchant affiliate networks, like those run by Amazon.com and CDnow can be thought of as "closed" networks, because affiliates can earn commissions only from the Web site of the merchant that is running the network.

34.     E-commerce merchants that did not want to build their own affiliate networks could outsource the task to Internet affiliate service bureaus.  Early providers of affiliate service bureaus were: Linkshare, founded in 1996; Be Free, founded in 1996; and Commission Junction, founded in 1998.  These companies could undertake the tasks of setting up the links to be used on the affiliate sites and keeping track of referrals, sales and commissions.  Affiliate service bureaus could operate affiliate networks for multiple merchants, but these networks might still operate as closed networks open only to affiliates that had contracted with specific merchants.

35.     "Open" affiliate networks also developed in the mid-1990s.  An open affiliate network recruits multiple merchant Web sites and multiple affiliate Web sites and—this is the open part—allows the affiliates to choose which merchants to promote.  Thus, affiliates of an open network can post links to multiple merchant Web sites, expanding their opportunities to earn commissions.  For example, an affiliate Web site with content about cooking could provide links to a merchant Web site that sells cookbooks, to a merchant Web site that sells cookware, and to a merchant Web site that sells specialty food items.  From the merchant's perspective, the open network offers the possibility of reaching a greater number of affiliates than the merchant could reach on its own.  Some of the companies that provided affiliate service bureaus also provided open affiliate networks.  In 1999, Linkshare was the leading provider of an open affiliate network.

36.     One of the fundamental components of any affiliate network is a transaction tracking system.  The merchant, of course, needs a means of keeping track of purchases and collecting payment.  But the administrator of the affiliate network also has to keep track of the sources of successful transactions so that the affiliates can be paid the commissions earned.  A second fundamental component of an affiliate network is a means of creating the links to be placed on the affiliate Web sites.  There are many ways of doing these things, but generally the link creation component and the transaction tracking component work together.

37.     To understand this, it would be useful to walk through the process of setting up an affiliate and tracking a transaction.  For the purposes of this example, I will make reference to the CDnow affiliate network as it existed prior to 1999, and as it is described in The CDnow Story (at pages 172-75).

*CONFIDENTIAL—ATTORNEYS' EYES ONLY*

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

ESSOCIATE, INC.,

      Plaintiff,

v.

    Case No. 11-CV-727

EPIC MEDIA GROUP, INC., ET AL.,

      Defendants.

## RESPONSIVE EXPERT REPORT OF PETER KENT
## ON INFRINGEMENT OF THE PATENT-IN-SUIT

*CONFIDENTIAL—ATTORNEYS' EYES ONLY*

## TABLE OF CONTENTS

Page

I.    Scope of Work and Information Considered ...................................................... 1

II.   Applicable Legal Standards and Principles ...................................................... 1

III.  General Background of Internet Affiliate Networks ......................................... 2

IV.   The Epic Direct System and Its Tracking Methods .......................................... 2

      A.    The Epic Direct System uses "cookie and pixel" tracking for nearly all
            transactions .................................................................................................. 2

      B.    Variations used in the Epic Direct system ............................................... 5

      C.    Preset variables in the Epic system ......................................................... 7

V.    Essociate's Claim Construction Theory and Its Errors ..................................... 9

      A.    Essociate's infringement theory is based on only one example, which is not
            representative of Epic's transactions. ................................................... 10

      B.    Essociate lacks critical evidence concerning the operation of SpeedDate.com.... 11

      C.    Essociate provides no evidence of SpeedDate.com being "configured" by Epic. 12

      D.    Essociate mis-identifies the affiliate ID and mis-describes how it is used in the
            Epic Direct System. ............................................................................... 14

      E.    Edwards mischaracterizes the tracking system of the SpeedDate.com example
            transaction ............................................................................................. 20

            1.    Edwards misdescribes the operation of the tracking pixel........................ 20

            2.    Edwards has no evidence that Epic used delay reporting for the
                  SpeedDate.com example transaction ....................................................... 24

            3.    Edwards does not show that the merchant landing page URL provides
                  identification of the affiliate for the "requisite tracking".......................... 25

      F.    Summary of response to Edwards' claim analysis ............................................. 25

VI.   Essociate improperly shifts the meaning of "correlation" to avoid invalidity while
      pressing its infringement case. ....................................................................... 27

*CONFIDENTIAL—ATTORNEYS' EYES ONLY*

I provide this report of my opinions, pursuant to Federal Rule of Civil Procedure 26(a)(2)

and the Court's preliminary pretrial conference order (Dkt. No. 11) as amended (Dkt. No. 46), in

response to the report of Essociate's expert, George Edwards, on infringement.

## I.    Scope of Work and Information Considered

1.    In preparing my opinion concerning infringement, I have reviewed and

considered the following documents:

a)    All materials cited in my previous report;

b)    The First Amended Complaint;

c)    Essociate's Supplemental Answers to Epic's First Interrogatories and Ex. A
thereto (the "Essociate Contentions");

d)    The transcript of the October 2, 2012 and October 3, 2012 deposition of
Sasenarine "Rocky" Appiah and deposition Exhibit 4 thereto;

e)    The transcript of the October 2, 2012 deposition of Richard Okin and exhibits
thereto;

f)    The Plaintiff's Expert Disclosure (George Edwards, PhD., dated November 13,
2012);

g)    My personal interview with Rick Okin conducted on December 12, 2012;

h)    The Epic offers URL table (offer_urls.csv);

i)    The website at www.bitly.com.

## II.    Applicable Legal Standards and Principles

2.    I apply here the legal standards and principles set out in my previous report.  I

incorporate that information here by reference.

### III.    General Background of Internet Affiliate Networks

3.      This report assumes familiarity with the basic principles of Internet affiliate networks, which I discussed in my previous report. I incorporate that information here by reference.

4.      In his report, Edwards uses abbreviations for two important claim terms. For the purpose of clarity and consistency, I will use those abbreviations as well. "SID" is the abbreviation for "source Webmaster unique identifier." "TWUID" is the abbreviation for "target Webmaster unique identifier."

### IV.    The Epic Direct System and Its Tracking Methods

5.      The Epic system uses a fundamentally different transaction tracking method than the one claimed in the '660 patent. Most important: the Epic system does its own transaction and commission tracking, and it does not depend on the merchant's system to recognize that a user request comes from a particular Epic affiliate. Accordingly, in the Epic system, there is no assigned "Target Webmaster Unique ID," and there is no "Correlation" operation that is critical to the invention claimed in the '660 patent.

#### A.    The Epic Direct System uses "cookie and pixel" tracking for nearly all transactions

6.      The transaction tracking method used by the Epic system is similar to the one used by Linkshare in the mid-1990s. It is referred to variously as "cookie tracking," "pixel tracking" or as I will refer to it here, "cookie and pixel tracking." The system is generally described in Epic's Advertiser Implementation Guide. Deposition Exhibit 6.

7.      The process begins with a merchant setting up an "offer" to be promoted in the Epic system. For the sake of this explanation, I will use a hypothetical example of an offer from Netflix. Let us say that Netflix would like to promote an offer to Epic affiliates: Netflix will

offer a free three-month subscription to new subscribers, and it will pay \$25 to Epic for every

new subscriber that comes from Epic's affiliates. Epic, in turn will pay \$20 to the affiliate,

keeping a \$5 commission for itself.

    8.    All offers require the merchant to have a "landing page," which is identified with

a URL. See Advertiser Implementation Guide, section 2.1. When a user clicks through from an

affiliate's promotion of the offer, the user will ultimately be directed to the merchant's landing

page. In this case, the Netflix landing page URL would be something like:

           www.netflix.com/signup.html

    9.    The landing page is the place where the user can complete some action, such as

making a purchase or signing up for some service. In this example, it is where a user would sign

up for a Netflix subscription.

    10.    It is important to note that the format and content of the landing page and its URL

are determined by the merchant, not Epic. Commonly, the merchant will set up a landing page to

receive users from affiliate networks that is distinct from its standard home page or signup page.

For example, Netflix might chose to create a landing page for its internet affiliate marketing

efforts that looks like this:

           www.netflix.com/affiliates/signup.html

    11.    Merchants use many variations on how they structure their landing pages and the

landing page URLs to suit their own purposes.

    12.    For its part, in setting up an offer that will be available to its affiliates, Epic

creates a "jump link," also referred to in the Advertiser Implementation Guide as an Advertiser

link. A jump link will be created for and provided to each Epic affiliate who would like to

promote the offer. The jump link will appear like this:

           x.azjmp.com/009Gv

13.    In this example, "x.azjmp.com" is the domain and subdomain on the Epic system where user requests will be processed. "009Gv" is the Epic link ID which encodes pertinent information for this link, including at least the affiliate ID, the offer ID and the traffic type. The affiliate ID is the numerical code that is assigned to each affiliate in the Epic system. The offer ID is a numerical code that is assigned to each offer. A merchant will have as many offer IDs as it has separate offers. The traffic type indicates what type of user traffic the affiliate would provide, such as web traffic from a website or traffic from an email campaign. Other variables might also be encoded in the link ID, depending on the offer and the needs of the merchant and the affiliates.

14.    To promote the offer, the Epic affiliate will place the jump link on its own materials that it publishes. The affiliate might, for example, simply place the jump link in an email, along with a message saying something like "click here for a free Netflix subscription." Commonly, the affiliate will place the jump link on its website as part of a banner advertisement. In our example, the affiliate will be able to copy banner ad artwork for the Netflix offer and paste it onto its website.

15.    When a user clicks on the banner ad, the user is directed by the jump link to the Epic system, where the Epic system decodes the link ID. The Epic system makes a record of the user request, and it places a cookie (a small, hidden text file) on the user's computer for tracking purposes. The cookie stores the offer ID and the affiliate ID on the user's computer. The Epic system then redirects the user to the merchant's landing page URL. These steps are invisible to the user, to whom it appears that the banner ad linked directly to the merchant's website.

16.    If the user completes the transaction for which the merchant has agreed to pay, the user is brought to a lead conversion page on the merchant's system. The lead conversion page,

or the "success" page, will typically say something like "thanks for signing up" to the user. But the real purpose of the lead conversion page in the Epic system is that it includes a "tracking pixel." The pixel is invisible to the user, because it is set up to display as a one-pixel by one-pixel transparent square. The function of the pixel is to prompt the user's browser to process a line of code that triggers the execution of a script on the Epic system. The script reads the cookie from the user's computer, and the Epic system makes a record of the successful transaction. After recording both the offer ID and the affiliate ID from the cookie on the user's computer, Epic tracks the required payment information. In our example, Epic makes a record that Netflix owes Epic $25, and that the affiliate has earned $20.

17.     Neither Epic nor the affiliate relies on the merchant system for tracking transactions or commissions. The merchant likely knows that the Epic system has provided a referral, because it can monitor its incoming web traffic. Also, the merchant may have set up a special landing page for Epic traffic. But the merchant need not know, and in the example I have shown here would not know, which particular affiliate had produced the traffic that resulted in the new Netflix subscriber.

**B.     Variations used in the Epic Direct system**

18.     The vast majority of Epic affiliate transactions—something like 95 percent—are set up and tracked using this basic "pixel and cookie" method. There are, however, a relatively small number of offers that are processed through variations on this method.

19.     One variation is necessitated by merchants who cannot or will not use a lead conversion page or run the pixel. Some merchants may simply object to the placement of cookies on their customer's computers. More commonly, though, the offer requires some action that cannot be immediately confirmed. For example, the offer from a credit card company may not pay a commission until the user has not only signed up for, but been approved for and

5

actually used the credit card. In such a case, the credit card company will use a "delay reporting" method instead of the "cookie and pixel" method.

20.    In earlier implementations of the delay reporting function, the merchant system would have the merchant track the successful lead conversions and send a report of those transactions to the Epic system. The Advertiser Implementation Guidelines provided a format for the merchant to use in sending the transaction in formation to Epic (.csv, or comma delimited format) and a provided that this information could be sent to Epic by email or by FTP. Advertiser Implementation Guidelines, p. 11. I understand from Rick Okin, that Epic Media's more recent practice was to use a more efficient, "click hash" method for delay reporting. I note that the revision date of the Advertiser Implementation Guidelines is November 12, 2008.

21.    In the click hash method, the Epic system generates a "click hash" when the user clicks on the jump link. The click hash is a unique code that represents that particular user click, and the Epic system records data related to that click in its data base. The click hash is appended to the merchant landing page URL. For example, if a credit card company were using the delay reporting method, the link to the credit card company landing page would look something like this:

www.creditcard.com/affiliates/signup.html?click_hash=789XyZ00

22.    The click hash is itself meaningless to the merchant system, but the merchant system keeps track of that click hash until the user completes the required action. Then at some point, the merchant system sends the click hash back to the Epic system, typically by email or FTP. Upon receipt of the click hash, the Epic system notes that the transaction is complete, and that the affiliate has earned a commission. Again, the merchant system does not need to know the identity of the source webmaster; it simply passes the click hash back to the Epic system and

the Epic system completes the tracking. In other words, the delay reporting method, like the cookie and pixel method, does not rely on merchant to track transactions.

23.    This "delay reporting" method is not a tracking method described in the Independent Claims of the '660 Patent; those claims require that tracking is accomplished by way of a URL that "includes the correlated Merchant unique identifier" (a TWUID—Target Webmaster Unique Identifier) and thus "provide[s] identification of the source Webmaster." The Epic delay-reporting method does not use a TWUID, and in the click hash method does not identify the source Webmaster, and thus is not a method of "requisite tracking" as described in these claims.

24.    A second variation, "server-to-server reporting," is very much like delay reporting, except that the click hash is sent back to Epic in real time by means of a live connection between the Epic server and the merchant server. The variation is useful when there is no need to delay the reporting of the transaction, but the merchant system cannot use cookies. However, this method still does not require the URL to identify the source affiliate by way of a TWUID, and thus is not the "requisite tracking" described in the Independent Claims of the '660 Patent.

C.    **Preset variables in the Epic system**

25.    The Epic system does not rely on merchants to track transactions and commissions for particular affiliates, and thus there is no need for the Epic system to provide the identity of the affiliate to the merchant. However, some merchants request that the affiliate ID or other information is passed along to them for their own purposes. Some merchants would like to determine which affiliates are most productive, or which affiliates are sending low-quality traffic. If, for example, some affiliates produce a large number of bogus transactions, the merchant may investigate and ultimately seek to disqualify that affiliate.

26.    To serve the various needs of its merchants and its affiliates, Epic allows, upon request, certain preset variables to be passed along to the merchant system. These variables include: the affiliate ID, affiliate sub-ID, click hash value, and a fixed code to represent the Epic system, "az2." The requested variables are appended to the merchant landing page URL.

27.    When variables are to be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link. For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIA
> TE_ID%%

28.    In the syntax of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL. The "%%" designates the beginning and the end of the label of the variable. Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL. If the affiliate's ID were 12354, the landing page URL would look like this:

> www.netflix.com/affiliates/signup.html?affiliate_id=12345

29.    The merchant would then be able to record the affiliate's ID for whatever purposes it wanted. However, the Epic system would still use the cookie and pixel method (or one of the delay reporting methods) for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant.

30.    If the merchant requests it, the Epic system can also allow use of a sub ID variable, which can be useful for affiliates. Imagine, for example, that the affiliate is a website operated by a local newspaper at the domain name www.citytoday.com. The website, like the newspaper, has various sections, including news, sports, and arts. The affiliate promotes Epic

offers, and it would like to keep track of whether the offers were more successful in the sports

section or the arts section. Let's say that CityToday puts the Netflix offer in both the sports

section and the arts section. When the affiliate places the offer in the sports section, the

"sub_ID=001" is appended to the jump link. When the affiliate places the offer in the arts

section, it appends "sub_ID=002."

31.     When the user clicks on the jump link, the landing page URL is completed by

filling in the variables. The pre-formatted landing page URL would look like this:

>     www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIA
>     TE_ID%%& sub_id=%%SUB_ID%%

32.     If the user clicked on the jump link in the sports section, the landing page URL

would be completed to look like this:

>     www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_i
>     d=001

33.     In transaction and commission reports, both the merchant and the affiliate would

know that the commission was earned by affiliate 12345 and that the traffic came from a link

that had sub id 001 associated with it. In our example, the affiliate would thus know that this

successful transaction came from the sports page. Again, however, Epic would be tracking the

transaction and commission by using its cookie and pixel tracking method, and Epic would not

use the passed-along variables for its own transaction and commission reports.

## V.     Essociate's Claim Construction Theory and Its Errors

34.     Essociate's infringement theory focuses on the Epic system's capacity to pass

certain variables and information to the merchant affiliate system. But even when the affiliate ID

is passed along to the merchant system, this type of transaction is still not infringing for multiple

reasons as I explain below.

A.    **Essociate's infringement theory is based on only one example, which is not representative of Epic's transactions.**

35.    One fundamental problem with the Essociate's infringement contentions and Mr. Edwards' report is that is based on a single example: one offer from SpeedDate.com. The Epic system has been used with many different merchants, who have made more than 53,000 offers through the Epic system. The single SpeedDate.com offer that Essociate cites in its infringement contentions as an example is simply not representative of all Epic transactions. And Essociate has not identified which transactions it regards as infringing, beyond giving this single example.

36.    The SpeedDate example—even as Essociate incorrectly analyses it—cannot be representative of all transactions for several reasons. First, and perhaps most important, only transactions between the Epic system and another affiliate network can be infringing. The Epic system has its own merchants. Any transactions involving Epic's many own merchants cannot be infringing because these are not transactions with "virtual" affiliates. In large measure, the Epic system operates just like the Linkshare "hub" system described in the '660 patent. When Epic deals directly with its merchants, its affiliates are not Virtual Affiliates as required in each of the claims of the '660 patent.

37.    Second, the Epic system does not infringe the '660 patent with any transaction in which the affiliate ID is not passed on to the merchant. As explained above, Epic's basic cookie and pixel tracking system (and its delay reporting variants) does not require that the affiliate ID be passed on to the merchant's system. The passing of the affiliate ID is an option that many merchants do not require. If the merchant system is not provided the identification of the Epic affiliate, that transaction cannot be infringing.

38.    Thus, even with this preliminary analysis, it is clear that the Epic system does not infringe the '660 patent with any transaction in which it engages with the merchant directly,

rather than engaging the merchant's affiliate network. It is also clear that the Epic system does not infringe with any transaction in which does not pass the affiliate ID to the merchant's affiliate network. In other words, many of the thousands of offers promoted through the Epic system would not infringe the '660 patent, even under the dubious theory that Essociate advances in its expert's report.

39.    To be clear: it is my opinion that *none* of Epic's transactions infringe the '660 patent. My point is that Essociate has failed to identify which transactions it is accusing of infringement beyond giving a single example of one offer among the tens of thousands of offers made through the Epic system.

    **B.    Essociate lacks critical evidence concerning the operation of SpeedDate.com**

40.    Essociate uses a single SpeedDate.com offer as its one and only example of Epic's infringement. However, Essociate fails to cite to any evidence that would establish critical elements of its infringement case with even this example.

41.    I note here that Essociate's infringement contentions provide information about the operation of the SpeedDate.com system merely "on information and belief." Specifically, Essociate contends "on information and belief" that SpeedDate.com maintains a unique identification system for its affiliates. Essociate Contentions, p. 4. Essociate does not provide any evidence to confirm that SpeedDate.com provides a unique identification system for its affiliates, or what that system is.

42.    A second problem with Essociate's evidence is that it does not establish that the Epic system engaged with the SpeedDate.com affiliate network. Essociate has cited a portion of the SpeedDate.com website that indicates that SpeedDate.com operates an affiliate network. Essociate Contentions, Ex. 3. But Essociate lacks any evidence that shows that the Epic system

used the SpeedDate.com affiliate network, rather than engaging directly with SpeedDate.com as a merchant.

43.     Edwards showed in his report that in the example SpeedDate.com transaction, the Epic system redirected users to a mysdate.com domain, which then redirected to the SpeedDate.com site. Edwards cites no evidence that mysdate.com is the SpeedDate-affiliate system domain.  It is equally likely that mysdate.com is the domain set up by SpeedDate to receive its own affiliate traffic.  The use of a different domain does not necessarily demonstrate the use of an affiliate network.

44.     I understand from Mr. Okin that SpeedDate.com was a merchant that used the Epic system.  Essociate cites nothing to show that Epic used SpeedDate.com's affiliate system. Each of the independent claims in the '660 patent, 1, 15 and 28 (and thus each of the dependent claims, too) require that the accused system work with Virtual Affiliates.  If SpeedDate.com is just another merchant using the Epic system, then Epic's affiliates are not Virtual Affiliates, and Essociate's infringement case fails entirely.

45.     However, even if the SpeedDate.com example were an example of a Virtual Affiliate arrangement, Essociate's infringement case still fails, because the Epic system does not operate in the manner claimed in the '660 patent.

C.     **Essociate provides no evidence of SpeedDate.com being "configured" by Epic**

46.     The '660 patent requires that a "configuring" operation be performed on the target system, in this case, SpeedDate.com.  As provided in claim 1, the method requires the:

> configuring an existing target affiliate system to receive referrals
> from a first plurality of Webmasters in an affiliate pool of source
> Webmasters such that the target Merchant affiliate system
> recognizes a transaction as originating from a source Webmaster in
> an affiliate pooling system, including the step of:

> assigning a source Webmaster unique identifier for each of said
> first plurality of Webmasters each operating at least one web site

'660 patent, 3:47-57. The important point here is that the accused infringer, Epic Media, must

perform the step of configuring the target system, SpeedDate.com, so that SpeedDate.com

recognizes a transaction as originating from a particular Epic affiliate.

47.     Edwards states that "One instance of an existing target merchant affiliate system

so configured by the Service is operated by SpeedDate.com" Edwards Report, p. 3. But

Edwards cites no evidence to show that Epic configured the SpeedDate.com affiliate system as

required by the 660 patent. Mr. Edwards' report describes only how the *Epic system* was

configured, but he provides no discussion, and has no evidence, concerning the configuration of

the SpeedDate.com system.

48.     Edwards describes how Epic provides IDs to its affiliates, and uses a database

named AzoogleAds to manage offers (Edwards Report, p. 3); he states that "The Service

structures the software that operates the Epic virtual affiliate network" (p. 4), he describes at

length his (mistaken) assessment of how Epic creates links (pp. 5-7); and he explains that the

"An Epic advertising manager can configure the landing page URL associated with an

advertiser's specific offer" (p. 6), but at no point does he discuss how the SpeedDate.com system

is configured.

49.     The closest Edwards comes to describing a "configuration" operation on a target

system is the placement of the tracking "pixel" on the target system's "success" or "lead

conversion page." Edwards Report, p. 8. But this is not the type of configuration required by the

patent, which requires the step of configuring the target system, SpeedDate.com, so that

SpeedDate.com *recognizes a transaction as originating from a particular Epic affiliate.*

13
A1967

50.    The reason for this is that the pixel is not used by the target merchant system to

recognize the source affiliate. Rather, the pixel prompts the Epic system to read the cookie on

the user's computer. Thus, it does not provide a way for "the target Merchant affiliate system

[to] recognize a transaction as originating from a source Webmaster in an affiliate pooling

system." The pixel does not provide any information, tracking or otherwise, to SpeedDate.com

as the target system.

**D.    Essociate mis-identifies the affiliate ID and mis-describes how it is used in the Epic Direct System.**

51.    Edwards bases his report on the following sequence of URL redirection, which

Essociate contends it discovered in its investigation of the Epic system:

> http://x.azjmp.com/4b4Gq?sub=12268
>
> http://mysdate.com/?a=53&c=1&s1=48192&s2=12268
>
> http://www.speeddate.com/index.php?page=signup&action=join&
> afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639
> 528

Essociate Contentions, at p. 11. According to Essociate, these are the URLs used when a user

clicks on the example SpeedDate.com offer on an Epic affiliate's web site.

52.    In his report, Edwards concludes, based on his evaluation of this sequence, that:

> The [Epic] Service creates or recognizes a relationship between
> SIDs for participants in the Epic affiliate network and TWUIDs at
> the target affiliate system. When the Sample Epic URL is clicked,
> the Service creates or recognizes a relationship between the
> received SID and a TWUID.

Edwards Report, p. 7. However, Edwards is fundamentally mistaken in his identification of the

various URL elements used in the Epic system. Ultimately, Edwards is incorrect that the Epic

system uses a TWUID or that it recognizes a relationship between the SID and the TWUID.

53.    According to Essociate's infringement contentions, the SID in this example is:

4b4Gq?sub=12268

Essociate Contentions, p. 3.

54.    This is incorrect. As I explain above, 4b4Gq is the Epic *link ID*, a code generated to identify the particular *link* set up for a particular offer promoted by an affiliate. The SID, using the definition I provided in my previous report, is "The unique identifying code assigned to each webmaster in the source affiliate system." In the Epic system, the SID is the Epic affiliate ID. In the SpeedDate.com example, the SID is the Epic affiliate ID: 48192.

55.    Even using Essociate's proposed definition, <4b4Gq?sub=12268> is not the SID. According to Essociate, the SID is "a unique identifying code assigned to a webmaster within an affiliate pool of source webmasters." In the Epic system, the unique identifying code assigned to the webmaster is the affiliate ID. The particular affiliate in this example, 48192, would have multiple link IDs assigned to it, one for each offer that it wished to promote. As for the sub=12268 portion of the link, that is a sub ID viable that the affiliate can apply at its convenience. Okin Dep. 10/02/12, Page 213:3-214:16. Again, the affiliate 48192 might have multiple sub IDs.

56.    The '660 patent makes clear that the SID is a unique identifying code assigned to each "webmaster," not an identifier assigned to each offer or to each link. For examples:

> The present invention addresses these needs by providing a method for affording virtual affiliates access to an existing affiliate system. First, having been assigned a source unique identifier (source Webmaster ID), each of a group of Webmasters operates a web site.

'660 patent, 3:66-4:3.

> As discussed in greater detail below, each Webmaster in the affiliate pool 306 has assigned to it a unique identifying code, referred to below as the "source Webmaster ID."

'660 patent, 7:64-66.

57.    The link ID is decoded by the Epic system to find information about the particular

link clicked upon, including the affiliate ID of the Webmaster to which the link was issued, the

"offer" on the target merchant site to which the link points, a "program ID" (essentially a

development artifact was never really used, and so is always set to 1), and a code indicating the

traffic type—whether the link will be placed into a Web page, an email message, or a search-

engine PPC ad, for instance. The second part of this data—*?sub=12268*—is the sub ID. As

explained above, the sub ID is an optional variable that the affiliate could insert and use for its

own purposes.

58.    Edwards is somewhat equivocal in his identification of the SID. He endorses

Essociate's infringement contentions, and he identifies <4b4Gq?sub=12268> as the SID.

However, he also indicates that "alternatively," the SID might somehow be contained within

<4b4Gq?sub=12268>. As he puts it:

> <4b4Gq?sub=12268> is a SID (or alternatively, contains a SID or
> discloses an SID when interpreted by the Service) assigned to a
> particular Participating Webmaster in the Service's affiliate
> network

Edwards Report, p. 5. If Edwards means by this that the SID is the Epic affiliate ID, he is

correct, because that is the unique ID assigned to affiliates in the EPIC system. But his report

does not put it that way, and to support his infringement analysis he endorses Essociate's view

that the SID in this example is <4b4Gq?sub=12268> .

59.    Essociate and Edwards contend that, in the SpeedDate.com example, the TWUID

is < a=53&c=1&s1=48192&s2=12268>. This, too, is incorrect.

60.    The TWUID, according to the definition I proposed in my previous report, is "a

unique identifying code assigned to a virtual affiliate that is functional in the target affiliate

system." Kent Invalidity Report, ¶72. Essociate's proposed definition is apparently not

materially different: "a unique identifying code assigned to each source Webmaster in the source

affiliate pool that is functional within the target Merchant's home Affiliate System." Edwards

Report, p. 7.

61.    As a preliminary point, there can be no TWUID if there is no target affiliate

system. As I indicated in my earlier report, a target affiliate system is "A merchant affiliate

system to which virtual affiliates can refer traffic." Kent Invalidity Report, ¶ 81. In other words,

if there is no virtual affiliate arrangement, there can be no TWUID, and the method of the '660

patent is not used. As discussed above, Essociate has not shown, and has no evidence, that in the

SpeedDate.com example, the Epic system engaged the SpeedDate.com affiliate system, rather

than engaging SpeedDate.com directly as a merchant in the Epic system. But, even assuming

that Epic did engage the SpeedDate.com affiliate network, Essociate and Edwards have not

indentified a TWUID in the example transaction.

62.    As Edwards puts it:

> In the scenario described above, the TWUID is a unique identifier
> assigned by SpeedDate.com to each of its affiliates. In the current
> example, the Service creates or recognizes a relationship between
> the SID <4b4Gq?sub=12268> and the TWUID
> <a=53&c=1&s1=48192&s2=12268>.

Edwards Report, p. 7. Thus, according to Edwards, a=53&c=1&s1=48192&s2=12268 is a

TWUID, an example of the unique code that SpeedDate assigns to each of its affiliates.

63.    As I explained above, when an offer is set up on the Epic system, the merchant

provides a format for its landing page links. In the SpeedDate.com example, that format was:

> http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2
> =%%SUB_ID%%

64.    I could determine this format by reviewing Epic's offers_url table, which lists

information for all of the offers promoted in the Epic system. As you can see from the landing

page link format in the example, SpeedDate.com elected to use two of the Epic system preset variables, AFFILIATE_ID and SUB_ID, which are appended to the end of the landing page URL.

65.    To review the process, when a user clicks on a banner ad containing the Epic jump link,

http://x.azjmp.com/4b4Gq?sub=12268,

the user is directed to the Epic server. The Epic server decodes the link ID, 4b4Gq, and looks up the landing page link format for that offer. The Epic server then fills in the preset variables to create landing page link,

http://mysdate.com/?a=53&c=1&s1=48192&s2=12268.

The Epic system then directs the user to that landing page link. Then, according to Essociate, the SpeedDate.com system redirects the user to the SpeedDate.com signup page at

http://www.speeddate.com/index.php?page=signup&action=join&
afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639
528.

66.    Essociate and Edwards contend that "a=53&c=1&s1=48192&s2=12268" is the TWUID, but this is incorrect because it is not the unique code that SpeedDate.com assigns to each of its affiliates.

67.    I note first that Essociate provides no evidence of how the SpeedDate.com system operates, other than showing that is uses this sequence of URLs. Essociate does not show anything about the affiliate identification system used by SpeedDate.com. The link format

http://mysdate.com/?a=53&c=1&s1=%%AFFILIATE_ID%%&s2
=%%SUB_ID%%

was provided by SpeedDate.com. We do not know what the a=53&c=1 variables represent. However, in reviewing the offers_url table, I found 27 offers that had been set up to direct to the

mysdate.com domain. Six of those also used the "a=53&c=1" variables, but 21 used other
configurations.

    68.    For example, one offer that used a mysdate.com domain used this link format:

        http://mysdate.com/?a=53&c=2&s1=%%AFFILIATE_ID%%&s2
        =0182751C-%%SUB_ID%%

If the same Epic affiliate—48192—used this offer with the same sub id, the landing page link
would be:

        http://mysdate.com/?a=53&c=2&s1=48192&s2=0182751C-12268.

Following Essociate's logic, the TWUID in this case would be

        a=53&c=2&s1=48192&s2=0182751C-12268

even though it was the same Epic affiliate using the same sub ID.

    69.    Because the elements of the link format vary from offer to offer, it is simply
inaccurate to say that "a=53&c=1&s1=48192&s2=12268" is an example the unique code that
SpeedDate.com assigns to each affiliate in the Epic system. Any Epic affiliate would have a
different such "TWUID" for each offer that it promoted. What really happens is that the Epic
affiliate ID, 48192 in this example, is appended to the landing page link and passed on to the
merchant. The target merchant system is simply given the Epic-assigned SID, appended to or
imbedded in the landing page URL format that the target merchant selects. There is no TWUID
in this example transaction.

    70.    Nor is there any correlation operation in this example transaction, as required in
the '660 patent. The claimed invention requires a correlation operation. As claim 1 illustrates,
the invention requires the operation of:

> correlating the received source Webmaster unique identifier to a
> target Webmaster unique identifier corresponding to the unique
> identification system of the requested Merchant affiliate system;

'660 patent, 21:66-22:2.

71.     In the SpeedDate.com example transaction, the Epic system SID is not correlated to another unique identifier assigned to the affiliate by SpeedDate.com. The Epic system SID is simply passed through to SpeedDate.com without any correlation operation.

72.     This does not satisfy the requirements of the '660 patent. Merely passing through the SID to the target system does not satisfy the required correlating operation. Essociate has specifically disclaimed the concept of merely passing the SID through to the merchant, and on several occasions made quite clear that "correlation" was the essential element. 2012 Landau Dep. 176:16-177:12, 157:19-158:22, 127:1 – 127:21. 2010 Landau Dep. 38:8 - 44:2.

73.     Mr. Landau stated that the heart of the invention—the "light bulb moment"—was the "correlation function." 2012 Landau Dep. 176:16-177:12. And Mr. Landau identified the "correlation function" as being the essential difference between the Old XPays system, in use prior to May 1, 1999—a system that passed through the SID to the target system—and the New XPays system put into operation on or about May 5, 1999, the system on which the '660 patent was purportedly based.  2012 Landau Dep. 157:19-158:22.

### E.     Edwards mischaracterizes the tracking system of the SpeedDate.com example transaction

74.     Edwards' analysis the transaction tracking in the SpeedDate.com example is flawed in at least three basic ways.

#### 1.     Edwards mis-describes the operation of the tracking pixel

75.     Edwards describes in his report how the Epic system used a "tracking pixel." Edwards Report, p. 8. However, Edwards does not seem to understand how this system really worked, or perhaps has failed to describe it clearly. It is important to understand how this system worked, because if one accepts Edwards' description one will be left with the impression that

data is being pulled from the merchant system, when in fact it is being pulled from the

purchaser's computer.

76.    Edwards has omitted all mention of "cookies," which are essential to the

operation of the tracking pixel. As explained earlier, the tracking pixel works in combination

with a cookie that has been placed onto the user's computer by the Epic system, after the user

first clicked on the link on the source Webmaster's Web site. But the term *cookie* appears

nowhere in Edwards' report.

77.    Edwards describes the process as follows:

> The tracking pixel reporting function is used to obtain transaction
> information from the target Merchant affiliate system for specified
> transactions. The tracking pixel is a small segment of computer
> code, or script, which is inserted into the code of the "lead
> conversion page." The lead conversion page is a web page to
> which web traffic is redirected after completing a transaction. The
> tracking pixel may contain the offer_id, which is a unique
> identifier associated with each offer advertised by a merchant. (*Id.*)
> The tracking pixel causes a request to be sent to the Epic system
> indicating that a transaction originating from a Participating
> Webmaster in the Epic virtual affiliate system occurred.
> (Advertiser Implementation Guide at 8 "Epic reads Tracking
> Pixel... on the Advertiser's lead conversion page; ...associates the
> Lead, the Affiliate, and the Offer; and returns the data to Epic.")

Edwards Report, p. 8.

78.    This is wrong in a number of significant ways. First, it is misleading to refer to

the tracking pixel as "a small segment of computer code, or script, which is inserted into the code

of the 'lead conversion page.'" Edwards implies here that there is some kind of script that runs

on the merchant system. This is not correct.

79.    Actually, a "tracking pixel" is configured to appear as an essentially invisible

image: usually a transparent one-by-one pixel, referenced within the HTML code of the Web

page by an image tag (*<img>*), or an iframe tag (*<iframe>*). The Advertiser Implementation
Guide (on Page 10) shows several example *<iframe>* tags, such as this one:

> <iframe src="https://l.azjmp.com/f.php?o=[offer_id]" width="1"
> height="1" frameborder="0"></iframe>

This tag would create a one-pixel (*width="1" height="1"*) "window" in the Web page, with no
border around it (*frameborder="0"*); thus the window would be invisible. But the real purpose of
the tracking pixel would be to cause the purchaser's browser to request a file from the Epic
system, using the URL *https://l.azjmp.com/f.php?o=[offer_id]*; this is the script (*f.php*) that
would read the purchaser's cookie.

    80.    The script that reads the cookie is stored on, and run on, the Epic server. When
the users Web browser loads the page, the browser sends a request to the Epic server for the
invisible image and the script; requesting these items triggers the Epic server to run the script,
which in turn reads the cookies on the user's computer.

    81.    The second fundamental mistake in Edwards' analysis of the tracking pixel
concerns the source of the transaction information.  Contrary to Edwards' assertion, the "tracking
pixel reporting function" is not to "obtain transaction information from the target Merchant
affiliate system." Rather, the tracking pixel prompts the Epic system to retrieve data from the
cookie previously stored on the user's computer.  The transaction information does not come
from the merchant's system.

    82.    Edwards faulty analysis of the tracking pixel may be based on his omission of a
critical few words when quoting the Advertiser Implementation Guide.  Edwards omitted certain
references to cookies.  As Edwards quoted the Advertiser Implementation Guide:

> Epic reads Tracking Pixel… on the Advertiser's lead conversion
> page; …associates the Lead, the Affiliate, and the Offer; and
> returns the data to Epic.

Edwards Report, p. 9. In fact, what the Advertiser Implementation Guide actually states (with the omitted portions bolded) is:

> Epic reads Tracking Pixel **(explained on following page)** on the Advertiser's lead conversion page; **checks the user-side for cookies;** associates the Lead, the Affiliate, and the Offer; and returns the data to Epic.

Advertiser Implementation Guide, p. 8. Edwards omission of the phrase "checks the user-side for cookies" leaves the misleading impression that the merchant/advertiser's system returns the date to the Epic system. In fact the phrase "checks the user-side for cookies" makes clear that the transaction tracking information comes from the user's browser.

83.    In his discussion of claim 3, Edwards repeats the mistaken claim that through the use of the tracking pixel, "the Epic server obtains transaction information from the target Merchant affiliate system for specified transactions" and that "the Epic Service obtains transaction information from the target Merchant affiliate system upon completion of a transaction, referred to as a 'lead.'" Edwards Report, p. 11. Edwards quotes the Advertiser Implementation Guidelines as stating that the pixel "'triggers verification activities to check if the lead was from an Epic Affiliate referral' and if so 'return[s] data to Epic for reporting.'" *Id.* But this is highly misleading, because the verification activities do not draw information from the merchant system.

84.    Edwards makes the same mistake in discussing claim 6. Edwards contends here that that "Epic obtains transaction information by granting the target Merchant affiliate system access to the Epic Service via the tracking pixel functionality, which causes transaction information to be provided to the Epic Service when an image is placed on a website associated with the target Merchant affiliate system." Edwards Report, p. 11. The target Merchant affiliate system is not "granted access" to the Epic service via the tracking pixel in any conceivable way.

85.    In discussing claim 13, Edwards again states that "transaction information is

transferred from the target Merchant affiliate system to the Epic Service by implementing Epic's

tracking pixel." Edwards Report, p. 12. Again he is wrong; transaction information is not

transferred from the target system, it comes from the cookies that Edwards has not described.

### 2.    Edwards has no evidence that Epic used delay reporting for the SpeedDate.com example transaction

86.    As explained above, Epic uses the "cookie-and-pixel" method for the vast

majority of its transactions. In certain cases, the Epic system uses a delay reporting system, in

which transaction information is provided from the merchant to the Epic system.

87.    In his analysis of claims 3, 6, 10, 13, and 14, Edwards suggests that claim

limitations are satisfied by Epic's use of delay reporting. Edwards Report, pp. 11-12. But

Edwards' analysis is flawed because he provides no evidence whatsoever that the

SpeedDate.com transaction used any delay reporting method. Essociate did not, for example,

include the HTML code from the lead conversion page from the SpeedDate.com transaction, to

demonstrate that it did not contain the tracking pixel. Indeed, Edwards and Essociate have no

evidence that any transaction with a merchant affiliate network, and thus any transaction with

Virtual Affiliates, used delay reporting.

88.    I need to be clear, however, that even if the SpeedDate.com transaction had used

delay reporting, it would still not infringe the '660 patent, for the reasons given in paragraphs 34

to 87 above. The SpeedDate.com transaction does not demonstrate the use of a TWUID or the

correlation operation, regardless of the means by which the transaction tracking was reported to

Epic.

### 3.    Edwards does not show that the merchant landing page URL provides identification of the affiliate for the "requisite tracking"

89.    The '660 Patent requires that the URL created by the source affiliate system and used to direct traffic to the target affiliate system is used for "requisite tracking." As claim 1 provides, the invention includes the operation of:

> generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking.

'660 patent, 22:3-8.

90.    "Requisite tracking," as I explained in my previous report, "The tracking of transactions resulting from affiliate referrals and of the related commissions." Kent Invalidity Report, ¶ 84. When the Epic system used pixel-and-cookie tracking, the landing page URL was not used to "provide identification of the source Webmaster for requisite tracking." Identification of the source Webmaster (that is, the source affiliate) for tracking transactions and commissions came from the cookie on the user's computer. When the Epic affiliate ID is passed to the merchant, the merchant may use that information for its own purposes, but that information is not used for the "requisite" tracking of commissions.

### F.    Summary of response to Edwards' claim analysis

91.    I have summarized my element-by-element analysis of Edwards infringement opinions in a chart attached to this report as Exhibit A. I make here a few additional observations about certain aspects and shortcomings in Edwards' report.

92.    Essociate apparently has decided not to assert certain claims, because Edwards comments only on claims 1, 3, 6, 10, 13, 14, 15 and 28. For the sake of completeness, I include in the attached chart summary comments directed at each of the claims, including those that

Edwards did not mention, that is, claims 16, 19, 23, 26 and 27. I do not believe that a lay jury could understand these claims without expert guidance. I understand that because Essociate did not provide any expert analysis of these claims, Essociate will not be able to present these claims at trial.

93.     In my opinion, Edwards' discussion of the dependent claims 3, 6, 10, 13 and 14 on pages 11-12 is entirely conclusory. He does not provide any reason or evidence to show that elements in those claims were present in the single example transaction that he analyzed. For example, neither Edwards nor Essociate demonstrates the use of a banner ad by an Epic affiliate in connection with claims 10 and 23. Epic affiliates regularly use banner ads. But the example transaction does not show a banner ad on an Epic affiliate website. Rather, the Epic jump link is directly displayed on a page at www.bitly.com. Essociate has provided no evidence that www.bitly.com is a website operated by an Epic affiliate. Bitly.com is a link sharing site on which users may post links to other websites. It is likely that an Epic affiliate simply posted the jump link for the SpeedDate.com offer to www.bitly.com. Neither Edwards nor Essociate provides any evidence that an Epic affiliate operates the website with a banner ad as required by claims 10 and 23.

94.     Claim 15 (and the claims that depend from it, 16, 19, 23, 26 and 27) claim a computer program, and the elements of those claims require computer code segments that perform certain functions. Neither Edwards not Essociate has provided any discussion or analysis of the code to the Epic system. Although certain very general inferences might be drawn about the code based on the performance of the Epic system, in my opinion he has not sufficiently established what or how the Epic source code works to establish infringement.

95.    Claim 28 is a means-plus-function claim, as Edwards acknowledges. I understand that a means-plus-function claim construed to be limited to the structures disclosed in the specification. Neither Edwards nor Essociate analyses or describes the structures disclosed in the specification in their infringement analysis of claim 28. Indeed, Edwards' treatment of claim 28 is a mere three lines long. Accordingly, the analysis of claim 28 is merely conclusory and does not provide sufficient analysis to establish infringement.

## VI.    Essociate improperly shifts the meaning of "correlation" to avoid invalidity while pressing its infringement case.

96.    I understand that it is a fundamental principle of patent law that the claim terms of a patent must be construed the same way for both infringement and invalidity. In particular, in this case, the meaning of "correlating" must be the same for both infringement and invalidity. It appears to me, however, that Essociate is attempting to shift the meaning of "correlate" to avoid invalidity while pressing its infringement case against Epic Media.

97.    Essociate contends that the Old XPays system did not perform the correlation operation, and thus does not anticipate the '660 patent.

98.    As Mr. Landau explained the operation of the Old XPays system, XPays itself was provided an affiliate ID by the target affiliate systems that it worked with (Python and iGallery). 2012 Landau Dep. 117:14 – 117:22. The XPays ID would then form the first part of the code used by the target affiliate system. 2010 Landau Dep. 67:10 – 67:17; 2012 Landau Dep. 137:15 – 138:16. A script on the XPays system concatenated XPays' own ID with the affiliate's 5-digit affiliate ID from the XPays system. Landau Dep. 41:2 – 41:7. This concatenated ID was then passed to the target affiliate system. Landau Dep. 67:10 – 67:17. If a user followed the link from the XPays affiliate and successfully completed a transaction, the merchant sent an email to XPays containing the transaction information, including the affiliate ID that had been sent to the

target merchant.  2012 Landau Dep. 146:21-148:1. (See Expert Report of Peter Kent on the

Validity of the Patent-in-Suit for more details.)

99.    Essociate contends, however, that the Old XPays method did not perform the

crucial "correlating" operation, because the XPays affiliate ID was merely "substituted" by the

script on the Old XPays system.  As Mr. Landau explained during his deposition:

> Q. In response to your -- my question about the old X Pays and the
> new X Pays, you identified the correlation function as the crucial
> difference. Is that correct?
>
> …
>
> A. Generally speaking, yes, that is correct.
>
> Q. And then I asked you to explain what the correlation function is.
>
> …
>
> A. The correlation mechanism allows the network system to be
> ready to create the links, create the structures to -- in disparate
> systems, to have a way to have all the disparate systems still work
> in one structure.
>
> Q. When you say disparate systems, are you referring to multiple
> target affiliate networks?
>
> A. I'm referring to different methods of tracking and identification
> mechanisms for differing systems.
>
> Q. And again, for differing systems you're talking about different
> target affiliate systems?
>
> A. Yes.
>
> Q. How is it that was not accomplished by old X Pays?
>
> …
>
> A. The old X Pays was a simple substitution of the affiliate I.D.
> number and no logic required to determine if that was the proper
> way to set up a link.

2012 Landau Dep. 157:19-159:7 (objections omitted).  Essociate has also taken this position in litigation.  See, *e.g.*, Deposition Exhibit 17 (DuWors letter of January 3, 2010).

100.    When confronted with a challenge to the validity of the '660 patent, Essociate contends that "simple substitution" does not constitute "correlation" as that term is used in the claims of the '660 patent.  However, Essociate presses its infringement claim against Epic, even though the Epic system merely passes on the Epic affiliate ID to the merchant system, contending that this constitutes "correlation."   Essociate cannot deny that Old XPays performs a correlation operation while at the same time contending that the Epic system does so.

101.    Indeed, in my opinion, the Old XPays does perform the correlation function because it creates a TWUID by concatenating the XPays ID with the XPays affiliate ID, thus creating a new ID that functions in the target merchant's affiliate system, which is described as one of the embodiments in the '660 patent.  This is not simple substitution.

102.    But in the Epic system, even when the Epic system passes the affiliate ID to the merchant system, it performs only a simple substitution: the Epic affiliate ID is passed on to the merchant system as a separate variable.

103.    Thus, in my opinion, the Epic system does not infringe the '660 patent, but the '660 patent is invalid because it is anticipated by the Old XPays system.


Dated: December 17, 2012.                Respectfully submitted,


_____

Peter Kent

8827070_9

29

A1983

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served on December 17, 2012 to:

John DuWors
Derek Linke
Newman DuWors
1201 Third Avenue, #1600
Seattle, WA 98101

by email to the following addresses:

john@newmanlaw.com
linke@newmanlaw.com
lindsey@newmanlaw.com
sarah@newmanlaw.com

s/James D. Peterson_____
James D. Peterson

8852325_1

identifying Webmasters associated with the affiliate pooling system." ('660 pat., col. 11, lns. 13-15) One disclosed embodiment provides that:

> For example, the first portion of the code may be an acronym for the source system from which the Webmaster is sending traffic, while the next portion may consist of numbers that represent the particular source Webmaster ID assigned to the 20 Virtual Affiliate Webmaster. In this respect, the Merchant affiliate system recognizes that a transaction originates from the respective source system and recognizes the new target Webmaster ID such that the Merchant's existing tracking can take over.

('660 pat., col. 11, lns. 15–26)

Epic practiced the hybrid-string technique for correlation disclosed in the '660 Patent. When a Click URL is activated by a user clicking on a banner ad on an Epic webmaster's website, Epic receives a request for a merchant's website which includes that webmaster's unique Epic ID ("SID"). For any offer in the offer_urls table for a merchant affiliate system which required Epic to use a Destination Landing Page URL with a unique identifier for Epic and a value field filled with one or more of the macros "%%AFFILIATE_ID%%", "%%AFFILIATE-ID_SUB-ID%%", or "%%CLICK_HASH%%", Epic created or recognized a relationship between the SID and the hybrid string combining the unique identifier for Epic and that variable (the "TWUID"). (SPF 119)

In the SpeedDate.com example, Epic creates or recognizes a relationship between a SID for the originating Epic affiliate (<48192>)—which is included in <4b4Gq?sub=12268> in the unique click id <4b4Gq> (*See* Advertiser Implementation Guide at 7 (Each Click URL includes "pertinent information such as the affiliate id.") and the TWUID, <a=53&c=1&s1=48192&s2=12268>, a hybrid-string of characters including both the unique identifier SpeedDate.com assigned to Epic and the SID. (SPF 120)

In this example SpeedDate.com TWUID:

- • a=53 is the value field containing the unique ID assigned to Epic;

- • c=1 is the value field containing an identifier for a particular SpeedDate.com advertising offer;

- • s1=48192 is the value field containing the SID of the originating Epic affiliate; and

the target merchant system" in response to "a request from a visitor to the affiliate site." Rather, a visitor would not have been forwarded to the merchant in response to that request, but would have been only directed to an Intermediate Page (hosted by XPays, not the merchant).

Kent is also incorrect that the Old XPays system included the "correlation" step disclosed in the '660 Patent. (*See id.* at ¶¶ 126–170.) The correlation in the '660 Patent is between unique codes assigned to source webmasters and unique codes functional in the target merchant system. The Old Xpays system did not include unique codes functional in the target merchant system and therefore there was nothing which could be correlated.

Kent is incorrect that the Old XPays system included the "hybrid string" structure for correlation disclosed in the '660 Patent. Kent claims that the URLs used in the Old Xpays system were generated by "concatenation." (*Id.* at ¶ 133.) This is clearly incorrect, and Kent's use of that term indicates he either does not understand that meaning of that term as used in the art or does not understand the functionality ascribed to Old Xpays. My understanding of that term as it is used in the art is consistent with the definition and example provided on the Wikipedia page for "concatenation": "In formal language theory and computer programming, string concatenation is the operation of joining two character strings end-to-end. For example, the concatenation of 'snow' and 'ball' is 'snowball'." (*See* http://en.wikipedia.org/wiki/Concatenate).

But the Old XPays system did not involve any URLs formed through concatenation. And none of the materials Kent claims to have reviewed, or with which I am familiar, indicate otherwise. Rather, it is clear that the xmake.cgi script—even assuming that was used in connection with iGallery and Python, which does not appear to

be the case—operated by substitution. That script substituted a placeholder, <!--ASJCGI--> with the 5-digit code for a particular Xpays affiliate. (Kent acknowledges this functionality later in his opinion. (*See* Kent Report at ¶ 145.)) There was no concatenation.

But the hybrid string structure for correlation disclosed in the '660 Patent refers to the creation of codes, not URLs: "the Merchant affiliate system may also use a hybrid string of characters as a target Webmaster ID for identifying Webmasters associated with the affiliate pooling system." ('660 Patent at col. 11; ll. 13-15.) There was no creation of a "target Webmaster ID" in the Old Xpays system (by concatenation or otherwise). Kent noticeably avoids any discussion of the use of a target Webmaster ID and instead focuses on the creation of URLs.

Kent's conclusion about the functionality of the Old XPays system is incorrect and not supported. He claims that in that system, the merchant affiliate system "recognize[d] the new target Webmaster ID such that the Merchant's existing tracking can take over." (Kent Report at ¶ 136.) But there were no "new target Webmaster IDs" in Old XPays. And there is no indication whatsoever that the 5-digit Xpays affiliate code that XPays included in URLs was recognized in any way by either Python or iGallery, much less "tracked" by either of those systems.

Kent's description of the Landau testimony on this issue is false. (*See* Kent Report at ¶ 138). He claims that Landau testified that the affiliate ID provided to XPays would be "the first part of the code used by the target affiliate system" and provides two deposition citations in support of that position (*Id.*) But in the first testimony Kent cites, Landau identified the string "81193000025" only as an "11-digit string," and never as a

## INTRODUCTION

Essociate's summary judgment opposition has two fundamental problems.

First, instead of basing its response on the evidence of record in this case, Essociate relies heavily on two substantial new declarations, one by its lead counsel, John DuWors, and a 163-paragraph declaration by the inventor, Michael Landau, who also serves as Essociate's invalidity expert. These two declarations are improper for multiple reasons: they lack foundation; they constitute untimely expert testimony; and they contradict Landau's prior sworn testimony. Essociate cannot escape summary judgment by means of sham declarations like these.

Second, Essociate reads the claims terms of '660 patent broadly for infringement, but unreasonably narrowly for invalidity. Properly viewed, the '660 patent does not claim a system like Epic's. The Old XPays system (the inventors' own prior affiliate network) is an embodiment specifically described in the specification of the '660 patent. And, certainly, if Essociate can stretch the '660 patent to cover the Epic affiliate network, then the patent is invalid view of Old XPays.

Epic's summary judgment evidence stands almost entirely unrebutted by any admissible evidence, and Epic is therefore entitled to judgment as a matter of law.

## ARGUMENT

### I. Much of Essociate's summary judgment evidence must be excluded.

Before turning to the merits, we address the admissibility of Essociate's summary judgment evidence. Essociate cannot create a genuine dispute of material fact unless it has evidence that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(1)(B). But much of the evidence Essociate adduces in its opposition would not be admissible at trial because it was disclosed too late, contradicts prior testimony, or lacks proper foundation.

### A.   Essociate's invalidity expert reports should be stricken.

Essociate's expert reports from Michael Landau (Dkt. 85) and David Stern (Dkt. 86) are admittedly untimely.  The Court should exclude them because Essociate has not met its burden to show that its tardiness was either justified or harmless.  *See Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741-42 (7th Cir. 1998). The delay was not "harmless," particularly in this Court where the time between expert disclosures and summary judgment is already tight. Because Essociate served the reports on Christmas Eve, when Epic's attorneys and witnesses were entitled to spend time with their families, Essociate's delay effectively reduced the working time between the disclosure of Essociate's expert reports and the summary judgment deadline to less than a month.  Essociate also insisted on deposing Don Mathis during this time.  Dkt. 103. Epic managed to (substantially) make the summary judgment deadline, but not without pushing other professional and personal matters to the margin.

Essociate offers no real justification for the delay, saying only that it was caused by the holiday travel of its counsel and witnesses.  *See* Essociate's Brief in Opposition to Defendants' Motion (Dkt. 109) ("Essociate Br.") at 61.  Pre-planned travel should not justify a unilateral and unconsented extension of an expert disclosure deadline. The late disclosure of the Landau and Stern reports was not justified or harmless, and the Court should exclude them.

### B.   The Landau Declaration is an improper sham affidavit.

Michael Landau's February 22, 2013 declaration is the quintessential sham affidavit. *See* Dkt. 108 ("Landau Decl.").  It also comprises an improper supplemental expert report, and it should be disregarded on both grounds. Landau wears many hats in this case: Essociate's Chief Technology Officer and its Treasurer, inventor on the '660 patent, patent invalidity expert, and the purported developer of Old XPays, the primary prior art reference at issue in this motion.

2

Apparently, he wears each of these hats in making his February 22 declaration, but none of them make the declaration proper.

The "sham affidavit" rule prohibits litigants from creating issues of fact with affidavits that contradict their prior sworn testimony and that fail to give a credible explanation for the discrepancies. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996) (listing statements deemed by courts to be "sworn testimony" subject to the rule, such as answers to interrogatories); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998). "'If such contradictions were permitted . . . the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut.'" *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (quoting *Bank of Illinois*, 75 F.3d at 1168–69). Landau's declaration repeatedly directly contradicts his prior deposition testimony, and Landau provides no explanation for these discrepancies. For example, in his 2012 deposition, Landau testified that he could not recall whether he took steps to preserve certain documentation, but in his February 22 declaration, he apparently knew certain dates by which the documentation was lost or discarded. *Compare* Oct. 8, 2012 Landau Dep. 171:11-176:4 *with* Landau Decl. ¶ 120. Another example is that in 2010, Landau testified that affiliate systems Python and iGallery used a five-digit XPays ID for transaction tracking, but Landau now summarily denies this in his declaration. *Compare* 2010 Landau Dep. 27:10-29:25; 42:4-12; 43:13-20 *with* Landau Decl. ¶¶ 58-59. Other examples of Landau's contradictions are noted throughout this brief, Epic's response to Essociate's Supplemental Proposed Facts, and in Epic's reply concerning its proposed findings of fact.

Many of the statements in Landau's declaration should also be disregarded because they are mere conclusory assertions, unsupported by specific facts. Conclusory statements in

affidavits opposing a motion for summary judgment are insufficient to raise a genuine issue of material fact. *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985); *see also Bragg v. Navistar Int'l Transp. Corp*., 164 F.3d 373, 377 (7th Cir. 1998); *Adusumilli v. City of Chicago*, 164 F.3d at 360. This Court has previously disregarded these types of conclusory statements, explaining that summary judgment is the "put up or shut up" moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of the events. *Williams v. Berge,* No. 02-283-bbc, 2003 WL 23204305, at *6 (W.D. Wis. Jan. 28, 2003) (citation omitted). Landau's declaration is full of conclusory denials of facts established by other evidence in this case. In particular, paragraphs 34-42; 45-73, 75, 129, 134-39, 141-42, 156, and 163, constitute conclusions or denials that are uncorroborated by any other evidence, and in many cases contradicted by Landau's own prior deposition testimony.

The Court should also exclude any expert testimony in Landau's declaration as improper supplementation. Supplemental expert opinion is only permissible to correct mistakes and oversights, not to include new material and opinions that should have been included in the original report. *Baratto v. Brushstrokes Fine Art, Inc*., 701 F. Supp. 2d 1068, 1071 (W.D. Wis. 2010); *see also, e.g*., *Innogenetics N.V. v. Abbott Laboratories*, No. 05-575, 2006 WL 6000791, at *1 (W.D. Wis. Aug. 3, 2006). This is precisely what Essociate is trying to do, providing new examples, illustrations, and even additional opinions through Landau's conclusory sham declaration. The Court's original scheduling order in this case makes clear that the expert disclosure requirements of Rule 26 apply with full force to any employee of a party who intends to offer expert testimony. Dkt. 11. Expert testimony related to Essociate's infringement case had to be disclosed by November 13, and for Essociate's invalidity case, the expert deadline was

December 17.  Landau's declaration includes extensive expert evidence on both infringement and invalidity that should have been disclosed by December 17 at the latest.  This includes any evidence pertaining to the operation of the Epic system, as the only means of access to that information is as Essociate's expert.  It also includes any opinion testimony concerning the scope of the '660 patent, the meaning of the terms of the '660 patent, and the validity of the '660 patent. All these are topics for expert testimony, not the province of a fact witness. It must also include opinion evidence concerning Old XPays, because none of the provisions for lay opinion evidence would be applicable to Landau's evidence regarding Old XPays. *See* Landau Decl. ¶¶ 5, 7-9, 12, 15, 22-24, 26-43, 45-59, 61-73, 75, 121-142, 145-150, 155, and 157-163.  Essociate cannot create a genuine dispute of fact with a sham declaration like this one.  The Court should reject this transparent attempt to avoid summary judgment.

### C. The DuWors declaration lacks foundation and provides inappropriate fact testimony from Essociate's lead attorney.

The declaration of Essociate's lead litigation counsel, John DuWors, should be mostly disregarded as well.  *See* Dkt. 105 ("DuWors Decl.").  An attorney declaration can be used to submit copies of documents that can be authenticated by counsel (as in paragraphs 2-6, 12, and 25-28).  But the DuWors declaration inexplicably provides factual evidence concerning several matters of which DuWors has no personal knowledge.  In particular, the DuWors declaration provides factual evidence concerning: Epic's creditors, Essociate's "belief" regarding when a document was executed, and the operation of the Epic Network.  *See* DuWors Decl. ¶¶ 7, 16-24.  DuWors' declaration violates the requirement in Federal Rule of Civil Procedure 56(c)(1) that declarations must be made based on personal knowledge.   DuWors also should not be serving as both a counsel and a witness in this case.  *See* ABA Model Rule 3.7. The Court should disregard Paragraphs 7-11, 13-24, and 29-36 in the DuWors declaration.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| ESSOCIATE, INC. | |
| Plaintiff, | **CASE NO. 11-cv-727-bbc** |
| v. | |
| AZOOGLE.COM, INC., EPIC MEDIA GROUP, INC., SOCIAL ASSETS LLC d/b/a KINETIC SOCIAL, and DOES 1–10; | |
| Defendants. | |

### EPIC MEDIA'S FIRST SET OF INTERROGATORIES AND PLAINTIFF ESSOCIATE, INC.'S ANSWERS AND OBJECTIONS THERETO

TO:   ESSOCIATE, INC., by and through John Du Wors and Derek Linke, its counsel

of record

Pursuant to Federal Rule of Civil Procedure 33, Defendant Epic Media Group,

Inc., formerly known as Azoogle.com, Inc., (collectively hereinafter "Defendant"), by its

attorneys, submits its First Set Of Interrogatories to Plaintiff Essociate, Inc. and requests

that Plaintiff answer the following interrogatories separately, fully and under oath,

pursuant to Rule 33, and within the time period provided by the Federal Rules of Civil

Procedure. Plaintiff is requested to supplement all responses to these interrogatories as

required by Federal Rule of Civil Procedure 26(e). The following definitions and

instructions apply:

### INSTRUCTIONS AND DEFINITIONS

1.      These instructions are intended to cover the information and documents or

things sought through these interrogatories and requests and all information and

documents or things in Plaintiffs global charge and/or possession as well as those subject

to its custody and/or control, whether in its possession, at the office of its attorneys, and/or at any other place and/or in the possession of any other person and/or entity subject to Plaintiffs control.

2.　　To the extent that Plaintiff considers any of the requests or interrogatories objectionable, answer that portion of the interrogatory or request, or subpart thereof, to which Plaintiff has no objection and separately state the portion of the interrogatory or request, or subpart thereof, to which Plaintiff lodged an objection, stating the specific grounds for the objection.

3.　　With respect to any information, documents, communications and/or tangible items or things (collectively "documents") withheld from production, on any basis whatsoever, including without limitation, on the basis of the attorney-client privilege and/or the work product doctrine, Plaintiff shall serve with its responses herein a separate list of all such documents and communications that states and identifies the following:

a.　　In detail, the precise basis for the privilege claimed by the objection made with respect to the document or communication; and

b.　　If the privilege relates to a written communication or document:

i.　　the date the documents bear, if any, and if different, the date on which the document was created;

ii.　　the nature of the documents (i.e., draft or final letter, memoranda, report etc.), the author(s) or originator(s) of the document, the title (if any), and the subject matter of the document;

iii.　　the name, business address, and business affiliation of each

- 2 -

and every person who drafted, wrote, produced, executed, signed, edited, reviewed, revised and/or otherwise participated in creating and/or altering the documents;

    iv.    the name, business address and business affiliation of each and every person who received the document, or any copy thereof, or was permitted to learn of its contents;

    v.    the number of pages of the documents; and

    vi.    the name, business address and business affiliation of each and every person who has possession, custody and/or control of the document or any copy of the document.

    c.    If the privilege relates to an oral communication:

    i.    the date on which the communication occurred;

    ii.    the name, business address and business affiliation of each and every person who participated in the communication; and

    iii.    the general nature of the communication.

4.    With respect to Plaintiff's answer to each interrogatory and/or subpart thereof, identify the source of the information given with as much particularity as possible, including the nature, designation, and location of any files that contain such information and the custodian of the files, and identify each document which supports, in whole or in part, the answers to each interrogatory.

5.    For any document or thing no longer in existence or which cannot be located, identify the document or thing; state how and when it passed out of existence or could no longer be located, and the reasons therefore; and identify each person having

knowledge concerning such disposition or loss, and each document or thing evidencing such document or thing's prior existence or facts concerning its nonexistence or loss.

6.      If Plaintiff answers an interrogatory pursuant to Rule 33(d), for each interrogatory and subpart thereof, specify the particular documents or things responsive to that interrogatory and subpart thereof and, for each document, specify its source, author, recipients, and the date of preparation, if not contained on the face of the document.

7.      Where an interrogatory requests information not known to Plaintiff, or documents or things not in Plaintiff's possession, Plaintiff shall identify the person or persons having such knowledge or possessing the requested documents or things.

8.      Plaintiff is requested to preserve all documents and things that may be relevant to the subject matter of this action and to discontinue any document destruction policy that may impact such documents or things.

9.      The term "Plaintiff" refers to Plaintiff Essociate, Inc.

10.     The terms "Defendant" or "Defendants" refer to Azoogle.com, Inc. and Epic Media Group, Inc. collectively.

11.     The phrase "the '660 Patent" refers to U.S. Patent No. 6,804,660 B2.

12.     The phrase "patent-in-suit" refers to the '660 Patent and any subsequent patent asserted by Plaintiff in the case.

13.     The phrase "related application" means any and all nonprovisional and provisional patent applications related to the patent-in-suit, any continuations, continuations-in- part, divisions, interferences, reexaminations, requests for reexamination, reissues, parents, foreign counterpart applications, and any other

- 4 -

applications disclosing, describing or claiming any invention disclosed, described or claimed in the patent-in-suit, or claiming the benefit of the filing date of any application whose benefit is claimed in the patent-in-suit, whether or not abandoned and whether or not issued, and any applications the filing date of which the patent-in-suit claims the benefit.

14.     The phrase "related patent" means any and all patents issued upon related applications, including without limitation any patents which may have been opposed, contest, or subject to any nullity proceedings.

15.     The term "date" as used herein means the exact day, month and year, if ascertainable, or if not, the best approximation (including relationships to other events).

16.     The terms "identify," "identifying" or "identity" as used herein, when used in reference to:

     a.     an individual means to state his or her full name, present or last known residence address, present or last known business address, and position or business affiliation;

     b.     a business entity means to state its form, full name, address of its present or last principal place of business, and its principal line of business;

     c.     a document means to state its date, author, recipients (including recipients of copies), type (i.e., letter, memorandum, book, telegram, chart, etc.), title (or identifying or descriptive code number, file number or label), a brief description of its subject matter, its present and former locations, and the name of all persons having possession, custody or control of it;

     d.     a thing means to state its name, type and model number and all

past and present unique designations (both publicly known and internally used), a brief description of its subject matter, its present and former locations, whether it has been made, used, leased, and/or sold by or for Plaintiff, the identity of the individual or business entity who made it, where it was manufactured, and the name of all persons having possession, custody or control of it; and

   e.  a communication means to state its date, the communicator, the communicatee, the type of communication (i.e. conversation, telephone call, letter, note, etc.) and a brief description of its subject matter.

  17.  The term "person" refers to any individual, corporation, proprietorship, association, joint venture, company, partnership or any legal or business entity, including governmental bodies and/or agencies.

  18.  The term "document" or "documents," as used herein, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents" in Federal Rules of Civil Procedure 34(a) and includes the terms "writing" and "recording" and "photograph" as those phrases arc defined in Federal Rules of Evidence 1001(1) and 1001(2), including drafts and annotated copies. Electronic mail is included within the definition of the term "document." A draft or non-identical copy is a separate document within the meaning of the term "document." Furthermore, the term "document" is used herein in its customary broad sense to include without limitation the following items, whether printed or reproduced by any process, or written or produced by hand, and whether or not claimed to be privileged or otherwise excludable from discovery, namely: notes, letters, correspondence, communications, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations,

diaries, reports, laboratory and research reports and notebooks, engineering notebooks, source code, charts, plans, drawings, photographs, minutes or recordings of meetings, including directors' meetings, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, marketing plans, business plans, strategic plans, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, data compilations, electronic mail, electronically stored data, computer tapes or disks, computer printouts, computer directories, computer files and all material fixed in a tangible medium, including computers, of whatever kind known to or in the possession, custody and/or control of Plaintiff.

19.     The terms "thing" and "things" shall be interpreted broadly and include any tangible object other than a document.

20.     The term "communication" shall be interpreted broadly and means the transmittal of information by any means, which shall include, but not be limited to, correspondence, memoranda, notes, letters, and/or any record of any transmittal or exchange of infom1ation whether orally, in writing, electronically, in person, by telephone or otherwise, including any utterance to another person, whether in person, by telephone or otherwise, including voice-mail.

21.     The term "each" means "all, each and every."

22.     The term "every" means "all, each and every."

23.     The term "any" means "any and all."

24.     The term "including" means "including but not limited to."

25.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

26.     The plural form of any word shall include the singular form and the singular form shall include the plural. Any reference to a male pronoun shall also constitute reference to a female pronoun.

27.     Unless otherwise stated, the term "Complaint" shall mean the complaint or any amendment thereto which is the basis for the above captioned case.

### GENERAL OBJECTIONS

1.     Plaintiff Essociate, Inc. ("Essociate") objects to these interrogatories ("Interrogatories") to the extent the Interrogatories seek information protected by the attorney-client privilege, work product doctrine, investigative privilege, expert privilege, or any other applicable privilege.

2.     Essociate objects to the Interrogatories to the extent they purport to impose obligations on Essociate greater than those imposed under the Federal Rules of Civil Procedure (each a "Rule" or the "Rules").

3.     Essociate objects to the Interrogatories as unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of relevant information.

4.     Essociate objects to the Interrogatories that seek in response an opinion or contention that relates to questions of law or fact or the application of law to fact. Essociate's responses may be revised or supplemented as Essociate becomes aware of additional facts during discovery.

5.     Essociate objects to the Interrogatories as premature to the extent Essociate has yet to conduct the relevant discovery or investigation with respect to the facts at issue, and to the extent Essociate does not currently possess the requested information or documents. Essociate will update its responses hereto, as and when Essociate completes such discovery, and to the extent the information is properly discoverable.

6.     Essociate objects to the Interrogatories as vague and ambiguous, overly broad and unduly burdensome to the extent the Interrogatories seek information that can be readily and more easily obtained from some source other than Essociate.

7.     Essociate objects to the Interrogatories to the extent they seek information that constitutes trade secret or other confidential research, development, or commercial information that will be protected by the confidential protective order to be entered in this action.

8.     Essociate reserves the right to supplement these responses as discovery continues and/or other responsive documents are located.

Each of the following responses are subject to and without waiving the foregoing General Objections. Essociate responds as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1**: Set forth the factual basis and explanation for Plaintiff's contention that Defendant infringes, induces infringement, or contributorily infringes any claim of the patent-in-suit, including an identification of each individual claim of the patent-in-suit Plaintiff alleges Defendant infringes and the factual support for such a contention, including an explanation of how Defendant allegedly infringes each limitation of each asserted claim.

**ANSWER: 1.** Essociate incorporates its general objections by reference and specifically objects this interrogatory is overly broad and burdensome, calls for legal conclusions regarding the construction of the '660 Patent, and requires Essociate to answer about materials which Epic has produced designated ATTORNEYS' EYES ONLY or SOURCE CODE – RESTRICTED ACCESS – ATTORNEYS' EYES ONLY under the stipulated protective order, meaning that only Essociate's counsel is able to access those materials.

Without waiving the foregoing objections, Essociate answers as follows: Essociate asserts that Epic directly infringes several claims of the '660 Patent: 1, 3, 6, 10, 13, 14, 15, 16, 19, 23, 26, 27, and 28.

As further described in Exhibit A hereto, Epic offers an online affiliate network at <http://www.epicdirectnetwork.com> and previously at <http://www.azoogleads.com/> that allows Epic's webmaster affiliates to refer customer traffic to an existing target affiliate system.

In the example shown in Exhibit A, Epic has its own affiliate system which enables webmasters to become affiliates in the SpeedDate.com affiliate network and post

advertisements for SpeedDate.com on their websites. Potential customers click on those advertisements which directs them to SpeedDate.com's website.

Epic's "virtual affiliate" system allows Epic's participating webmasters to post banner ads and drive traffic to SpeedDate.com's website even if Epic's webmasters are not SpeedDate.com affiliates. Epic assigns a unique identifier (a "SID") to each of its participating webmasters, and correlates that identifier to another unique identifier (a "TWUID") which corresponds to SpeedDate.com's identification system for its own affiliates. This system results in the generation of a URL (associated with a banner advertisement) which, when clicked on by a potential customer, leads to SpeedDate.com's website. SpeedDate.com recognizes the transaction as originating from a particular webmaster in Epic's "virtual affiliate" system. This system enables the tracking of the webmaster who is the source of traffic for a given transaction.

Essociate recorded the following URL redirection using Epic's affiliate network:

http://x.azjmp.com/4b4Gq?sub=12268

http://mydate.com/?a=53&c=1&s1=48192&s2=12268

http://www.speeddate.com/index.php?page=signup&act ion=join&afid=53&asid=48192&asid2=12268&pid=865 9&cid=1&xid=8639528

The claim chart attached as Exhibit A to these discovery responses shows an element-by-element application of the asserted claims to Epic's use and provides an example of Epic's infringing conduct.

In addition to the example discussed in the attached Exhibit A, Essociate also recorded the following URL redirection sequence for the same SpeedDate.com offer available in the Epic affiliate network:

http://x.azjmp.com/4b46s

http://mysdate.com/?a=53&c=1&s1=8043&s2=

http://www.speeddate.com/index.php?page=signup&action=join&afid=53
&asid=8043&asid2=&pid=8659&cid=1&xid=8639528

These URLs are also for the SpeedDate.com target affiliate system but include a different SID and TWUID. This confirms that those identifiers are as unique identifiers within the source affiliate system and the target affiliate system, respectively.

## CERTIFICATION

The undersigned attorney for Plaintiff Essociate, Inc. has reviewed the foregoing answers and objections to EPIC MEDIA'S FIRST SET OF INTERROGATORIES and certifies that they are in compliance with the Federal Rules of Civil Procedure.

DATED: October 23, 2012.

By: s/ Derek Linke _____

## VERIFICATION

I, Michael Landau, CTO of Plaintiff Essociate, Inc., have read the foregoing answers to EPIC MEDIA'S FIRST SET OF INTERROGATORIES, know the contents thereof, and believe the same to be true.

DATED: October 23, 2012.

_____
Michael Landau

**CONFIDENTIAL**

# EXHIBIT A

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|--------------------------------|
| **1** | A method for providing Virtual Affiliates to an existing target affiliate system, the method comprising the operations of: | The accused instrumentality, identified as the "Epic Direct Network", performs a method to provide Virtual Affiliates to at least one target affiliate system.<br><br>Attachments 1 and 2 illustrate Epic Direct's materials describing its affiliate network. |
| **1** (cont) | configuring an existing target affiliate system to receive referrals from | The accused instrumentality has configured at least one existing target affiliate system to receive referrals. One instance of an existing target affiliate system so configured by the accused instrumentality is operated by SpeedDate.com. Information describing the SpeedDate.com target affiliate system is available at <http://www.speeddate.com/apps/site/views/mp/affiliates.php> (See Attachment 3). |
| **1** (cont) | a first plurality of Webmasters in an affiliate pool of source Webmasters | Participants in Epic Direct's virtual affiliate network constitute an "affiliate pool of source Webmasters." The participants act as a group of Webmasters who can refer customer traffic to an existing target affiliate system.<br><br>A subset of the participants in Epic Direct's virtual affiliate network ("Participating Webmasters") sign up to send referrals to the target affiliate system (e.g., the "SpeedDate.com target affiliate system).<br><br>Epic Direct's affiliate system includes an affiliate pool of source Webmasters. |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **1** (cont) | such that the target Merchant affiliate system recognizes a transaction as originating from a source Webmaster in an affiliate pooling system, including the step of: | The accused instrumentality so structures its affiliate network that the target affiliate system (*e.g.*, SpeedDate.com) recognizes a transaction between the target affiliate system and a participant in the Epic Direct affiliate network as originating from Epic Direct's affiliate network.<br><br>As shown through the performance of the various claimed steps below, in one example, SpeedDate.com recognizes a transaction as originating from a Epic Direct source Webmaster website. |
| **1** (cont) | assigning a source Webmaster unique identifier for each of said first plurality of Webmasters each operating at least one web site; | The accused instrumentality assigns a source Webmaster unique identifier ("SID") for each Participating Webmaster in the accused instrumentality's affiliate network.<br><br>In one example, <4b4Gq?sub=12268> is the SID assigned to a particular participant in the accused instrumentality's affiliate network.<br><br>An Epic Direct affiliate URL was found on the website attached as Attachment 4. That URL is <http://x.azjmp.com/4b4Gq?sub=12268><br><br>The domain name <azjmp.com> is owned by Epic Direct. See Attachment 5.<br><br>That URL includes tracking code associated with an advertisement used in connection with an advertising campaign of a target affiliate system, the SpeedDate.com affiliate system in this example. The advertisement URL is constructed with the tracking code, which refers to an image and includes a link that is followed when the image is clicked. The link includes the unique identifier (the SID). Here the SID is <4b4Gq?sub=12268>.<br><br>Each of the webmasters operates at least one web site, in at least one of which the advertisement code is incorporated. |

3

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|--------------------------------|
| **1** **(cont)** | receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, | A participant in Epic Direct's affiliate network displays an ad promoting SpeedDate.com on a web page. (See Attachment 4.) A visitor to the web page clicks the ad.<br><br>The accused instrumentality receives, as a result of the click, a user request for a URL to the target affiliate system.<br><br>For example, when a visitor to a participant's web page clicks on the provided advertisement for SpeedDate.com, the click on the link shown as:<br><br>http://x.azjmp.com/4b4Gq?sub=12268<br><br>is received by the accused instrumentality and indicates a request for a URL to the SpeedDate.com affiliate system. |
| **1** **(cont)** | wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, | Clicking the following link acts as the request for a URL to the SpeedDate.com affiliate system:<br><br>http://x.azjmp.com/4b4Gq?sub=12268<br><br>The unique SID <4b4Gq?sub=12268> is transmitted with the request as a component of the HTML request for the resource pointed to by the above link. |
| **1** **(cont)** | and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters; | On information and belief, the target affiliate system, SpeedDate.com in this example, maintains a unique identification system for its affiliates (*i.e.*, Webmasters who direct consumer traffic to SpeedDate.com's website), and each affiliate has a "target Webmaster unique identifier" ("TWUID"). |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **1**<br><br>**(cont)** | correlating the received source Webmaster unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and | The accused instrumentality creates or recognizes a relationship between the received SID to a TWUID at the requested Merchant affiliate system.<br><br>When the following link is clicked, the accused instrumentality resolves the received SID to the appropriate TWUID:<br><br>http://x.azjmp.com/4b4Gq?sub=12268<br><br>In the scenario described above, the TWUID is a unique identifier assigned by SpeedDate.com to each of its affiliates. In the current example, the SID <4b4Gq?sub=12268> correlates to the TWUID <a=53&c=1&s1=48192&s2=12268>. |
| **1**<br><br>**(cont)** | generating a URL for the requested Merchant affiliate system, | The accused instrumentality generates a URL that is associated with the requested Merchant affiliate system, SpeedDate.com in this example.<br><br>In the current example the URL is:<br><br><http://mysdate.com/?a=53&c=1&s1=48192&s2=12268><br><br>That URL is then redirected to<br><br><http://www.speeddate.com/index.php?page=signup&action=join&afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639528> |
| **1**<br><br>**(cont)** | wherein the URL includes the correlated target Webmaster Merchant unique identifier; | As indicated above, the URL generated by the accused instrumentality includes the correlated TWUID <a=53&c=1&s1=48192&s2=12268> |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|------------------------|-------------------------------|
| **1** (cont) | whereby the URL can be utilized to access the requested Merchant affiliate system, and | The above URL can be used to access the requested Merchant affiliate system. In the current example, the above URL points to the SpeedDate.com affiliate system at:<br><br><http://mysdate.com/?a=53&c=1&s1=48192&s2=12268><br><br>That URL is then redirected to<br><br><http://www.speeddate.com/index.php?page=signup&action=join&afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639528><br><br>and, when clicked, causes resources to be retrieved from the SpeedDate.com website. (See Attachment 6) |
| **1** (cont) | further provide identification of the source Webmaster for requisite tracking. | The TWUID from the URL can be used to identify and track the referring source Webmaster. In the current example, the TWUID <a=53&c=1&s1=48192&s2=12268><br><br>allows identification of the Participating Webmaster as the source because the TWUID contains the unique affiliate ID assigned to that particular webmaster by the Epic Direct system: <48192>. This is confirmed by reviewing Epic's offer_URLs database which provides the following link structure for SpeedDate.com offers available through the Epic Direct system:<br><br><http://mysdate.com/?a=53&c=1&s1=%%AFFILIA TE_ID%%&s2=%%SUB_ID%%><br><br>Where the text <%%AFFILIATE_ID%%> is a placeholder for the insertion of the unique Epic affiliate ID. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| 3 | A method as recited in claim 1, further comprising the operation of obtaining transaction information from the target Merchant affiliate system for specified transactions. | The Epic Direct Network obtains transaction information from the target Merchant affiliate system for specified transactions via Epic's tracking pixel or delay reporting functions. |
| 6 | A method as recited in claim 3, wherein the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to transfer the trans- action information to the affiliate pooling system. | Epic obtains transaction information by granting access to its Epic Direct Network to a target Merchant affiliate system by allowing it to transfer transaction information for specific transactions to the Epic Direct Network using Epic's tracking pixel or delay reporting functions. |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| 10 | A method as recited in claim 1, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system. | At least one of the plurality of Webmasters in the Epic Direct Network operates a web site having a banner ad for a related Merchant affiliate system.<br><br>In the present example, a banner ad for the SpeedDate.com Merchant affiliate system was found on the website attached as Attachment 4. That URL is <http://x.azjmp.com/4b4Gq?sub=12268>. On information and belief, that banner ad was placed on that website by a Webmaster operating that website.<br><br>The SpeedDate.com banner ad shown on Attachment 4 is related to the SpeedDate.com Merchant affiliate system because it promotes the SpeedDate.com Merchant affiliate system and, when clicked on, ultimately directs a user to a website associated with the SpeedDate.com Merchant affiliate system. |
| 13 | A method as recited in claim 1, wherein the operation of configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes the step of: selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system. | Epic additionally configures a Merchant affiliate system to receive referrals from a first plurality of Webmasters by selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the Epic Direct Network affiliate pooling system by implementing Epic's tracking pixel or delay reporting functions with respect to that target Merchant affiliate system. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|--------------------------------|
| **14** | A method as recited in claim 13, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry. | Epic's tracking pixel function transfers transaction information via script call. Epic's delay reporting function transfers transaction information via email. |
| **15** | A computer program embodied on a computer readable medium for providing Virtual Affiliates to an existing affiliate system, the computer program code comprising: | The accused instrumentality, identified as the "Epic Direct Network", is a computer program embodied on a computer readable medium that provides Virtual Affiliates to an existing affiliate system.<br><br>Attachments 1 and 2 illustrate Epic Direct's materials describing its affiliate network. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **15**<br><br>**(cont)** | a code segment for configuring an existing affiliate system to receive referrals from source Webmasters of an affiliate pool of Webmasters, including: | The accused instrumentality has a code segment for configuring at least one existing affiliate system to receive referrals. One instance of an existing target affiliate system so configured by the accused instrumentality is operated by SpeedDate.com. Information describing the SpeedDate.com target affiliate system is available at <http://www.speeddate.com/apps/site/views/mp/affiliates.php> (See Attachment 3).<br><br>Participants in Epic Direct's virtual affiliate network constitute an affiliate pool of source Webmasters. The participants act as a group of Webmasters who can refer customer traffic to an existing affiliate system.<br><br>A subset of the participants in Epic Direct's virtual affiliate network ("Participating Webmasters") sign up to send referrals to the target affiliate system (e.g., the "SpeedDate.com target affiliate system).<br><br>Epic Direct's affiliate system includes an affiliate pool of Webmasters.<br><br>Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|-------------------------------|
| **15** **(cont)** | a code segment for assigning a unique identifier for each of a first plurality of Webmasters each operating at least one web site; | The accused instrumentality has a code segment for assigning a source Webmaster unique identifier ("SID") for each Participating Webmaster in the accused instrumentality's affiliate network. <br><br> In one example, <4b4Gq?sub=12268> is the SID assigned to a particular participant in the accused instrumentality's affiliate network. <br><br> An Epic Direct affiliate URL was found on the website attached as Attachment 4. That URL is <http://x.azjmp.com/4b4Gq?sub=12268> <br><br> The domain name <azjmp.com> is owned by Epic Direct. See Attachment 5. <br><br> That URL includes tracking code associated with an advertisement used in connection with an advertising campaign of a target affiliate system, the SpeedDate.com affiliate system in this example. The advertisement URL is constructed with the tracking code, which refers to an image and includes a link that is followed when the image is clicked. The link includes the unique identifier (the SID). Here the SID is <4b4Gq?sub=12268>. <br><br> Each of the webmasters operates at least one web site, in at least one of which the advertisement code is incorporated. <br><br> Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|----------------------------------|
| **15** **(cont)** | a code segment for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters; | A participant in Epic Direct's affiliate network displays an ad promoting SpeedDate.com on a web page. (See Attachment 4.) A visitor to the web page clicks the ad. <br><br> The accused instrumentality has a code segment for receiving, as a result of the click, a user request for a URL to the target affiliate system. <br><br> For example, when a visitor to a participant's web page clicks on the provided advertisement for SpeedDate.com, the click on the link shown as: <br><br> http://x.azjmp.com/4b4Gq?sub=12268 <br><br> is received by the accused instrumentality and indicates a request for a URL to the SpeedDate.com affiliate system. <br><br> Clicking the following link acts as the request for a URL to the SpeedDate.com affiliate system: <br><br> http://x.azjmp.com/4b4Gq?sub=12268 <br><br> The unique SID <4b4Gq?sub=12268> is transmitted with the request as a component of the HTML request for the resource pointed to by the above link. <br><br> On information and belief, the target affiliate system, SpeedDate.com in this example, maintains a unique identification system for its affiliates (*i.e.*, Webmasters who direct consumer traffic to SpeedDate.com's website), and each affiliate has a "target Webmaster unique identifier" ("TWUID"). <br><br> Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **15** **(cont)** | a code segment for correlating the received source Web master unique identifier to a target Webmaster unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and | The accused instrumentality has a code segment for creating or recognizing a relationship betwee the received SID to a TWUID at the requested Merchant affiliate system.<br><br>When the following link is clicked, the accused instrumentality resolves the received SID to the appropriate TWUID.<br><br>http://x.azjmp.com/4b4Gq?sub=12268<br><br>In the scenario described above, the TWUID is a unique identifier assigned by SpeedDate.com to each of its affiliates. In the current example, the SID <4b4Gq?sub=12268> correlates to the TWUID <a=53&c=1&s1=48192&s2=12268>.<br><br>Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **15** **(cont)** | a code segment for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated target Webmaster Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Webmaster for requisite tracking. | The accused instrumentality has a code segment for generating a URL that is associated with the requested Merchant affiliate system, SpeedDate.com in this example.<br><br>In the current example the URL is:<br><br><http://mysdate.com/?a=53&c=1&s1=48192&s2=12268><br><br>That URL is then redirected to<br><br><http://www.speeddate.com/index.php?page=signup&action=join&afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639528><br><br>As indicated above, the URL generated by the accused instrumentality includes the correlated TWUID <a=53&c=1&s1=48192&s2=12268><br><br>The above URL can be used to access the requested Merchant affiliate system. In the current example, the above URL points to the SpeedDate.com affiliate system at:<br><br><http://mysdate.com/?a=53&c=1&s1=48192&s2=12268><br><br>That URL is then redirected to<br><br><http://www.speeddate.com/index.php?page=signup&action=join&afid=53&asid=48192&asid2=12268&pid=8659&cid=1&xid=8639528><br><br>and, when clicked, causes resources to be retrieved from the SpeedDate.com website. (See Attachment 6)<br><br>The TWUID from the URL can be used to identify and track the referring source Webmaster. In the current example, the TWUID <a=53&c=1&s1=48192&s2=12268><br><br>allows identification of the Participating Webmaster as the source because the TWUID contains the unique affiliate ID assigned to that particular webmaster by the Epic Direct system: <48192>. This is confirmed by reviewing Epic's offer_URLs database which provides the following link structure for SpeedDate.com offers available through |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **16** | A computer program as recited in claim 15, further comprising a code segment for obtaining transaction information from the target Merchant affiliate system for specified transactions. | The Epic Direct Network obtains transaction information from the target Merchant affiliate system for specified transactions via Epic's tracking pixel or delay reporting functions.<br><br>Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |
| **19** | A computer program as recited in claim 16, wherein 40 the transaction information is obtained by granting the target Merchant affiliate system access to an affiliate pooling system and allowing said Merchant affiliate system to trans-<br><br>fer the transaction information to the affiliate pooling system. | Epic obtains transaction information by granting access to its Epic Direct Network to a target Merchant affiliate system by allowing it to transfer transaction information for specific transactions to the Epic Direct Network using Epic's tracking pixel or delay reporting functions. |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|--------------------------------|
| 23 | A computer program as recited in claim 15, wherein at least one of the plurality of Webmasters operates a web site having a banner ad for a related Merchant affiliate system. | At least one of the plurality of Webmasters in the Epic Direct Network operates a web site having a banner ad for a related Merchant affiliate system.<br><br>In the present example, a banner ad for the SpeedDate.com Merchant affiliate system was found on the website attached as Attachment 4. That URL is <http://x.azjmp.com/4b4Gq?sub=12268>. On information and belief, that banner ad was placed on that website by a Webmaster operating that website.<br><br>The SpeedDate.com banner ad shown on Attachment 4 is related to the SpeedDate.com Merchant affiliate system because it promotes the SpeedDate.com Merchant affiliate system and, when clicked on, ultimately directs a user to a website associated with the SpeedDate.com Merchant affiliate system. |
| 26 | A computer program as recited in claim 15, wherein<br><br>the code segment for configuring a Merchant affiliate system to receive referrals from a first plurality of Webmasters, further includes:<br><br>code segment for selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the affiliate pooling system. | Epic additionally configures a Merchant affiliate system to receive referrals from a first plurality of Webmasters by selecting at least one transfer mode by which transaction information is transferred from the target Merchant affiliate system to the Epic Direct Network affiliate pooling system by implementing Epic's tracking pixel or delay reporting functions with respect to that target Merchant affiliate system.<br><br>Essociate makes this contention on information and belief because Epic has designated its source code as SOURCE CODE – RESTRICTED ACCESS – ATTORNEY'S EYES ONLY under the stipulated protective order. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|-------|-------------------------|--------------------------------|
| 27 | A computer program as recited in claim 26, wherein at least one transfer mode is selected from the group consisting of electronic mail, file transfer protocol, script call and manual entry. | Epic's tracking pixel function transfers transaction information via script call. Epic's delay reporting function transfers transaction information via email. |
| 28 | A system for providing virtual affiliates to an existing affiliate system, the system comprising | The accused instrumentality, identified as the "Epic Direct Network", is a system for providing Virtual Affiliates to an existing affiliate system.<br><br>Attachments 1 and 2 illustrate Epic Direct's materials describing its affiliate network. |
| 28 (cont) | means for configuring an existing affiliate system to receive referrals from a referring Webmaster in an affiliate pool of Webmasters, including means for assigning a source Webmaster unique identifier for each of a first plurality of Webmasters each operating at least one web site; | The accused instrumentality has a means for configuring at least one existing affiliate system to receive referrals. One instance of an existing target affiliate system so configured by the accused instrumentality is operated by SpeedDate.com. Information describing the SpeedDate.com target affiliate system is available at <http://www.speeddate.com/apps/site/views/mp/affiliates.php> (See Attachment 3).<br><br>Participants in Epic Direct's virtual affiliate network constitute an affiliate pool of source Webmasters. The participants act as a group of Webmasters who can refer customer traffic to an existing affiliate system.<br><br>A subset of the participants in Epic Direct's virtual affiliate network ("Participating Webmasters") sign up to send referrals to the target affiliate system (e.g., the "SpeedDate.com target affiliate system).<br><br>Epic Direct's affiliate system includes an affiliate pool of Webmasters. |

CONFIDENTIAL

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **28**<br><br>**(cont)** | means for receiving a user request for a target Merchant affiliate system URL from a web site operated by a particular referring Webmaster of the first plurality of Webmasters, wherein the user request includes the source Webmaster unique identifier for the particular referring Webmaster, and wherein the target Merchant affiliate system includes a unique identification system for its own affiliated Webmasters; | The accused instrumentality has a means for assigning a source Webmaster unique identifier ("SID") for each Participating Webmaster in the accused instrumentality's affiliate network.<br><br>In one example, <4b4Gq?sub=12268> is the SID assigned to a particular participant in the accused instrumentality's affiliate network.<br><br>An Epic Direct affiliate URL was found on the website attached as Attachment 4. That URL is <http://x.azjmp.com/4b4Gq?sub=12268><br><br>The domain name <azjmp.com> is owned by Epic Direct. See Attachment 5.<br><br>That URL includes tracking code associated with an advertisement used in connection with an advertising campaign of a target affiliate system, the SpeedDate.com affiliate system in this example. The advertisement URL is constructed with the tracking code, which refers to an image and includes a link that is followed when the image is clicked. The link includes the unique identifier (the SID). Here the SID is <4b4Gq?sub=12268>.<br><br>Each of the webmasters operates at least one web site, in at least one of which the advertisement code is incorporated. |

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **28** **(cont)** | means for correlating the received unique identifier to a Merchant unique identifier corresponding to the unique identification system of the requested Merchant affiliate system; and | A participant in Epic Direct's affiliate network displays an ad promoting SpeedDate.com on a web page. (See Attachment 4.) A visitor to the web page clicks the ad. The accused instrumentality has a means for receiving, as a result of the click, a user request for a URL to the target affiliate system. For example, when a visitor to a participant's web page clicks on the provided advertisement for SpeedDate.com, the click on the link shown as: http://x.azjmp.com/4b4Gq?sub=12268 is received by the accused instrumentality and indicates a request for a URL to the SpeedDate.com affiliate system. Clicking the following link acts as the request for a URL to the SpeedDate.com affiliate system: http://x.azjmp.com/4b4Gq?sub=12268 The unique SID <4b4Gq?sub=12268> is transmitted with the request as a component of the HTML request for the resource pointed to by the above link. On information and belief, the target affiliate system, SpeedDate.com in this example, maintains a unique identification system for its affiliates (*i.e.*, Webmasters who direct consumer traffic to SpeedDate.com's website), and each affiliate has a "target Webmaster unique identifier" ("TWUID"). |

**CONFIDENTIAL**

| Claim | U.S. Pat. No. 6,804,660 | Epic's Online Affiliate Network |
|---|---|---|
| **28** **(cont)** | means for generating a URL for the requested Merchant affiliate system, wherein the URL includes the correlated Merchant unique identifier, whereby the URL can be utilized to access the requested Merchant affiliate system, and further provide identification of the source Web master for requisite tracking. | The accused instrumentality has a means for creating or recognizing a relationship between the received SID to a TWUID at the requested Merchant affiliate system. When the following link is clicked, the accused instrumentality resolves the received SID to the appropriate TWUID. http://x.azjmp.com/4b4Gq?sub=12268 In the scenario described above, the TWUID is a unique identifier assigned by SpeedDate.com to each of its affiliates. In the current example, the SID <4b4Gq?sub=12268> correlates to the TWUID <a=53&c=1&s1=48192&s2=12268>. |

**Epic Media Group, Inc.—Infringement Claim Chart**

**Attachment 1**



# Epic Media Group, Inc.—Infringement Claim Chart

## Attachment 2



## Home  Contact Us  About Epic Direct  Clients  Epic Advisors  Publisher Tools  Legal  Contests  More Links

# What We Do For Publishers.

### Epic Direct. The Largest Performance-Based Network.

The Epic Direct Network provides the opportunity for ambitious publishers of all shapes and sizes to launch prevalent and lucrative Cost-Per-Action (CPA) campaigns through a superior self-service marketing platform that supports search, web/banner, social media, email and incentivized traffic.

The Epic Direct Network provides a trusted name (since 2000), outstanding customer service, dependable and accurate tracking and customized timely payments. After all, almost 45,000 publishers can't be wrong!

Despite being a self serve network, our management team is here to support you 24/7. Our insightful and professional staff understands how to target campaigns to the right publishers. The distribution team can appreciate the pain points you experience as internet marketers and we are happy to offer assistance and advice across all platforms. Since time is money in this industry we believe you should be able to get information no matter where you are or what you are doing. This is why we are the first ad network to introduce applications and gadgets for ALL your mobile devices - you can now check stats and manage your account on the go! Should your assigned manager be unavailable you can reach a dedicated team member called the Epic Advisors at any time at theadvisors@epicdirectnetwork.com.

### What We Do For Publishers.

To learn more about why you should work with the Epic Direct Network select your traffic type in the drop down box below:

I am a...

### Want to Become a Publisher?



Click below to apply to become an Epic Direct Network Publisher.

Click Here to Apply

## Why we are the best CPA network around.

➜ Monthly Publisher rewards & contests

➜ Largest selection of exclusive private campaigns

➜ Experienced Network Management team & 24/7 publisher support

➜ Proprietary tracking and interface access via iPhone and Blackberry applications

➜ Award winning creative services (IAC winner 2 years in a row for Best Email Campaign)

➜ Customized and timely payment terms

➜ Interface tools to help increase your ROI

➜ Easily manage sub ID's /SOAP API

➜ Place and manage your own tracking / ping back pixels

➜ FAQ library for easy access to information

© 2011 Epic Direct Network, All Rights Reserved. A Subsidiary of Epic Media Group.

Legal • Site Map • Privacy Policies   

A2029

# Epic Media Group, Inc.—Infringement Claim Chart

## Attachment 3



# Join SpeedDate's Affiliate Program today

By partnering with us you'll be promoting an innovative leader in online dating that's committed to providing members with the best experience.

SpeedDate brings members together within minutes. This is your chance to promote a one-of-a-kind site with easy conversions. Take advantage of our expertise as you earn money.

**Affiliates Inquiries**

**Contact**
affiliates@speeddate.com










© 2011 SpeedDate.com. All Rights Reserved | Protected by U.S. Pat. No. 7,203,674

A2031

**Epic Media Group, Inc.—Infringement Claim Chart**

**Attachment 4**



**bitly**                    Shorten & Share    |    Analyze                              Sign In    Sign Up

---

**9 links** in this bundle - Hide Previews

### dealchase's bundle

▶ **Dehumidifiers & Dehumidifier Ratings at SimplyDehumidifiers.com**



SimplyDehumidifiers.com has partnered with notable brands such as EdgeStar, Danby, LG, Frigidaire and Sunpentown to provide our customers with the highest rated, most efficient portable and residential dehumidifiers. Feel free to call us at 888-645-3418 and speak to one of our knowledgeable dehumidifier experts.

http://www.dpbolvw.net/click-3933807-10705057
*http://bitly.com/gAif9G* - Info Page+

---

▶ **Living Direct: Buy Home Appliances, Outdoor Patio Furniture, Electric Fireplaces & More**



Shop for home appliances, patio furniture sets, kitchen electrics & electric fireplace heaters. LivingDirect.com offers major brands at guaranteed low prices.

http://www.kqzyfj.com/click-3933807-10787441
*http://bitly.com/g5wsQT* - Info Page+

---

▶ **Ice Makers, Refrigerators, Wine Coolers, Washers, Dryers, Dishwashers, Air Conditioners &**



Find a huge selection of hard-to-find appliances & accessories at CompactAppliance.com. Whether you are looking for a compact refrigerator, home or commercial ice maker, beverage cooler, wine refrigerator, washer dryer combo, portable dishwasher, or portable air conditioner-chances are we have it.

http://www.kqzyfj.com/click-3933807-10729268
*http://bitly.com/gY5arE* - Info Page+

---

▶ **MyRewardsVault**

This is an auto renewing subscription service that will continue until canceled anytime by texting STOP to short code 84287. Available to users over 18 for $9.99 per month charged on your wireless account or deducted from your

---

### Bundle stats

dealchase - Owner

Views: **2**
Created: **8 months ago**
Last Modified: **8 months ago**
Short link: *bitly.com/g1ZMoi*
Facebook: **f Like**

| Clone bundle | Share |

### Sources

www.dpbolvw.net (1)
myrewardsvault.com (1)
www.webmd.com (1)
x.azjmp.com (3)
www.leadcola.com (1)
www.kqzyfj.com (2)

### Bundles by dealchase

Best Deals Ever! 0 links
Created: 01/14/2011 5 links
Created: 01/14/2011 3 links
Created: 01/14/2011 9 links
Just one more day left - shop now to get 20% off on our top categories! 5 links

---

prepaid balance for 2 clues & 1 quiz per week on T-Mobile, AT&T, Verizon Wireless, Sprint, Nextel, Virgin Mobile USA, U.S.

🌐 http://myrewardsvault.com/LP/prom-195820/f1a94cef2...
*http://bitly.com/ez5oax - Info Page+*

---

▶ **Snuggi Dog, the little blanket that keeps your dog warm and snuggly. Also get the Talking D**

🅒 http://x.azjmp.com/4b4Hs?sub=12109
*http://bitly.com/exNoTL - Info Page+*

---

▶ **MyFunCards -- 1,000 FREE eCards and free greeting cards for every occasion!**

🌐 http://x.azjmp.com/4b4HF?sub=12258
*http://bitly.com/fGr97q - Info Page+*

---

▶ **Online Speed Dating - SpeedDate.com**

Meet local singles on the world's first online speed dating site. Free online dating service with webcam, chat, and IM! Start dating right now!

❤️ http://x.azjmp.com/4b4Gq?sub=12268
*http://bitly.com/gpWGVf - Info Page+*

---

▶ **Lipitor Recall Grows by 19,000 Bottles**

Smelly Bottles Plague Popular Cholesterol Drug Dec. 21, 2010 -- The Lipitor recall continues with Pfizer's recall of 19,000 more bottles of the popular cholesterol drug. A musty smell has led to four recalls, totaling 345,000 bottles since August 2010. The latest recall is dated Dec. 17 on Pfizer's web site.

WebMD http://www.webmd.com/news/20101221/lipitor-recall-...
*http://bitly.com/fK2QS5 - Info Page+*

---

▶ ⬛ http://www.leadcola.com/trackingcode.php?code=IGzG...
*http://bitly.com/gPZmuF - Info Page+*

---

👤 DISQUS ·

**Add New Comment**

A2034



**Showing 0 comments**

Sort by  Popular now ⇕    ✉ Subscribe by email    🔊 Subscribe by RSS

blog comments powered by **DISQUS**

**bitly**
Help
Tools
Partners
API
Sign Up

**bitlyverse**
bitly Enterprise
news.me
bitly labs
Engineering Blog

**Company**
About
Blog
Jobs
Privacy
Terms of Service

**Community**
Feedback
Contact
Report Abuse

© 2011 bitly ™

# Epic Media Group, Inc.—Infringement Claim Chart

## Attachment 5



# AZJMP.com FAQ's

## Some frequently asked questions

➜ What is AZJMP.com?

➜ Emails containing AZJMP.com in the URL

➜ The Opt-Out Process

### What is AZJMP.com?

Owned and operated by Epic Direct, Azjmp.com, is an advertising technology that delivers above grade performance for various marketers across different types of advertising medium. One of the services that we provide to our clients is our advertising network, which connects advertisers and email publishers to the consumer, who in return may benefit from the advertisers' promotions and other special offers.

### Emails containing AZJMP.com in the URL

If you have received an email with the Azjmp.com as a link, it is important to understand that Epic Direct and the advertiser are not directly responsible for the email you received that contains the advertisement with Azjmp.com as the domain name. An email publisher sent you the email because you are subscribed to their mailing list. Both Epic Direct and our Advertisers want to ensure that you receive only the emails for which you have opted in.

### The Opt-Out Process

If you feel you have received an unsolicited email and that email contains an advertisement with the Azjmp.com in the URL, follow the email publisher's unsubscribe (opt-out) procedures contained in the email. All emails with content that contain advertisements with the Azjmp.com domain name must have clear and proven instructions for opting-out from that email publisher's lists. Due to the nature of databases, the unsubscribe process may take up to 48 hours to complete. If, after this time, you continue to receive emails from the SAME email publisher, try going to the email publisher's website and contacting them directly. If this does not yield a stop to the emails, we can assist in getting you removed from the publisher's email list. However, because we do not control any part of the email publisher's mailing process, we do not guarantee results. If the email publisher uses advertisements supplied by Epic Direct's advertising clients, we can try additional means and pressure to contact them and resolve any opt-out requests provided.

## Contact Us

### Email Addresses

**Advertiser and Agency Inquiries**
sales@epicdirectnetwork.com

**Publisher and Affiliate Inquiries**
publishers@epicdirectnetwork.com

**Inquiries Outside North America**
epicUK@epicdirectnetwork.com

**Human Resources**
careers@epicdirectnetwork.com

**Technology or General Inquiries**
help@epicdirectnetwork.com

**Report Abuse**
abuse@epicdirectnetwork.com

### Phone & Fax

**Toll Free Number**
1-866-891-0300

**Toll Free Fax Number**
1-888-666-3120

© 2010 Epic Direct Network, All Rights Reserved. A Division of Epic Media Group          Legal • Privacy Policies

A2037

**Epic Media Group, Inc.—Infringement Claim Chart**

**Attachment 6**



Essorcictes, Inc. v. Azoogle.com, Inc., et. al.   11 CV 00727 BBC          Video Deposition of Michael Landau

| Page 126 | Page 128 |
|---|---|

**Page 126**

1   A.   Yes, it is.
2   Q.   "Once there, the visitor had to click,
3   yet again, typically on a banner or text element
4   embedded with the merchant link." Is that
5   consistent with your testimony?
6   A.   Yes, it is.
7   Q.   And your recollection of the old X Pays?
8   A.   Yes it is.
9   Q.   "Only then would the visitor arrive at
10   the merchants own website." Is that accurate?
11   A.   Yes, it is.
12   Q.   It is consistent with your testimony and
13   with your recollection of old X Pays?
14   A.   Yes, it is.
15   Q.   "This awkward two-click system required
16   no correlation between the unique identifier
17   assigned by the affiliate hub and the identifier
18   assigned by the merchant affiliate system." Is that
19   accurate?
20   MR. DU WORS: Objection. Calls for a legal
21   conclusion.
22   BY THE WITNESS:
23   A.   Yes, that's accurate.
24   BY MR. PETERSON:

**Page 127**

1   Q.   And what is your understanding of the
2   term "correlation"?
3   MR. DU WORS: Objection. Calls for a legal
4   conclusion.
5   BY THE WITNESS:
6   A.   Correlation in the sense refers to a
7   mapping.
8   BY MR. PETERSON:
9   Q.   Can you explain that? What do you mean
10   by the term mapping?
11   A.   I would say it goes beyond substitution
12   where there needs to be logic involved. So that
13   instead of straight substitution, there is some form
14   of logic that occurs to determine what would be a
15   correlation.
16   Q.   So your suggestion of the mapping, if I
17   understand you correctly, is that correlation occurs
18   when there is a mapping of a relationship between
19   one user I.D. and another user I.D.?
20   A.   No, it's not necessarily a mapping. It's
21   a -- it's the logic that can result in a mapping.
22   Q.   Is your understanding of the term
23   "correlation" as you're discussing it here, one that
24   is derived from your specialized knowledge or

**Page 128**

1   expertise as a computer programmer?
2   MR. DU WORS: Objection. Calls for a legal
3   conclusion.
4   BY THE WITNESS:
5   A.   I'm not sure what the computer programmer
6   aspect has to do with.
7   BY MR. PETERSON:
8   Q.   Well, is this -- is the term correlation
9   one we would just know because we have a common
10   English word? Or does it have a specialized meaning
11   as within your field of expertise?
12   MR. DU WORS: Objection. Calls for
13   speculation.
14   BY THE WITNESS:
15   A.   Yes, I don't know.
16   BY MR. PETERSON:
17   Q.   You don't know whether correlation is a
18   technical term within the field of affiliate
19   networks?
20   MR. DU WORS: Objection. Asked and answered.
21   Calls for speculation.
22   BY THE WITNESS:
23   A.   I don't know how other people view the
24   word.

**Page 129**

1   BY MR. PETERSON:
2   Q.   Again, just talking about people who are
3   knowledgeable in the field of internet affiliate
4   networks, is correlating a technical term that has a
5   meaning within that environment?
6   A.   I'm not sure I have heard it expressed by
7   others in any way to know the answer there.
8   Q.   So it would be fair to say, as you sit
9   here right now, you cannot tell me that correlating
10   has some technical meaning within the field of
11   internet affiliate networking?
12   MR. DU WORS: Same objection.
13   BY THE WITNESS:
14   A.   Can you state that again?
15   BY MR. PETERSON:
16   Q.   Sure. As we're sitting here right now,
17   you cannot tell me that the term correlating has the
18   technical meaning within the field of internet
19   affiliates?
20   MR. DU WORS: Objection. Asked and answered.
21   Calls for speculation.
22   BY THE WITNESS:
23   A.   I don't know how other people interpret
24   the word.

33  (Pages 126 to 129)

5621ccb9-884a-4766-ac58-311b213870f9

Associates, Inc. v. Azoogle.com, Inc., et. al.   11 CV 00727 BBC          Video Deposition of Michael Landau

| Page 130 | Page 132 |
|---|---|
| 1 BY MR. PETERSON: | 1   A.   Yes. It's in the bit of text that starts |
| 2   Q.   So if we step back in a general way, look | 2 with a less than sign and then an exclamation point, |
| 3 at the discussion in the two paragraphs under the X | 3 then a dash dash ASG dash dash. |
| 4 Pays Technology, in Deposition Exhibit No. 17, would | 4   MR. DU WORS: What page are we on? |
| 5 you say that is an accurate description of old X | 5   THE WITNESS: I'm on 49 at this point. |
| 6 Pays? | 6 BY MR. PETERSON: |
| 7   MR. DU WORS: Objection. The document speaks | 7   Q.   All right. I'm going to ask you to put |
| 8 for itself. | 8 an arrow in the margin of the location in the |
| 9 BY THE WITNESS: | 9 template that you're discussing. |
| 10   A.   I would say the way it's described there | 10   A.   There are a number of locations. There |
| 11 is accurate, yes. | 11 are substitutions, various places. |
| 12 BY MR. PETERSON: | 12   Q.   If you would then, in the -- let's do it |
| 13   Q.   Take a moment to review the section under | 13 in the left margin, if you will. It's a little |
| 14 the -- of the letter under the heading "The Code"? | 14 easier to see because we have a straight left |
| 15   A.   Through to the next page? | 15 margin. Put an arrow at the beginning of each line |
| 16   Q.   Yes. | 16 of the script that has the substitution in it. I |
| 17   A.   Okay. | 17 see you have put one arrow at about a quarter of the |
| 18   Q.   You spoke before of a substitution that | 18 way down from the top. Go ahead. |
| 19 was accomplished by mean of the X make.CGI script. | 19   A.   I think that's it. Do you want me to go |
| 20 Does this section of the letter accurately describe | 20 on to the next page? |
| 21 the manner in which that substitution was | 21   Q.   You can go on to the next page. I don't |
| 22 accomplished? | 22 believe you will -- no, I take it back. On Page |
| 23   MR. DU WORS: Objection. Over broad. | 23 151, I think there's another. I think there is one |
| 24 BY THE WITNESS: | 24 on the following page 152, a couple of them. |

| Page 131 | Page 133 |
|---|---|
| 1   A.   Generally speaking, yes. | 1   A.   Okay. |
| 2 BY MR. PETERSON: | 2   Q.   Can you tell me why there are multiple |
| 3   Q.   If I direct your attention to the | 3 substitutions on the page? |
| 4 exhibits to the letter, Exhibit A has a slip sheet | 4   A.   Yes, I can. |
| 5 at bates number ending 1048, and on the following | 5   Q.   Go ahead. |
| 6 page I believe there is a script. That Exhibit A | 6   A.   I believe that there are a number of |
| 7 runs from Bates range ending 1049 through bates | 7 reasons actually, that there are multiple. One is |
| 8 range ending in 1053. Would you identify what that | 8 that the way you link out images and banners on HTML |
| 9 script is? | 9 page, you have to link out the images individually |
| 10   MR. DU WORS: Objection. Calls for | 10 to those pages, unless there are -- otherwise there |
| 11 speculation. | 11 in old HTML, it ends up causing some issues with |
| 12 BY THE WITNESS: | 12 display. So if a page is made up of four or five |
| 13   A.   This look to be a template of HTML, not | 13 images, each of the images, to make the page look |
| 14 necessarily a script. | 14 right and to make them bold, would need to be |
| 15 BY MR. PETERSON: | 15 clicked out. |
| 16   Q.   So would this be a template for an X Pays | 16   Q.   So tell me if the paraphrase is accurate. |
| 17 landing page? | 17 Landing page on X Pays might have multiple locations |
| 18   MR. DU WORS: Objection. Calls for | 18 on which the user could click to pursue the offer? |
| 19 speculation. | 19   MR. DU WORS: I'll object. Not sure the |
| 20 BY THE WITNESS: | 20 witness was done with his previous answer before |
| 21   A.   I believe it does, yes. | 21 this question began. Just like to note that for the |
| 22 BY MR. PETERSON: | 22 record. Go ahead, answer if you can. |
| 23   Q.   Can you identify the location where the | 23 BY THE WITNESS: |
| 24 placeholder is for the web master affiliate I.D.? | 24   A.   Can you rephrase. |

34  (Pages 130 to 133)

5621ccb9-884a-4766-ac58-311b213870f9

Essociates, Inc. v. Azoogle.com, Inc., et. al.   11 CV 00727 BBC          Video Deposition of Michael Landau

Page 154

1  respectfully suggest that if it's new X Pays,
2  specify that in the question.
3  BY MR. PETERSON:
4    Q.  Let's be clear because we're talking
5  about the -- after the sextoys.com campaign was
6  introduced, I believe that is the event that you
7  identified as defining the new X Pays, correct?
8    A.  That's correct.
9    Q.  So how did the sextoy -- is it sex toys?
10   A.  Singular.
11   Q.  Did sextoy.com campaign differ from the
12 relationship that X Pays already had with that old X
13 Pays had with Eye Gallery.
14     MR. DU WORS: Objection. Vague. Over broad.
15 BY THE WITNESS:
16   A.  Because the way that sextoy.com
17 functioned, it would not work with a substitution of
18 the X Pays I.D. number without more.
19 BY MR. PETERSON:
20   Q.  What more was required?
21   A.  What more was required was to create a
22 block of codes, at that point finite, that could be
23 referenced between X Pays I.D., and what needed to
24 be put on the link for sex toys.

Page 155

1    Q.  And why was that needed?
2    A.  That was needed because of the
3  particulars of the sex toy functionality. The way
4  the sex toy store shopping cart functioned.
5    Q.  What was it about the way the sextoy.com
6  shopping cart that required a different method than
7  that employed by Old X Pays?
8    A.  Going back 13 years, I'm not sure exactly
9  why it didn't work, but the owner of sex toy
10 basically said it would not work as is.
11   Q.  So what part did the owner say would not
12 work?
13   A.  The substitution of the I.D. in the link
14 would not work.
15   Q.  Do you know why that is?
16   A.  I don't know why. Just would not accept
17 it, no.
18   Q.  And it's not to -- not specifically
19 speaking so much about the sextoy.com campaign. But
20 just in general, what is sextoy.com?
21   A.  Sextoy.com is basically an Amazon.com for
22 sex toys.
23   Q.  Did it operate in an affiliate network?
24     MR. DU WORS: Objection. Vague as to when.

Page 156

1  BY THE WITNESS:
2    A.  I believe they did.
3  BY MR. PETERSON:
4    Q.  And that was at the inception of new X
5  Pays, May of 1999?
6    A.  Yes.
7    Q.  Your belief is that they did operate an
8  affiliate network?
9    A.  Yes.
10   Q.  So did X Pays become an affiliate of the
11 sextoys.com affiliate network?
12   A.  Yes, I believe so.
13   Q.  Did it get an I.D. as a sex toy
14 affiliate?
15   A.  I'm not sure if it was an I.D. or user
16 name, but there was some variable.
17   Q.  Describe for me, as though I am a member
18 of the jury, in the simplest possible terms, what
19 you think the invention of the 660 patent is?
20     MR. DU WORS: Objection. Calls for a legal
21 conclusion, and over broad.
22 BY THE WITNESS:
23   A.  It's the ability to correlate multiple
24 websites, offers, commission opportunities in

Page 157

1  various platforms.
2  BY MR. PETERSON:
3    Q.  How does that differ from what old X Pays
4  was able to do?
5      MR. DU WORS: Objection. Calls for a legal
6  conclusion. Over broad.
7  BY THE WITNESS:
8    A.  I think the difference is the correlation
9  mechanism.
10 BY MR. PETERSON:
11   Q.  I would like you to explain what the
12 correlation mechanism is.
13   A.  The correlation --
14     MR. DU WORS: Objection. Vague as to which
15 correlation mechanism you're talking about.
16 BY THE WITNESS:
17   A.  Can you repeat the question?
18 BY MR. PETERSON:
19   Q.  In response to your -- my question about
20 the old X Pays and the new X Pays, you identified
21 the correlation function as the crucial difference.
22 Is that correct?
23     MR. DU WORS: Objection. Calls for a legal
24 conclusion.

40  (Pages 154 to 157)

Scheff & Associates, Inc.
(312) 214-1994
A2043

5621ccb9-884a-4766-ac58-311b213870f9

Essociates, Inc. v. Azoogle.com, Inc., et. al.   11 CV 00727 BBC          Video Deposition of Michael Landau

Page 158

1  BY THE WITNESS:
2      A.  Generally speaking, yes, that is correct.
3  BY MR. PETERSON:
4      Q.  And then I asked you to explain what the
5  correlation function is.
6      MR. DU WORS:  Objection.  Calls for a legal
7  conclusion.
8  BY THE WITNESS:
9      A.  The correlation mechanism allows the
10 network system to be ready to create the links,
11 create the structures to -- in disparate systems, to
12 have a way to have all the disparate systems still
13 work in one structure.
14 BY MR. PETERSON:
15     Q.  When you say disparate systems, are you
16 referring to multiple target affiliate networks?
17     A.  I'm referring to different methods of
18 tracking and identification mechanisms for differing
19 systems.
20     Q.  And again, for differing systems you're
21 talking about different target affiliate systems?
22     A.  Yes.
23     Q.  How is it that was not accomplished by
24 old X Pays?

Page 159

1      MR. DU WORS:  Objection.  Calls for a legal
2  conclusion.
3  BY THE WITNESS:
4      A.  The old X Pays was a simple substitution
5  of the affiliate I.D. number and no logic required
6  to determine if that was the proper way to set up a
7  link.
8  BY MR. PETERSON:
9      Q.  For some reason that did not work with
10 the sextoy.com storefront, correct?
11     A.  Yes, that's correct.
12     Q.  But you don't know why the old X Pays
13 method did not work with the sextoy.com storefront,
14 is that correct?
15     MR. DU WORS:  Objection.  Misstates the
16 witness's prior testimony.
17 BY THE WITNESS:
18     A.  Yes, I'm not -- I know it did not work.
19 I don't know what about their system made it not
20 work though.
21     MR. PETERSON:  All right.  I'm going to
22 suggest that we take a break now.  It's a little
23 early for your call, but let's take a break, do your
24 call, then we will come back and continue after

Page 160

1  that.
2      THE VIDEOGRAPHER:  Going off the video record
3  at 3:57 p.m.
4          (WHEREUPON, a break was taken.)
5      THE VIDEOGRAPHER:  We are back on the video
6  record at 4:32 p.m.
7  BY MR. PETERSON:
8      Q.  Before the break, we were talking about
9  the new X Pays system.  And I would like to ask a
10 few questions about the basic operation.  With the
11 new X Pays system, when a merchant wanted to promote
12 an offer through the X Pays system, did X Pays use
13 the domain -- I'm sorry, the banner generator -- let
14 me ask this fresh.  In new X Pays, did X Pays still
15 use the banner generator to generate the link that
16 the affiliate webmaster would use to promote the
17 offers?
18     A.  Yes, we did.
19     Q.  Did that banner -- strike that.
20     Did that length that the merchant
21 affiliates posted on their website still link to the
22 X Pays system?
23     A.  Say that again.
24     Q.  Did the length that the merchant -- I'm

Page 161

1  sorry, the -- let me start fresh again.
2      Did the link that the webmaster
3  affiliates posted on their websites still link to
4  the X Pays system?
5      A.  Yes, it did.
6      Q.  Did it link to the intermediate landing
7  page?
8      A.  I believe it did, yes.
9      Q.  And then, did that intermediate landing
10 page have a link then to the merchant website?
11     A.  Sometimes it did, yes.
12     Q.  When it did not, what did it link to?
13     A.  It redirected to the merchant system.
14     Q.  And you have a -- you have drawn a
15 distinction between the -- a link to the merchant
16 system and a redirect to the merchant system, if I'm
17 understanding you correctly.  Is that -- am I
18 correct that sometimes there was an intermediate
19 page with a link to the merchant system and
20 sometimes there was a redirect to the merchant
21 system?  Is that correct?
22     A.  You're talking about in the new X Pays
23 system?
24     Q.  In the new X Pays?

41 (Pages 158 to 161)

Scheff & Associates, Inc.
(312) 214-1994
A2044

5621ccb9-884a-4766-ac58-311b213870f9

| From: | Michael Landau <michael@essoc.com> |
| --- | --- |
| Sent: | Thursday, May 19, 2005 2:51 PM |
| To: | e2 <evan@essoc.com> |
| Subject: | hitlist draft ... pls turnaround quickly so i can send |

Hi All,

This initial description is meant as a brief overview of how we feel the '660 patent fits into the current online advertising industry/market. Some of it is factual, some of it is analytical, and some of it is just informational.

Please let me know if you have any questions or if I am unclear in any way. It is very likely that my extreme familiarity with the concepts involved sometimes makes me take for granted others' core understanding of the basic topics.

Also, this is meant to be a non-hyped analytical description of the industry, but the growing 4 billion dollar/year market this patent targets (and by some accounts 10 billion/year, including adult) speaks for itself. In addition, the recent trend toward consolidation involving deep pockets, such as Experian and Value Click, leads us to believe the fire will only get hotter.

Please lmk when we can arrange a time to discuss this further.

Regards,

Michael Landau
Essociate Inc.


Infringing Behavior:
Reduced to a too simplistic, albeit more understandable, rule, infringement of the '660 Affiliate Pooling patent occurs when online performance marketing crosses and interfaces separate affiliate system boundaries. As a simple example, True.com (a dating site) has it's own affiliate program, but also allows other affiliate programs, like Azoogle, to promote True.com services thorugh Azoogle-managed affiliates/webmasters. Azoogle webmasters are "Virtual Affiliates" of the True.com system, because at a certain point during the surfer's interaction the Azoogle system "hands off" to the True system. Subsequently, the Azoogle system receives data back from the True system, allowing the Azoogle affiliate to be compensated.

As a more complex example, Netflix has its own branded affiliate program that it runs through the Linkshare Affiliate Network, but also allows other Affiliate/Ad networks (sometimes called "agencies") to re-market Netflix services for perfomance based compensation to the external Virtual Affiliates.

Evolution of Non-Adult Ad Networks:
Having invented this model in the adult advertising market in the late 90's, we saw it initially ridiculed, and more recently copied and adopted in Adult and Non-Adult. Initially, non-adult affiliate programs and networks were of the "standalone" or "hub" variety, as described in our patent. A very important distinction is that the pre-2000 "hub" networks were still internalized networks that utilized a shared affiliate back-end architecture. And most ad networks during this time period were simply advertising agencies, reselling click-thru (CPC) and impression (CPM) inventory for their clients. As online



EXHIBIT
36

ESS_CONF_EMAIL000139.htm

performance-based advertising gained momentum in the non-adult market post-2000, affiliate networks needed brand names and a variety of products and services to expand their reach and to provide increasingly relevant advertising to webmasters. As such, affiliate networks began expanding by Affiliate Pooling with recognizable products and services such as Netflix, Columbia House, Jackpot.com, and many others, in non-exclusive arrangements that utilized multiple affiliate platforms/systems.

In an initial analysis, our first "indicator" is whether the product/service being advertised by the external affiliate system is also offered through the product/service's own branded affiliate system. If so, there is a strong possibility that the systems are Affiliate Pooling because it is very likely that the "source" system (i.e. Azoogle) eventually turns things over to the "target" system (i.e. True.com) to complete the transaction. In two instances where Brian has contacted companies, Azoogle & AffiliateFuel, both claim they do not infringe because they simply use cookie or pixel tracking. We do not believe them, as these tracking mechanisms are not 100% reliable, and they are doing their webmasters a disservice by relying on inefficient and faulty tracking mechanisms. Simple pixel tracking is very 1997. Further, we have specific information from CardTraffic.com, who we have done buisness with for 7 years in the adult world, that Azoogle was working on a deal to interface with CardTraffic so that Azoogle webmasters could promote CardTraffic products. And even if cookies or pixels are involved, that is not dispositive. The bottom line is that, at this point in the evolution of the industry, many many affiliate networks will have some degree of infringing behavior realting to some of their offered products/services being advertised.

Degrees of Infringement and Niche Markets:
It is also important to understand the degree to which a source affiliate network is infringing and to also analyze the target affiliate system. For example, not everything that Azoogle advertises infringes on the patent. Exclusive offers and products and services that are completely tracked within their internal affiliate system probably do not cross affiliate system boundaries. To varying degrees, most affiliate networks are a mix of internally tracked and externally interfacing systems. And since most programs started as 100% internally tracked, it is likely that only 20%-50% are externally tracked, depending on the evolution of the program. Further, it is possible that a company like Azoogle uses tracking as described in the patent for some products/services when available, and pixel tracking when the target affiliate system cannot provide Affiliate Pooling customization/configuration.

Besides affiliate networks, affiliate programs such as Netflix or True also infringe when they participate in the Pooling mechanism. In many instances we may have to balance targeting the source affiliate system versus the target affiliate system. So, in terms of another too simple rule, "affiliate programs that sub-track for other external affiliate programs" are also infringing. For example, AdultFriendFinder, a very successful company, has recently been targeting adult affiliate programs to interface so that these affiliate programs can promote AFF services via an Affiliate Pooling mechanism. We are currently negotiating with DateApp.com, a rival of AFF, who will then have the competitive advantage to Affiliate Pool and the corresponding marketing advantage. Interestingly enough, Gary Kremen had indicated to us that he thought that Match.com was likely infringing with many of their marketing deals.

Certainty:
Having been on the technology-development side of this model for over 7 years, it is hard to imagine many instances where our initial inclination that someone is infringing is wrong. The Affiliate Pooling mechanism described in the patent is certainly the most efficient and

A2046

reliable method for this model of cross-marketing.

It is also interesting to note that the extremely critical adult
webmaster community has chimed-in about the patent and prior art, and
Acacia patent commentator Brandon Shalton of FightThePatent.com has done
his own diligence on our patent. No one has produced any prior art, and
Brandon seems to come up just short of an endorsement. Here is a link
to that discussion:
http://www.gofuckyourself.com/showthread.php?threadid=372026

or you can download the PDFs I made of all the posts:
https://secure.ipatent.com/essociate/gfy_patent_posts.zip

Preliminary Targets (and some other big online advertising companies):

** Azoogleads.com **
- Biggest target - they claim to pay out $3mil per month in commissions.
- Infringing because they appear to be pooling with True.com, and may
have integrated with CardTraffic. We also know someone at PythonMedia
in Canada who worked with them, and almost worked for them. He beleives
they are infringing.

** RealBigCash.com **
- Adult affiliate program copying XPays model.
- Owned by notorious spammer Scott Richter.
- May be on the verge of bankruptcy ... domain does not resolve.

** AdultFriendFinder **
- Largest adult-oriented dating site.
- Possibly infringing.
- Adult company AEBN had been promoting AFF thru AEBN affiliates in
violation of the patent. At our demand, AEBN has since removed these
links to avoid infringing, apparently letting AFF know the specific
reason. We have been told that AFF has indicated they would fight us if
we came after them directly.

** Linkshare.com **
- Uses hub model as described in patent.
- May still be participating in infringing activity if a branded
affiliate program within their system interfaces to Affiliate Pool with
an external affiliate network. Example: Netflix.

** Coverclicks.com **
- Essociate has a publisher account with Coverclicks.
- Most of the offers in this network are not infringing, but our
PythonMedia contact has indicated that they have in the past ...
specifically with PythonMedia products/services.

** Revenue.net **
- Owned by Oversee.net
- Founded in 2000.
- Also owns DomainSponsor.com which is a domain parking service to
monetize valuable type-in domains and re-purchased expired domains with
existing traffic. Domain parking involves optimizing the landing page
of a domain to maximize clicks or transactions by the surfer. And in
order to provide diverse advertising, it is likely that some of the
links are implementing the Affiliate Pooling mechanism.

** AffiliateFuel.com **
- Recently purchased by Experian Interactive, which also owns
MetaReward.
- We beleive they are infringing because they are promoting Netflix thru
their affiliates. When Brian contacted them they denied infringing.
But it is possible that they were not infringing then, but have recently
begun infringing by promoting Netflix.

ESS_CONF_EMAIL000139.htm

- I have tried to sign up for an account in their program thru a sister company of ours, but our application was denied.

** Emarketmakers.com **
- Owned by Vendare Group which is owned by IdeaLab.
- Essociate has a publisher account with Emarketmakers.
- We believe they are infringing because they have a wide variety of offers, some of which have their own affiliate programs.

** DarkBlue.com **
- Infringing because some of their offers are/were interfaced with external affiliate programs like PythonMedia.
- Owner of domain registrar Fabulous.com ... we have a wholesale/bulk domain registration account with Fabulous. Fabulous also has a sophisticated domain parking system as described in the Revenue.net section above.

** TrafficMarketplace.com **
- Not much info, but we beleive they are infringing because they are promoting Netflix thru their affiliates.

** Advertising.com **
- Some of their offers may be using Pooling mechanisms.
- Not sure of start date for Pooling, so may be concurrent inventor.
- Essociate has a publisher account with Advertising.com, but has never actually advertised for them.

** DoubleClick **
- Some of their offers may be using Pooling mechanisms, but no specific information.
- Original dominant advertising company for CPM and CPC advertising.

** ValueClick.com, CommissionJunction.com **
- Public company that appears to be aquiring other companies.
- CJ.com is a hub like Linkshare.
- They also purchased hub system BeFree awhile back.
- May be participating in infringing activity if a branded affiliate program within their system interfaces to Affiliate Pool with an external affiliate network.
- CJ has been around for a long time and so they may be a concurrent inventor. But again, we strongly beleive that most companies that that existed pre-2000 had offers that were all tracked within their internal system, i.e. there was no external interface.

** Adteractive.com **
- Not much info, but we beleive they are infringing because they are promoting Netflix thru their affiliates.

Other Targets for Further Investigation:

** TrafficSynergy.com **
- Appears to be just an affiliate hub system like LInkshare.

** Clixgalore.com **
- Appears to be just an affiliate hub system like Linkshare.

** LinkConnector.com **
- Violating our Virtual Affiliate trademark.

** FastClick.com **
** Clickbooth.com **
** RexTopia.com **
** Primaryads.com **
** MaxBounty.com **

A2048

** CPAEmpire.com **
** MarketLeverage.com **
** Addrive.com **
** Lynxtrack.com **
** Eadvertising.com **
** PartnerWeekly.com **
** DirectResponse.com **
** Advaliant.com **

ESS_CONF_EMAIL000139.htm

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| ESSOCIATE, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-727-bbc |
| | ) | |
| EPIC MEDIA GROUP, INC., ET AL, | ) | **[FILED UNDER SEAL]** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY TO PLAINTIFF ESSOCIATE, INC.'S RESPONSE TO DEFENDANTS' STATEMENT OF PROPOSED FINDINGS OF FACT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The defendants, (collectively "Epic"), reply as follows to plaintiff Essociate, Inc.'s ("Essociate") Response to Defendants' Statement of Proposed Findings of Fact in Support of Motion for Summary Judgment.

**A.      Background Of The Parties**

**Epic Fact No. 1.**      Essociate, Inc. ("Essociate") is the plaintiff and the owner of the patent asserted in this patent infringement case, namely U.S. Patent No. 6,804,660.  Dkt. No. 58, First Amended Complaint, ¶ 6.

**Essociate Resp.**    Undisputed.

**Epic Fact No. 2.**      Michael Landau and Evan Horowitz are the founders of Essociate, and are the inventors of the '660 patent.  Declaration of James D. Peterson, ("Peterson Decl."), ¶ 7, Ex. 5 ('the 660 patent); Dkt. No. 58, First Amended Complaint, ¶¶ 15-18.

**Essociate Resp.**    Undisputed.

**Epic Fact No. 18.**     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), (c), and/or 1400(b).  Dkt. No. 58 First Amended Complaint ¶ 14; Dkt No. 63, Answer to First Amended Complaint ¶14.

      **Essociate Resp.**     Undisputed.

**C.**      **The Patent-in-Suit, U.S. Patent No. 6,804,660**

**Epic Fact No. 19.**     The patent-in-suit, U.S. Patent No. 6,804,660 (the '660 patent), entitled "System Method and Article of Manufacture for Internet Based Affiliate Pooling," was issued to inventors Michael Landau and Evan Horowitz on October 12, 2004.  Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

      **Essociate Resp.**     **Disputed.** The '660 Patent was issued to Essociate, and Mr. Landau and Mr. Horowitz are the listed inventors. Landau Decl. ¶ 14.

      **Epic Reply.**     **No material dispute**.  Epic Media agrees that Landau and Horowitz are the listed inventors on the patent and that the patent was issued to Essociate as the assignee.

**Epic Fact No. 20.**     Application serial no. 09/846,159, which resulted in the'660 patent, was filed on May 1, 2001. Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

      **Essociate Resp.**     Undisputed.

**Epic Fact No. 21.**     Application serial no. 09/846,159 and the '660 patent claim priority to U.S. provisional patent application serial no. 60/201,041 , which was filed on May 1, 2000. Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

      **Essociate Resp.**     Undisputed.

**Epic Fact No. 22.**     The invention date of the invention claimed in the '660 patent was May 5, 1999, which is the date that XPays launched an advertising campaign for the SexToy.com website.  Peterson Decl., ¶ 12, Ex. 10 (Essociate's response to Interrogatory No. 4).

**Essociate Resp.**      Undisputed.

**Epic Fact No. 23.**      The '660 patent discloses and claims a method, system and computer program for providing "virtual affiliates" access to an existing affiliate system. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent).

**Essociate Resp.**      Undisputed.

**Epic Fact No. 24.**      Virtual affiliates are affiliates of one affiliate system, referred to in the patent as the "source system" which can send traffic to an existing system, the "target system" without actually joining the target affiliate network. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent).

>    **Essociate Resp.**      **Disputed. "**Virtual affiliates" carries the meaning set forth in the '660 Patent—which does not prohibit the virtual affiliate from being a member of the target affiliate network. Acting as a virtual affiliate merely requires that the webmaster in question be sending traffic to the target affiliate system independent of any membership that webmaster might have in the target affiliate network. Landau Decl. ¶ 15, Ex. A ('660 Patent) at 1.

>    **Epic Reply.**      **No genuine dispute of fact or law**.  Essociate's response is a claim construction argument and it does not contradict Epic's position. "Independent of any membership" is essentially the same as "without actually joining."

**Epic Fact No. 25.**      The '660 patent does not claim to have invented the concept of virtual affiliates, it claims a particular multi-step technique for providing virtual affiliates to a target affiliate system. Peterson Decl. ¶ 7, Ex. 5 ('the 660 patent); Dkt. No. 85, Landau Report at 32.

**Epic Reply.** **No material dispute**. The subject line of the email was "hitlist draft . . . pls turn around quickly so I can send."

**Epic Fact No. 36.** The May 19, 2005 email from Michael Landau to Evan Horowitz identified Azoogleads.com as Essociate's "[b]iggest target" on its list of "[p]reliminary targets" and stated that "they claim to pay out $3mil per month in commissions . . . Infringing because they appear to be pooling with True.com and may have integrated with CardTraffic." The email acknowledged that cookie and pixel tracking does not infringe the '660 patent. Peterson Decl., ¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).

**Essociate Resp.** **Disputed.** Essociate disputes that the email acknowledges that the use of cookie and pixel tracking precludes infringement of the '660 Patent. Peterson Decl., ¶ 21, Ex. 19 (Landau Email to Horowitz, May 19, 2005).

**Epic Reply.** **No genuine dispute**. The email acknowledges that pixel tracking is not "as described in the patent." In the email, Landau states that "not everything that Azoogle advertises infringes on the patent. Exclusive offers and products and services that are completely tracked within their internal affiliate system probably do not cross affiliate system boundaries . . . Further, it is possible that a company like Azoogle uses tracking as described in the patent for some products/services when available and pixel tracking when the target affiliate system cannot provide Affiliate Pooling customization/configuration."

**Epic Fact No. 37.** On May 25, 2005, Michael Landau forwarded the body of the May 19, 2005 email to John Hopf, a potential investor. Peterson Decl., ¶ 20, Ex. 18 (Landau Email to Hopf, May 25, 2005).

**Essociate Resp.** Undisputed.

13

     **Essociate Resp.**  Undisputed.

  **Epic Fact No. 57.**  The landing page is the place where the user can complete some action, such as making a purchase or signing up for some service.  Kent Infringement Report ¶ 9; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

     **Essociate Resp.**  **Disputed.** The Destination Landing Page need not allow the user to take any action for the '660 Patent to be infringed. For example, sometimes compensation will become owing purely as a result of the user having visited the merchant's site. Landau Decl. ¶ 27.

     **Epic Reply.**  **No genuine material dispute**.  There is no evidence that Epic operated on a pay-per-click basis.  Whether the '660 patent reads on a pay-per-click system is immaterial.  Moreover, paragraph 27 of the Landau declaration is merely a conclusory argument about the scope of the 660 patent which the Court should disregard.

  **Epic Fact No. 58.**  The format and content of the landing page and its URL are determined by the merchant, not Epic.  Commonly, the merchant will set up a landing page to receive users from affiliate networks that is distinct from its standard home page or signup page. Kent Infringement Report ¶ 10; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

     **Essociate Resp.**  **Disputed.** The format and content of the Destination Landing Page URL was often dictated by Epic's customer service representative—especially when the merchant operated an existing target affiliate system and requested that the Destination Landing Page ultimately reached by the users

referred from the Accused Epic Network contain values to enable requisite tracking of the referring source webmaster affiliate. And Epic further configured these URLs to include encrypted click-hashes containing these identifying values which the Accused Epic Network used for secondary tracking. The formatting of these Destination Landing Page URLs occurred when they were configured by an Epic customer service representative who modified the Destination Landing Page URLs provided by merchant customers operating an existing target affiliate system to include macros that in turn caused the destination landing page URLs reached by referred users to contain source webmaster identifiers. October 2 Okin Dep. 73:18- 74:9, 116:17-22, 118:12-24, 144:11–155:7, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23, 19:24-20:24; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 19, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8, 14.

**Epic Reply.** **No genuine dispute**. None of the evidence cited by Essociate disputes the proposed fact. The proposed fact is confirmed by Essociate's own supplemental proposed fact No. 93 which provides that "the merchant would provide Epic a format for a destination landing pledge URL to which Epic should redirect traffic from Epic's affiliates."

**Epic Fact No. 59.** Merchants use many variations on how they structure their landing pages and the landing page URLs to suit their own purposes. Kent Infringement Report ¶ 11; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 4.

**Essociate Resp.** Undisputed.

Page URLs as a secondary method of tracking and it can also use non-click-hash URLs contained within its merchant's records to reconcile disputes between the Accused Epic Network and its merchant customers over transaction tracking. All that is required to infringe the '660 Patent is for the use of the source webmaster ID values included in Destination Landing Page URLs to become a possible source of tracking for either the merchant or the Accused Epic Network or both. October 2 Okin Dep. 73:18-74:9, 116:17-22, 118:12-24, 144:11–155:7, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 21, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14 (stating that "click_hash variables . . . should be reported under [the Afill ID] field."); Landau Decl. ¶ 29, Ex. A ('660 Patent).

**Epic Reply.** **No genuine dispute**. Essociate's response is merely argument about the scope of the '660 patent and the value of its technology. Nothing in the cited evidence places any portion of proposed fact No. 73 in dispute.

**Epic Fact No. 74.** To serve the various needs of its merchants and its affiliates, Epic allows, upon request, certain preset variables to be passed along to the merchant system. These variables include: the affiliate ID, affiliate sub-ID, click hash value, and a fixed code to represent the Epic system, "az2." The requested variables are appended to the merchant landing page URL. Kent Infringement Report ¶ 26; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

**Essociate Resp.** Undisputed.

**Epic Fact No. 75.**    When variables are to be passed along, the merchant landing page URLs are formatted to include variables that will be filled in when the user clicks on the jump link.  For example, if Netflix had requested that the affiliate ID be passed along, the Netflix landing page URL would be pre-formatted on the Epic system like this:

www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%% Kent Infringement Report ¶ 27; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

> **Essociate Resp.    Disputed.** The affiliate ID values contained within an infringing Destination Landing Page URL are not "passed along"—they are created anew and included in a hybrid string of characters along with a value identifying the Accused Epic Network as the referring system as a function of the macros an Epic customer service representative configures the Destination Landing Page URL to include. Landau Decl. ¶ 30.

> **Epic Reply.    No genuine dispute**.  Essociate's response is merely argument about the scope of the 660 patent.  Paragraph 30 of the Landau declaration is inadmissible as untimely expert testimony, and is itself merely argument.

**Epic Fact No. 76.**    In the syntax of protocols used on the Epic system (and in internet protocols generally), the "?" designates the end of the location part of the URL.  The "%%" designates the beginning and the end of the label of the variable.  Then, when a user clicks on the jump link, the Epic system fills in the variables in the pre-formatted URL to complete the merchant landing page URL.  If the affiliate's ID were 12354, the landing page URL would look like this: www.netflix.com/affiliates/signup.html?affiliate_id=12345 Kent Infringement Report ¶ 28; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

**Essociate Resp.** Undisputed.

**Epic Fact No. 77.** The merchant would then be able to record the affiliate's ID for whatever purposes it wanted. However, the Epic system would still use the cookie and pixel method for tracking this transaction and any resulting commissions, just as though the affiliate ID had not been passed on to the merchant. Kent Infringement Report ¶ 29; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

> **Essociate Resp.** **Disputed.** Where a click-hash containing an encrypted reference to the source webmaster's identifier is included in the Destination Landing Page URL the accused Epic Network uses that encrypted set of values as a secondary method of tracking to audit or confirm the tracking data obtained through its use of cookies or pixels. Also, the Accused Epic Network can use the literal referred webmaster values for tracking either form its own records or the merchants'—especially where there is a dispute over transaction data. October 2 Okin Dep. 112:2-114:2, 115:10-17, 116:17-22, 118:12-24, 144:11–155:7; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 22, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14.
>
> **Epic Reply.** **No genuine dispute**. Essociate's description of the use of the click hash does not place any portion of proposed fact No. 77 in dispute. The click-hash method of transaction tracking (which has not been timely accused of infringement) involves a code generated by the Epic system that would be meaningless to the merchant. It could be decoded by the Epic system, but not by

the merchant and thus it cannot be used by the merchant for tracking. *See* Epic

Reply Br. at Section III.C.

**Epic Fact No. 78.** If the merchant requests it, the Epic system can also allow use of a

sub ID variable, which can be useful for affiliates. Imagine, for example, that the affiliate is a

website operated by a local newspaper at the domain name www.citytoday.com. The website,

like the newspaper, has various sections, including news, sports, and arts. The affiliate promotes

Epic offers, and it would like to keep track of whether the offers were more successful in the

sports section or the arts section. Let's say that CityToday puts the Netflix offer in both the

sports section and the arts section. When the affiliate places the offer in the sports section, the

"sub_ID=001" is appended to the jump link. When the affiliate places the offer in the arts

section, it appends "sub_ID=002." Kent Infringement Report ¶ 30; Kent Decl. ¶3; Appiah Decl.

¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

**Essociate Resp.** Undisputed.

**Epic Fact No. 79.** When the user clicks on the jump link, the landing page URL is

completed by filling in the variables. The pre-formatted landing page URL would look like this:

www.netflix.com/affiliates/signup.html?affiliate_id=%%AFFILIATE_ID%%&

sub_id=%%SUB_ID%% Kent Infringement Report ¶ 31; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

**Essociate Resp.** Undisputed.

**Epic Fact No. 80.** If the user clicked on the jump link in the sports section, the

landing page URL would be completed to look like this:

www.netflix.com/affiliates/signup.html?affiliate_id=12345&sub_id=001 Kent Infringement

Report ¶ 32; Kent Decl. ¶3; Appiah Decl. ¶ 3-4.

**Essociate Resp.** Undisputed.

Report ¶ 33; Kent Decl. ¶3; Appiah Decl. ¶ 3-4; *see also* Peterson Decl. ¶ 24, Ex. 22 (Advertiser Implementation Guide), p. 5.

        **Essociate Resp.     Disputed.** The Accused Epic Network relied on the inclusion of click-hashes of Destination Landing Page URLs for secondary tracking and was able to use the literal values in those Destination Landing Page URLs for tracking as well which is all that is necessary to infringe the '660 Patent. October 2 Okin Dep. 112:2-114:2, 115:10-17, 116:17-22, 118:12-24, 144:11–155:7; October 3 Appiah Dep. 43:9-17, 44:16-24, 45:15-46:1; Du Wors Decl. ¶ 23, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 8, 14 (stating that "click_hash variables . . . should be reported under [the Afill ID] field."); Landau Decl. ¶ 31, Ex. A ('660 Patent).

        **Epic Reply.     No genuine dispute**.  Essociate's response is argument about the scope of the '660 patent.  The information concerning Epic's use of the click hash is inaccurate and even if true would not place any portion of proposed fact No. 83 in dispute.

    **Epic Fact No. 84.**     SpeedDate.com is an Epic client, a merchant who uses the Epic system.  Appiah Decl. ¶ 7; *see also* Kent Infringement Report ¶ 35-36; Kent Decl. ¶3.

        **Essociate Resp.**     Undisputed.

    **Epic Fact No. 85.**     A 2009 insertion order documents the relationship between SpeedDate.com and Epic.  The insertion order also shows that SpeedDate.com would use the cookie and pixel method of transaction tracking.  The insertion order demonstrates that SpeedDate.com used basic cookie and pixel tracking, because it indicates that SpeedDate.com was able to display the pixel on its conversion page and that "Epic/Azoogle will provide HTTP

tracking pixel code to the Advertiser." Appiah Decl. ¶ 7; *see also* Kent Infringement Report ¶ 35-50; Kent Decl. ¶3.

> **Essociate Resp.    Disputed.** This insertion order reveals that SpeedDate.com requested a customer service representative on behalf of the Accused Epic Network configure the Destination Landing Page URL that is part of SpeedDate.com's existing target affiliate network to include both the source webmaster ID and sub-ID of the referring source webmaster affiliate to be included in the Destination Landing Page URL as target webmaster identifier functional within SpeedDate.com's target affiliate network to be used for requisite tracking. October 2 Okin Dep. 73:18-74:9, 213:15-214:16; October 2 Appiah Dep. 10:19-11:2, 11:19-12:23, 19:24-20:24; Du Wors Decl. ¶ 24, Ex. F (Advertiser Cheat Sheet and Implementation Guide) at 3, 8; Appiah Decl. Ex. A (Insertion Order) at 2.

> **Epic Reply.    No genuine dispute**.  Essociate's response does not place any portion of proposed fact No. 85 in dispute.  Essociate cites no evidence to show that the destination landing page URL is part of SpeedDate.com's existing affiliate network.  *See* Epic Reply Br. at Section III.B.3.

**Epic Fact No. 86.**    The Epic affiliate ID number 48192 belongs to an Epic affiliate in Denver, Colorado.  Appiah Decl. ¶ 8.

> **Essociate Resp.**    Undisputed.

## F.    Facts concerning the prior art and the invalidity of the '660 patent

**Epic Fact No. 87.**    Internet affiliate systems began in the middle 1990s.  Dkt. No. 81, Expert Report of Peter Kent on the Validity of the Patent-in-Suit ("Kent Invalidity Report") ¶ 30; Kent Decl. ¶2.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 88.**     Among the most well known early affiliate systems are those run by Amazon and Linkshare, both beginning in 1996.  Kent Invalidity Report ¶ 32-34; Kent Decl. ¶2.

**Essociate Resp.**     Undisputed.

**Epic Fact No. 89.**     Both Amazon and Linkshare are acknowledged as prior art affiliate networks in the '660 patent.  Peterson Decl. ¶ 7, Ex. 5 (the '660 patent).

**Essociate Resp.**     Undisputed.

**Epic Fact No. 90.**     XPays, LLC operated an affiliate network prior to May 1,1999.  Oct. 8, 2012 Landau Deposition, 82: 17 – 83:22; see also Kent Invalidity Report ¶ 64; Kent Decl. ¶2.  The affiliate network operated by XPays before May 1, 1999 is referred to as "Old XPays." The affiliate system operated by XPays after May 1, 1999 is referred to as "New XPays."

> **Essociate Resp.     Disputed.** "Old XPays" was used after May 1, 1999 and "New
> XPays" was not used prior to May 5, 1999. Landau Decl. ¶ 32.
>
> **Epic Reply.     No genuine material dispute**.  The parties agree that New XPays
> was first used on May 5, 1999.  Epic does not challenge Essociate's position that
> it also continued to use the Old XPays system for some time after May 1, 1999.

**Epic Fact No. 91.**     Old XPays was not disclosed during the prosecution of the '660 patent.  Peterson Decl. ¶ 7, Ex. 5 (the '660 patent); Peterson Decl. ¶ 8; Ex. 6 ('660 file history).

> **Essociate Resp.     Disputed.** The structure of Old XPays was disclosed both
> during the prosecution of the '660 Patent and in the discussion of prior art of the
> '660 Patent as it was substantially identical to Linkshare. Landau Decl. ¶ 33, Ex.
> A ('660 Patent).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESSOCIATE, INC.,

                          Plaintiff,

          v.

AZOOGLE.COM, INC., and EPIC
MEDIA GROUP,

                          Defendant.

PRELIMINARY PRETRIAL
CONFERENCE ORDER

11-cv-727-bbc

---

    This court held a preliminary pretrial conference on December 28, 2011.  All parties were represented by counsel.  The court set the schedule for this case and advised the parties that their conduct throughout this case is governed by this pretrial conference order and the attachments to it.  The parties should not expect to receive extensions of the deadlines set in this order.  It is each party's responsibility to complete all necessary work within the time allotted.  Fed. R. Civ. Pro. 6(d) shall not apply to documents served pursuant to Rules 5(b)(2)(E) & (F).  Please note that the court recently has imposed new requirements on the parties in patent lawsuits.

    The parties and their attorneys must at all times treat everyone involved in this lawsuit with courtesy and consideration.  The parties must attend diligently to their obligations in this lawsuit and must reasonably accommodate each other in all matters so as to secure the just, speedy and inexpensive resolution of each proceeding in this matter as required by Fed. R. Civ. Pro. 1.  Failure to do so shall have consequences.

1. **New Requirement: establishing standing to assert the patent(s): February 10, 2012**

   **Response: February 24, 2012**

   By the first date, plaintiff must submit to the court proof that it has standing to sue on the patents claimed, either by stipulation or by admissible evidence. If standing is disputed, then defendant must file its opposition by the second date.

2. **Amendments to the Pleadings: February 10, 2012**

   After this date, a party may not amend its pleadings without first receiving leave of court.

3. **(A) Plaintiff's Infringement Contentions: February 24, 2012**

   By this date, plaintiff must identify each claim in each patent being asserted against each accused device.

   **(B) Defendant's Contentions of Invalidity/Unenforceability: March 23, 2012**

   By this date, defendant must disclose its contentions of invalidity and unenforceablity.

4. **Exchange of Terms and Proposed Constructions: April 23, 2012**

   **Responses: May 7, 2012**

   Not later than the exchange date, all parties must exchange each party's list of all terms for which that party intends to request construction by the court during summary judgment motions practice, along with its proposed constructions. Not later than the response deadline, a party may supplement and amend its disclosures. These documents should not be filed with the court. The court no longer holds claims construction hearings. The court will consider and rule on requests for claims construction as part of the summary judgment motions practice.

5.      **Disclosure of Reliance on Advice of Counsel: June 8, 2012**


6.      **Disclosure of Liability Experts: Proponent: June 8, 2012**

                                    **Respondent: July 20, 2012**

        All disclosures mandated by this paragraph must comply with the requirements of Rule 26(a)(2).  Supplementation pursuant to Rule 26(e) is limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition, or before the general discovery cutoff if no one deposes the expert.  Any employee of a party who will be offering expert opinions during any phase of this case must comply with all of these disclosure requirements.

        Failure to comply with these deadlines and procedures could result in the court striking the testimony of a party's experts pursuant to Rule 37.  The parties may agree among themselves to modify deadlines and procedures relating to experts.


7.      **Deadline for Filing Dispositive Motions: August 24, 2012**

        Dispositive motions may be filed and served by any party on any date up to the deadline set above. All dispositive motions must be accompanied by supporting briefs. All responses to any dispositive motion must be filed and served within 21 calendar days of service of the motion. Any reply by the movant must be filed and served within 10 calendar days of service of the response. The parties may not modify this schedule without leave of court.

        If any party files a motion for summary judgment, then all parties must follow this court's procedure governing such motions, a copy of which is attached to this order. The court will not consider any document that does not comply with its summary judgment procedure. A party may not file more than one motion for summary judgment in this case without leave of court.

Parties are to undertake discovery in a manner that allows them to make or respond to dispositive motions within the scheduled deadlines. The fact that the general discovery deadline cutoff, set forth below, occurs after the deadlines for filing and briefing dispositive motions is not a ground for requesting an extension of the motion and briefing deadlines.

**New Requirement:** not later than one week after the reply brief is filed for a summary judgment motion, the parties must jointly submit to the court a chart that lists which claims and which products actually are at issue in the summary judgment motion. If there is more than one summary judgment motion, the parties must submit a separate chart for each motion.

8.     **Disclosure of Damages Experts: Proponent: November 13, 2012**

**Respondent: December 14, 2012**

The requirements of Paragraph 6 also apply to these disclosures.

9.     **Discovery Cutoff: January 18, 2013**

All discovery in this case must be completed not later than the date set forth above, absent written agreement of all parties to some other date. Absent written agreement of the parties or a court order to the contrary, all discovery must conform with the requirements of Rules 26 through 37 and Rule 45. Rule 26(a)(1) governs initial disclosures unless the parties agree to the contrary.

The following discovery materials *shall not* be filed with the court unless they concern a motion or other matter under consideration by the court: interrogatories; responses to interrogatories; requests for documents; responses to requests for documents; requests for admission; and responses to requests for admission.

A party need not file a deposition transcript with the court until that party is using the deposition in support of some other submission, at which time the entire deposition must be

4

filed. Depositions that are not filed with the court by the deadline for filing pretrial submissions shall not be used by any party for any purpose at trial. All deposition transcripts must be in compressed format. The court will not accept duplicate transcripts. The parties must determine who will file each transcript.

A party may not file a motion regarding discovery until that party has made a good faith attempt to resolve the dispute. All efforts to resolve the dispute must be set forth in any subsequent discovery motion filed with this court. By this order, the court requires all parties to a discovery dispute to attempt to resolve it quickly and in good faith. Failure to do so could result in cost shifting and sanctions under Rule 37.

Because the parties will not receive extensions of other deadlines in this case, they must file discovery motions promptly if self-help fails. Parties who fail to do so may not seek to change the schedule on the ground that discovery proceeded too slowly to meet the deadlines set in this order.

All discovery-related motions must be accompanied by a supporting brief, affidavit, or other document showing a *prima facie* entitlement to the relief requested. Any response to a discovery motion must be served and filed within seven calendar days of service of the motion. Replies may not be filed unless requested by the court.

**10.    Settlement Letters: January 18, 2013**

Not later than this date, each party must submit a confidential settlement letter to the clerk of court at <u>clerkofcourt@wiwd.uscourts.gov</u>. The letter should set forth the terms and conditions upon which that party would settle this case. The letter should be marked "Under Seal" and should not be sent to opposing counsel. These letters will not become part of the record in this case. Upon receipt of the letters, the clerk of court will initiate settlement discussions with counsel.

This is the only required settlement activity in this lawsuit. The court has other settlement resources that are available upon the parties' joint request to the clerk of court.

11.    **Rule 26(a)(3) Disclosures *and* all motions in limine: January 18, 2013**

**Objections: February 4, 2013**

The first date is the deadline to file and serve all Rule 26(a)(3) disclosures, as well as all motions in limine, proposed voir dire questions, proposed jury instructions, and proposed verdict forms. All responses in opposition are due by the second date. The format for submitting proposed voir dire questions, jury instructions and verdict forms is set forth in the Order Governing Final Pretrial Conference, which is attached.

**New Requirement:** Each party must accompany its proposed jury instructions and verdict questions with a memorandum explaining the reasons for its requests and citing its authority for them. A party objecting to its opponent's proposed jury instructions, verdict form or verdict questions must submit a memorandum explaining the basis and authority for its opposition. *The parties no longer need to submit copies of these submissions to chambers.*

12.    **Final Pretrial Conference: February 14, 2013 at 4:00 p.m.**

Lead counsel for each party must appear in person.

**New Requirement:** A party that wishes to obtain daily copy of the trial transcript must make arrangements with the court reporters as soon as possible but not later than the day of the final pretrial conference or ten calendar days before the first day of trial, whichever is earlier. Failure to do so constitutes waiver.

13. **Trial: February 25, 2013 at 9:00 a.m.**

Trial shall be to a jury of eight and shall be bifurcated. The parties estimate that this case will take 5 days to try. Absent further order of this court, the issues to be tried shall be limited to those identified by the parties in their pretrial conference report to the court.

This case will be tried in an electronically equipped courtroom and the parties shall present their evidence using this equipment. The parties shall ensure the compatibility of their personal equipment with the court's system prior to the final pretrial conference. Failure to do so constitutes waiver.

14. **Reporting Obligation of Corporate Parties.**

All parties that are required to file a disclosure of corporate affiliations and financial interest form have a continuing obligation throughout this case promptly to amend that form to reflect any changes in the answers.

Entered this 29th day of December, 2011.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESSOCIATE, INC.,

                 Plaintiff,

v.

AZOOGLE.COM, INC. and
EPIC MEDIA GROUP,

                 Defendant.

AMENDED
SCHEDULING ORDER

11-cv-727-bbc

---

At a July 18, 2012 unrecorded telephonic conference, the court reset the schedule as follows:

Disclosure of Reliance on Advice of Counsel: November 5, 2012

Disclosure of Liability Experts: Proponent: November 5, 2012

                           Respondent: December 14, 2012

Deadline for Filing Dispositive Motions: February 1, 2013

Disclosure of Damages Experts: Proponent: May 3, 2013

                           Respondent: May 31, 2013

Discovery Cutoff: June 28, 2013

Settlement Letters: June 28, 2013

Rule 26(a)(3) Disclosures *and* all motions in limine: June 28, 2013

                           Objections: July 15, 2013

Final Pretrial Conference: August 1, 2013 at 4:00 p.m.

Jury Selection and Trial: August 12, 2013 at 9:00 a.m.

The parties still predict a five-day trial.

Entered this 18th day of July, 2012.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge



# Advertiser Implementation Guide

**Version 3.0.3**

**Target Audience:**
**Advertiser technical contact**

EPIC003213

# Table of Contents

1. INTRODUCTION ................................................................................. 3

    1.1. Document Objective ............................................................... 3

    1.2. Business Overview................................................................. 3

2. TECHNICAL DESCRIPTION .............................................................. 4

    2.1. Advertiser Offer Landing Page and URL .................................... 4

    2.2. Preset Epic Variables............................................................. 5

    2.3. Sub ID Restrictions............................................................... 6

    2.4. Hardcoded Custom Variables .................................................. 6

    2.5. Affiliate Links and Tracking .................................................... 7

    2.6. Return Days........................................................................ 8

    2.7. Tracking Pixel and Integration................................................ 9

    2.8. Advertiser Order ID ............................................................10

    2.9. Delay Reporting .................................................................11

    2.10. Email Opt-Out Suppression File .............................................12

    2.11. Advertiser-Side Reporting....................................................13

    2.12. Test and Launch ................................................................14

3. PROCESS FLOW ...........................................................................15

4. HELP...........................................................................................16

A2072

EPIC003214

# 1. INTRODUCTION

## 1.1. Document Objective

The goal of this Implementation Guide is to provide Advertiser technical persons with a high-level overview of the Epic Advertising and its AzoogleAds Network, how our program works, features that we offer, and what is required to integrate with our network.

## 1.2. Business Overview

Epic Advertising (www.EpicAdvertising.com) is a global online performance marketing company that provides advertisers with measurable Internet advertising impact. Leveraging proprietary and patent-pending technologies, and the over 38,000 publishers in AzoogleAds, its highly-acclaimed performance ad network, Epic provides its advertising partners with performance and direct response marketing services, search engine marketing, media planning, branded marketing campaigns and a targeted, worldwide online reach. A pioneer in both the online performance marketing industry and in Internet advertising integrity assurance and compliance, Epic Advertising brings an intense focus on achieving the highest ROI yield for its advertising partners via transparent Display and Search consumer web traffic. Epic scales its solutions through enormous internet reach, proprietary and patent-pending technology and unparalleled industry expertise.

Our Advertiser offers generally consist of a flat-fee payout to Publishers for every lead that they refer and convert (CPA).

We define a lead as a Publisher referred customer that completes a specific action as defined in an Advertiser's offer (such as product sales, service registrations, or new lead acquisitions).

Our Epic business managers work with our Advertisers to develop attractive offers to promote to our Publisher marketplace.



Finally, our robust technology enables us to facilitate the administrative needs necessary to push offers to our Publisher network, track traffic and lead conversions, and provide reports to analyze offer performances.

<div align="center">A2073</div>

EPIC003215

Some of the major tasks that Epic performs on behalf of our Advertisers via our platform are:

- Creating offers

- Uploading promotional assets such as email campaign copies, banners for website ads, suggested keywords for search programs

- Designating landing page URLs and any variables that Advertisers may want AzoogleAds to pass to their website (for their internal tracking purposes)

- Analyzing traffic, leads converted, and revenue performances by means of reporting

## 2.    TECHNICAL DESCRIPTION

### 2.1.    Advertiser Offer Landing Page and URL

All offers (whether Publishers promote user traffic to Advertisers via email, web, or search) require a landing web page. The purpose is when a user clicks-thru from a Publisher's promotion, the user will be directed to the Advertiser's landing page for an offer.

For example, this may be the Advertiser's homepage, a product page, or a sign up page such as:

http://www.advertiserspage.com
http://www.advertiserspage.com/product-abc.html
http://www.advertiserspage.com/registration.html

The offer landing page is generally hosted by the Advertiser and the URL provided to our Epic managers.

A2074

EPIC003216

## 2.2. Preset Epic Variables

**To accommodate some technical terms, please note that from this point forward, Publishers are referred to as Affiliates.**

Upon request, Epic can pass any of the following preset variables to the Advertiser for their internal tracking or reconciliation purposes:

| Variable name * | Variable value as set up in AzoogleAds system | Variable value description |
|---|---|---|
| affiliate_id | %%AFFILIATE_ID%% | Epic's unique numeric id for Affiliates |
| sub_id | %%SUB_ID%% | An offer specific **constant** value that Advertisers may want limited, special affiliates to pass to them via Epic affiliate links ** |
| affiliate_id-sub_id | %%AFFILIATE-SUB%% | The combination of affiliate_id and sub_id values |
| click_hash | %%CLICK_HASH%% | An alpha-numeric value which when decoded identifies affiliate, click, and offer data *** |
| nsrc | az2 | For advertisers not placing tracking pixels, this **constant** variable value pair can be passed along with click_hash to help advertisers identify Epic leads |

\*    Can be renamed as long as it adheres to standard URL format rules.

\*\*   If a field called "Data Pass-Thru" is turned on in the Epic system for the offer (set up by Epic Managers), any additional variables appended to affiliate links (usually set up by the Affiliates or Affiliate Managers running the offer) may also be passed.

\*\*\* Enabled by turning on a field called "Direct Reporting" in the Epic system for the offer (set up by Epic Managers).

For example:  If an Advertiser wants to log the "affiliate id" of Affiliates sending user traffic, then in the Epic system the landing URL will be set up, per offer, like this by an Epic manager:

http://www.advertiserspage.com?affiliate_id=%%AFFILIATE_ID%%
http://www.advertiserspage.com/product-abc.html?affiliate_id=%%AFFILIATE_ID%%
http://www.advertiserspage.com/registration.html?affiliate_id=%%AFFILIATE_ID%%

Upon a user's arrival to the Advertiser's offer landing page, the URL may appear like this:

http://www.advertiserspage.com?affiliate_id=12345
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345
http://www.advertiserspage.com/registration.html?affiliate_id=12345

A2075

EPIC003217

To use these preset Epic variables, Advertisers should notify their Epic manager in advance so that proper set up and tests may be observed.

> URL format follows a set of standard rules for passing variables. A question mark (?) indicates the end of the web address, and the beginning of the variables being passed. The first variable will always be pre-pended with a question mark. All additional variables thereafter will be pre-pended by an ampersand (&).

## 2.3. Sub ID Restrictions

Note that the sub_id's value is restricted to alphanumeric characters and _ (underscore). This means a-z and 0-9 respectively as well as the underscore symbol.

The use of spaces or any of the following characters is strictly prohibited:

| Character | Description | Character | Description |
|-----------|-------------|-----------|-------------|
| ; | Semi-colon | - | Minus sign |
| , | Comma | $ | Dollar sign |
| / | Front slash | % | Percent sign |
| \ | Back slash | ^ | Carrot |
| ? | Question mark | ! | Exclamation mark |
| : | Full colon | ( | Open parenthesis |
| = | Equal sign | ) | Close parenthesis |
| # | Number sign | ~ | Tilde |
| & | Ampersand | ' | Single quote |
| + | Plus sign | " | Double quote |
| [ | Open bracket | ] | Close bracket |
| { | Open bracket | } | Close bracket |
| > | Greater than | < | Less than |
| | | Pipe | _ | Underscore |
| * | Asterisk | @ | At sign |

## 2.4. Hardcoded Custom Variables

Hardcoded custom variables, adhering to standard URL format rules, may also be passed to Advertisers upon request. This allows Epic to send additional data to Advertisers, using their own specified variables, for extended internal tracking purposes.

All hardcoded custom variables will retain their names throughout the process and should follow the same standard as variable sub_id's. This means that no spaces and no special characters will be accepted in the variable names or their values.

A2076

EPIC003218

For example:  If an Advertiser wants to log the preset Epic variable "affiliate_id" of Affiliates sending user traffic and also the Epic "offer_id" the traffic is for, then in the Epic system the landing URL will be set up, per offer, by an Epic manager like this:

http://www.advertiserspage.com?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=%%AFFILIATE_ID%%&offer_id=6789

Notice that the offer_id variable's value is hardcoded to the landing page URL.

Upon the user's arrival to the Advertiser's offer landing page, the URL may appear like this:

http://www.advertiserspage.com?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=12345&offer_id=6789

To use hardcoded custom variables, Advertisers should notify their Epic manager in advance so that proper set up and tests may be performed.

## 2.5.   Affiliate Links and Tracking

For Epic to manage all the offers, traffic, activities, and reporting in our Advertiser and Affiliate network, all Advertiser links are provided to Affiliates in the form of Epic offer-specific links first.

A sample Epic Affiliate link is below:
http://x.azjmp.com/009Gv

In this example, **x.azjmp.com** is the Epic sub-domain and domain respectively; and "**009Gv**" is the Epic unique id for this link which contains pertinent information such as:

- The affiliate id
- The offer id
- The traffic type

When a user clicks-thru an Affiliate link, the user will first hit the Epic server where our system will immediately decode the link and redirect the user to the appropriate Advertiser offer landing page.

Upon the user's arrival to the Advertiser's landing page, Epic will set cookies on the user-side to tag the prospect with Epic data for tracking purposes.

The URL the user lands with will usually appear as the offer landing page URL as provided to Epic – along with any variables requested such as:

http://www.advertiserspage.com?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/product-abc.html?affiliate_id=12345&offer_id=6789
http://www.advertiserspage.com/registration.html?affiliate_id=12345&offer_id=6789

A2077

EPIC003219

## 2.6.    Return Days

This feature enables Advertisers to compensate Affiliates for leads that were not converted during the users' initial visit via an Affiliate link; but, rather is converted during a subsequent visit.

> With Return Days, Epic offer Advertisers the opportunity to specify, per offer, a time window for Affiliates to be credited for a future lead conversion completed from a previous unconverted click.

This functionality uses cookie technology.  When a user clicks-thru from an offer-specific Affiliate link and lands on the Advertiser website, Epic will set a Return Days cookie on the user-side.  This cookie will store information for this feature including the number of days the cookie will be valid before it expires, which our system will read.

The cookie will remain valid either before its auto expiration date or when an Affiliate deletes the cookie.

Typically, Returns Days are set to expire in 30, 60, or 90 days.  Epic recommends higher Return Days as a competitive incentive to attract affiliates.

Below is an example of how Return Days work if an offer is set for 30 Return Days:

- User clicks through from an Affiliate offer link.

- Epic sets cookies on the user-side including one for 30 Return Days.

- Epic redirects the user to Advertiser's website.

- User lands on Advertiser's offer landing page.

- User departs Advertiser's website before converting.

- User returns to Advertiser's website directly or via a bookmark within 30 days (not from an Affiliate link).

- User proceeds to complete the offer transaction and lands on Advertiser's lead conversion page (usually a Thank You or Confirmation page).

- Epic reads Tracking Pixel (explained on following page) on the Advertiser's lead conversion page; checks the user-side for cookies; associates the Lead, the Affiliate, and the Offer; and returns the data to Epic.

- Affiliate will be credited for the lead.

    **Continue**...

A2078

EPIC003220

To offer Return Days, Advertisers should notify their Epic managers in advance so that proper set up and tests may be performed.

---

**Note:**

In order to credit affiliates properly, Advertisers that are working with **multiple** networks (Epic + other networks) and planning to use Return Days will need to set their **own** cookies and codes; so that they may track each network's traffic and then conditionally display the correct network's tracking pixel on their lead conversion page.

---

## 2.7. Tracking Pixel and Integration

Our system tracks various activities including key statistics such as impressions and clicks for both Advertiser and Affiliate reporting.

**In order to close the circle and track leads, we simply require Advertisers to add a 1 line IFRAME tracking pixel code in the body of their lead conversion page (typically a Thank You or Confirmation page).\*\***

---

Advertisers that are running Epic programs only, can simply display the Epic tracking pixel every time "any" users land on their lead conversion page.

Advertisers that are running multiple ad/affiliate network programs (Epic + other networks) **and** offering Return Days will need to set their own cookies/codes to track each network's traffic; and conditionally display the correct network's tracking pixel on their lead conversion page in order to credit affiliates properly.

---

The pixel will be invisible to the Advertiser's website visitors; and it will not change the Advertiser website's look and feel.

The code cleanly displays a transparent 1x1 pixel graphic which triggers verification activities to check if the lead was from an Epic Affiliate referral; if yes, then return data to Epic for reporting.

**The pixel can be implemented as secure (https://) or non-secure (http://) depending on the Advertiser's needs.**

---

HTTPS is an encrypted version of HTTP implemented over an encrypted SSL, Secure Socket Layer, standard. SSL enables the encryption of sensitive information in order to provide reasonable protection from eavesdroppers during online data transmissions.

Epic's SSL certificate is registered for the domain of **azjmp.com**

---

**Advertiser's Epic Manager will distribute a unique code per Advertiser, per offer. \*\***

A2079

EPIC003221

**Sample IFRAME Tracking Pixel Code (Do Not Use)**

Secure:
<iframe src="https://l.azjmp.com/f.php?o=[offer_id]" width="1" height="1" frameborder="0"></iframe>

Non-Secure:
<iframe src="http://l.azjmp.com/f.php=[offer_id] height="1" width="1" frameborder="0"></iframe>

\*     [offer_id] would be replaced with the unique ID of the Epic offer.

\*\*  If IFRAME pixel is incompatible with Advertiser website, Epic will provide an IMG pixel.

## 2.8.     Advertiser Order ID

We highly recommend that you pass a unique value or orderID in the tracking pixel.

Simply append the value using "**e=**" to the tracking pixel.  For example:

```
<iframe src="http://l.azjmp.com/f.php?o=1234&e=XXXXX" width="1" height="1"
frameborder="0"></iframe>
```

Our system will capture your unique/orderID value associated with each lead.

A2080

EPIC003222

## 2.9.    Delay Reporting

This feature is only required for advertisers who can not add an Epic tracking pixel to their lead conversion page.  This results in the lack of lead tracking and reporting by Epic.

In order to secure reporting, Epic will need the Advertiser to track the lead conversions themselves and then send the "Delay Reporting" to us.

### File Format:

- Comma delimited format (.csv)

Note:  File may be zipped.

### File Header and Fields:

- Offer Name (required)
- Offer ID (required)
- Affil ID (required) *
- Sub ID (required if applicable)
- YYYY-MM-DD (required)
- No. of Leads (required)

* If using affiliate_id-sub_id **or** click_hash variables, data should be reported under this field.

### File Naming Convention:

- [offer id]_[YYYYMMDD].csv

For example, 1234_20081112.csv
where 1234 is the offer ID.

### File Transfer via Email:

- Email Address:  reporting@azoogleads.com
- Subject Line:  Delay Reporting – Offer ID **[offer id]**

For example, Delay Reporting – Offer ID 1234
where 1234 is the offer ID.

Alternatively, Epic can pick up the reports from an Advertiser's hosted FTP site. Advertiser will need to create an FTP account for Epic and provide the login information to us.

### File Transfer Frequency:

- Daily

A2081

EPIC003223

## 2.10. Email Opt-Out Suppression File

This feature is only required for advertisers accepting e-mail traffic types (affiliates may run e-mail campaigns promoting the advertiser's offer). In which case, the advertiser will need to provide consumers with the option to unsubscribe/opt-out from receiving future e-mail promotions.

According to CANSPAM, all consumer unsubscribe requests must be processed with 10 business days of request. To accommodate processing time, advertisers must deliver their suppression lists, containing new unsubscribe email addresses, to AzoogleAds between 1-7 business days of a consumer's unsubscribe request.

We currently utilize the services of UnsubCentral (www.unsubcentral.com) to process and host our advertisers' suppression files. UnsubCentral will remove any email address which contains any special characters which are not compliant with RFC standards. Our publishers will download your suppression list directly from UnsubCentral.

UnsubCentral currently has several options for automation methods available. The preferred methods are via email or FTP, or if you are also an UnsubCentral client.

### Email

- We will provide you with a unique UnsubCentral email address to send your suppression lists to
  - ❖ Looks like **[HASH]**@EpicAdvertising.login2.unsubcentral.com
- When emailing suppression lists to UnsubCentral, there are no hard coded size limitations for incoming email to UnsubCentral. Emailing an attachment or one email address per line within the body of the email are both supported, but the file needs to be in a standardized format for UnsubCentral to be able to process it.
- Currently, the files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ. .XLS files, .XLSX files, .DOC files, .DOCX files, .RTF files and other proprietary formats are not supported by UnsubCentral.
- Each email address within the suppression list needs to be on its own line without any extra characters. Leading and trailing whitespace, commas, quotations, and other delimiters should all be removed leaving nothing but one email address on each line.

### FTP

- UnsubCentral will automatically log into the your FTP server weekly to retrieve and process the suppression list
- If your FTP site has IP restrictions, you must allow UnsubCentral's IP address to access their FTP server, as well as our own IP address
- The files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ. Other formats such as .XLS files, .XLSX files, .DOC files, .RTF files are not supported by UnsubCentral. The files can be comma-delimited or tab-delimited, but email addresses in the first column are preferred

## A2082

Last Updated: 11/12/2008 Filename: aig v3.0.3

EPIC003224

- Dynamic filenames are supported using regular expressions

### Mutual UnsubCentral Clients

- If you are already working with UnsubCentral, we will setup an automatic fetch to pull their suppression list from their UnsubCentral account weekly
- To do this, we will need a permanent key (i.e. One that does not expire)
- To make the key permanent, please contact your UnsubCentral account manager to make that URL permanent and provide us with the full URL to the key (i.e. https://login.unsubcentral.net/uc/**[HASH]**)

### HTTP

- We can setup UnsubCentral to automatically fetch from a simple HTTP site
- Simple login credentials are supported (standard IE or FF popup box for login credentials)
- Static GET and POST URLs are also supported (e.g. http://www.yoursite.com/suppression/suppressionlist.zip)

  The files must be plaintext (.TXT or .CSV) and can be compressed as .ZIP, .RAR. or .GZ. Other formats such as .XLS files, .XLSX files, .DOC files, .RTF files are not supported by UnsubCentral. The files can be comma-delimited or tab-delimited, but email addresses in the first column are preferred

## 2.11. Advertiser-Side Reporting

Unless this feature is waived by Epic business managers, all advertisers are required to track Epic lead conversions internally and make the report accessible online behind a password-protected website to Epic.

Requirements:

- Login page with username and password requirements
- Both Itemized and Aggregate data viewing
- Ability to download the file in .csv (comma delimited) or .xls (excel) format
- Epic access to these reports should be available at all times

A2083

## 2.12.    Test and Launch

Once all the features that are selected for an Advertiser's offer/campaign are implemented, as defined by the Advertiser and their Epic manager, then advertiser-side (internal) and Epic-side (external) tests will need to be conducted. The goal is to ensure that lead conversion tracking and reporting are all in-place and set up properly prior to launch.

Following are general steps for testing and approval:

1.    **Advertiser performs internal test(s) by**

   a.    Clicking thru a test affiliate link, which an Epic technical manager will provide.

   b.    Completing a lead conversion (a sale, registration, etc).

   c.    Notifying the Epic technical manager once completed.

   d.    If Return Days feature is offered then a separate test is required by

      i.    Clicking thru a test affiliate link and departing the Advertiser website without completing a lead conversion on "visit 1".

      ii.    Visiting the Advertiser website directly and completing a lead conversion on "visit 2".

      iii.    Notifying Epic technical manager once completed.

2.    Epic technical manager verifies that the lead(s) was properly tracked and reported in the Epic system. *

3.    Once Step 2 is successful, the Epic technical manager will perform Steps 1-2 externally as a final test.

4.    Once Step 3 is successful, the Epic technical manager will officially sign off on the set-up approval.

\* If Delay Reporting, Email Suppression Files, or Advertiser-Side Reporting is required, then tests and approvals are necessary for these features as well.

---

**Please *CLEAR* your cookies before *EACH* test.**

---

A2084

EPIC00432

## 3.    PROCESS FLOW



Advertiser offer made available on the Epic | AzoogleAds Network

↓

Affiliate picks up Advertiser offer link from Epic | AzoogleAds

↓

Affiliate publishes Advertiser offer link via their promotional medium

↓

User clicks-thru offer link and Epic | AzoogleAds track clicks

↓

Epic | AzoogleAds set cookies to tag user and user lands on Advertiser offer landing

↓

User completes offer transaction & lands on Advertiser's lead conversion page, which triggers the Epic | AzoogleAds tracking pixel

↓

AzoogleAds tracking pixel reads cookies, associates transaction with lead data, and returns data to Epic | AzoogleAds

↓

Affiliate is credited for lead

A2085

EPIC003227

## 4.    HELP

For help during the implementation process, Advertisers will have access to their assigned Epic technical managers.

For help after launch, Advertisers may contact their dedicated Epic business managers. Our business managers will bring in the proper resources, including technical support assistance when needed.

Thank you for choosing Epic Advertising!

A2086

EPIC003228

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

ESSOCIATE, INC.,

        Plaintiff,

        Case No. 11-cv-727-bbc

    v.

        **[FILED UNDER SEAL]**

EPIC MEDIA GROUP, INC., ET AL.,

        Defendants.

---

### DECLARATION OF SASENARINE APPIAH

---

I, Sasenarine Appiah, do hereby declare and state as follows:

1.      I served in various positions responsible for technology at Epic Media Group from February 2006 to September 2011. My last position there was Senior Vice President of Technology. I now serve as the Senior Vice President of Technology at Kinetic Social and I have served in that position since September 2011.

2.      I make this declaration in support of the defendants' motion for summary judgment. I make this declaration on the basis of my personal knowledge.

3.      I am familiar with the operation and development of the Epic Direct System.

4.      I have reviewed Part IV of the December 17, 2012 expert report of Peter Kent, concerning the operation of the Epic Direct system. Mr. Kent's description of the Epic Direct system is accurate.

5.      The Epic Direct system was under constant development and improvement during my tenure at Epic Media Group. We could have designed the system to limit the circumstances in which the Epic affiliate ID was appended to the merchants landing page URL. We could have simply prohibited use of the affiliate ID variable in any transaction that involved other affiliate network. Alternatively, we could have prohibited the use of this pre-set variable entirely and

developed an alternative means of reporting the Epic affiliate IDs to merchants who wanted this information. For example, we could have arranged for batch reporting of transactions or automatic real-time reporting via email or some other channel.

6.     We have had the records of Epic Media Group searched for certain information concerning the transaction described in Essociate's infringement contentions.

7.     SpeedDate.com is an Epic client, a merchant who uses the Epic system. A 2009 insertion order documents the relationship between SpeedDate.com and Epic. The insertion order also shows that SpeedDate.com would use the cookie and pixel method of transaction tracking. The insertion order demonstrates that SpeedDate.com used basic cookie and pixel tracking, because it indicates that SpeedDate.com was able to display the pixel on its conversion page and that "Epic/Azoogle will provide HTTP tracking pixel code to the Advertiser." A true and correct copy of that insertion order is attached as Exhibit A . Based on a review of the offers_URL table, it appears that SpeedDate.com promoted approximately 600 offers through the Epic Direct System.

8.     The Epic Direct affiliate with ID no. 48192 is an individual in Denver, Colorado. The sub ID 12268 would have been selected by the affiliate in Denver for his own purposes.

9.     The variables a=53 and c=1 are part of the URL provided by SpeedDate.com, and they would have been selected and determined by SpeedDate.com for its own purposes.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 1, 2013.

Sasenarine Appiah

9036554_1

| AzoogleAds | AzoogleAds Insertion Order Cover Page | |
|---|---|---|
| | **Advertiser Information** | |
| Azoogle.com, Inc<br>60 Columbia Way, Suite #310<br>Markham, ON L3R 0C9<br>T: 905-946-0300<br>F: 888-666-3120 | Advertiser Name: | Speeddate.com |
| | Contact Name: | Jason Jacobi |
| | Address: | 50 Victoria Ave |
| | City, State, Zip | Millbrae, CA 94030 |
| | Phone #: | (650) 692-9000 |
| | Fax # | ———— |
| | E-mail Address: | jason@speeddate.com |
| | Web Address: | www.speeddate.com |
| | **Offer** | |

**Name of Client:** Speeddate.com

**Offer Name:** Speeddate.com-US only
**Offer ID:** _____
**Start Date:** 11/9/2009
**End Date:** 11/9/2010
**Acquisition Type:** Lead
**Model:** CPA
**Payout to Azoogle:** $4.50
**Payout Occurs When:** consumer registers for FREE account by entering valid information on the second page and clicking "continue"
**Advertiser-Side Volume Cap:** Cap at 400 leads/day to start (will grow to over 1k/day gradually)
**Traffic Types:** Web/Banner; Email; Search; Social Media – Display
**Return Days:** 0
**Countries Allowed:** US only
**Search Restrictions:** can not bid on the word "chat", or anything illegal or unethical by logical standards
**Offer Description:** Millions of Singles have Joined - Get Started Today for Free

World's largest online Speed dating site. Over 10,000 online now, waiting for you

**Traffic Type Descriptions:**

Search - Actively buying traffic on a pay per click basis from a search engine by bidding on keywords relevant to a given offer. Traffic can be driven either directly to the offer landing page, or through a landing page controlled by the publisher (which eventually links to the offer's landing page).

Email - Sending offers to subscribers via email. HTML or plain text creatives link to the offer landing page, or to a site where the offer's landing page link is present.

Display (Web/Banner) - Banner advertising on websites. The real estate on a website can either be purchased for a limited time (media buys), or owned outright by the publisher (content sites belonging to the pub).

Social Media– Display - Web/banner inventory that is paid for on a social networking site, typically on a pay per click basis. Facebook flyers would be an example.

| **Payment Terms** |
|---|

- **Payment Currency:**
- **Payment Terms:** Net 15 Monthly

## Tracking and Special Instructions

1. Will Advertiser be able to place AzoogleAds' tracking pixel to their conversion page? **Yes**
   a. If yes
      i. Which AzoogleAds tracking pixel format does the Advertiser prefer? **IFRAME**
      ii. Is the Advertiser's conversion page secured (https) or non-secured (http)? **HTTP**
      iii. Is AzoogleAds to provide a http or https pixel code to the Advertiser for placement? **Epic/Azoogle will provide HTTP tracking pixel code to Advertiser**
      iv. Does the Advertiser work with other networks? **Yes**
      v. When should the Advertiser fire (trigger) AzoogleAds' tracking page? **Advertisers should display Epic/Azoogle tracking pixel code on their lead conversion page only for Epic/Azoogle referred leads**
2. Will the Advertiser report leads to AzoogleAds via Real-Time (pixel placement) or Delay-Reporting? **Real Time**
   a. If via Delay-Reporting:
      i. What is the method?
      ii. What is format?
      iii. What is the frequency?
3. What are the lead reporting conditions? **Epic/Azoogle will +1 lead to reporting each time advertiser displays Epic/Azoogle tracking pixel code on their lead conversion page.**
4. Is the Advertiser required to have Advertiser-side reporting enabled for AzoogleAds access pre offer launch? **Yes**
   a. If not, is the capability required post offer launch?
5. Does the Advertiser need AzoogleAds to pass any variables to them? **Yes**
   a. If yes, what are the variables? **affiliate_id-sub_id**
6. Does the advertiser want to enable Return (Referral) Days? Cookie technology is required. **No**
7. Will the Advertiser be able to pass or report each lead's Order ID to AzoogleAds? **No**
8. Will the Advertiser add and test AzoogleAds features in their Test environment prior to launch? **No**
   a. If yes, what are the various Test environments? _____
9. Does the Advertiser's offers require purchases or the submission of private/sensitive information? **No**
10. Will the Advertiser offer Email traffic type (media)? **Yes**
    a. If yes, then suppression files will need to be delivered to AzoogleAds as follows:
       i. Delivery Method: **Via Email to UnsubCentral**
       ii. Frequency: **Weekly on Mondays**
11. Please include special technical instructions for consideration, if any: **n/a**

## General Campaign Description

- AzoogleAds' conversion tracking pixel is to be placed on the confirmation page immediately following the offer's Acquisition Type (see offer information sections) to track and to be used for all billing purposes.
- AzoogleAds' targeting pixel is to be placed on the Advertiser's home page.
- Advertiser will not allow prior to the sale or as an exit pop any advertisements for any other products unless AzoogleAds receives compensation and is contained in this IO.
- Advertiser will not allow a phone number to be placed on the landing page or any page AzoogleAds drives traffic to prior to the sale.

**The Azoogle Ads Advertiser Terms & Conditions shall apply to this Insertion Order.**

Speeddate.com

Signed: _____

Printed Name: Simon Tishinezky

Title: CEO

Date: 11/12/2009

Azoogle.com, Inc.

Signed: _____

Printed Name: Lolly Holman

Title: Sc Dk P.D

Date: 11/12/2009